**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| GREAT AMERICAN INSURANCE COMPANY, an Ohio corporation, | ) ) ) | |
| Plaintiff, | ) ) | Case No.  08-cv-02213 |
| vs. | ) ) | Hon. William T. Hart |
| HANDLER, THAYER & DUGGAN, LLC, an Illinois limited liability company; THOMAS J. HANDLER; STEVEN J. THAYER; JAMES M. DUGGAN; and GREGORY J. BERTSCH; | ) ) ) ) ) | **FILED UNDER SEAL** |
| Defendants. | ) ) | |

**F I L E D**

APR 2 9 2008
Apr 29, 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**PLAINTIFF'S MOTION FOR LEAVE TO WITHDRAW**
**COMPLAINT AND FILE AMENDED COMPLAINT UNDER SEAL**

Plaintiff Great American Insurance Company ("Great American"), pursuant to Fed. R.

Civ. P. 15(a) and Local Rule 5.7, respectfully moves this Court for an order allowing it to: (1)

withdraw from the public record its Complaint for Rescission and Other Relief presently on file

and (2) file the attached Amended Complaint for Rescission and Other Relief under seal.

**FACTS**

On April 16, 2008, Great American e-filed its Complaint.  (Docket #1.)  In brief, the

Complaint seeks a declaration of Great American's rights and responsibilities under a Lawyers'

Professional Liability Policy issued to Defendant Handler, Thayer & Duggan LLC ("HTD").

Both HTD and the individual defendants – each of whom is a partner in the firm – have been

sued by various former clients in multidistrict litigation now consolidated in the U.S. District

Court in and for the Eastern District of Kentucky.

On April 21, 2008, the Clerk of the Northern District of Illinois issued summons to the

various Defendants. (Docket #7.) Pursuant to Fed. R. Civ. P. 4(e) and the Illinois Supreme

Court Rule 102, Great American served the respective summons through the Cook County

Sheriff's Office. On April 23, 2008, Great American's counsel received a call from attorney

Katherine Smith Dedrick of Childress Duffy Goldblatt, Ltd., counsel for Defendants. Ms. Smith

Dedrick asked Great American to consider filing an amended pleading to remove certain

information contained in the Complaint.

After consideration of the issue, Great American has prepared the attached Amended

Complaint which, while stating the identical causes of action and requests for relief, eliminates

all references to the information identified by Ms. Smith Dedrick.

WHEREFORE, Great American respectfully requests that this Court enter an Order:

1.    permitting it to withdraw its Complaint and directing the Clerk of Court to remove

the imaged document (Docket #1), together with Exhibits A-G, from the CM/ECF

website; and

2.    granting Great American leave to file under seal the attached Amended

Complaint, together with Exhibits A-F, *instanter*.

Dated: April 29, 2008                          ___ /s/ Eric J. Marler ____

Scott O. Reed (IL Bar No. 3127632)
Eric J. Marler (IL Bar No. 6276648)
REARDON GOLINKIN & REED
111 West Washington Street
Suite 707
Chicago, Illinois 60602
Phone:        312/855-3700
Fax:          312/855-1089
E-mail:       sreed@rgrlaw.com
              emarler@rgrlaw.com

*Attorneys for Plaintiff Great American
Insurance Company*



## CERTIFICATE OF SERVICE

The undersigned, an attorney admitted to appear before this Court in this matter, hereby certifies under penalty of perjury as follows:

On April 29, 2008, I caused the foregoing **Plaintiff's Motion For Leave To Withdraw Complaint And File Amended Complaint Under Seal**, together with its attachments, to be served upon:

<div align="center">

Katherine Smith Dedrick, Esq.
Childress Duffy Goldblatt, Ltd.
515 N. State Street
Suite 2200
Chicago, IL 60610
Tel.: (312) 494-5596
Fax: (312) 494-0202
kdedrick@childresslawyers.com

</div>

by e-mail before 5:00 p.m. and by depositing a copy of same in the U.S. Mail at 111 West Washington Street, Chicago, Illinois, using the address shown above and proper postage prepaid.

<div align="right">

/s/ Eric J. Marler
Eric J. Marler (IL Bar No. 6276648)

</div>

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| GREAT AMERICAN INSURANCE COMPANY, an Ohio corporation, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | Case No. 08-cv-02213 |
| HANDLER, THAYER & DUGGAN, LLC, an | ) ) | Hon. William T. Hart |
| Illinois limited liability company; THOMAS J. HANDLER; STEVEN J. THAYER; JAMES M. DUGGAN; and GREGORY J. BERTSCH; | ) ) ) ) | **FILED UNDER SEAL** |
| Defendants. | ) ) | |

## AMENDED COMPLAINT FOR RESCISSION AND OTHER RELIEF

NOW COMES plaintiff GREAT AMERICAN INSURANCE COMPANY ("Great

American"), by and through its attorneys, Reardon Golinkin & Reed, and as its Amended

Complaint for Rescission and Other Relief against Defendants HANDLER, THAYER &

DUGGAN, LLC ("HTD"), THOMAS J. HANDLER ("Handler"), STEVEN J. THAYER

("Thayer"), JAMES M. DUGGAN ("Duggan"), and GREGORY J. BERTSCH ("Bertsch")

(collectively, "Defendants") alleges the following:

### NATURE OF ACTION

1.    Pursuant to 28 U.S.C. § 2201(a), Great American seeks a judicial rescission of

Lawyers' Professional Liability Policy No. LPL 665-41-57 05, under which it provided HTD

with $5 million in malpractice insurance coverage for the Policy Period October 6, 2006 to

October 6, 2007 (the "2006/07 Policy"), a true and correct copy of which is attached as Exhibit

A. During the course of their procurement of the 2006/07 Policy, Defendants misrepresented

and/or failed to disclose to Great American the existence of facts that would lead a reasonable attorney in their position to anticipate that a claim would be made against HTD and/or its partners. Defendants' misrepresentations and omissions were material to Great American's decision to, and reasonably relied upon by Great American in making its decision to, issue the 2006/07 Policy. The facts misrepresented and/or omitted by Defendants have now given rise to claims against them in litigation pending in Kentucky and Wisconsin.

2.      Alternatively, Great American seeks a judicial declaration that the 2006/07 Policy was issued based on a mistake of fact known to HTD, but not Great American, at the time the 2006/07 Policy was issued. As a result, the 2006/07 Policy should be reformed so that the limit of liability is reduced from $5 million to $1 million, which is the amount of coverage Great American provided to HTD for each preceding Policy Period. Great American is further entitled to a declaration that its defense and indemnification obligations under the 2006/07 Policy (if any) will be satisfied in full once that $1 reformed million limit of liability is exhausted through payment of defined Claims Expenses or Damages.

3.      Also in the alternative, Great American seeks a judicial declaration that certain terms and conditions of the 2006/07 Policy limit or preclude coverage for any judgment or settlement with respect to the defined Claims tendered by HTD for coverage under the Policy.

## PARTIES

4.      Great American is, and at all times material to this dispute was, a corporation organized under the laws of the State of Ohio, with its principal place of business in Cincinnati, Ohio.

5.      HTD is a law firm that practices in the areas of taxation, business law and estate

-2-

planning. According to the Illinois Secretary of State's website, HTD is, and at all times material to this dispute was, a limited liability company organized under the laws of the State of Illinois, with its principal place of business in Chicago, Illinois.

6.    HTD (along with certain of the individual Defendants, as set forth below) is presently named as a defendant in the following lawsuits, which have been tendered to Great American for defense and indemnification under the 2006/07 Policy:

a.    West Hills Farms, LLC; Arbor Farms, LLC; Nelson Breeders, LLC; MacDonald Stables, LLC; and Jaswinder and Monica Grover v. ClassicStar, LLC; ClassicStar Farms, LLC; ClassicStar 2004, LLC; National Equine Lending Co., LLC; New NEL, LLC; Geostar Corp.; Geostar Equine Energy, Inc.; Tony Ferguson; David Plummer; ClassicStar Thoroughbreds, LLC; Spencer Plummer; Karren Hendrix Stagg Allen & Co.; Thom Robinson; John Parrot; First Equine Energy Partners, LLC; Strategic Opportunity Solutions, LLC d/b/a Buffalo Ranch; ClassicStar 2005 Powerfoal Stables, LLC; ClassicStar Farms, Inc.; GeoStar Financial Services Corp.; Handler, Thayer & Duggan, LLC; and John Does 1-3, pending as Case No. 06-cv-00243-JMH in the U.S. District Court, Eastern District of Kentucky (Central Division) (the "West Hills Litigation"). The operative pleading in the West Hills Litigation is a Third Amended Complaint filed December 27, 2007, a true and correct copy of which is attached as Exhibit B;

b.    Gregory R. Raifman, individually and as Trustee of the Raifman Family Revocable Trust Dated 7/2/03; Susan Raifman, individually and as Trustee of the Raifman Family Revocable Trust Dated 7/2/03; Raifman Family Revocable Trust Dated 7/2/03; and Gekko Holdings, LLC, an Alaska limited liability company, dba Gekko Breeding and Racing v. ClassicStar, LLC, a Utah limited liability company; ClassicStar Farms, LLC, a Kentucky limited liability company; Strategic Opportunity Solutions, LLC, a Utah limited liability company d/b/a Buffalo Ranch; Geostar Corporation, a Delaware corporation; S. David Plummer; Spencer D. Plummer III; Tony Ferguson; Thomas Robinson; John Parrot; Handler, Thayer & Duggan, LLC, an Illinois limited liability company; Thomas J. Handler; Thomas J. Handler, J.D., P.C., an Illinois professional corporation; Karren Hendrix Stagg Allen & Company, P.C., a Utah professional corporation f/k/a Karren Hendrix & Associates, P.C., a Utah professional corporation; Terry L. Green; ClassicStar Farms, Inc., a

-3-

Delaware corporation; and Does 1-1000, inclusive, pending as Case No.
5:07-cv-00347-JMH in the U.S. District Court, Eastern District of
Kentucky (Central Division) (the "Raifman Litigation"). The operative
pleading in the Raifman Litigation is a First Amended Complaint filed
December 21, 2007, a true and correct copy of which is attached as Exhibit
C;

c.     J&L Canterbury Farms, LLC; and Leo & Jean Hertzog v. ClassicStar,
LLC; Geostar Corporation; S. David Plummer; Spencer Plummer; Tony
Ferguson; Private Consulting Group, Inc.; Wilmington Trust of
Pennsylvania; David S. Forman; Karren Hendrix Stagg Allen & Company,
P.C.; Terry L. Green; and Handler, Thayer & Duggan, LLC, pending as
Case No. 07-cv-00353-JMH in the U.S. District Court, Eastern District of
Kentucky (Central Division) (the "J&L Canterbury Litigation"). The
operative pleading in the J&L Canterbury Litigation is a Second Amended
Complaint filed December 27, 2007, a true and correct copy of which is
attached as Exhibit D; and

d.     Lynn T. MacDonald; Lindalee MacDonald; and MacDonald Stables, LLC
v. Handler, Thayer & Duggan, LLC; Thomas J. Handler; James M.
Duggan; and Gregory J. Bertsch, pending as Case No. 08-cv-00105-WCG
in the U.S. District Court, Eastern District of Wisconsin (Green Bay
Division) (the "MacDonald Litigation"). The operative pleading in the
MacDonald Litigation is a Complaint filed January 28, 2008, a true and
correct copy of which is attached as Exhibit E.

The above suits are referred to collectively as the "Underlying Litigation."

7.     Handler is an attorney licensed to practice in Illinois and is a partner in HTD.

Upon information and belief, Handler is a resident of Winnetka, Illinois. Handler is personally

named as a defendant in both the Raifman Litigation and the MacDonald Litigation.

8.     Thayer is an attorney licensed to practice in Illinois and is a partner in HTD.

Upon information and belief, Thayer is a resident of Hinsdale, Illinois. Thayer is not presently

named as a defendant in any of the Underlying Litigation.

9.     Duggan is an attorney licensed to practice in Illinois and is a partner in HTD.

Upon information and belief, Duggan is a resident of the State of Illinois. Duggan is personally

named as a defendant in the <u>MacDonald</u> Litigation.

10.     Bertsch is a partner at HTD who, according to the Illinois Attorney Registration and Disciplinary Committee's website, was last licensed to practice as an attorney in Illinois in 2006. Upon information and belief, Bertsch is a resident of Park Ridge, Illinois. Bertsch is personally named as a defendant in the <u>MacDonald</u> Litigation.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction based upon 28 U.S.C. § 1332. There is complete diversity of citizenship between plaintiff and all defendants and the amount in controversy exceeds seventy-five thousand dollars ($75,000), exclusive of interest and costs.

12.     As detailed herein, Great American has requested in writing that HTD agree to a voluntary rescission or reformation of the subject insurance coverage. HTD rejected Great American's offer. Defendants continue to make demands on Great American in connection with the Underlying Litigation both for the payment of ongoing defense costs and otherwise. These facts illustrate that an actual controversy exists within the meaning of 28 U.S.C. § 2201 involving the parties' rights and liabilities under the 2006/07 Policy, which controversy may be determined by a judgment of this Court.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) and (c) because it is the District in which the Policy was issued and because, upon information and belief, it is the District in which all Defendants reside.

## FACTUAL BACKGROUND

### The Policy

14.     HTD was the Named Insured under a series of six (6) professional liability

insurance policies issued by Great American on a yearly basis since October 6, 2001. Each of the five (5) Great American policies in force before October 6, 2006 provided HTD and its attorneys (including the individual Defendants) with an aggregate limit of liability of $1 million for the scheduled Policy Period, subject to a $10,000 deductible.

15.    The 2006/07 Policy provided HTD and its attorneys (including the individual Defendants) with an aggregate limit of liability of $5 million for the scheduled Policy Period (October 6, 2006/2007) subject to a $15,000 deductible. The 2006/07 Policy's limit of liability is reduced through the payment of defined Damages and Claim Expenses. HTD paid Great American a premium of $108,874.00 for the 2006/07 Policy.

16.    On October 6, 2007, HTD exercised its right under the 2006/07 Policy to purchase an unlimited Extended Reporting Period, for an additional premium of $245,639.00.

### Defendants' Relationship With ClassicStar

17.    Defendants' exposure in the Underlying Litigation stems from their involvement with an entity known as ClassicStar, LLC ("ClassicStar") and various of its corporate affiliates. Upon information and belief, ClassicStar first retained HTD in 2001 to provide advices on an investment vehicle called the Mare Lease Program (the "Program"). As alleged in the Underlying Litigation, participants in the Program invested money in exchange for the ability to lease the reproductive rights of ClassicStar-owned thoroughbred mares. Participants would breed the mares with stallions under arrangements facilitated by ClassicStar and would own any resulting foals outright.

18.    Among the services Defendants provided to ClassicStar in connection with the Program was the preparation of a September 28, 2001 letter opining on the tax consequences to

investors participating in the Program.  In brief, that letter concluded that, assuming a certain level of participation and other conditions were met, organizations established by investors for the Program would qualify as agricultural businesses and would be eligible to have profits taxed as capital gains rather than ordinary income.  As alleged in the Underlying Litigation, ClassicStar provided this opinion letter to Program investors as part of the promotional materials for the Program, and those investors relied on the opinion letter in deciding to participate in the Program.  Some of those investors – including those who are plaintiffs in the Underlying Litigation – have since been the subject of audits by the Internal Revenue Service, which has challenged the investors' right to claim certain deductions for participating in the Program, contrary to the conclusions of the opinion letter.

19.    Upon information and belief, and as alleged in part in the Underlying Litigation, HTD and its attorneys served as outside marketers for the Program.  Under this arrangement, HTD and its attorneys (including the individual Defendants) directly introduced several of the firm's own clients to the Program and received commissions from ClassicStar based on the amount invested by those individuals in the Program.

20.    In 2004, HTD assisted ClassicStar in the formation of First Equine Energy Partners, LLC ("FEEP").  Upon information and belief, FEEP was designed to allow Program investors to exchange their Program interests for interests in various energy operations, *e.g.*, working natural gas wells.  Upon information and belief, a substantial number of Program investors converted a portion of their Program units into FEEP units.

21.    As alleged in the Underlying Litigation, certain investors in FEEP elected to convert their interests into shares of stock in a company called Gastar Exploration, Ltd.

-7-

("Gastar"), a company related to ClassicStar. As alleged in the Underlying Litigation, Gastar

failed to provide those investors with their shares in a timely fashion and/or otherwise on the

terms promised.

### Facts Known To Defendants When HTD Applied For The 2006/07 Policy, But Which Were Not Disclosed To Great American

22.    In November 2004, the Internal Revenue Service issued an Information Document

Request ("IDR") to Spencer D. Plummer ("Plummer"), then the president of ClassicStar, in

connection with its investigation into whether the Program violated Section 6700 of the Internal

Revenue Code (26 U.S.C. § 6700; the "Section 6700 Investigation").

23.    Section 6700(a) generally imposes penalties on persons who, in the course of

organizing an entity or the selling of any interest in an entity, make or cause others to make

statements concerning the tax benefits of participating in said entity that the person knows or has

reason to know are false or fraudulent. The amount of the penalty is "equal to 50 percent of the

gross income derived (or to be derived) from such activity by the person on which the penalty is

imposed." 26 U.S.C. § 6700(a).

24.    In February 2005, Plummer, through counsel, responded to the IDR by submitting

various materials, including copies of the original and updated tax opinion letters prepared by

HTD for the Program. Upon information and belief, the Section 6700 Investigation remains

open today and is being handled by the Criminal Investigative Division of the IRS.

25.    By December 2005, a number of Program investors had been or were being

audited by the Internal Revenue Service. In response to the audits, ClassicStar contacted

Program investors asking them to sign a form: (a) acknowledging their awareness of the Section

6700 Investigation; (b) representing that they had "consulted with [their] own tax advisor(s) regarding the tax consequences of leasing mares and conducting other business with ClassicStar; and (c) affirming that they were "not relying on ClassicStar, any of its affiliates or their agents, including legal counsel or accountants, for advice regarding the tax consequences of leasing mares or conducting other business with ClassicStar."

26.     In January 2006, Program investors learned that ClassicStar was scaling back the size of the Program in order to address certain horse inventory issues.

27.     On February 23, 2006, the IRS raided ClassicStar's Kentucky headquarters, seizing ClassicStar's books and records as part of its continuing Section 6700 Investigation.

28.     In Spring 2006, various Program investors – including Lynn MacDonald (plaintiff in the MacDonald Litigation and the principal of MacDonald Stables, LLC, which is a plaintiff in both the West Hills Litigation and the MacDonald Litigation) – were investigating the Program's unsatisfactory performance and considering possible claims against ClassicStar.

29.     On May 8, 2006, the IRS issued a summons to HTD asking the firm to produce all documents pertaining to fees received by it from another Program investor as part of its continuing investigation into the Program.

<h3 align="center">HTD's Application For The 2006/07 Policy</h3>

30.     On or about August 25, 2006, HTD submitted its renewal application for the upcoming October 6, 2006/2007 Policy Period (the "Renewal Form").  A true and correct copy of the Renewal Form is attached hereto as Exhibit F.

31.     Question 16(b) of the Renewal Form asks the following: "How many incidents, circumstances, errors, omission [sic] or offenses which may result in a claim being made against

your firm or any individual for this insurance, are your [sic] now aware of?" HTD answered

Question 16(b) by stating "0 [zero]." As shown by the facts recited above, HTD's answer was

false and/or misleading at the time of its making. The statement also was material to Great

American's decision to issue the 2006/07 Policy.

32.     Immediately below Question 16(b), the Renewal Form states the following:

**WARRANTY, AUTHORIZED SIGNATURE AND CONTINUING DUTY TO UPDATE**

The undersigned is an authorized representative of the prospective Named Insured, and
acknowledges that the information provided with the Application, including all
supplements, attachments and replies to underwriter inquiries, and applications from
other insurance companies which have been submitted to Great American and made a
part of this Application:

1.      Will be relied upon by Great American Insurance Companies in
        determining the acceptability of the prospective Named Insured and the
        premium to be charged;

2.      Are true, accurate and complete; and

3.      Will be considered an integral part of any resultant insurance contract.

The undersigned further agrees that the prospective Named Insured has a continuing
duty, through date of policy inception, to update this Application, including all
supplements, attachments and replies to underwriter inquiries.

33.     Defendant Thayer signed the Renewal Form as the "authorized representative" of

HTD. HTD's agreement to the referenced warranty provision was material to Great American's

decision to issue the 2006/07 Policy.

**Facts Known To Defendants After HTD's Application For The 2006/07 Policy,
But Before The 2006/07 Policy's Inception, That Were Not Disclosed to Great American**

34.     On July 28, 2006, the initial complaint in the West Hills Litigation was filed.

Although plaintiffs did not specifically name HTD as a defendant in their complaint, they

challenged the accuracy of HTD's analysis of the Program's tax implications, which they

characterized as knowingly false.  Count II of the original <u>West Hills</u> complaint (Common Law

Fraud) was based on ClassicStar's alleged misrepresentations regarding the tax benefits of the

Program, which in turn were based on HTD's analysis and tax opinion letter.  Plaintiffs alleged

that they would not have invested in the Program save for the representations made concerning

the tax benefits.

35.     Defendants received a copy of the initial complaint in the <u>West Hills</u> Litigation no

later than September 13, 2006.

36.     None of the facts alleged in paragraphs 22 through 29 and paragraphs 34 through

35 were disclosed to Great American prior to the issuance of the 2006/07 Policy.

### Issuance Of The 2006/07 Policy

37.     On October 6, 2006 – the inception date of the 2006/07 Policy – HTD's insurance

broker contacted Great American's principal underwriter for the Policy asking to increase the

2006/07 Policy's limit of liability five-fold – from $1,000,000 to $5,000,000.

38.     In response to Great American's specific inquiry as to why the firm was now

seeking to increase its coverage limits, Defendant Thayer wrote:

> We recently added a partner, Jarrett Bostwick, from a larger firm who pointed out
> that our coverage amounts were relatively low considering the size of our firm.
> He suggested a $5,000,000 minimum, which seemed appropriate.  We are now
> competing with larger firms for clients and we don't want our coverage limits to
> ever effect [sic] our ability to get new clients.

39.     The above statement was false and/or misleading at the time of its making, and

was made as part of Defendants' material misrepresentations and/or omissions in procuring the

2006/07 Policy.  It also was material to Great American's decision to issue the 2006/07 Policy.

40.     Based on: (a) HTD's disclaimer in the Renewal Form of any knowledge of

-11-

"incidents, circumstances, errors, omissions or offenses" that could result in a claim against Defendants; (b) HTD's written warranty that the answers in the Renewal Form were "true, accurate and complete;" (c) the absence of any adverse supplemental information provided by Defendants between the time HTD submitted the Renewal Form and the time the 2006/07 Policy incepted; (d) the historically low incidence of claims against Defendants; and (e) Defendant Thayer's answer to the specific inquiry regarding HTD's reasons for the request for increased limits, Great American agreed to provide the requested increase in the liability limit for the 2006/07 Policy Period.

41.    On or about October 6, 2006, Great American issued to HTD the 2006/07 Policy. The Policy is written on a duty-to-defend basis and provides a limit of liability of $5 million for each defined Claim and in the aggregate for all defined Claims, inclusive of defined Claims Expenses, and subject to a deductible of $15,000 for each Claim.

### The Underlying Litigation & Subsequent Developments

42.    On or about April 10, 2007, a subpoena *duces tecum* was issued to HTD in connection with the West Hills Litigation (the "Subpoena"). Defendant Thayer forwarded a copy of the Subpoena to Great American. HTD retained Howard Lieber of Fisher Kanaris, P.C., to assist it in responding to the Subpoena.

43.    In the course of their discussions about the Subpoena with the attorneys for plaintiffs in the West Hills Litigation, Defendants learned that Program investor Lynn MacDonald was now asserting unspecified claims against them. Great American thereafter requested copies of HTD's Program-related file materials so it could begin its investigation into the matter.

-12-

44.     On May 14, 2007, the initial complaint in the <u>Raifman</u> Litigation was filed. It named HTD and Defendant Handler as defendants. Defendant Handler gave written notice to Great American of the suit. On or about June 1, 2007, Great American engaged John M. Drath of Drath Clifford Murphy Wennerholm & Hagen in San Francisco to defend that suit.

45.     On July 5, 2007, Great American issued a reservation of rights letter for the <u>Raifman</u> Litigation. In its letter, Great American agreed to provide HTD and Handler with a defense in the <u>Raifman</u> Litigation under the 2006/07 Policy, subject to a reservation of rights. At the time Great American issued its reservation of rights letter for the <u>Raifman</u> Litigation, Defendants had not yet produced the requested Program-related file materials.

46.     By the middle of August 2007, HTD had finally produced the documents requested by Great American in May 2007.

47.     In October 2007, the Judicial Panel on Multidistrict Litigation transferred the <u>Raifman</u> Litigation and the <u>J&L Canterbury</u> Litigation to the U.S. District Court for the Eastern District of Kentucky, where the first-filed <u>West Hills</u> Litigation was based and where ClassicStar's headquarters were located.

48.     On December 27, 2007, the Third Amended Complaint was filed in the <u>West Hills</u> Litigation, naming HTD as a defendant. On the same day, the Second Amended Complaint was filed in the <u>J&L Canterbury</u> Litigation, also naming HTD as a defendant. Great American was advised of the filing of these pleadings shortly thereafter.

49.     Contemporaneous with the foregoing developments, HTD and Handler retained the Lexington law firm of Dinsmore & Shohl LLP to represent them in connection with the <u>Raifman</u> Litigation, the <u>J&L Canterbury</u> Litigation and the <u>West Hills</u> Litigation. Great

-13-

American has consented to Dinsmore & Shohl's retention, and has agreed to pay the firm's reasonable and necessary fees and costs in defending HTD and Handler in the subject suits.  In light of these arrangements, attorneys Lieber (retained to address HTD's response to the Subpoena) and Drath (retained to defend the <u>Raifman</u> Litigation while it was based in California) are no longer involved with the Underlying Litigation.

50.    On January 28, 2008, the <u>MacDonald</u> Litigation was filed naming HTD, Handler, Duggan and Bertsch as defendants.  Great American was advised of the filing of this suit shortly thereafter.

51.    On February 7, 2008, Great American issued a comprehensive reservation of rights letter for the Underlying Litigation.  In its letter, Great American identified the myriad of coverage issues presented by the Underlying Litigation, including the misrepresentation and omission issues.  Great American's letter requested that HTD agree to a voluntary rescission or reformation of the subject insurance coverage, in exchange for the return of an appropriate amount of premium.  Great American's letter also reserved the right to seek recoupment of any amounts paid out from the 2006/07 Policy's limit of liability.

52.    HTD has refused to voluntarily rescind the 2006/07 Policy and the subsequent Extended Reporting Period.

## <u>COUNT I</u>

### (Rescission of the 2006/07 Policy and Extended Reporting Period)

53.    Great American realleges and incorporates by reference the allegations contained in paragraphs 1 through 52, inclusive.

54.    Section 154 of the Illinois Insurance Code provides as follows:

**Misrepresentations and false warranties.**

No misrepresentation or false warranty made by the insured or in his behalf in the
negotiation for a policy of insurance, or breach of a condition of such policy shall defeat
or avoid the policy or prevent its attaching unless such misrepresentation, false warranty
or condition shall have been stated in the policy or endorsement or rider attached thereto,
or in the written application therefor. No such misrepresentation or false warranty shall
defeat or avoid the policy unless it shall have been made with actual intent to deceive or
materially affects either the acceptance of the risk or the hazard assumed by the
company.

55.    Great American issued the 2006/07 Policy to HTD in reliance on the
representations made by Defendants in the Renewal Form, including but not limited to the
representation that they had no knowledge of any "incidents, circumstances, errors, omissions or
offenses which may result in a claim being made against your firm or any individual for this
insurance."

56.    HTD's representation in response to Question 16(b) of the Renewal Form that it
had no knowledge of any "incidents, circumstances, errors, omissions or offenses which may
result in a claim being made against your firm or any individual for this insurance" was false
and/or misleading at the time of its making. As detailed *supra* in paragraphs 22 through 29,
Defendants knew at the time they submitted the Renewal Form that:

        a.    the IRS was actively investigating ClassicStar's promotion of the Program
            under Section 6700 of the Internal Revenue Code, which including
            possible criminal and civil exposure arising out of their own activities in
            assisting in the formation and promotion of the Program;

        b.    ClassicStar was having problems obtaining sufficient horses needed to
            fulfill the promises of value communicated to investors by its

salespersons, which included HTD attorneys;

c.    ClassicStar had taken steps to insulate itself from potential liability to investors by issuing the form Representation Letter and Certificate in December 2005; and

d.    multiple Program investors were investigating the reasons for the Program's unsatisfactory performance.

57.    A reasonable attorney faced with the facts detailed *supra* in paragraph 56 at the time the Renewal Form was completed would have reasonably believed that they "may result in a claim being made" against the attorney or his or her firm.

58.    As detailed in paragraph 32 above, HTD also was duty-bound to supplement its previous answer to Question 16(b) as needed "through date of policy inception."

59.    As detailed in paragraphs 34 through 35, *supra*, despite HTD's written acknowledgment of this duty, Defendants did not advise Great American that plaintiffs in the West Hills Litigation, in their original complaint filed July 28, 2006, had directly challenged the validity of ClassicStar's representations concerning the tax benefits of participating in the Program – which in turn were based on advices given to ClassicStar by HTD.

60.    A reasonable attorney faced with the facts detailed in paragraphs 56 and 59, *supra*, would have reasonably believed that they "may result in a claim being made" against the attorney or his or her firm.

61.    Great American relied on the representations of Defendants in deciding to issue the 2006/07 Policy. As detailed above, those representations were false. At the time Defendants made the material misrepresentations and/or omissions of material fact, Great American did not

know the representations were false, but believed them to be true.

62.    Great American did not discover the material misrepresentations and/or omissions of material fact by Defendants until after receiving certain documents, including copies of HTD's client files, in August 2007 as part of the insurer's continuing investigation.

63.    If not for the material misrepresentations and/or omissions of material fact by Defendants, Great American would not have issued the 2006/07 Policy as written, or at all. Because Great American issued the 2006/07 Policy in reliance on the material misrepresentations and/or omissions of material fact by Defendants, Great American is entitled to an adjudication and judgment rescinding the 2006/07 Policy and the subsequent Extended Reporting Period. If the 2006/07 Policy and the subsequent Extended Reporting Period are not rescinded, Great American will be deprived of its anticipated bargains under those coverages.

64.    Great American is prepared to return to HTD all consideration it paid for the 2006/07 Policy and the subsequent Extended Reporting Period. Defendants likewise should be directed to restore to Great American all consideration furnished by Great American under that coverage, including all payments made by Great American with respect to claims tendered by Defendants under the 2006/07 Policy and the subsequent Extended Reporting Period coverage.

## COUNT II

### (In the Alternative, For Reformation of
### the 2006/07 Policy and Extended Reporting Period)

65.    Great American realleges and incorporates by reference the allegations contained in paragraphs 1 through 64, inclusive.

66.    Great American issued the 2006/07 Policy to HTD in reliance on the

representations and warranties HTD made in the Renewal Form.

67.    Great American issued the 2006/07 Policy to HTD with a substantially increased limit of liability for the 2006/07 policy period under a mistaken belief of material fact, brought about by the misrepresentations and/or omissions of material fact made by Defendants.  At the time Defendants made the misrepresentations and/or omissions of material fact, Great American did not know the representations were false, but believed them to be true and reasonably relied on them.

68.    Great American did not discover the material misrepresentations and/or omissions of material fact by Defendants until after it received certain documents, including copies of HTD's client files, in August 2007 as part of its continuing investigation.

69.    If not for Defendants' misrepresentations and/or omissions of material fact, Great American would not have issued the 2006/07 Policy as written, or at all.  Because Great American issued the 2006/07 Policy by reason of the material misrepresentations and/or omissions of material fact by Defendants, Great American is entitled to an adjudication and judgment reforming the 2006/07 Policy in such a manner as to provide Great American with its anticipated bargain under those coverages.

## COUNT III

### (For Declaration of No Coverage for Activities
### Not Constituting Defined Professional Legal Services)

70.    Great American realleges and incorporates by reference the allegations of paragraphs 1 through 69, inclusive.

71.    The 2006/07 Policy only provides coverage for defined Claims arising out of the

rendering or failure to render defined Professional Legal Services; that is, for:

> legal services and activities performed for others as a lawyer, notary public, arbitrator, mediator, title insurance agent, designated issuing lawyer to a title insurance company, court-appointed fiduciary, services rendered as a member of a bar association, ethics, peer review, formal accreditation board or similar professional boards or committees, or the publication or presentation of research papers or similar materials by an Insured but only if the fees generated from such work are not greater than five thousand dollars ($5,000). When any Insured renders or fails to render services as an administrator, conservator, receiver, executor, guardian, or any similar fiduciary capacity, or court-appointed trustee, the Insured's acts, errors and omissions shall be deemed professional legal services provided that this coverage shall not apply to any loss sustained by the Insured as the beneficiary or distributee of any trust or estate.

72.     Certain of the conduct complained of in the Underlying Litigation does not constitute Professional Legal Services as defined in the 2006/07 Policy.

73.     The West Hills Litigation (Exhibit B) alleges, *inter alia*, that HTD made certain representations about the Program to plaintiffs Jaswinder and Monica Grover "for the avowed reason of guiding [the] Grovers in their business affairs" and notes that

> The role of [HTD] and other professionals in the marketing gave the impression of viability and lawfulness of the Programs and substantially furthered and assisted ClassicStar's efforts in promoting and marketing the Programs; moreover, the participation, opinions and presentations of [HTD] were instrumental in the decision of [the] Grovers and others to participate and continue such participation in the ClassicStar and related exchange Programs.

These alleged marketing activities do not constitute defined Professional Legal Services under the 2006/07 Policy.

74.     The Raifman Litigation (Exhibit C) alleges, *inter alia*, that HTD and Handler made certain representations to the plaintiffs in that suit, including personal representations as to the tax benefits of the Program to plaintiff Susan Raifman during a ClassicStar marketing event in the Virgin Islands.  These alleged marketing activities do not constitute defined Professional

Legal Services under the 2006/07 Policy.

75.     The J&L Canterbury Litigation (Exhibit D) alleges, *inter alia*, that "from mid-2003 on, in promotional materials and in presentations" HTD made material misrepresentations to the plaintiffs in that suit concerning the tax implications of the Program. The suit specifically references an October 25, 2003 "sales presentation" attended by plaintiff Leo Hertzog with HTD attorney Jim Duggan, during which Duggan made representations concerning the favorable tax treatment available through the Program. These alleged marketing activities do not constitute defined Professional Legal Services under the 2006/07 Policy.

76.     The MacDonald Litigation (Exhibit E) alleges, *inter alia*, that the defendants in that suit "promoted ClassicStar, without regard to their clients' interests, because defendants were receiving millions of dollars in undisclosed commissions from ClassicStar for getting their clients to participate in those transactions." The suit recounts a litany of promotional statements made by the defendants in that suit, including those concerning the Program's promised benefits. Plaintiffs in the MacDonald Litigation expressly state a cause of action for "Recovery of Commission/Unjust Enrichment" and ask the court to create "a constructive trust of all Defendants' assets traceable to commissions or other fees received by Defendants as a result of Plaintiffs' participation in the ClassicStar Mare Lease Programs." These alleged marketing activities do not constitute defined Professional Legal Services under the 2006/07 Policy.

77.     Because the foregoing conduct as alleged in the Underlying Litigation does not constitute Professional Legal Services as the term is defined in the 2006/07 Policy, Great American is entitled to a judicial declaration that it has no obligation to indemnify HTD for any amounts paid in satisfaction or compromise of those claims.

-20-

## COUNT IV

### (For Declaration of No Coverage for Claims Not Alleging Damages)

78.     Great American realleges and incorporates by reference the allegations of

paragraphs 1 through 77, inclusive.

79.     The 2006/07 Policy only provides coverage for defined Damages; that is, for:

a monetary judgment or settlement, including any such judgment or settlement for
personal injury, but does not include fines or statutory penalties, sanctions
whether imposed by law or otherwise, any other amount awarded in any
disciplinary proceeding, the return of or restitution of legal fees, costs and
expenses, punitive or exemplary damages, the multiplied portion of multiplied
damages, amounts for which the Insured is not financially liable or which are
without legal recourse to the Insured or matters which may be deemed uninsurable
under the law.

80.     Certain of the elements presently requested as relief in the Underlying Litigation

do not constitute Damages as defined in the 2006/07 Policy or under applicable law.

81.     The elements of relief sought in the <u>West Hills</u> Litigation (Exhibit B) that do not

constitute defined Damages are:

        a.     punitive damages;

        b.     treble damages;

        c.     injunctive relief; and

        d.     a constructive trust on assets traceable to payment by Plaintiffs for benefit

            of Plaintiffs.

82.     The elements of relief sought in the <u>Raifman</u> Litigation (Exhibit C) that do not

constitute defined Damages are:

        a.     treble damages pursuant to 18 U.S.C. § 1964(c);

      b.     punitive damages;

      c.     rescission of the release provision, and any and all other clauses deemed necessary by the Court to obtain an equitable result, of the Purchase and Exchange Agreement between Plaintiffs and ClassicStar;

      d.     restitution of all consideration given under the Purchase and Exchange Agreement between Plaintiffs and ClassicStar;

      e.     imposition of a constructive trust; and

      f.     an accounting of the disposition of all money and property of Plaintiffs.

83.     The elements of relief sought in the J&L Canterbury Litigation (Exhibit D) that do not constitute defined Damages are:

      a.     punitive damages;

      b.     treble damages;

      c.     injunctive relief; and

      d.     imposition of a constructive trust.

84.     The elements of relief sought in the MacDonald Litigation (Exhibit E) that do not constitute defined Damages are:

      a.     disgorgement of commissions received by Defendants;

      b.     a constructive trust on Defendants' assets traceable to payment by Plaintiffs for benefit of Plaintiffs;

      c.     a constructive trust on all Defendants' assets traceable to commissions or other fees received by Defendants as a result of Plaintiffs' participation in the ClassicStar Mare Lease Programs;

    d.      punitive damages; and

    e.      statutory penalties pursuant to Wis. Stat. § 100.18.

85.    Because none of the foregoing elements of relief sought in the Underlying Litigation constitute defined Damages, Great American is entitled to a judicial declaration that it has no obligation to indemnify HTD for any amounts paid in satisfaction or compromise of those claimed elements.

### PRAYER FOR RELIEF

86.    For and as its relief as to Count I (Rescission), Great American seeks:

    a.      a declaration that the 2006/07 Policy and subsequent Extended Reporting Period are rescinded and declared void *ab initio*;

    b.      an order directing Defendants to restore to Great American all sums Great American paid to or on behalf of Defendants under the 2006/07 Policy and subsequent Extended Reporting Period

    c.      costs of suit incurred herein; and

    d.      other and further relief as this Court deems just and proper.

87.    For and as its relief as to Count II (Reformation), Great American seeks:

    a.      a declaration that the 2006/07 Policy and Extended Reporting Period are reformed to provide Great American with its anticipated bargain under the 2006/07 Policy and Extended Reporting Period, and specifically that the limit of liability for the 2006/07 Policy are $1 million for each Claim and in the aggregate;

    b.      costs of suit incurred herein; and

-23-

c.      other and further relief as this Court deems just and proper.

88.    For and as its relief as to Count III (Declaration Of No Coverage For Activities Not Constituting Defined Professional Legal Services), Great American seeks:

       a.      a declaration that certain of Defendants' actions marketing to plaintiffs in the Underlying Litigation do not constitute defined Professional Legal Services, as stated in paragraphs 73 through 76, above;

       b.      a declaration that Great American is under no duty or obligation to indemnify the Defendants or any other HTD attorneys for any defined Damages attributable to actions not constituting defined Professional Legal Services;

       c.      costs of suit incurred herein; and

       d.      other and further relief as this Court deems just and proper.

89.    For and as its relief as to Count IV (Declaration of No Coverage for Claims Not Alleging Damages), Great American seeks:

       a.      a declaration that certain elements of relief sought by plaintiffs in the Underlying Litigation do not constitute defined Damages, as stated in paragraphs 81 through 84, above;

       b.      a declaration that Great American is under no duty or obligation to indemnify the Defendants or any other HTD attorneys for any amounts not constituting defined Damages;

       c.      costs of suit incurred herein; and

       d.      other and further relief as this Court deems just and proper.

Dated: April 29, 2008

<u>/s/ Eric J. Marler</u>

Scott O. Reed (IL Bar No. 3127632)
Eric J. Marler (IL Bar No. 6276648)
REARDON GOLINKIN & REED
111 West Washington Street
Suite 707
Chicago, Illinois 60602
Phone:          312/855-3700
Fax:            312/855-1089
E-mail:         sreed@rgrlaw.com
                emarler@rgrlaw.com

*Attorneys for Plaintiff Great American
Insurance Company*

B  •A3•02/02/07•LPL6654157-05
                 0568109

COMPANY COPY

**GREAT AMERICAN.** INSURANCE GROUP
Administrative Office
580 Walnut Street
Cincinnati, Ohio 45202
Tel: 1-513-369-5000

CG 86 82 (Ed. 08 94)

Policy No. LPL. 665-41-57  - 05
Renewal Of LPL. 665-41-57  - 04

## LAWYERS PROFESSIONAL LIABILITY INSURANCE POLICY DECLARATIONS

| | |
|---|---|
| **NAMED INSURED AND ADDRESS:**<br>HANDLER, THAYER & DUGGAN, LLC<br>191 NORTH WACKER DRIVE, 23RD FLOOR<br>CHICAGO, IL  60606-1633 | **POLICY PERIOD:**    12:01 A.M.<br>Standard Time at the address of<br>the Named Insured as stated<br>herein.<br>From  10/06/06      To  10/06/07 |
| **THIS IS A CLAIMS MADE POLICY.<br>PLEASE REVIEW THE POLICY CAREFULLY.<br>THE POLICY IS LIMITED TO LIABILITY<br>FOR ONLY THOSE CLAIMS THAT ARE FIRST<br>MADE AGAINST THE INSURED DURING THE<br>POLICY PERIOD.** | **PRODUCER'S NAME AND ADDRESS:**<br>RITMAN & ASSOCIATES, INC.<br>1154 CONNER STREET<br>NOBLESVILLE, IN  46060 |

Insurance is afforded by:
GREAT AMERICAN INSURANCE COMPANY
(A capital stock corporation, hereinafter called Insurer)

**FORM OF NAMED INSURED'S BUSINESS:**

Insured is  (  ) Proprietorship    (  ) Partnership
            ( X ) Corporation       (  ) Association

**LIMIT OF LIABILITY:**

$ 5,000,000      Each Claim

$ 5,000,000      Aggregate

**DEDUCTIBLE:**

$ 15,000

**PREMIUM:**

$ 108,874.00      Amount                                         Class

18   No. of Lawyers

**FORMS AND ENDORSEMENTS** applicable to all Coverage Forms and made part of this
policy at time of issue are listed on the attached Forms and Endorsements
Schedule CG 7909 (02/91).

By acceptance of this policy the Insured agrees that the statements in the
Declarations and the Application and any attachments hereto are the Insured's
agreements and representations and that this policy embodies all agreements
existing between the Insured and the Company or any of its representatives
relating to this insurance.

Countersigned at: _____    Date Countersigned: _____

                    By _____
                                Authorized Representative

CG 86 82 (Ed. 08/94) PRO          (Page 1 of 1)



**GREAT AMERICAN.**
INSURANCE GROUP

Administrative Offices
580 Walnut Street
Cincinnati, Ohio 45202
Tel: 1-513-369-5000

CG7909
(Ed. 02 91)

## LEGAL PROFESSIONAL LIABILITY CLAIMS-MADE POLICY FORMS AND ENDORSEMENTS SCHEDULE

It is hereby understood and agreed the following forms and endorsements are attached to and are a part of this policy:

| | Form and Edition | Date Added*<br>or<br>ST Date Deleted | Form Description |
|---|---|---|---|
| 1. | CG8681 | IL | LAWYERS PROFESSIONAL LIABILITY POLICY COVERAGE |
| 2. | CG7908 | IL | NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT |
| 3. | CG7908 | IL | EXCESS NOT FOR PROFIT DIRECTORSHIP ENDORSEMENT |
| 4. | CG7908 | IL | ILLINOIS CANCELLATION AND NONRENEWAL END |
| 5. | CG7908 | IL | AMEND NOTICE OF CLAIMS ADDRESS ENDORSEMENT |
| 6. | CG7908 | IL | ILLINOIS EXTENDED REPORTING PERIODS ENDORSEMENT |
| 7. | CG7908 | IL | AMENDED INSURED DEFINITION ENDORSEMENT |
| 8. | CG7908 | IL | ACCOUNTANT EXCLUSION ENDORSEMENT |
| 9. | CG7908 | IL | VICARIOUS LIABILITY EXCLUSION ENDORSEMENT |
| 10. | CG7908 | IL | PREDECESSOR FIRM DESIGNATION ENDORSEMENT |
| 11. | CG7908 | IL | SPECIFIC ATTORNEY(S) PRIOR ACTS EXCLUSION END |
| 12. | CG7908 | IL | SPECIFIC CLAIM EXCLUSION ENDORSEMENT |
| 13. | | | |
| 14. | | | |
| 15. | | | |
| 16. | | | |
| 17. | | | |
| 18. | | | |
| 19. | | | |
| 20. | | | |
| 21. | | | |
| 22. | | | |

*If not at inception



Administrative Offices
580 Walnut Street
Cincinnati, Ohio 45202
Tel: 1-513-369-5000

CG 86 81
(Ed. 05 98)

### THIS IS A CLAIMS MADE AND REPORTED POLICY. PLEASE READ IT CAREFULLY.

### LAWYERS PROFESSIONAL LIABILITY INSURANCE POLICY COVERAGE FORM

In consideration of the undertaking of the Named Insured to pay, when due, the premium and the deductible as described herein and in the amounts stated in the Declarations, and in reliance upon the statements in the application, and subject to the Limits of Liability shown in the Declarations, and subject to all of the terms of this insurance, the Company agrees with the Named Insured as follows:

### I. Coverage

A. **Professional Liability and Claims Made Clause:** This policy shall pay on behalf of each Insured all sums in excess of the deductible amount and up to the limits of liability stated in the Declarations which the Insured shall become legally obligated to pay as damages as a result of CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD AND REPORTED TO THE COMPANY DURING THE POLICY PERIOD

  (i) caused by any act, error or omission for which the Insured is legally responsible, or

  (ii) because of personal injury

  and, in each case, arising out of the rendering or failure to render professional legal services, PROVIDED ALWAYS THAT such act, error or omission or personal injury happens:

  1. during the policy period; or

  2. prior to the policy period, provided that prior to the effective date of the first Lawyers Professional Liability Insurance Policy issued by the Company to the Named Insured and continu-

ously renewed and maintained in effect to the inception of this policy period:

  (a) the Insured did not give notice to any prior insurer of any such act, error or omission; and

  (b) the Insured had no reasonable basis to believe that the Insured had breached a professional duty or to foresee that a claim would be made against the Insured; and

  (c) there is no prior policy or policies which provide insurance for such liability or claim, unless the available Limits of Liability of such prior policy or policies are insufficient to pay any liability or claim, in which event this policy will be excess over any such prior coverage, subject to this policy's terms, Limits of Liability, exclusions and conditions.

B. **Consent to Settle, Defense:** The Company shall defend any claim against any Insured including the appeal thereof seeking damages to which this insurance applies even if any of the allegations of the suit are groundless, false, or fraudulent, provided, however, the Company shall have neither the right nor the duty to defend any disciplinary proceeding. In the event the violation of disciplinary rules or other professional misconduct alleged in any disciplinary proceeding is not proven by a final and enforceable determination by a tribunal of competent jurisdiction adverse to the Insured and is not admitted by the Insured, then the Company shall reimburse the Insured for all reasonable fees, costs and expenses incurred by the Insured and no deductible will apply in

CG 86 81 (Ed. 05/98) XS　　　　　(Page 1 of 12)

connection with such disciplinary proceeding. In the event the violation of disciplinary rules or other professional misconduct alleged in any disciplinary proceeding is proven by a final and enforceable determination by a tribunal of competent jurisdiction adverse to the Insured but is not admitted by the Insured, then the Company shall reimburse the Insured for all reasonable fees, costs and expenses incurred by the Insured in excess of the deductible set forth in the Declarations, subject to a limit of $10,000.

The Company shall have the right to make any investigation it deems necessary and, with the written consent of the Insured, any settlement of any claim covered by the terms of this policy. If the Insured shall refuse to consent to any settlement or compromise recommended by the Company and acceptable to the claimant and shall elect to contest the claim, then the Company's liability under this policy shall not exceed and shall be limited to the amount for which the Company would have been liable for damages and claims expenses if the claim had been so settled or compromised, when and as so recommended. The Company shall have no liability for claims expenses incurred thereafter and shall have the right to withdraw from the further investigation and/or defense thereof by tendering control of such investigation or defense to the Insured, and the Insured agrees, as a condition of the issuance of this policy, to accept such tender.

## II. Definitions

Whenever used in this policy:

"Bodily Injury" means physical injury, sickness, disease or death of any person.

"Claim" means a demand received by any Insured for money or services, including the service of suit or institution of arbitration proceedings against the Insured, or a disciplinary proceeding.

"Claim expenses" means:

1. fees charged by any lawyer designated by the Company;

2. all other fees, costs and expenses resulting from the investigation, adjustment, defense and appeal of a claim, if incurred by the Company.

However, "claim expenses" does not include salary charges of regular employees or of the officials of the Company or any fees, costs or expenses of any Insured.

"Damages" means a monetary judgment or settlement, including any such judgment or settlement for personal injury, but does not include fines or statutory penalties, sanctions whether imposed by law or otherwise, any other amount awarded in any disciplinary proceeding, the return or of restitution of legal fees, costs and expenses, punitive or exemplary damages, the multiplied portion of multiplied damages, amounts for which the Insured is not financially liable or which are without legal recourse to the Insured or matters which may be deemed uninsurable under the law.

"Disciplinary proceeding" means a proceeding in which a complaint alleging violation of any disciplinary rule or other professional misconduct is brought before a tribunal of competent jurisdiction which shall make a determination subject to appeal or other review and/or a final and enforceable determination as to whether such alleged professional misconduct is to be the subject of discipline.

"Insured" means:

1. if the Named Insured is an individual, such individual;

2. if the Named Insured is a partnership, such partnership and each lawyer who is a partner thereof including any incorporated partner and each shareholder of any such incorporated partner;

3. if the Named Insured is a professional corporation or professional association, such professional corporation or professional association and each lawyer who is a shareholder or member thereof;

4. each lawyer employed by the Named Insured;

5. any person who previously qualified or who during the policy period qualifies as an insured under 2., 3., or 4., above but only to the extent such person performs or has performed **professional legal services** on behalf of the Named Insured;

6. each lawyer acting as "of counsel" but only while performing **professional legal services** on behalf of the Named Insured;

7. any lawyer who is acting as an independent contractor or on a per diem basis to the Named Insured, but only as respects **professional legal services** rendered on behalf of the Named Insured or any predecessor;

8. all nonlawyer employees who were, are now or become employees of the Named Insured, but only while acting within the scope of their employment services on behalf of the Named Insured;

9. the estate, heirs, executors, administrators, assigns and legal representatives of each Insured in the event of the Insured's death, incapacity, insolvency or bankruptcy, but only to the extent that the Insured would otherwise be provided coverage under this policy.

**"Named Insured"** means the person or entity designated in the Declarations and any predecessor of such entity. For purposes of this definition,

> **"predecessor"** means any individual or entity engaged in the practice of law to whose financial assets and liabilities the Named Insured is the majority successor in interest.

**"Personal Injury"** means (a) false arrest, humiliation, detention or imprisonment, wrongful entry, eviction or other invasion of private occupancy, abusive litigation (criminal or civil), abuse of process or (b) the publication or utterance of a libel or slander or other defamatory or disparaging material, or a publication or utterance in violation of an individual's right of privacy.

**"Policy period"** means the period from the inception date of this policy to the policy expiration date as set forth in the Declarations or its earlier termination date, if any.

**"Professional Legal Services"** means legal services and activities performed for others as a lawyer, notary public, arbitrator, mediator, title insurance agent, designated issuing lawyer to a title insurance company, court-appointed fiduciary, services rendered as a member of a bar association, ethics, peer review, formal accreditation board or similar professional boards or committees, or the publication or presentation of research papers or similar materials by an Insured but only if the fees generated from such work are not greater than five thousand dollars ($5,000). When any Insured renders or fails to render services as an administrator, conservator, receiver, executor, guardian, or any similar fiduciary capacity, or court-appointed trustee, the Insured's acts, errors and omissions shall be deemed professional legal services provided that this coverage shall not apply to any loss sustained by the Insured as the beneficiary or distributee of any trust or estate.

**"Property Damage"** means injury to or destruction of any tangible property or loss of the use resulting therefrom. Tangible property does not include currency and negotiable instruments.

**"Totally and permanently disabled"** means that the Insured has become so disabled as to be wholly prevented from rendering professional legal services in the Insured's capacity as a lawyer provided that such disability:

1. has existed continuously for not less than 6 months; and

2. is expected to be continuous and permanent.

**"Totally and permanently disabled"** shall not include any condition which:

1. is a result of war or acts of war, whether or not declared;

2. occurred during active service in the armed forces of any country; or

3. results from:

   a. intentionally self-inflicted injuries;

   b. attempted suicide, whether or not sane; or

CG 86 81 (Ed. 05/98) XS                    (Page 3 of 12)

c. the abuse or misuse of addictive chemical compounds or alcohol.

## III. Extended Reporting Periods

A. **Automatic Claims Reporting Period:** If the Named Insured or the Company shall cancel or refuse to renew this policy and the Named Insured has not obtained another policy of lawyers professional liability insurance within sixty (60) days of the termination of their policy, then the Company shall extend the insurance afforded by this policy subject otherwise to its terms, Limits of Liability, exclusions and conditions to apply to CLAIMS FIRST MADE AGAINST THE INSURED DURING THE 60 DAYS immediately following the effective date of such nonrenewal or cancellation, but only by reason of any act, error or omission committed or alleged to have been committed in rendering or failing to render professional legal services before such effective date and otherwise covered by this insurance. Such period shall hereinafter be referred to as the "Automatic Reporting Period."

B. **Optional Reporting Period:** If the Named Insured or the Company shall cancel or refuse to renew this policy, then the Named Insured, upon payment of an additional premium as set forth herein, shall have the option to extend the insurance afforded by this policy subject otherwise to its terms, Limits of Liability, exclusions and conditions, to apply to CLAIMS FIRST MADE AGAINST THE INSURED DURING (A) 12 MONTHS, (B) 24 MONTHS, (C) 36 MONTHS, (D) 60 MONTHS or (E) AN UNLIMITED PERIOD, as elected by the Named Insured, immediately following the effective date of such nonrenewal or cancellation, but only by reason of any act, error or omission committed in rendering or failing to render professional legal services before such effective date and otherwise covered by this insurance.

The extension of coverage for claims first made after the nonrenewal or cancellation of this policy arising out of any act, error or omission occurring prior to the effective date of such nonrenewal or cancellation and otherwise covered by this

policy shall be endorsed hereto, if purchased, and shall hereinafter be referred to as the "Optional Reporting Period."

The premium for the Optional Reporting Period, if elected by the Named Insured, shall be (a) 100% for 12 MONTHS, (b) 135% for 24 MONTHS, (c) 150% for 36 MONTHS, (d) 185% for 60 MONTHS or (e) 225% for AN UNLIMITED PERIOD, of the full annual premium for this policy.

At the commencement of the Optional Reporting Period, the entire premium therefor shall be deemed earned, and in the event the Named Insured terminates the Optional Reporting Period before its expiration for any reason, the Company shall not be liable to return to the Named Insured any portion of the premium for the Optional Reporting Period.

The fact that the period during which claims must be first made against the Insureds under this policy is extended by virtue of the Optional Reporting Period shall not in any way increase the Limits of Liability of this policy. However, if the Company offers to renew this policy and the Named Insured refuses to accept such renewal offer, then the Company's liability for claims reported during Optional Reporting Period, if applicable, shall be reinstated to the Limit of Liability set forth in the Declarations.

C. **Electing the Optional Reporting Period:** As a condition precedent to the Named Insured's right to elect the Optional Reporting Period, any and all premiums and deductibles that are due must have been paid and all other terms and conditions of this policy must have been complied with. No Optional Reporting Period shall be available when any Insured's license or right to practice his or her profession is revoked, suspended by or surrendered at the request of any regulatory or judicial authority.

The Named Insured's right to elect the Optional Reporting Period must be exercised by notice in writing not later than sixty (60) days after the effective date of the nonrenewal or cancellation of this policy. Such notice must indicate the total

extension period desired AND MUST IN-
CLUDE PAYMENT OF PREMIUM FOR SUCH
OPTIONAL REPORTING PERIOD.

If such conditions precedent are not sat-
isfied on the effective date of the non-
renewal or cancellation of this policy or if
such notice is not timely given to the
Company, the Named Insured shall not at
a later date be able to exercise such right.

D. **Nonpracticing Reporting Period.** If any
insured, except those under Section II.
**Definitions, "Insured," sub-subsection
7.,** shall retire or otherwise cease the pri-
vate practice of law during the policy pe-
riod, then such insured, upon payment of
an additional premium set forth herein,
shall have the option to extend the insur-
ance afforded by this policy subject oth-
erwise to its terms, Limits of Liability, ex-
clusions and conditions, to apply to
CLAIMS FIRST MADE AGAINST THE IN-
SURED AND REPORTED TO THE COM-
PANY DURING (a) 12 MONTHS, (b) 24
MONTHS, (c) 36 MONTHS, (d) 60 MONTHS
or (e) AN UNLIMITED PERIOD, as elected
by such insured, immediately following
the date of the expiration of this policy or
the effective date of this policy's can-
cellation, if sooner, but only by reason of
any act, error or omission committed or
alleged to have been committed by such
insured in rendering or failing to render
professional legal services before the
insured's date of retirement or termina-
tion of private practice and otherwise
covered by the insurance, PROVIDED there
is no other insurance in effect on or after
the insured's date of retirement or ter-
mination of practice which covers the in-
sured for such liability or claim. Such
other insurance shall render this coverage
inapplicable, even though the Limits of Li-
ability of such other insurance may be in-
adequate to pay all losses and claim ex-
penses and/or the deductible amount and
deductible provisions of such other insur-
ance may be different from those of this
policy.

The extension of coverage for claims
first made after the date of the expiration
of this policy or the effective date of this
policy's cancellation, if sooner, arising out
of any act, error or omission occurring

prior to the insured's date of retirement
or termination of private practice and oth-
erwise covered by this policy shall be
further endorsed to this policy, if elected,
and shall hereinafter be referred to as the
"Nonpracticing Reporting Period."

The premium for the Nonpracticing Re-
porting Period, if elected by the insured,
shall be (a) 100% for 12 MONTHS, (b)
135% for 24 MONTHS, (c) 150% for 36
MONTHS, (d) 185% for 60 MONTHS or (e)
225% for AN UNLIMITED PERIOD, of the
full annual premium per insured lawyer for
this policy PROVIDED that in the event (a)
an insured shall die, except by suicide, (b)
an insured who was the sole proprietor,
partner (including the shareholder of an
incorporated partner), shareholder, mem-
ber or employed lawyer of the Named
Insured becomes totally and permanent-
ly disabled, or (c) an insured who was a
sole proprietor, partner (including the
shareholder or an incorporated partner),
shareholder, member or employed lawyer
of the Named Insured with three con-
secutive full years of coverage by the
Company shall retire or otherwise cease
the private practice of law during the
policy period, such insured shall be en-
titled to a Nonpracticing Reporting Period
at no additional premium.

The deductible amount and deductible
provisions of this policy will be waived
with respect to claims first made against
the insured during the Nonpracticing Re-
porting Period if elected by such insured.

The Limits of Liability stated in the Dec-
larations and described in Section VI.
LIMITS OF LIABILITY A. and B. of this
policy shall be reinstated for claims first
made against the insured during the Non-
practicing Reporting Period, if elected by
such insured. If the Limits of Liability stat-
ed in the Declarations make this a "low
limit policy" (defined for the purposes of
this section of the policy only as a policy
which has a "per claim" Limit of Liability
less than $250,000 and an "aggregate"
Limit of Liability less than $750,000), a
special "InflationGuard" feature described
below shall determine the applicable Limits
of Liability during the Nonpracticing Re-
porting Period.

InflationGuard. This feature applies solely to a policy that meets the definition of a "low limit policy" above and provides that the Limit of Liability during the first twelve months of the Nonpracticing Reporting Period will be reinstated to those described in Section VI. LIMITS OF LIABILITY A. and B. of this policy. The "per claim" and "aggregate" Limits of Liability for claims first made and reported during each successive twelve month period of the Nonpracticing Reporting Period, if applicable, shall increase ten percent (10%) over the applicable "per claim" and "aggregate" Limits of Liability of the preceding twelve month period, but in no case shall these Limits of Liability increase after the fourth twelve month period, if applicable, nor shall the "aggregate" Limit of Liability be reinstated during each successive twelve month period by virtue of this provision.

E. **Electing the Non-Practicing Reporting Period:** As a condition precedent to any Insured's electing the Nonpracticing Reporting Period, the full annual premium of this policy and any deductibles that are due must have been paid and all other terms and conditions of this policy must have been complied with. The Nonpracticing Reporting Period shall not be available when any Insured's license or right to practice his or her profession is revoked, suspended by or surrendered at the request of any regulatory authority or judicial authority.

If during the Nonpracticing Reporting Period, the Insured first becomes aware that an Insured has committed a specific act, error or omission in professional services for which coverage is otherwise provided hereunder, and if the Insured shall during the Nonpracticing Reporting Period, give written notice to the Company of:

(i) the specific act, error or omission; and

(ii) the injury or damage which has resulted or may result from such act, error or omission; and

(iii) the circumstances by which the Insured first became aware of such act, error or omission,

then any claim that may subsequently be made against the Insured arising out of such act, error or omission shall be deemed for the purposes of this insurance to have been made during the Nonpracticing Reporting Period.

The Insured's right to elect the Nonpracticing Reporting Period must be exercised by notice in writing not later than sixty (60) days after the date of the expiration of this policy or the effective date of this policy's cancellation, if sooner. Such notice must indicate the total extension period desired AND MUST INCLUDE PAYMENT OF PREMIUM, IF ANY, FOR SUCH NONPRACTICING REPORTING PERIOD.

If such conditions precedent are not satisfied on the effective date of such nonrenewal or cancellation or if such notice is not timely given to the Company, the Insured shall not at a later date be able to exercise such right.

IV. **Exclusions**

A. This policy does not apply:

1. to any judgment or final adjudication based upon or arising out of any dishonest, deliberately fraudulent, criminal, malicious or deliberately wrongful acts or omissions committed by any Insured, however, the Company will defend allegations of the foregoing acts or omissions until the time that the act or omission is factually proven;

2. to claims arising out of any Insured's services and/or capacity as:

(a) an officer, director, partner, trustee, or employee of a corporation, partnership, association, trust or fund, (including a pension, welfare, profit sharing, mutual or investment fund or trust) or any other business enterprise or charitable organization of any kind or nature (defined for the purposes of this Exclusion and Exclusions 5 and 6 as an "Organization"), other than that of the Named Insured, except this exclusion does not apply to a court-appointed trustee;

(b) a public official, or an employee of a governmental body, subdivision, or agency;

(c) a fiduciary under the Employee Retirement Income Security Act of 1974 and its amendments or any regulation or order issued pursuant thereto, except if the insured is deemed to be a fiduciary solely by reason of legal advice rendered with respect to an employee benefit plan;

3. any claim based upon or arising out of bodily injury or property damage, unless:

(a) the liability for such claim is caused by the performance of professional legal services by the insured;

(b) such bodily injury or property damage would not have otherwise occurred directly or indirectly but for the performance of professional legal services by the insured and no other cause or circumstance contributed to the loss, including but not limited to the negligence of a third party;

(c) such bodily injury or property damage takes place on premises occupied by the Named Insured;

(d) such bodily injury does not happen to any insured and such property damage does not occur to any property owned by any insured;

(e) the liability for such claim does not arise directly or indirectly out of any obligation under any workers' compensation, disability benefits or unemployment compensation law or any similar law;

(f) such bodily injury or property damage does not arise out of actual, alleged or threatened pollution; and

(g) the liability for such claim does not arise directly or indirectly out of the use, ownership, and/or maintenance of owned, nonowned, hired, rented, or loaned automobiles, trucks, aircraft or watercraft by the insured;

however, this exclusion does not apply to mental illness or emotional distress or humiliation caused by personal injury;

4. to any claim made by one insured against another insured unless an attorney:client relationship exists;

5. to any claim brought against any insured (the insured against whom such claim is brought being defined for purposes of this Exclusion as the "Defendant Insured") based upon or arising out of the work performed by the Defendant Insured with respect to any Organization:

(a) if the claim arises solely because the Defendant Insured is an officer, director, trustee or partner of the Organization, or if the Defendant Insured is an employee of the Organization or controls, operates or manages the Organization, either individually or in a fiduciary capacity, including if the Defendant Insured owns, maintains or uses any property of the Organization or

(b) if the Defendant Insured and/or members of the immediate family of the Defendant Insured own(s) 10% or more of the issued and outstanding shares, units or other portions of the capital of the Organization;

6. to any claim based upon or arising out of the work performed by any insured with respect to any Organization in which the insured(s) and/or members of the immediate family(ies) of the insured(s) own 30% or greater of the issued and outstanding shares, units or other portions of the capital of the Organization.

**B. Waiver of Exclusion (Innocent Insured) and Breach of Conditions:** Whenever coverage under any provision of this policy would be excluded, suspended or lost

1. because of Section IV. Exclusions, sub-section 1. relating to any judgment or final adjudication based upon or arising out of any dishonest, deliberately fraudulent, criminal, malicious or deliberately wrongful acts or omissions by any Insured, or

2. because of noncompliance with Section VII. Claims, subsection A. Notice of Claims relating to the giving of notice to the Company with respect to which any other Insured shall be in default solely because of the default or concealment of such default by one or more Insureds responsible for the loss or damage otherwise insured hereunder,

the Company agrees that such insurance as would otherwise be afforded under this policy shall apply with respect to each and every Insured who did not personally commit or personally participate in committing one or more of the acts, errors or omissions described in either such exclusion or such condition; provided that if the condition be one with which such Insured can comply after receiving knowledge thereof, the Insured entitled to the benefit of the Waiver of Exclusion and Breach of Conditions shall comply with such condition promptly after obtaining knowledge of the failure of any other Insured to comply therewith.

With respect to Provision B. 1. above, the Company's obligation to pay in the event of such waiver shall be excess of the deductible and excess of the full extent of any assets in the Named Insured, or monetary value attributed to such assets, of any Insured who is not a beneficiary of the waiver.

**V. Territory**

The insurance afforded applies worldwide.

**VI. Limits of Liability**

A. **Limits of Liability - Each Claim:** The liability of the Company for EACH CLAIM FIRST MADE AGAINST THE INSURED AND REPORTED TO THE COMPANY DURING THE POLICY PERIOD, THE AUTOMATIC CLAIMS REPORTING PERIOD AND ANY OTHER EXTENDED REPORTING PERIOD, IF APPLICABLE, shall not exceed the amount stated in the Declarations for each claim, and shall include all claim expenses.

B. **Limits of Liability - Aggregate:** The total liability of the Company for ALL CLAIMS FIRST MADE AGAINST THE INSURED AND REPORTED TO THE COMPANY DURING THE POLICY PERIOD, THE AUTOMATIC CLAIMS REPORTING PERIOD AND ANY OTHER EXTENDED REPORTING PERIOD, IF APPLICABLE, shall not exceed the amount stated in the Declarations as aggregate, and shall include all claim expenses.

If two or more policies of Lawyers Professional Liability Insurance issued by the Company covering any Insured apply to the same claim or claims for which the Insureds are jointly and severally liable, the Company shall not be liable under this policy for a greater proportion of such damages and claim expenses than the Company's liability under this policy bears to the total liability of the Company under all applicable valid and collectible insurance issued by the Company, provided that the Company shall not pay on behalf of all such Insureds any sum that exceeds the Limit of Liability of that policy issued by the Company which has the highest applicable Limit of Liability.

C. **Deductible:** The deductible amount stated in the Declarations shall be applicable to all damages and claim expenses, for each and every claim, and shall be paid by the Insureds as a condition precedent to payment of any loss by the Company hereunder.

Such amount shall be paid by the Insureds for each and every claim within thirty (30) days of written demand therefor by the Company regardless of the number of claims first made during the policy pe-

riod, the Automatic Claims Reporting Period, and any other Extended Optional Reporting Period, if applicable:

The determination of the Company as to the reasonableness of the claim expenses shall be conclusive on the Insureds.

The Insured shall be entitled to a reduced deductible of fifty percent (50%) of the amount stated in the Declarations if during the policy period, the Automatic Claims Reporting Period, or any other Extended Reporting Period, if applicable, a claim is first made against the Insured and the Insured agrees, at the Company's written request and pursuant such terms and conditions as the Company requires, to submit such claim to arbitration or mediation. The right to elect arbitration or mediation shall be at the Company's sole option provided, however, that no such claim shall be submitted to arbitration without prior written consent of the Insured.

**Multiple Policy Deductibles:** If two or more policies of Lawyers Professional Liability Insurance issued by the Company covering any Insured apply to the same claim or claims for which the Insureds are jointly and severally liable, the applicability of deductibles shall be determined in the same manner as the Limits of Liability are determined per sub-section B. above.

D. **Multiple Insureds, Claims and Claimants:** The inclusion herein of more than one Insured or the making of claims by more than one person or organization shall not operate to increase the Company's Limits of Liability. Claims alleging, based upon, arising out of or attributable to the same or related acts, errors or omissions shall be treated as a single claim regardless of whether made against one or more than one Insured. All such claims, whenever made, shall be considered first made during the policy period or any Extended Reporting Period in which the earliest claim arising out of such acts, errors or omissions was first made, and all such claims shall be subject to the same Limits of Liability.

E. **Payment and Apportionment of Claim Expenses:** All claim expenses shall first be subtracted from the applicable Limit of Liability with the remainder, if any, being the amount available to pay damages. If the Limits of Liability are exhausted prior to settlement or judgment of any pending claim, the Company shall have the right to withdraw from the further investigation or defense thereof by tendering control of such investigation or defense to the Insured, and the Insured agrees, as a condition to the issuance of this policy, to accept such tender.

VII. **Claims**

A. **Notice of Claims:** The Insureds shall, as soon as practicable, give to the Company written notice of any claim(s) or potential claim(s) made against any Insured.

In the event suit is brought against any Insured, the Insureds shall immediately forward to the Company every demand, notice, summons, complaint or other process received directly or by the Insured's representatives.

Written notice of any claim against any Insured, as well as of each demand on or action against the Company, shall be delivered to the Company addressed as follows:

Great American Insurance Company
c/o Tamarack American
205 East 42nd Street
New York, New York 10017
Attention: Claims Division

All notices to the Company must be in writing.

B. **Discovery Clause:** Should any Insured first become aware during the policy period or any Extended Reporting Period, if applicable, that an Insured has committed a specific act, error or omission in rendering or failing to render professional legal services for which coverage is otherwise provided hereunder, and should any Insured during the policy period or any Extended Reporting Period, if applicable, give written notice to the Company of:

1. the specific act, error or omission; and

2. the injury or damage which has resulted or may result from such act, error or omission; and

3. the circumstances by which the Insured first became aware of such act, error or omission,

then any claim that may subsequently be made against the Insured arising out of such act, error or omission shall be deemed for the purposes of this insurance to have been made during the policy period or any Extended Reporting Period, if applicable.

C. Assistance and Cooperation of the Insured: The Insured shall cooperate with the Company and upon the Company's request shall submit to examination and interrogation by a representative of the Company, under oath if required, and shall attend hearings, depositions and trials, and shall assist in effecting settlement, securing and giving evidence, obtaining the attendance of witnesses and in the conduct of suits and other proceedings, as well as in the giving of a written statement or statements to the Company's representatives, including investigating and coverage counsel, and meeting with such representatives for the purpose of investigation including the investigation of coverage issues and/or defense, all without charge to the Company. The Insured shall further cooperate with the Company and do whatever is necessary to secure and effect any rights of indemnity, contribution or apportionment which any Insured may have. The Insured shall not, except at the Insured's own cost, make any payment, admit any liability, settle any claims, assume any obligation or incur any expense without the prior written consent of the Company. If requested in writing by the Company to attend a trial, hearing, or arbitration proceeding, the Company shall pay up to $500 per day for loss of earnings to an Insured for attendance each day or part thereof arising from a claim against an Insured subject to a maximum of $5,000 per claim and $10,000 in the aggregate for all claims. Any

payment made pursuant to this paragraph will be in addition to the Limits of Liability set forth in the Declarations.

D. False or Fraudulent Claims: If any Insured shall commit fraud in proffering any claim under this policy as regards amount or otherwise, the insurance provided under this policy shall become void as to such Insured from the date such fraudulent claim is proffered.

VIII. Conditions

A. Firm Changes: The Named Insured shall report changes during the policy period which affect 50% or greater of the Named Insured's total lawyer population within sixty (60) days of such change, however, this provision shall not apply if the Named Insured had less than six (6) lawyers who met the definition of Insured at the inception of this policy. In the event of a merger, dissolution or acquisition, the Named Insured shall notify the Company at least 30 days prior to the projected date of such change. In each case, the Company will have the right to accept, alter or decline coverage and to charge an additional premium.

B. Subrogation: In the event of any payment under this policy, the Company shall be subrogated to all the Insured's rights of recovery therefor against any person or organization, provided, however, the Company shall not exercise any rights of subrogation against any Insured who did not commit the wrongdoing. The Insureds shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights and the Insured shall do nothing to prejudice such rights.

Any amount recovered upon the exercise of such rights of subrogation shall be applied as follows: first, to the repayment of expenses incurred toward subrogation; second, to damages and/or claim expenses paid by the Insured in excess of the Limits of Liability hereunder; third, to damages and/or claim expenses paid by the Company; fourth, to damages and

claim expenses paid by the Insured in excess of the deductible; and last, to repayment of the deductible.

C. **Action Against the Company:** No action shall lie against the Company unless, as a condition precedent thereto, the Insured shall have fully complied with all the terms of this policy, nor until the amount of the Insured's obligation to pay shall have been fully and finally determined either by judgment against the Insured after actual trial or by written agreement of the Insured, the claimant and the Company.

Nothing contained in this policy shall give any person or organization the right to join the Company as a co-defendant in any action against any Insured to determine the Insured's liability. Bankruptcy or insolvency of any Insured or of the Insured's estate shall not relieve the Company of any of its obligations hereunder.

D. **Application:** By acceptance of this policy, the Insureds agree that the statements in the application are personal representations, that they shall be deemed material and that this policy is issued in reliance upon such representations and that this policy embodies all agreements existing between the Insured and the Company, or any of its agents, relating to this insurance.

E. **Other Insurance:** Subject to the limitation of coverage as set forth in subparagraph 2(c) of Section I. Coverage - A. Professional Liability and Claims Made Clause for prior insurance, this insurance shall be in excess of the amount of the applicable deductible of this policy and any other valid insurance available to the Insured which insurance is either collectible or uncollectible only because the Limits of Liability thereof shall have been exhausted, whether such other insurance is stated to be primary, pro rata, contributory, excess, contingent or otherwise, unless such other insurance is written only as a specific excess insurance over the Limits of Liability provided in this policy.

F. **Changes:** Notice to any agent or knowledge possessed by any agent or other person acting on behalf of the Company

shall not effect a waiver or a change in any part of this policy or estop the Company from asserting any right under the terms of this policy, nor shall the terms of this policy be waived or changed, except by written endorsement issued to form a part of this policy.

G. **Assignment:** Assignment of interest under this policy shall not bind the Company unless its consent is endorsed in writing hereon.

H. **Cancellation:** This policy may be cancelled by the Named Insured by surrender thereof to the Company or by mailing to the Company written notice stating when thereafter such cancellation shall be effective. If cancelled by the Insured, the Company shall retain the customary short rate proportion of the premium.

This policy may be cancelled by the Company by mailing to the Named Insured written notice stating when, not less than thirty (30) days thereafter, such cancellation shall be effective. However, if the Company cancels the policy because the Insured has failed to pay a premium or deductible when due, this policy may be cancelled by the Company by mailing a written notice of cancellation to the Named Insured stating when not less than ten (10) days thereafter such cancellation shall be effective. Such notice shall be conclusive on all Insureds. Any such notice of cancellation and any other notice to be provided by the Company to the Named Insured or any Insured hereunder shall be mailed to the Named Insured at its address set forth in the Declarations.

The mailing of notice as aforementioned shall be sufficient notice and the effective date of cancellation stated in any notices shall become the end of the policy period. Delivery of such written notice by the Named Insured or the Company shall be the equivalent of mailing.

If cancelled by the Company, earned premium shall be computed pro rata. Premium adjustment may be made at the time cancellation is effected or as soon as practicable thereafter.

IN WITNESS WHEREOF, the Company has caused this policy to be executed and attested, but this policy shall not be valid unless countersigned on the Declarations by a duly authorized representative of the Company.

*Kira Stolley Howell*
Secretary

*Carl H. Lindner III*
President





Administrative Offices
580 Walnut Street
Cincinnati, Ohio 45202
Tel. 1-513-369-5000

CG7908
(Ed. 02 91)

**THIS ENDORSEMENT AMENDS THE POLICY. PLEASE READ IT CAREFULLY.**

## NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
### (BROAD FORM)

In consideration of the premium charged it is hereby understood and agreed that:

I. This policy does not apply:

  A. Under any Liability Coverage, to bodily injury or property damage

    1. with respect to which an insured under this Policy is also an insured by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

    2. resulting from the hazardous properties of nuclear material and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the Insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

  B. Under any Medical Payments Coverage, or any Supplementary Payments provision relating to first aid, to expenses incurred with respect to bodily injury resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

  C. Under any Liability Coverage, to bodily injury or property damage resulting from the hazardous properties of nuclear material, if

    1. the nuclear material (a) is at any nuclear facility owned by, or operated by or on behalf of an insured or (b) has been discharged or dispersed therefrom;

    2. the nuclear material is contained in spent fuel or waste at any time possessed, handled, use, processed, stored, transported or disposed of by or on behalf of an Insured; or

    3. the bodily injury or property damage arises out of the furnishing by an Insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this Exclusion (3) applies only to property damage to such nuclear facility and any property thereat.

II. As used in this endorsement:

  "hazardous properties" include radioactive, toxic or explosive properties;

  "nuclear material" means "source material, special nuclear material or by-product material;

  "source material," special nuclear material," and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof,

  "spent fuel" means any element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor;

  "waste" means any waste material (1) containing by-product material and (2) resulting form the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under Paragraph (a) or (b) thereof,





GREATAMERICAN.
INSURANCE GROUP

Administrative Offices
580 Walnut Street
Cincinnati, Ohio 45202
Tel: 1-513-369-6000

CG7908
(Ed. 02 91)

"nuclear facility" means

1. any nuclear reactor,

2. any equipment or device designed or used for (a) separating the isotopes of uranium or plutonium, (b) processing or utilizing spent fuel, or (c) handling, processing or packaging waste,

3. any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the Insured a the premises where such equipment or device is located consists of or contains more than twenty-five (25) grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

4. any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

"nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a selfsupporting chain reaction or to contain a critical mass of fissionable material;

"property damage" includes all forms of radioactive contamination of property.

All other terms and conditions remain unchanged.

  

GREAT**AMERICAN.**
INSURANCE GROUP

Administrative Offices
580 Walnut Street
Cincinnati, Ohio 45202
Tel 1-513-369-5000

CG7908
(Ed. 02 91)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**EXCESS NOT-FOR-PROFIT DIRECTORSHIP EXTENSION ENDORSEMENT**

This endorsement modifies insurance provided under the following:

LAWYERS PROFESSIONAL LIABILITY INSURANCE POLICY

In consideration of the premium charged it is hereby understood and agreed that notwithstanding **Exclusions** and the **Limit of Liability-Each Claim** and **Limit of Liability-Aggregate** stated in the Declarations,

(1) a sublimit of liability – each claim of $50,000, as part of and not in addition to the Limit of Liability – each claim stated in the Declarations; and

(2) a sublimit of liability – aggregate of $50,000, as a part of and not in addition to the Limit of Liability – aggregate stated in the Declarations

shall be available, but shall not constitute the only Limits of Liability available, for all claim expenses (but not for any damages) of each and every insured who was or now is or during the policy period becomes a duly elected or appointed Director or Officer of any not-for-profit organization arising out of any act, error or omission committed or alleged to have been committed in rendering or failing to render services in the insured's capacity as such a Director or Officer of a not-for-profit organization. The term "not-for-profit organization" shall not include the Named Insured or any client of the Named Insured.

Further, coverage as is afforded by virtue of this endorsement shall be specifically excess and shall, except as otherwise provided in this endorsement, follow the form of valid directors and officers liability insurance which must have been issued to such not-for-profit organization and

which must be either collectible or uncollectible only because the Limits of Liability thereof shall have been exhausted, whether such other insurance is stated to be primary, pro rata, contributory, excess, contingent or otherwise, and shall be specifically excess of any indemnification provided by such not-for-profit organization. Further, if said directors and officers liability insurance shall have been issued to such not-for-profit organization by the Company or any affiliate of the Company then the sublimit of liability for claim expenses covered by virtue of this endorsement with respect to any such not-for-profit organization shall be reduced by the Limit of Liability of such directors and officers liability insurance provided by the Company or such affiliate of the Company to such not-for-profit organization.

Furthermore, it is understood and agreed that coverage as is afforded by virtue of this endorsement shall not apply to any claim or claims for any alleged act, error or omission if, as of the effective date of the first Lawyers Professional Liability Insurance Policy for which coverage as is afforded by this endorsement was granted issued by the Company to the Named Insured and continously renewed and maintained in effect with the Company to the effective date of this policy, (or in the case of any person who during the period of this policy qualifies as an insured, as of the date of such qualification), the insured, as of such date, knew or could have reasonably foreseen that such act, error or omission could lead to a claim.

**All other terms and conditions remain unchanged.**





Administrative Services
580 Walnut Street
Cincinnati, Ohio 45202
Tel: 1-513-369-5000

CG7908
(Ed. 02 91)

## THIS ENDORSEMENT AMENDS THE POLICY.  PLEASE READ IT CAREFULLY.

## ILLINOIS CANCELLATION AND NONRENEWAL ENDORSEMENT

This endorsement modifies insurance provided under the following:

> LAWYERS PROFESSIONAL LIABILITY POLICY
> CORPORATE LAWYERS PROFESSIONAL LIABILITY POLICY

In consideration of the premuim paid, it is hereby understood and agreed that the section, sub-section or provision in the policy entitled CANCEL-LATION is deleted in its entirety and replaced by the following:

**Cancellation**

1. This policy may be canceled by the Named Insured by surrender thereof to the Company or by mailing to the Company written notice stated when thereafter such cancellation shall be effective.

2. If this policy has been in effect for sixty (60) days or less, the Company may cancel this policy by mailing to the Named Insured written notice of cancellation at least:

   (a) ten (10) days prior to the effective date of cancellation if the Company cancels for nonpayment of premium; or

   (b) thirty (30) days prior to the effective date of cancellation if the Company cancels for any other reasons.

3. If this policy has been in effect for more than sixty (60) days, this policy may not be can-celled by the Company except for one or more of the following reasons:

   (a) nonpayment of premium;

   (b) the policy was obtained through a material misrepresentation;

   (c) any insured violated any of the terms and conditions of the policy.

   (d) the risk originally accepted has measurably increased;

   (e) certification to the Director of the Com-pany's loss of reinsurance for all or a substantial part of the underlying risk in-sured; or

   (f) a determination by the Director that the continuation of the policy could place the Company in violation of the insurance laws of this state.

4. If the Company cancels the policy because the Insured has failed to pay a premium when due, this policy may be canceled by the Company by mailing written notice of cancellation to the insured at least ten (10) days prior to the effective date of cancellation.

5. If the Company cancels this policy for any reason specified in Provision 3.(b) through (f) above, this policy may be canceled by the Company by mailing written notice to the in-sured at least sixty (60) days prior to the effective date of cancellation.

6. All notices of cancellation by the Company shall be mailed to the Named Insured at the last mailing address known by the Company and shall state the reason(s) for the cancella-tion.  A copy of all such notices shall be sent to the insured's broker, if known.  The Com-pany shall maintain proof of mailing of such notice on a recognized U.S. Post Office form or a form acceptable to the U.S. Post Office. The mailing of notice as aforesaid shall be sufficient proof of notice.  The time of the surrender of the/effective date and hour of cancellation stated in the notice shall become the end of the policy period.

CG 79 08 (Ed. 02 91) PRO





CG7908
(Ed. 02 91)

7. The Named Insured is authorized to act on behalf of all insureds with respect to the giving and receiving of notice of cancellation and to the receiving of any return premium that may become payable under this policy.

8. If the Named Insured cancels, earned premium shall be computed in accordance with the short rate table and procedure in use for this policy. If the Company cancels, earned premium shall be computed pro rata. Premium adjustment may be made either at the time cancellation is effected or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

**Nonrenewal**

1. If the Company decides not to renew this policy, the Company shall mail written notice to the Named Insured and the mortgagee or lien holder at least sixty (60) days advance notice of its intention not to renew. The notice shall state the reason(s) for the nonrenewal. A copy of all such notices shall be sent to the insured's broker, if known.

2. In the event such notice is provided at least thirty-one (31) days but less than sixty (60) days prior to expiration of the policy, the Company will extend the policy for sixty (60) days or until the effective date of any similar insurance procured by the Named Insured, whichever is less, on the same terms and conditions as the policy sought to be terminated.

3. In the event such notice is provided less than thirty-one (31) days prior to the expiration of the policy, the policy shall be extended for a period of one (1) year or until the effective date of any similar insurance procured by the Named Insured, whichever is less, on the same terms and conditions as the policy sought to be terminated.

4. The premium for extensions of coverage as described above shall be prorated in accordance with the amount of last year's premium. The Company shall be entitled to this premium for the extension of coverage and such extension may be contingent upon the payment of such premium.

**All other terms and conditions remain unchanged.**

CG 79 08 (Ed. 02 91) PRO

 

**GREAT**AMERICAN.
INSURANCE GROUP

Administrative Offices
580 Walnut Street
Cincinnati, Ohio 45202
Tel: 1-513-369-5000

CG7908
(Ed. 02 91)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### AMEND NOTICE OF CLAIMS ADDRESS ENDORSEMENT

HOW YOUR COVERAGE IS CHANGED:

SECTION A. OF VII. **CLAIMS** IS HEREBY DELETED IN ITS ENTIRETY AND REPLACED WITH THE FOLLOWING:

A.     NOTICE OF CLAIMS: THE INSUREDS SHALL, AS SOON AS PRACTICABLE, GIVE TO THE COMPANY WRITTEN NOTICE OF ANY CLAIM(S) OR POTENTIAL CLAIM(S) MADE AGAINST ANY INSURED.

IN THE EVENT SUIT IS BROUGHT AGAINST ANY INSURED, THE INSUREDS SHALL IMMEDIATELY FORWARD TO THE COMPANY EVERY DEMAND, NOTICE, SUMMONS, COMPLAINT OR OTHER PROCESS RECEIVED DIRECTLY OR BY THE INSURED'S REPRESENTATIVES.

WRITTEN NOTICE OF ANY CLAIM AGAINST ANY INSURED, AS WELL AS OF EACH DEMAND ON OR ACTION AGAINST THE COMPANY, SHALL BE DELIVERED TO THE COMPANY ADDRESSED AS FOLLOWS:

GREAT AMERICAN INSURANCE COMPANY
2435 NORTH CENTRAL EXPRESSWAY
SUITE 1400
RICHARDSON, TX 75080-2771

ALL NOTICES TO THE COMPANY MUST BE IN WRITING.

### ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.




**GREAT**AMERICAN.
INSURANCE GROUP

Administrative Offices
580 Walnut Street
Cincinnati, Ohio 45202
Tel: 1-513-369-5000

CG7908
(Ed. 02 91)

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### ILLINOIS EXTENDED REPORTING PERIODS

This endorsement modifies insurance provided under the following:

LAWYERS PROFESSIONAL LIABILITY POLICY

I.  In consideration of the premium paid, it is hereby understood that the provision in the policy entitled OPTIONAL REPORTING PERIOD in EXTENDED REPORTING PERIODS is amended as follows:

  1.  The third paragraph is deleted in its entirety and replaced by the following:

    The premium for the Optional Reporting Period, if elected by the Named Insured, shall be (a) 100% for 12 months, (b) 135% for 24 months, (c) 160% for 36 months, (d) 185% for 60 months or (e) 225% for AN UNLIMITED PERIOD, of the expiring annual premium for this policy.

  2.  The fourth paragraph is deleted in its entirety and replaced by the following:

    At the commencement of the Optional Reporting Period, the entire premium therefor shall be deemed earned.  The Optional Reporting Period shall not be cancelled for any reason.

II.  It is further understood and agreed that the provision in the policy entitled ELECTING THE OPTIONAL REPORTING PERIOD in EXTENDED REPORTING PERIODS is amended as follows:

  1.  The first paragraph is deleted in its entirety.

  2.  The third paragraph is deleted in its entirety and replaced by the following.

    If such notice is not timely given to the Company, the Named Insured shall not at a later date be able to exercise such right.

III.  It is further understood and agreed that the provision in the policy entitled NONPRACTICING REPORTING PERIOD in EXTENDED REPORTING PERIODS is amended as follows:

  1.  The first paragraph is deleted in its entirety and replaced by the following:

    D.  NONPRACTICING REPORTING PERIOD: If any insured, except those under Section II. Definitions, "insured," subsection 7., shall retire or otherwise cease the private practice of law during the policy period, then such insured, upon payment of an additional premium set forth herein, shall have the option to extend the insurance afforded by this policy subject otherwise to its terms, Limit of Liability, exclusions and conditions, to apply to CLAIMS FIRST MADE AGAINST THE INSURED AND REPORTED TO THE COMPANY DURING (a) 12 MONTHS, (b) 24 MONTHS, (c) 36 MONTHS, (d) 60 MONTHS or (e) AN UNLIMITED PERIOD, as elected by such insured, immediately following the date of the expiration of this policy or the effective date of this policy's cancellation, if sooner, but only by reason of any act, error or omission committed or alleged to have been committed by such insured in rendering or failing to render professional legal services before the insured's date of retirement or termination of private practice and otherwise covered by the insurance, HOWEVER, if other insurance is procured on or after the insured's date of Retirement or termination of private practice which covers such liability or



**GREAT**AMERICAN.
INSURANCE GROUP

Administrative Offices
580 Walnut Street
Cincinnati, Ohio 45202
Tel: 1-513-369-5000

CG7908
(Ed. 02 91)

claim, this coverage shall be excess to the Limits of Liability of said other insurance.

2. The third paragraph is deleted in its entirety and replaced by the following:

The premium for the Nonpracticing Reporting Period, if elected by the Insured, shall be (a) 100% for 12 MONTHS (b) 135% for 24 MONTHS, (c) 150% for 36 MONTHS (d) 185% for 60 MONTHS or (d) 225% for AN UNLIMITED PERIOD, of the expiring annual premium per Insured lawyer for this policy PROVIDED that in the event (a) an Insured shall die, (b) an Insured who was the sole proprietor, partner (including the shareholder of an incorporated partner), shareholder, member or employed lawyer of the Named Insured becomes totally and permanently disabled, or (c) an Insured who was a sole proprietor, partner, (including the shareholder or an incorporated partner),

shareholder, member or employed lawyer of the Named Insured with three consecutive full years of coverage by the Company shall retire or otherwise cease the private practice of law during the **policy period**, such Insured shall be entitled to a Nonpracticing Reporting Period at no additional premium.

IV.  It is further understood and agreed that the provision in the policy entitled **ELECTING THE NONPRACTICING REPORTING PERIOD IN EXTENDED REPORTING PERIODS** is amended as follows:

1. The first paragraph is deleted in its entirety.

2. The fourth paragraph is deleted in its entirety and replaced by the following:

If such notice is not timely given to the Company, the Named Insured shall not at a later date be able to exercise such right.

**All other terms and conditions of the policy remain unchanged.**



**GREAT**AMERICAN.
INSURANCE GROUP

Administrative Offices
580 Walnut Street
Cincinnati, Ohio 45202
Tel 1-513-369-5000

CG7908
(Ed, 02 81)

## THIS ENDORSEMENT AMENDS THE POLICY. PLEASE READ IT CAREFULLY.

### AMENDED INSURED DEFINITION ENDORSEMENT

This endorsement modifies insurance provided under the following:

LAWYERS PROFESSIONAL LIABILITY INSURANCE POLICY

In consideration of the premium charged, it is hereby understood and agreed that **Definitions, Insured,** subparagraph **5.** is amended to read as follows:

a. any person who had previously qualified and no longer qualifies as an Insured under **2., 3.,** or **4.** above but only to the extent such person performed professional legal services on behalf of the Named Insured;

b. any person who during the policy period qualifies as an Insured under **2., 3.,** or **4.** above but if during the policy period the person no longer qualifies as an Insured under **2., 3.,** or **4.** above, then only to the extent such person has performed professional legal services on behalf of the Named Insured.



**GREATAMERICAN.**
INSURANCE GROUP

Administrative Offices
580 Walnut Street
Cincinnati, Ohio 45202
Tel: 1-513-369-5000

CG7908
(Ed. 02 91)

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### ACCOUNTANT EXCLUSION ENDORSEMENT

It is hereby understood and agreed that the following is added to Section IV. Exclusions:

A.   This policy does not apply:

to claims arising out of the rendering or failing to render **professional legal services** for others in the insured's capacity as an accountant.

All other terms and conditions remain unchanged.

GREAT**AMERICAN.**
INSURANCE GROUP

Administrative Offices
580 Walnut Street
Cincinnati, Ohio 45202
Tel: 1-513-369-5000

CG7908
(Ed. 02 91)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**VICARIOUS LIABILITY EXCLUSION ENDORSEMENT**

HOW YOUR COVERAGE IS CHANGED:

UNDER IV, EXCLUSIONS, THE FOLLOWING EXCLUSION IS ADDED:

ANY CLAIM WHEREIN IT IS ALLEGED THAT YOU ARE LEGALLY RESPONSIBLE FOR ANY ACT, ERROR OR OMISSION OF ANY OTHER PERSON WHO IS NOT AN INSURED AS DEFINED BY THE POLICY, INCLUDING BUT NOT LIMITED TO THEORIES OF PARTNERSHIP BY ESTOPPEL, APPARENT PARTNERSHIP, VICARIOUS LIABILITY AND/OR ANY SIMILAR THEORY.

**ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.**



GREATAMERICAN.
INSURANCE GROUP

Administrative Offices
580 Walnut Street
Cincinnati, Ohio 45202
Tel. 1-813-369-5000

CG7908
(Ed. 02 91)

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

PREDECESSOR FIRM DESIGNATION ENDORSEMENT
TO POLICY CG 8681

HOW YOUR COVERAGE IS CHANGED:

UNDER II. DEFINITIONS, "NAMED INSURED", THE FOLLOWING FIRM IS DESIGNATED AS THE "PREDECESSOR FIRM" FOR THE PURPOSE OF THIS POLICY:

　　Thayer & Associates, Ltd
　　Steven J. Thayer

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

CG 79 08 (Ed. 02 91) PRO　　　　Page 1 of 1

 

GREATAMERICAN.
INSURANCE GROUP

Administrative Offices
580 Walnut Street
Cincinnati, Ohio 45202
Tel: 1-813-369-5000

CG7908
(Ed. 02 91)

## THIS ENDORSEMENT AMENDS THE POLICY, PLEASE READ IT CAREFULLY.

## SPECIFIC ATTORNEY(S) PRIOR ACTS EXCLUSION

In consideration of the premium charged, it is hereby understood and agreed that this policy does not apply to any claim arising out of any acts, errors or omissions committed or alleged to have been committed by any of the following insured(s) prior to the Specific Date(s) as set forth below opposite the name of such insured(s):

| | Insured | Specific Date |
|---|---|---|
| 1. | Handler, Thayer & Duggan, LLC | Unlimited |
| 2. | Thomas J. Handler | 11/01/97 |
| 3. | Douglas S. Robson | 01/01/01 |
| 4. | Greg Bertsch | 11/01/00 |
| 5. | Steven Bonneau | 08/19/02 |
| 6. | Susan F. Lilvendahl | 11/17/03 |
| 7. | Philip T. Powers | 11/10/05 |
| 8. | David Michael Henderson | 05/12/06 |
| 9. | Lisa C. Williams | 06/05/06 |
| 10. | Jarrett T. Bostwick | 02/01/06 |
| 11. | Gabriel Tsui | 07/31/06 |
| 12. | | |
| 13. | | |
| 14. | | |
| 15. | | |
| 16. | | |
| 17. | | |
| 18. | | |
| 19. | | |
| 20. | | |
| 21. | | |
| 22. | | |
| 23. | | |
| 24. | | |
| 25. | | |

## All other terms and conditions remain unchanged.

The Named Insured understands and agrees to the above.

Name of Firm: _____

Signature: _____

Date: _____





CG7908
(Ed. 02 91)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### SPECIFIC CLAIM EXCLUSION ENDORSEMENT

This endorsement modifies insurance provided under the following:

### LAWYERS PROFESSIONAL LIABILITY INSURANCE POLICY COVERAGE FORM

In consideration of the premium charged, it is hereby understood and agreed that this policy does not apply to any claim made against any insured arising in whole or in part out of any circumstances, acts, errors, and/or omissions relating to the following claims or incidents:

1. Great Western Bank, as Trustee of James & Cynthia Hilligas Charitable Remainder Unitrust

2.

3.

4.

5.

6.

7.

8.

9.

10.

B  *A3*02/02/07*LPL6*54157-05
0568109

COMPANY COPY

**GREAT AMERICAN.**
INSURANCE GROUP

Administrative Office
580 Walnut Street
Cincinnati, Ohio 45202
Tel: 1-513-369-5000

CG 79 10 (Ed. 02 91)

Policy No.    LPL  665-41-57  - 05
Effective Date of Change  01/29/07

## POLICY CHANGES

| NAMED INSURED AND ADDRESS: | POLICY PERIOD: |
|---|---|
| HANDLER, THAYER & DUGGAN, LLC<br>191 NORTH WACKER DRIVE, 23RD FLOOR<br>CHICAGO, IL  60606-1633 | 12:01 A.M. Standard Time at the<br>address of the Named Insured<br>shown at left.<br>From: 10/06/06     To: 10/06/07 |

| THIS ENDORSEMENT CHANGES THE POLICY.<br><br>PLEASE READ IT CAREFULLY. | CONTACT PERSON AND ADDRESS:<br>RITMAN & ASSOCIATES, INC.<br>1154 CONNER STREET<br>NOBLESVILLE, IN  46060 |
|---|---|

This insurance is underwritten by the:
GREAT AMERICAN INSURANCE COMPANY
(A capital stock corporation)

SPECIFIC ATTORNEY(S) PRIOR ACTS EXCLUSION ENDORSEMENT CG 7908 IS AMENDED TO
ADD ATTORNEY MICHAEL PASSANANTI EFFECTIVE JANUARY 29, 2007.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

**FORMS AND ENDORSEMENTS** hereby added:   CG7910

**FORMS AND ENDORSEMENTS** hereby amended:   CG7908      CG8682

**FORMS AND ENDORSEMENTS** hereby deleted:

Countersigned _____    By _____
                Date                              Authorized Representative

CG 79 10 (Ed. 02/91) PRO        (Page 1 of 1 )          JSC 02/02/07    Mailed
                                                                        2-9-07

 

**GREATAMERICAN.**
INSURANCE GROUP

Administrative Offices
580 Walnut Street
Cincinnati, Ohio 45202
Tel: 1-513-369-5000

CG7908
(Ed. 02 91)

## THIS ENDORSEMENT AMENDS THE POLICY, PLEASE READ IT CAREFULLY.

### SPECIFIC ATTORNEY(S) PRIOR ACTS EXCLUSION

In consideration of the premium charged, it is hereby understood and agreed that this policy does not apply to any claim arising out of any acts, errors or omissions committed or alleged to have been committed by any of the following Insured(s) prior to the Specific Date(s) as set forth below opposite the name of such Insured(s):

| | Insured | Specific Date |
|---|---|---|
| 1. | Handler, Thayer & Duggan, LLC | Unlimited |
| 2. | Thomas J. Handler | 11/01/87 |
| 3. | Douglas S. Robson | 01/01/01 |
| 4. | Greg Bertsch | 11/01/00 |
| 5. | Steven Bonneau | 08/19/02 |
| 6. | Susan F. Lifvendahl | 11/17/03 |
| 7. | Philip T. Powers | 11/10/05 |
| 8. | David Michael Henderson | 05/12/06 |
| 9. | Lisa C. Williams | 06/05/06 |
| 10. | Jarrett T. Bostwick | 02/01/06 |
| 11. | Gabriel Tsui | 07/31/06 |
| 12. | Ryan Michael Knoll | 10/23/06 |
| 13. | Michael Passananti | 01/29/07 |
| 14. | | |
| 15. | | |
| 16. | | |
| 17. | | |
| 18. | | |
| 19. | | |
| 20. | | |
| 21. | | |
| 22. | | |
| 23. | | |
| 24. | | |
| 25. | | |

### All other terms and conditions remain unchanged.

The Named Insured understands and agrees to the above.

Name of Firm: _____

Signature: _____

Date: _____

CG 79 08 (Ed. 02 91) PRO                    (Page 1 of 1)

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION AT LEXINGTON**
**CASE NO.: 06-243-JMH**

West Hills Farms, LLC,                                                    **PLAINTIFFS**
Arbor Farms, LLC,
Nelson Breeders, LLC,
MacDonald Stables LLC and
Jaswinder and Monica Grover

v.

ClassicStar, LLC, ClassicStar Farms, LLC,                                **DEFENDANTS**
ClassicStar 2004, LLC,
National Equine Lending Co., LLC,
New NEL, LLC, Geostar Corp.,
Geostar Equine Energy, Inc.,
Tony Ferguson, David Plummer,
ClassicStar Thoroughbreds, LLC,
Spencer Plummer,
Karren Hendrix Stagg Allen & Co.,
Thom Robinson, John Parrot,
First Equine Energy Partners, LLC,
Strategic Opportunity Solutions, LLC d/b/a Buffalo Ranch,
ClassicStar 2005 Powerfoal Stables, LLC,
ClassicStar Farms, Inc.,
GeoStar Financial Services Corp.,
Handler, Thayer & Duggan, LLC,
and John Does 1-3.

## THIRD AMENDED COMPLAINT

For their Third Amended Complaint against the defendants, the Plaintiffs West Hills,

LLC ("West Hills"), Arbor Farms, LLC ("Arbor"), Nelson Breeders, LLC ("Nelson"),

MacDonald Stables LLC ("MacDonald"), and Jaswinder and Monica Grover

("Grovers")(collectively "Plaintiffs"), through counsel, state as follows:

## I. INTRODUCTION AND NATURE OF THE CASE

1.      Acting together, over the past five years, the defendants have converted a thoroughbred horse breeding operation into a vehicle used to defraud unsuspecting purchasers of nearly $600 million.

2.      Operating in a number of states, including Kentucky, defendants aggressively marketed and sold thoroughbred Mare Lease Programs (the "Mare Lease Programs") to wealthy individuals interested in participating in the thoroughbred horse industry.

3.      The United States government is currently pursuing a criminal investigation into the activities of the defendants relating to the Mare Lease Programs, and in February, 2006 acting on federal search warrants, seized the books and records of ClassicStar, LLC.  As a result, the participation of Plaintiffs and all others who participated in the Mare Lease Programs have been called into question.

4.      As described by the defendants, the Mare Lease Programs gave purchasers ownership of thoroughbred breeding interests worth millions of dollars with the potential to own extremely valuable thoroughbred foals as a result of the breeding.  Moreover, by virtue of certain tax benefits associated with the Mare Lease Programs, purchasers could fund their participation with an out-of-pocket outlay of only a fraction of the Mare Lease Program's value.

5.      However, defendants deliberately sold Mare Lease Programs with a total value of tens of millions of dollars greater than the thoroughbred interests owned by defendants could sustain.  Defendants contrived to disguise this fact by substituting non-thoroughbred horse pairings for the thoroughbred interests promoted and promised to purchasers and by encouraging participants in the Programs to exchange their Mare Lease interests for interests in a variety of related entities.

2

6.    Defendants touted these related entity investments as having features, such as guaranteed puts or buy backs, which ensure that Purchasers could at the least fully recoup their investments. However, at that time Defendants knew that many of the entities could not meet their future obligations because their ability depended on the existence of sufficiently valuable Mare Lease interests or because those entities were overcommitted.

7.    By these means, in 2004 alone, the defendants succeeded, by virtue of their fraudulent practices, in selling more than $160 million dollars of Mare Lease Programs at a time when defendants owned only approximately $40 million of thoroughbred equine bloodstock. Plaintiffs' direct losses as a result of this scheme exceed $20 million.

8.    Based on the defendants' fraudulent misrepresentations and other illegal actions in connection with the Mare Lease Programs, Plaintiffs bring this action against defendants pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1961 *et. seq.*, and other federal and state laws. Defendants engaged in such violations directly and as co-conspirators. The state law claims arise out of the same transaction or occurrence or series of transactions or occurrences that form the basis of the RICO cause of action.

## II. PARTIES, JURISDICTION AND VENUE

9.    Plaintiff West Hills is a limited liability company organized and existing under the laws of the state of Oregon with its principal place of business located in Portland, Oregon.

10.    Plaintiff Arbor is a limited liability company organized and existing under the laws of the state of Oregon with its principal place of business located in Portland, Oregon.

11.    Plaintiff Nelson is a limited liability company organized under the laws of the state of Washington with its principal place of business located in Bellevue, Washington.

3

12.     Plaintiff MacDonald is a limited liability company organized under the laws of the state of Wisconsin with its principal place of business located in Wisconsin.

13.     Plaintiffs, Jaswinder and Monica Grover ("Grovers"), are citizens and residents of the State of Nevada.

14.     Defendant David Plummer ("Plummer") is, upon information and belief, a citizen and resident of the State of Utah with a residence or place of business located at Farmington, Utah.

15.     Defendant Spencer Plummer ("Spencer Plummer") is, upon information and belief, a citizen and resident of the State of Utah with a residence or place of business located in Farmington, Utah.

16.     Defendant Tony Ferguson ("Ferguson") is, upon information and belief, a citizen and resident of the State of Florida with a residence or place of business located at Tampa, Florida.

17.     Defendant Karren Hendrix Stagg Allen & Co. ("Karren Hendrix") is, upon information and belief, a citizen and resident of the State of Utah with a place of business located in Salt Lake City, Utah.

18.     Defendant Handler, Thayer & Duggan, LLC ("Handler") is a professional corporation of lawyers and tax consultants with its principal place of business located in Chicago, Illinois.

19.     Defendant Thom Robinson ("Robinson") is, upon information and belief, a citizen and resident of the state of Michigan.

20.     Defendant John Parrot ("Parrot") is, upon information and belief, a citizen of the United States Virgin Islands.

4

21.    Defendant ClassicStar, LLC is a limited liability company organized and existing under the laws of Utah and authorized to conduct business in Kentucky, with a registered agent located in Lexington, Kentucky. ClassicStar and/or ClassicStar Farms, LLC operate two horse farms with approximately 600 acres and have employed approximately 40 individuals in Kentucky.

22.    Defendant ClassicStar Farms, LLC ("ClassicStar Farms") is a limited liability company organized and existing under the laws of Kentucky, with a registered agent located in Lexington, Kentucky.

23.    Defendant ClassicStar Farms, Inc. ("CFI") is a Delaware corporation with its principal place of business in Michigan.

24.    Defendant ClassicStar Thoroughbreds of Kentucky, LLC ("ClassicStar Thoroughbreds") is a limited liability company organized and existing under the laws of Delaware, with a place of business located in Versailles, Kentucky.

25.    Defendant ClassicStar 2004, LLC ("ClassicStar 2004") is or was a limited liability company organized under the laws of Utah, doing business from ClassicStar's offices.

26.    Defendant National Equine Lending Company, LLC ("NELC") is a Utah limited liability company with a registered agent located in Salt Lake City, Utah.

27.    Defendant New NEL, LLC ("New NEL") is a Utah limited liability company with a registered agent located in Salt Lake City, Utah. Upon information and belief, New NEL is the successor-in-interest to NELC.

28.    Defendant GeoStar Corporation ("GeoStar") is a corporation organized and existing under the laws of Delaware with a registered agent located in Michigan. Defendant GeoStar is a closely-held corporation that owns, indirectly through subsidiaries, ClassicStar.

5

Three individuals, Ferguson, Robinson and Parrott, own the primary interest in GeoStar, with a small percentage of GeoStar currently owned or owned in the past by Spencer Plummer. In addition to ClassicStar, GeoStar owns approximately 15% of Gastar Exploration Ltd. ("Gastar"), a publicly traded corporation.

29.    Defendant First Equine Energy Partners LLC ("FEEP") is a limited liability company organized and existing under the laws of Nevada with a place of business located in Tampa, Florida.

30.    Defendant GeoStar Equine Energy, Inc. ("GEEI") is a corporation which is, upon information and belief, organized under the laws of either Delaware or Texas, with its principal place of business in Michigan. Defendants Parrot, Robinson and Ferguson serve as officers and/or directors of GEEI. GEEI is the managing member of FEEP.

31.    Defendant Strategic Opportunity Solutions LLC, d/b/a Buffalo Ranch ("SOS") is a limited liability company organized and existing under the laws of Utah with a place of business located in Utah.

32.    Defendant, GeoStar Financial Services Corp. ("GFS") is, upon information and belief, a corporation organized and incorporated in the State of Delaware, with its principal place of business in Michigan.

33.    Defendant, ClassicStar 2005 Powerfoal Stables, LLC is, upon information and belief, a limited liability company organized and existing under the laws of Delaware, doing business from ClassicStar's offices.

34.    Defendants John Does 1-3 are entities affiliated with GeoStar, SOS or ClassicStar or who participated in or had knowledge of the scheme described herein, and who received the

6

proceeds of the Mare Lease Programs under circumstances making their retention of the benefits of those proceeds improper as against Plaintiffs.

35.     At all times relevant to this Complaint, each of the defendants was and is a "person" as that term is defined in 18 U.S.C. §1961 and used in 18 U.S.C. §1962.

36.     Pursuant to 28 U.S.C. §1331, this Court has original jurisdiction over the subject matter of this case because all of part of the claims arise from the defendants' violations the United States Code, including, *inter alia*, the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. §1961, *et. seq.* It appears that this Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) as it involves citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

37.     This Court has supplemental jurisdiction over the subject matter of the claims asserted herein that arise under state law pursuant to 28 U.S.C. §1367(a) and the doctrines of pendent and ancillary jurisdiction, because the state law claims arise from a common nucleus of operative fact giving rise to the federal claims alleged this case.

38.     This Court has personal jurisdiction over each of the defendants in this action pursuant to 18 U.S.C. §1965(a), (b) and (d) and KRS 454.210, as each regularly transacts business in Kentucky or has minimum contacts with Kentucky, through their involvement with, management of, or receipt of funds from the ClassicStar Mare Lease Programs and the operation of ClassicStar farms in Versailles, Kentucky, such that it is reasonable for this Court to exercise jurisdiction over them.

39.     Venue is proper in this district pursuant to 18 U.S.C. §1965 and 28 U.S.C. §1391 as one or more of the defendants reside, are found, have agents, or transact their affairs within

7

the Lexington jury division of this Court and conducted their fraudulent scheme, through use of the United States Mail or interstate wire communications in an illegal manner, from this District.

### III. PARTICIPATION IN THE THOROUGHBRED INDUSTRY AND TAX TREATMENT

40.     Mare leases represent one alternative method of participating in the thoroughbred industry. Rather than investing in a mare directly by way of purchase, the participant leases the rights to the mare for a breeding season and then purchases a stallion nomination to be used in connection with the leased mare, retaining or selling the foal that results from the breeding. Often the arrangement also includes the price of board for the mare and/or foal insurance.

41.     Mare leases are a recognized mode of participation in the thoroughbred industry. Prior to the acquisition of control by Plummer and Ferguson, ClassicStar's predecessor conducted a well regarded operation that included boarding and leasing of thoroughbred mares.

42.     Participation in the equine industry has certain tax effects. A taxpayer that is actively engaged in the horse business may be entitled to deduct as ordinary and necessary farm business expenses the amounts that he pays in connection with the business during any tax year. Such ordinary expenses can include insurance, board fees, stud fees, and either the depreciation of a mare purchased by the taxpayer or the cost of leasing a mare if the taxpayer chose to enter into a leasing program, rather than make an outright purchase.

43.     When the mare, whether leased or purchased, is bred to a stallion and produces a foal that is sold, the net revenue that is received by the taxpayer may be taxed as ordinary income rather than as capital gains. Because the cost of producing the foal was deducted as an ordinary expense, the taxpayer has no basis in the foal, making the proceeds, net of selling costs, taxable ordinary income.

8

44.    When a taxpayer purchases a horse for breeding or racing purposes and retains ownership for two years before selling the horse, however, any gain on the sale receives capital gains treatment and is subject (in the highest tax bracket) only to 15% taxation, as opposed to the 37% applicable to ordinary income.

45.    A taxpayer may be entitled to deduct his breeding expenses even if the source of his investment is a loan, provided that the requirements of various regulations relating to the loan are met.

## IV.  DEFENDANTS' FRAUDULENT SCHEMES

46.    Since at least 2001, the individual defendants presided over and, in concert with the defendants identified in Count I, *infra*, were associated with and conducted the affairs of an enterprise which systematically and wrongfully obtained hundreds of millions of dollars from purchasers of fraudulent Mare Lease Programs.  These defendants' schemes were presented, marketed and sold to purchasers by these defendants using, *inter alia*, the United States mail and/or interstate wire communications.  The illegal conduct of these defendants included mail fraud, wire fraud, misrepresentation and misappropriation of purchaser's funds.

47.    Prior to 1998, the thoroughbred mare leasing and boarding operation currently controlled by ClassicStar was run by an unrelated entity known as Classic Breeders, LLC ("Classic Breeders").

48.    Classic Breeders owned over 60 mares valued at approximately $6 million, in addition to a number of stallion nominations available for use in connection with the Classic Breeders mares.

49.    Classic Breeders employed both David Plummer and his son Spencer Plummer.

9

50.     In 2000, an entity controlled by David Plummer purchased most of the assets of Classic Breeders and continued its thoroughbred mare operations.

51.     Through its subsidiaries, GeoStar, under Ferguson's control, subsequently acquired ownership of the entity formerly known as Classic Breeders and changed its name to ClassicStar, LLC.

52.     ClassicStar, LLC continued to operate the thoroughbred boarding and mare leasing business, in conjunction with its wholly-owned subsidiary ClassicStar Farms.

53.     ClassicStar also operated its Mare Lease Program sales through other wholly owned and controlled subsidiaries which had no function or existence separate from ClassicStar. For instance, ClassicStar 2004 was formed to facilitate sales from 2004 forward, but at all times functioned as nothing more than another name under which ClassicStar operated its Mare Lease business. Further, ClassicStar's affairs were also conducted through its parent and/or subsidiary companies such as CFI, which contracted with Spencer Plummer for Plummer to act on behalf of ClassicStar, without regard to the separate existence of those companies. Accordingly, all allegations of the Complaint against or referring to "ClassicStar" include both ClassicStar, LLC, ClassicStar 2004, LLC and CFI.

54.     However, subsequent to the acquisition of control by Plummer, GeoStar, and Ferguson, ClassicStar began inflating the value of its Mare Lease Programs and selling far more Programs than the thoroughbred interests owned by ClassicStar could support.

55.     In marketing its Mare Lease Programs, ClassicStar distributed promotional materials both personally through its agents and through the United States mail and other interstate methods of communication.

10

56.    For instance, in mailings addressed to a "Prospective Client, CPA, Attorney or Tax Advisor," David Plummer marketed the ClassicStar Mare Lease Programs as an extremely profitable opportunity, with a historical net cash return on investment of 1133%.

57.    ClassicStar Brochures also touted its ownership of high quality thoroughbred mares and its ability to provide the "Ultimate Tax Solution, which converts ordinary income to long-term capital gains."

58.    Virtually all of the ClassicStar marketing materials provided to Plaintiffs and others described the Programs as an investment in thoroughbreds.    For instance, the Due Diligence and Mare Lease Information Booklet provided to Plaintiffs discussed how mares were bred to "the very best thoroughbred stallions," and another promotional brochure discussed GeoStar's involvement in the Programs through its ownership of a "thoroughbred horse breeding business."

59.    Once ClassicStar had generated interest in its thoroughbred breeding operations, its agents, including Ferguson and Plummer, would make personal presentations regarding the benefits of purchasing a Mare Lease Program.    Often, Plummer would explain the operations of the Kentucky farms, while Ferguson would address the purported financial benefits of the program.

60.    Ferguson was described on materials provided to Plaintiffs and other participants as ClassicStar's Co-Managing Member.    He also was listed as a member of FEEP's advisory committee in its private placement memoranda, as a contact person and tax partner for FEEP, and as President and CEO of Gastar and GeoStar.

11

61.    Ferguson actively took part in the management of ClassicStar's financial operations and provided direction to Plummer regarding the marketing of the Programs, thus furthering the sale of the Programs and the defendants' scheme.

62.    Parrot and Robinson also took active roles in the management of ClassicStar's sale and promotion of the Mare Lease Programs.

63.    Parrot and Robinson, acting as controlling members of GeoStar and ClassicStar and on behalf of ClassicStar, negotiated with various salespeople to pay the salespeople commissions in return for promoting the ClassicStar Mare Lease Programs. For instance, Parrot negotiated an arrangement to pay a commission to the law firm representing Plaintiffs Nelson, West Hills and Arbor Farms, for promoting Plaintiffs' involvement in the Programs, and Robinson, acting on behalf of ClassicStar Farms, signed an employment agreement with Plummer which set forth Plummer's obligations with regard to the promotion of the Mare Lease Programs.

64.    Parrot also reviewed and approved of marketing materials used by ClassicStar, including materials illustrating projected returns on investment and the attorney opinion letters offered to participants to reassure them as to the stability of the Programs.

65.    Spencer Plummer was identified on promotional materials and correspondence as ClassicStar's President and often executed documents comprising the Program, such as the Letters of Intent signed by Plaintiffs and Mare Lease agreements. Spencer Plummer executed MacDonald's initial letter of intent in 2003, which misrepresented the values of the services and equine interests provided in connection with the Programs, signed a similar letter of intent with similar representations with Nelson in 2004, corresponded with Arbor Farms and West Hills regarding how they could achieve the "full tax benefits" of the Programs in August of 2004

12

without disclosing facts material to the tax treatment of the Programs as explained further herein, executed the Mare Leases and other legal documents included in the Plaintiffs' Programs, and executed several agreements in connection with the trade out of MacDonald's equine interests, including MacDonald's FEEP agreement.

66.      Plummer was identified on materials distributed by ClassicStar as ClassicStar's founder. He also acted as ClassicStar's Director of Marketing and the Director of Marketing for GeoStar, and promoted the sale of the Mare Lease Programs, including to Plaintiffs. He also executed legal documents provided to Plaintiffs as ClassicStar's CEO.

67.      In marketing the fraudulent scheme, ClassicStar, Plummer and/or the agents retained by ClassicStar, GeoStar and the individual defendants to promote the Programs explained that the Mare Lease Programs they offered for sale included several components.

68.      The primary component involved participation in the breeding of thoroughbred horses. Participants would receive a list of a ClassicStar thoroughbred mares available for lease and a listing of stallion nominations owned by ClassicStar to be used in connection with the mares.

69.      Once participants indicated their interest in the program, ClassicStar would provide a book detailing the available mares and nominations. Participants would make selections from the catalog and, in most instances, rely on selections made by agents of ClassicStar or ClassicStar Farms after consultation with participants.

70.      ClassicStar's marketing materials and Plummer, Spencer Plummer and other agents of ClassicStar represented that ClassicStar owned the mares and the nominations from which participants would choose their pairings, and that, assuming a successful breeding, the participants would own the thoroughbred foals that would result.

13

71.     ClassicStar, through its marketing materials and its agents, including Plummer, Spencer Plummer and Ferguson, also marketed the Mare Lease Programs as complying with IRS guidelines for generating certain tax benefits.     For example, ClassicStar unequivocally represented that, by following its recommendations regarding participation in the Mare Lease Programs, participants could properly deduct the value of the Mare Lease Programs as ordinary business expenses on their income tax returns.

72.     According to ClassicStar and its agents, the purchase price for the Mare Lease Programs would equal the total value of mare leases, stallion services and pre-paid boarding provided in connection with the mare leases, with the price associated with the mare leases being set at 30% of the market value of the mare as given to the participants.  For instance, Plummer specifically discussed this methodology for establishing the lease fee with Plaintiffs in early meetings regarding their participation.

73.     ClassicStar further represented that the Mare Lease Programs included a feature whereby the participants could defer the profit on the sale of their foals and, by exchanging their interests in the foals or leases for ownership units in one or more limited liability companies or partnerships, obtain capital gains treatment for the income from their participation in the Mare Lease Program (the "alternative investments").

74.     At various times, defendant GeoStar, acting at the direction of Ferguson, Robinson and Parrot, made available both stock and working interests in gas properties which it owned in order to facilitate this aspect of the program and offer further incentive to participants. It did so either by way of direct sales to participants or contributions to alternative investments such as FEEP or similar entities.

14

75.    For instance, participants who chose to subscribe to FEEP units would exchange a portion of their breeding interests for preferred units, which carried with them a "put option" described as providing a guaranteed return.    FEEP's assets purportedly consisted of the contributed breeding rights as well as working interests in a number of gas wells contributed by the owner of the common units, GeoStar Equine Energy, Inc.  In order to make this option more attractive and to reassure participants as to the stability of the investment, GeoStar guaranteed payment on the put.

76.    In addition, Robinson, Ferguson, Plummer and Spencer Plummer served as members of FEEP's Advisory Committee, thus vouching for the legality and stability of the FEEP transaction.

77.    ClassicStar also encouraged participants to purchase more expensive Mare Lease Programs than they otherwise would have by arranging for defendants to borrow a large portion of the necessary funds from a supposedly independent company, NELC.  Thus ClassicStar, through its marketing materials and agents, represented that the participants could purchase the Mare Lease Programs with an initial cash outlay amounting to only a fraction of the value of the total mare lease package, because a substantial portion would be funded by NELC.

78.    As part of this marketing scheme, ClassicStar provided to Plaintiffs and other participants an opinion letter dated September 7, 2001 prepared by Karren Hendrix, essentially vouching for the soundness of the Programs from a tax standpoint.

79.    Terry Green ("Green"), the CPA who prepared this letter, was also identified as ClassicStar's CPA on its marketing materials and served as NELC's accountant as well.

80.    ClassicStar also provided to Plaintiffs and other participants various opinion letters which they obtained from attorneys to whom they paid commissions based on the referral

15

of participants to ClassicStar, including an opinion letter from Handler which essentially vouched for the soundness of the Programs from a tax standpoint.

81.     Participants were also given information regarding the farms operated by ClassicStar Farms, which helped create the appearance of legitimacy by allowing ClassicStar to represent itself as a successful thoroughbred breeding operation.

82.     Thus, the defendants acting together promoted a Program which represented that participants would receive breeding rights (a lease) to a group of thoroughbred mares, along with the right to use ClassicStar's stallion nominations in connection with the leased mares, boarding for the mares and foals, and ownership of the resulting thoroughbred foals. In addition, the participants would be able to deduct the total cost of participating in the Program as an ordinary business expense and would ultimately receive capital gains treatment of the income resulting from their activities.

83.     Defendants marketed the Programs and these features to a number of potential participants, generating more than $500,000,000 in sales between 2001 and 2004.

84.     The defendants misrepresented virtually every material aspect of the Mare Lease Programs and/or concealed material information which they had a duty to disclose. Specifically, defendants led participants, including Plaintiffs, to believe that they were receiving millions of dollars of interests in thoroughbred bloodstock, that the Mare Lease Programs fairly reflected the value of the horses and services involved, and that ClassicStar had structured the Programs so that the financing arrangement qualified with Internal Revenue Service requirements for the deduction taken by purchasers.

85.     In fact, the costs and sales figures used to calculate the historical return on investment were entirely fictional, and they grossly overstated both the actual costs which would

16

have been involved in the Mare Lease Programs and the value of the horses involved. Thus, ClassicStar did not, as represented as a basis for the attorney opinion letter provided to Plaintiffs, charge a fee which reflected the fair market value of the services and property involved.

86.    Moreover, ClassicStar, in conjunction with and/or at the direction of the other defendants, intentionally oversold the Programs, knowing that ClassicStar and/or ClassicStar Farms did not have ownership of the thoroughbred interests necessary to support the valuations placed on the Programs or the number of Programs sold.

87.    For instance, ClassicStar, in 2004, entered into Mare Lease Programs valued at approximately $160 million, with the majority of the Programs consisting of the mare leases and stallion fees. However, ClassicStar's ownership in equine bloodstock for this period was no more than approximately $40 million, one fourth of the value sold.

88.    In fact, in May of 2004, in a letter addressed to "valued clients" including MacDonald, and signed by Spencer Plummer, ClassicStar represented that it had $30 million in available inventory for the upcoming (2004) Program year. It then proceeded to enter into 2004 Programs with the four Plaintiffs alone which had a total cost of $64 million and into 2004 Programs with numerous other purchasers as well.

89.    To conceal this intentional policy of overselling the Mare Lease Programs and further their fraudulent scheme, the defendants contrived to substitute, in large part, non-thoroughbred mares (from a roundup horse breed used to herd livestock in the west) for a number of the thoroughbred mares which should have been included in the Lease. Plaintiffs did not learn of this substitution until after making payment to ClassicStar.

90.    As part of this substitution scheme, SOS, under the direction of Plummer, and other properties owned by ClassicStar Farms were set up to support purported embryo implants

17

from quarter horses into surrogate roundup mares. In theory, the embryo implants would have produced quarter horses, because artificial breeding is allowed in the quarter horse industry. However, upon information and belief, ClassicStar may have owned embryos resulting from certain quarter horse pairings, but it did not own mares sufficient to support even the quarter horse aspect of the program.

91.    Instead, contrary to the representations of Plummer and ClassicStar, Plummer owned the majority of quarter horses included in Plaintiffs' Programs.

92.    Plummer subsequently transferred these quarter horse interests to SOS, which accepted such transfer with knowledge of their lease to Plaintiffs. Thus, SOS and Plummer, by their involvement, contributed to the concealment of the practice of overselling by ClassicStar.

93.    Whether such implants actually occurred or produced foals is unknown. However, Plaintiffs believed, and the defendants led them to believe, that their entire initial investment was in thoroughbred horses: leasing a thoroughbred mare and paying for the services of a thoroughbred stallion to obtain through the breeding process a thoroughbred foal. None of the defendants disclosed the involvement of the quarter horse embryos, surrogate mares or artificial breeding to plaintiffs until Plaintiffs had paid for the Mare Lease Programs.

94.    Defendants further sold as part of the Programs multiple quarter horse embryos from individual mares, with the knowledge that it was highly unlikely that a majority of these embryos would successfully produce foals.

95.    Both because of the substantial possibility that a foal would not result and the price at which quarter horse foals, as opposed to thoroughbred foals, typically sold, the values placed on the (likely fictional) embryos by ClassicStar and Plummer greatly exceeded any

18

reasonable value for such interests, a fact known to ClassicStar, Plummer, and Spencer Plummer at the time they requested payment from Plaintiffs and thereafter.

96.    Plummer or SOS actually owned the quarter horses identified on the schedules of breeding pairings belonging to participants and Plummer prepared these schedules, which included the inflated values and appeared to substantiate the cost of the Program as identified in the Letters of Intent signed by Plummer and/or Spencer Plummer and upon which Plaintiffs based their payments.

97.    Because participants such as Plaintiffs would not own the expected number of thoroughbred foals at the end of the breeding season, defendants knew that participants could not possibly achieve the rate of return represented.

98.    Even if participants elected one of the "alternative investments" offered by ClassicStar, such as FEEP, and contributed a portion of their leases to another entity, their ownership interest in that entity would lack the represented value because the entity would not hold the assets needed to fulfill any put obligations associated with those interests. However, the existence of the alternative investments and the availability of Gastar stocks helped to disguise the lack of adequate thoroughbred mares to sustain the Programs.

99.    Also to facilitate the policy of deliberate overselling, NELC conspired with the other defendants to create a financing plan for the Mare Lease Programs that both helped to conceal the substitution of non-thoroughbreds and led participants, including Plaintiffs, to claim deductions which resulted in tax savings or refunds. By promoting the tax savings, ClassicStar was able to induce participants to purchase more highly priced Mare Lease Programs than they otherwise would have.

100.    NELC was operated for the purpose of facilitating the sale of the Mare Lease Programs, but ClassicStar actually loaned the amounts used to finance the Mare Lease Programs to NELC, a fact not disclosed to Plaintiffs.

101.    This circular loan structure and the ownership in NELC by Plummer's brother-in-law and ClassicStar's CPA Green, a fact also not disclosed to Plaintiffs, together with other irregularities in defendants' transactions have led to a criminal investigation by the Internal Revenue Service, of the programs and practices of ClassicStar and its affiliates, despite the representations by ClassicStar and its agents, including Plummer and Ferguson, that they had disclosed all facts necessary for Plaintiffs to rely on their assurances regarding the proper tax treatment of the expenses.

102.    NELC knowingly conspired with the other defendants to conceal the nature of its dealings with ClassicStar and the overvaluation of the ClassicStar Mare Lease Programs.

103.    Upon information and belief, NELC also accepted a portion of the proceeds of the Mare Lease Programs with knowledge that defendants had obtained same by concealing and misrepresenting certain facts including, *inter alia*, those regarding NELC.

104.    Green continued in his role with NELC with knowledge of the funding of NELC by ClassicStar and, as ClassicStar's accountant, knew or should have known of the overselling of the Mare Lease Programs and the various devices for concealing that overselling. Nonetheless, Green continued to advise participants, including Plaintiffs, through seminars, consultations and a prepared opinion, that the Programs met all IRS requirements for the advertised benefits. Green also assisted in the preparation of marketing materials used by ClassicStar to promote the Mare Lease Programs.

20

105.    Upon information and belief, New NEL is the successor-in-interest to NELC and has continued its operations.

106.    Plummer and/or SOS received substantial payments representing the proceeds of the Mare Lease sales, and other substantial compensation from those sales, with knowledge of the fraudulent nature of the quarter horse embryo program.

107.    Spencer Plummer likewise, with knowledge of the fraud, received commissions and other substantial compensation from the sales.

108.    Defendants GeoStar, Ferguson, Robinson and Parrot also knowingly accepted the proceeds of the other defendants' fraudulent schemes. For instance, early in the history of the Programs, ClassicStar advanced approximately $100 million to GeoStar.

109.    This advance allegedly took place in exchange for GeoStar's agreeing to exchange working gas interests which it owned for participants' equine interests acquired through the Mare Lease Programs.

110.    At various other times, GeoStar, acting at the direction of Ferguson, also made available Gastar stock for exchange and did so with knowledge that the Mare Lease Programs had been substantially overvalued and with the intent of facilitating and concealing the fraudulent schemes.

111.    However, ClassicStar's financial records reflect a net transfer of approximately $40 million to GeoStar in 2004 alone.

112.    Upon information and belief, defendants ClassicStar and/or ClassicStar Farms purchased substantial assets, including thoroughbred mares which they allegedly owned prior to payment by Plaintiffs, with funds received by Plaintiffs in exchange for the fictional thoroughbred interests and the Mare Lease Programs. For instance, in 2004, the year in which

21

all of the Plaintiffs purchased Mare Lease Programs, ClassicStar reportedly spent $9,835,000 for a dozen mares.

113. Further, defendants used a portion of the fraudulently obtained funds to support the activities of ClassicStar, ClassicStar Farms, GeoStar and/or their affiliates, and SOS which accepted the funds with knowledge of the fraud and conspired with the other defendants to conceal the true operation of the Mare Lease Programs.

114. The use of these funds, in operation of the farms, the activities of GeoStar touted as alternative investments, and the marketing of the Mare Lease Programs facilitated the continuation of the fraudulent scheme and enabled the defendants to defraud Plaintiffs.

115. Using these fraudulent schemes, the defendants obtained over $500 million from participants.

116. ClassicStar dispersed a substantial portion of its assets, including approximately 90 broodmares, two of which were the subject of MacDonald's 2005 leases and described as pregnant on the sales catalog, in November 2006.

117. However, under the direction of Ferguson, ClassicStar appears to be continuing to conduct the Mare Leasing business through ClassicStar Thoroughbreds, which now appears to own some of the thoroughbred mares formerly owned by ClassicStar.

118. MacDonald was introduced to the Mare Lease Programs in mid-2003, at a teleconference attended by Plummer and Ferguson. Plummer explained the components of the Programs, including the fees charged in connection with the Programs, the projected returns based on past profits, and the establishment of the mare lease fee at one-third the fair market value of the mares, while Ferguson explained GeoStar's connection with and backing of the Programs. As explained, *supra*, the representations regarding these features were all inaccurate.

119.    At this meeting, the Programs were described by Plummer and Ferguson as thoroughbred breeding Programs, which included a realistic potential for profit based on past experience, the tax benefits described above, and the potential for alternative investments which would maintain the favorable tax treatment promoted by ClassicStar and its agents.  These representations also lacked any basis in fact.

120.    ClassicStar prepared an "Illustration" for MacDonald, presented by Plummer and Ferguson, dated June 18, 2003.  This Illustration identified ClassicStar as "a Division of the GeoStar Group" and offered a net after tax revenue projection on a $19 million payment of $6 million, with options to convert equine interests to methane gas working interests which could then convert to Gastar stock.  The projections contained in this Illustration lacked any factual basis.

121.    In connection with this Illustration, ClassicStar represented that it owned the mares being leased and it would board these mares at ClassicStar Farm's property in Kentucky. In fact, ClassicStar intended to and did lease a number of quarter horses owned by Plummer or SOS.

122.    MacDonald elected to participate in the 2003 Program, and purchase mare leases, based on ClassicStar, Ferguson and Plummer's misrepresentations regarding the value of the mares, their ownership by ClassicStar, the expected return and ClassicStar's conformity to the regulations applicable to the advertised tax benefits.

123.    MacDonald consulted with ClassicStar regarding certain breeding pairs and made payment, through the use of interstate mail and wire, to ClassicStar in the amount of $14 million, consisting of cash and the proceeds of an NELC loan.

124.    Upon receiving its final pairings, after payment, MacDonald objected to the inclusion of many more mares than expected in the Program.

125.    MacDonald subsequently learned from Plummer that ClassicStar lacked available thoroughbreds to fill the Programs it sold and had instead assigned quarter horses to it.

126.    MacDonald objected to this substitution and ClassicStar agreed to exchange its 2003 Program interests for other assets.

127.    It was agreed that the stock would be restricted for one year, after which MacDonald would be free to transfer it.

128.    The stock was not transferred in accordance with the agreement, with the result that MacDonald's ability to transfer the stock was delayed by an additional year during which time the fair market value of the stock declined.

129.    ClassicStar arranged for MacDonald to contribute its remaining 2003 equine interests to FEEP in exchange for preferred units of FEEP of equivalent value.

130.    The units had associated with them both a "put" and a "call" feature. Pursuant to the put, the owners of FEEP units had an option to require FEEP to purchase the units at a fixed price per unit. However, under the FEEP agreement, FEEP would first apply the purchase price to payment of any NELC debt. GeoStar guaranteed the put option.

131.    In reality, FEEP served as a vehicle for concealing the fraudulent valuation of the quarter horse interests, because it virtually guaranteed that participants would not seek other purchasers for those interests and provided a methodology for repayment of the NELC loan which, through the participation of NELC in the scheme, did not reveal that the equine assets securing the loan lacked the value placed on them by ClassicStar.

132.    Because of the gross overvaluation of the equine interests contributed to FEEP, it appears that the FEEP units received by MacDonald cannot have the represented value.

133.    FEEP's other assets purportedly consisted of working interests in gas wells assigned to FEEP by its managing member, GEEI, which is controlled by GeoStar.

134.    However, upon information and belief, these working interests were not assigned or lacked the value represented.

135.    GEEI was aware of this fact and failed to disclose same to MacDonald.

136.    Accordingly, MacDonald's units lack the value represented by ClassicStar and, upon information and belief, FEEP cannot perform its obligation on the put.

137.    Based on assurances from Plummer, in conversations in mid-2004, and from other ClassicStar agents, that MacDonald would receive the expected valuable interests in a proposed 2004 lease program, MacDonald made payments to ClassicStar, through interstate mail and wire, totaling $8 million in 2004.

138.    However, MacDonald's final pairings again did not conform to ClassicStar's representations.

139.    As a result of MacDonald's objections, ClassicStar agreed to trade the equine interests for other assets, including additional FEEP units, various specified thoroughbred breeding interests, and shares of an entity called GeoEquities, which had additional mineral interests.

140.    ClassicStar and FEEP have neither performed these agreements nor fully refunded MacDonald's payment.

25

141.    Upon information and belief, ClassicStar and GeoStar created GeoEquities to function as an alternative investment like FEEP, but contrary to their representations to MacDonald, never funded or operated that entity.

142.    Thus, ClassicStar misrepresented the value of both programs to MacDonald, did not disclose the value of the quarter horse interests, and did not disclose the status of NELC. Plummer and Ferguson made such representations and/or omissions at the meetings described above, and Spencer Plummer executed documents containing the inflated values without disclosing same. Further, neither NELC nor Terry Green disclosed its connection to ClassicStar, despite MacDonald's dealings with NELC as a lender.

143.    Representatives of ClassicStar first approached plaintiff Nelson Breeders in February or March of 2004.

144.    At a March 2004 meeting between representatives of ClassicStar, including Plummer, and Nelson Breeders, ClassicStar provided Nelson Breeders with an "Illustration" of the Mare Lease Program.

145.    The Illustration, which identified ClassicStar as "a division of the GeoStar Group," represented that, for an up-front investment of approximately $2,900,000, Nelson's participation would generate tax savings of approximately $11,000,000 and net after tax mare lease revenue of approximately $9 million.

146.    Nelson Breeders' Illustration also outlined several options to exchange a portion of the Mare Leases for alternative investments, including ownership of an interest in an entity called First Energy Partners, Inc. and exchange of that interest for stock in GasStar, Ltd., a publicly traded company controlled by GeoStar and Ferguson. The Illustration also offered the option of using a percentage of the interests for repayment of the NELC loan and, by virtue of a

26

put option associated with the GasStar stock, provided for a projected net after tax return of 326%. The projections contained in the Illustration lacked any factual basis.

147.    ClassicStar prepared a second Illustration for Nelson Breeders in April 2004, which closely resembled the first except that the alternative investments now involved First Equine Partnership and an entity called GeoEquities LLC.

148.    Plummer met with Nelson Breeders in April 2004 in Lexington, Kentucky, and discussed the Illustration and various features of the Program.

149.    ClassicStar's agents, including Plummer, represented to Nelson that the projections contained in the Illustrations rested on verified past results and that transactions described by the Illustrations would not raise any concerns with the IRS because they were structured to comply with IRS rules and regulations. These representations were false.

150.    Moreover, ClassicStar represented that it owned sufficient thoroughbred interests to justify the cost of the Program and that Nelson Breeders would own any foals resulting from its pairings and be free to sell them, train them, or contribute them to one of the alternative investments at its option. These representations were false.

151.    Nelson Breeders attended additional presentations by Plummer, Ferguson and other representatives of ClassicStar, including Doug Anderson, in May and October of 2004, at which times they explained the Mare Lease Program business model, including the basis for the fees (which was misrepresented), the expected returns (which had no basis in fact), and the tax benefits (which were misrepresented).

152.    Relying on these representations, Nelson Breeders executed a binding letter agreement (with an effective date of April 28, 2004) signed by Spencer Plummer committing it

27

to a schedule of payments and to executing the actual mare lease and boarding agreements after consultation with ClassicStar regarding the particular thoroughbred pairings.

153.    Shortly thereafter Nelson made a payment of $2,812,000 to ClassicStar and continued to make payments and incur obligations (to NELC) totaling $28 million up until the execution of the mare lease and boarding agreements in December 2004. Nelson made such payments through interstate mail and wire in reliance on the representations of ClassicStar and its agents.

154.    Again, ClassicStar and NELC acting through their agents misrepresented the ownership and value of the mares, concealed material facts regarding same, and failed to disclose the NELC connection with ClassicStar.

155.    West Hills attended a presentation by Plummer and Doug Anderson in March-April 2004, in which Plummer made representations regarding the expected returns on the Programs, the tax benefits of the Programs and the costs associated with the Programs. Each of these representations was false, in that the Programs were not structured so as to confer the touted tax benefits and the projected returns and the fees both lacked any basis in fact.

156.    ClassicStar presented an Illustration similar to the Nelson Illustration to West Hills in or around May 2004, in which it represented that for approximately $800,000 upfront, West Hills' participation would generate $3,100,000 in after tax revenue, based on tax savings of approximately $5,800,000 and utilizing a NELC loan of $6,500,000 (half the amount of the total program).

157.    Also in May 2004, Plummer and other agents of ClassicStar explained to West Hills the operation of the Mare Lease Programs, including the methodology of setting the fees based on the fair market value of the interests and services provided at a meeting attended by

28

Plummer. Plummer also met with West Hills in June 2004 and, in addition to the representations described above, explained GeoStar's affiliation with ClassicStar and GeoStar's connection to Gastar, as the majority owner of a publicly traded company.

158.   Again ClassicStar and its agents, including Plummer, represented that the total cost of the Mare Lease Program, (approximately $13,000,000 in West Hills' illustration) reflected 30% of the fair value of the mares, the fair value of the stallion nominations, and the fair value of the services provided by ClassicStar and/or ClassicStar Farms, that ClassicStar had assured the Mare Lease Program's compliance with all IRS requirements, and that historical performance figures supported the projections. All these representations were false.

159.   ClassicStar also falsely represented that West Hills would own any foals resulting from the pairings and that it owned thoroughbred horses sufficient to justify the projections and costs.

160.   Arbor Farms met with Plummer in Oregon in early 2004, where Plummer gave a general description of the programs as thoroughbred breeding operations.

161.   Plummer met with Arbor Farms again prior to May 2004 and explained the fee structure, including the establishment of the Mare Lease fee as 30% of the value of the mare, and the tax benefits as outlined above.

162.   At a subsequent meeting in or around October 2004, Plummer specifically explained the potential financing arrangements available to Arbor through NELC, emphasizing the deductibility of the loan. At no time did Plummer disclose the connection between NELC and ClassicStar.

163.   ClassicStar also provided information, including the Karren Hendrix opinion letter and the attorney opinion letter to Plaintiffs. Green also mailed the ClassicStar tax returns

29

prepared by Karren Hendrix, which grossly overstated the expenses of ClassicStar's operations, to Arbor and West Hills' accountant on or around July 29, 2004.

164.    Agents of ClassicStar and GeoStar, including Ferguson, further sought to reassure Arbor regarding the stability of the Programs by discussing with Arbor GeoStar's oversight of the ClassicStar operations.

165.    In reliance on these representations, including the accuracy of the values in the tax returns, Arbor Farms and West Hills, on or around July 30, 2004, forwarded to ClassicStar executed letter agreements from Plummer and Spencer Plummer committing them to making payment and executing the mare lease and boarding agreements after consultation with ClassicStar regarding the pairings, in essentially the same form as the Nelson agreements.

166.    On September 24, 2004, ClassicStar mailed invoices to West Hills and Arbor Farms for $4,482,494 and $4,491,807, respectively, and included a schedule of additional payments. These amounts were represented to reflect the value of the interests and services to be provided by ClassicStar in connection with the Mare Lease Programs, but were in fact far in excess of the true value of such interests and services.

167.    Thereafter, from October 2004 through December 2004, West Hills and Arbor Farms, in reliance in the invoices and the representations, each paid, by wire and check, approximately $7,000,000 to ClassicStar.

168.    Plaintiffs also executed notes to NELC, in the principal amount of $25,088,000 for Nelson Breeders and $7,000,000 each for West Hills and Arbor Farms. ClassicStar represented to plaintiffs that it had received the proceeds of these loans in letters dated December 23, 2004.

169.    On or around December 23, 2004, each of the plaintiffs executed and sent to ClassicStar the mare lease and breeding agreements making up the body of the program. By this time, in accordance with the terms of the letter agreement, Plaintiffs had already transferred tens of millions of dollars to ClassicStar.

170.    The Leases specifically warranted that ClassicStar owned the mares involved.

171.    The Leases also gave ClassicStar the right to substitute another mare for the thoroughbred mares chosen by defendants, but required that the substitution be of equal value to the original mare.

172.    Unknown to Plaintiffs until well after payment for the 2004 Programs, ClassicStar filled the Nelson, West Hills and Arbor Farms 2004 Programs with a small portion of thoroughbred and a majority of quarter horse pairings.

173.    Accordingly, as described above, these Plaintiffs received only a fraction of the promised value.

174.    Moreover, they did not receive interests in mares owned by ClassicStar, but rather, it appears, in mares owned by Plummer or SOS, for which ClassicStar lacked any rights.

175.    Plaintiffs have therefore suffered the loss of the greater portion of their investments.

176.    Defendants Plummer and ClassicStar subsequently attempted to forestall Plaintiffs' inquiry into this loss by continuing to assure Plaintiffs of the viability of the Programs and by offering investment in FEEP and other GeoStar controlled entities as potential alternatives.

177.    Grovers were introduced to the Mare Lease Program in late 2002/early 2003 in several face-to-face meetings with Plummer and thereafter with Ferguson. Plummer explained

31

the components of the Programs, including the fees charged in connection with the Programs, the projected returns based on past profits, and the establishment of the mare lease fee at one-third the fair market value of the mares, while Ferguson explained GeoStar's connection with and backing of the Programs. As explained, *supra*, the representations regarding these features were all inaccurate.

178.    At these meetings the Programs were described by Plummer and Ferguson as thoroughbred breeding Programs, which included a realistic potential for profit based on past experience, the tax benefits described above, and the potential for alternative investments which would maintain the favorable tax treatment promoted by ClassicStar and its agents. These representations also lacked any basis in fact.

179.    ClassicStar prepared an "Illustration" for Grovers, presented by Plummer and Ferguson, dated October 20, 2003. This Illustration identified ClassicStar as "a Division of the GeoStar Group" and offered a net after tax revenue projection on a $1.085 million payment of $4.823 million, with options to convert equine interests to methane gas working interests which could then convert to Gastar stock. The projections contained in this Illustration lacked any factual basis.

180.    In connection with this Illustration, ClassicStar represented that it owned the mares being leased and it would board these mares at ClassicStar Farm's property in Kentucky. In fact, ClassicStar intended to and did lease a number of quarter horses owned by Plummer or SOS.

181.    ClassicStar also paid Handler to prepare various attorney opinion letters to vouch for the integrity of the Mare Lease Program for use by ClassicStar as a promotional aid in selling

32

their Program including an attorney opinion letter prepared by Handler for Grovers, which opinion letter was provided directly to Grovers.

182.   Grovers elected to participate in the 2003 Program, and purchase mare leases, based on ClassicStar, Ferguson and Plummer's misrepresentations regarding the value of the mares, their ownership by ClassicStar, the expected return and ClassicStar's conformity to the regulations applicable to the advertised tax benefits.

183.   Grover consulted with ClassicStar regarding certain breeding pairs and made payment, through the use of interstate mail and wire, to ClassicStar in the amount of $8,065,112 million, consisting of cash and the proceeds of an NELC loan.

184.   In early 2004, David Plummer and Tony Ferguson recommended to Grovers that they exchange a substantial portion of their equine interests for alternative available investments in oil and gas, which they were told represented a better and more diversified strategy for generating profits.  During this meeting, Plummer and Ferguson assured Grovers that they could convert tax free into these new oil and gas investment opportunities.

185.   Pursuant to this proposal, ClassicStar arranged for Grovers to contribute approximately 60% of their equine interests to FEEP in exchange for preferred units of FEEP of equivalent value.

186.   The units had associated with them both a "put" and a "call" feature.  Pursuant to the put, the owners of FEEP units had an option to require FEEP to purchase the units at a fixed price per unit.  However, under the FEEP agreement, FEEP would first apply the purchase price to payment of any NELC debt.  GeoStar guaranteed the put option.

187.   In reality, FEEP served as a vehicle for concealing the fraudulent valuation of the quarter horse interests, because it virtually guaranteed that participants would not seek other

33

purchasers for those interests and provided a methodology for repayment of the NELC loan which, through the participation of NELC in the scheme, did not reveal that the equine assets securing the loan lacked the value placed on them by ClassicStar.

188. Because of the gross overvaluation of the equine interests contributed to FEEP, it appears that the FEEP units received by Grovers cannot have the represented value.

189. FEEP's other assets purportedly consisted of working interests in gas wells assigned to FEEP by its managing member, GEEI, which is controlled by GeoStar.

190. However, upon information and belief, these working interests were not assigned or lacked the value represented.

191. GEEI was aware of this fact and failed to disclose same to Grovers.

192. Accordingly, Grovers' units lack the value represented by ClassicStar and, upon information and belief, FEEP cannot perform its obligation on the put.

193. In addition, ClassicStar arranged for Grovers to exchange substantially all of their remaining equine interests for an Installment Note in the amount of $3,796,707, payable by a purported GeoStar entity called GeoStar Financial Services Corporation ("GFSC"). Ferguson signed for GFSC. The full Note amount was due and payable on or before July 15, 2007.

194. Upon information and belief, GFSC had no assets, and it has failed to make any of the required payments of its Installment Note to Grovers.

195. Thereafter, in late 2004, based on representations from Plummer and Ferguson and other agents of GeoStar and ClassicStar that the 2003 Mare Lease Program was performing as represented and that their oil and gas investments were generating profits, Grovers purchased an additional $2.2 million of Mare Lease Program interests, the vast majority of which equine interests they exchanged for FEEP units in early 2005.

34

196.    To date, despite demand, Grovers have received no information about their FEEP investments or their installment note, and they have received no payments or installments or other distributions from FEEP or GFSC.

197.    By this complaint, Grovers are exercising their put option with FEEP, and they are demanding that FEEP and/or GeoStar pay them the put price of $1 per unit, or $7,214,335.

## V. THE PREDICATE ACTS

198.    The defendants identified in Count I, *infra*, conspired to and did engage in mail and wire fraud in violation of 18 U.S.C. §1341 or §1343 by using, or causing to be used, the United States mail or interstate wire communications in furtherance of and for the purposes of executing schemes to defraud and to obtain and maintain money by false pretenses. Each use of the mails or interstate wire communications in furtherance of and for the purposes of executing the schemes constitutes a separate and distinct violation of 18 U.S.C. §1341 and/or §1343. Some of the relevant uses are described in, *inter alia*, paragraphs 59, 116, 131, 146, 147, 160, 161, and 162 and on the Schedule attached as Exhibit A and incorporated by reference herein.

199.    The defendants identified in Count I used mail and wire communications to collect the proceeds of the fraudulent scheme, to induce Plaintiffs to forward payments to them, to forestall Plaintiffs' inquiry into the scheme, and to induce Plaintiffs' participation.

200.    The misrepresentations of the defendants identified in Count I using the United States mail and for the purpose of causing the use of the United States mail and interstate wire communications by others were made with the intent to defraud Plaintiffs, and Plaintiffs in fact reasonably relied upon such misrepresentations, including those relating to the nature of the Mare Lease Programs, to their detriment.

35

## COUNT I – RICO
### (by all Plaintiffs against ClassicStar, ClassicStar Farms, ClassicStar 2004, CFI, NELC, New NEL, GeoStar, Ferguson, Plummer and Spencer Plummer, as set forth below)

201.    The allegations of paragraphs 1 – 200 are incorporated by reference as if fully set forth herein.

### Violation of 18 U.S.C. §1962(a), (c) and (d) in connection with ClassicStar, ClassicStar 2004 and ClassicStar Farms

202.    At all times relevant to the Complaint, defendants ClassicStar, ClassicStar 2004 and ClassicStar Farms were each an enterprise as that term is defined in 18 U.S.C. §1961(4) and used in 18 U.S.C. §1962. Each was created and existed as an entity engaged in or affecting interstate commerce apart from the pattern of racketeering activity alleged in this Complaint.

203.    Defendants Ferguson, Plummer, Spencer Plummer, GeoStar, ClassicStar, ClassicStar 2004 and ClassicStar Farms conspired to and did derive or receive income from a pattern of racketeering activity some part of which was invested in and used to operate ClassicStar, ClassicStar 2004 and/or ClassicStar Farms, enabling plaintiffs to be defrauded as set forth herein. Such conduct constituted a violation of 18 U.S.C. §1962(a) and (d).

204.    Each of the defendants identified in this Count was associated with or employed by ClassicStar, ClassicStar 2004 and/or ClassicStar Farms and conspired to and did, as part of that employment or association, conduct or participate in the conduct of the affairs of ClassicStar, ClassicStar 2004 and/or ClassicStar Farms through engaging in a pattern of racketeering activity. Such conduct constituted a violation of 18 U.S.C. §1962(c) and (d).

205.    The actions of each of the defendants identified in this Count, including the conduct of the affairs of ClassicStar, ClassicStar 2004 and/or ClassicStar Farms through a pattern of racketeering activity, took place over a period of at least four years and included multiple acts of mail and wire fraud.

36

206. The defendants identified in this Count have continuously engaged in criminal activities, including, but not limited to, mail or wire fraud, as described in the preceding allegations, as part of their overall scheme for at least four years and will continue indefinitely unless prevented.

207. This pattern of racketeering activity in the conduct of ClassicStar, ClassicStar 2004 and/or ClassicStar Farms, including acts of mail and wire fraud, have occurred within the relevant time periods outlined in 18 U.S.C. §1961(5).

208. Through their conduct of the ClassicStar, ClassicStar 2004 and/or ClassicStar Farms enterprises, the defendants identified in this Count have made or caused to be made or distributed communications by United States mail which included misrepresentations of material fact regarding the Mare Lease Programs and have made or caused to be made interstate wire transfers as a result of such misrepresentations. Examples of such communications and transfers in furtherance of the fraudulent schemes are described in attached A and throughout the preceding allegations, including in Paragraph 164.

209. By virtue of these and similar communications occurring over at least the past four years, the defendants identified in this Count have engaged in and are continuing to engage in an uninterrupted series of predicate acts of mail and wire fraud that were related to one another in furtherance of the fraudulent schemes.

210. As a direct and proximate result of the conduct of the defendants identified in this Count as set forth herein, including their conduct of the affairs of and investment in ClassicStar, ClassicStar 2004 and/or ClassicStar Farms, Plaintiffs were injured in their business and property and continue to suffer injuries, including the amount of their investment and legal expenses.

Violations of 18 U.S.C. §1962(a), (c) and (d) in Connection with GeoStar

37

211.   Also, at all times relevant to the Complaint, defendant GeoStar was an enterprise as that term is defined in 18 U.S.C. §1961(4) and used in 18 U.S.C. §1962. It was created and existed as an entity engaged in or affecting interstate commerce apart from the pattern of racketeering activity alleged in this Complaint.

212.   Defendants Ferguson, Plummer, Spencer Plummer, ClassicStar, ClassicStar 2004 and ClassicStar Farms conspired to and did derive or receive income from a pattern of racketeering activity some part of which was invested in and used to operate GeoStar, enabling plaintiffs to be defrauded as set forth herein. Such conduct constituted a violation of 18 U.S.C. §1962(a) and (d).

213.   Defendants Ferguson, Plummer, Spencer Plummer, ClassicStar, ClassicStar 2004, ClassicStar Farms and NELC each was associated with or employed by GeoStar and conspired to and did, as part of that employment or association, conduct or participate in the conduct of the affairs of GeoStar through engaging in a pattern of racketeering activity.    Such conduct constituted a violation of 18 U.S.C. §1962(c) and (d).

214.   These acts of defendants Ferguson, Plummer, Spencer Plummer, ClassicStar, ClassicStar 2004, ClassicStar Farms and NELC, including the conduct of the affairs of GeoStar through a pattern of racketeering activity, took place over a period of at least four years and included multiple acts of mail and wire fraud.

215.   Defendants Ferguson, Plummer, Spencer Plummer, ClassicStar, ClassicStar 2004, ClassicStar Farms and NELC have continuously engaged in criminal activities including, but not limited to, mail and wire fraud, as part of their overall scheme for at least four years and will continue indefinitely unless prevented.

38

216. This pattern of racketeering activity, including acts of mail fraud and wire fraud, have occurred within the relevant time periods outlined in 18 U.S.C. §1961(5).

217. Through their conduct of the GeoStar enterprise, defendants Ferguson, Plummer, Spencer Plummer, ClassicStar, ClassicStar 2004, ClassicStar Farms and NELC have made or caused to be made or distributed communications by United States mail which included misrepresentations of material fact regarding the Mare Leasing Programs and have made or caused to be made interstate wire transfers as a result of such misrepresentations. Examples of such communications and transfers in furtherance of the fraudulent schemes are described in Exhibit A and throughout the preceding allegations, including at Paragraph 164.

218. By virtue of these and similar communications occurring over at least the past four years, defendants Ferguson, Plummer, Spencer Plummer, ClassicStar, ClassicStar 2004, ClassicStar Farms and NELC have engaged in and are continuing to engage in an uninterrupted series of predicate acts of mail and wire fraud that were related to one another in furtherance of the fraudulent schemes.

219. As a direct and proximate result of this conduct, including defendants Ferguson, Plummer, Spencer Plummer, ClassicStar, ClassicStar 2004, ClassicStar Farms and NELC's conduct of the affairs of and investment in GeoStar, Plaintiffs were injured in their business and property and continue to suffer injuries, including the amounts of their investments and legal expenses.

Violations of 18 U.S.C. §1962(a), (c) and (d) in Connection with the ClassicStar Enterprise

220. At all times relevant to the Complaint, defendants Ferguson, Plummer, Spencer Plummer, the companies which they formed, caused to be formed, or controlled, including ClassicStar, ClassicStar 2004, ClassicStar Farms, GeoStar and NELC, and various agents of

39

those companies constituted an association in fact and therefore are an "enterprise" as that term is defined in 18 U.S.C. §1961(4) and used in 18 U.S.C. §1962 (hereinafter the "ClassicStar Enterprise"). The ClassicStar Enterprise was created and has existed as an ongoing association engaged in or affecting interstate commerce, apart from the pattern of racketeering activity alleged in this Complaint.

221.    Each of the defendants identified in this Count was associated with or employed by the ClassicStar Enterprise and each conspired to and did as part of that employment or association conduct or participate in the conduct of the affairs of the ClassicStar Enterprise through engaging in a pattern of racketeering activity. Such conduct constituted a violation of 18 U.S.C. §1962(c) and (d).

222.    Each of the defendants identified in this Count conspired to and did derive or receive income from a pattern of racketeering activity, some part of which was used to operate the ClassicStar Enterprise, enabling the ClassicStar Enterprise to defraud plaintiffs as set forth herein. Such conduct constituted a violation of 18 U.S.C. §1962(a) and (d).

223.    As a whole, the defendants identified in this Count acted in concert, with specific, well-defined roles in the ClassicStar Enterprise, as described in the preceding allegations, to achieve the common goal of defrauding participants such as the Plaintiffs into making payments for the misrepresented Mare Leasing Programs.

224.    These acts, including the conduct of the affairs of the ClassicStar Enterprise through a pattern of racketeering activity, took place over a period of at least four years and included multiple acts of mail and wire fraud.

40

225.    The defendants identified in this Count have continuously engaged in criminal activities including, but not limited to, mail and wire fraud, as part of their overall scheme for at least four years and will continue indefinitely unless prevented.

226.    This pattern of racketeering activity, including acts of mail fraud and wire fraud, have occurred within the relevant time periods outlined in 18 U.S.C. §1961(5).

227.    Through their conduct of the ClassicStar Enterprise, the defendants identified in this Count have made or caused to be made or distributed communications by United States mail which included misrepresentations of material fact regarding the Mare Leasing Programs and have made or caused to be made interstate wire transfers as a result of such misrepresentations. Examples of such communications and transfers in furtherance of the fraudulent schemes are described in Exhibit A and throughout the preceding allegations, including at Paragraph 164.

228.    By virtue of these and similar communications occurring over at least the past four years, the defendants identified in this Count have engaged in, and are continuing to engage in, an uninterrupted series of predicate acts of mail and wire fraud that were related to one another in furtherance of the fraudulent schemes.

229.    As a direct and proximate result of these defendants' conduct as set forth herein, including the conduct of the affairs of and investment in the ClassicStar Enterprise by the defendants identified in this Count, Plaintiffs were injured in their business and property and continue to suffer injuries, including the amounts of their investments and legal expenses.

230.    Pursuant to 18 U.S.C. §1964(c), Plaintiffs are entitled to recover from the defendants identified in this Count I, jointly and severally, treble damages, their costs and reasonable attorney fees.

41

## COUNT II – COMMON LAW FRAUD
### (by all Plaintiffs against Plummer, Ferguson, Spencer Plummer, ClassicStar, GeoStar, ClassicStar Farms, ClassicStar 2004, CFI, NELC, New NEL, SOS, FEEP, GEEI, Thom Robinson and Jon Parrot)

231. The allegations of paragraphs 1 - 230 are incorporated by reference as if fully set forth herein.

232. In order to induce plaintiffs to purchase the Mare Lease Programs, and with the intent that plaintiffs rely on their representations, the defendants identified above (the "Count II defendants") made certain misrepresentations of material fact and omitted to disclose certain material facts which they had a duty to disclose.

233. As described specifically above, from 2003 on, in promotional materials and in presentations, the Count II defendants either:

(a)    represented to Plaintiffs that Plaintiffs could claim the deductions described in connection with the Mare Lease Programs and that defendants had structured the programs to fall well within IRS requirements for such deductions, that the actions of the defendants complied with all applicable laws, that the Plaintiffs were provided services of value equal to the amounts attributed to the mare leases, stud fees and boarding costs, and that the horses involved in the programs had corresponding value, that all of the horses involved in the programs were thoroughbreds, that all of the horses in the programs were owned by ClassicStar and that the historical figures justified the projected returns referenced in the Illustrations; or

(b)    failed to disclose the relationship between ClassicStar and NELC; failed to disclose the ownership of many of the leased mares by Plummer and/or SOS; and failed to disclose that the majority of the breeding interests being sold to them by ClassicStar and financed by its affiliate NELC were completely bogus or at the least grossly overvalued, rendering them subject to challenge by the IRS; or

42

(c)   knowingly received the proceeds of these fraudulent representations and omissions.

234.   Thus, each of the Count II defendants actively participated in and benefited from the fraudulent scheme through which the Plaintiffs were damaged, as follows:

(a)   defendants Plummer, Spencer Plummer, Ferguson, and defendants ClassicStar, GeoStar, NELC, FEEP and GEEI, through these and other of their agents, misrepresented material facts regarding the Mare Lease Programs, including that defendants had structured the programs to fall well within IRS requirements for such the deductions described in connection with the Mare Lease Programs, that the actions of the defendants complied with all applicable laws, that the Plaintiffs were provided services of value equal to the amounts attributed to the mare leases, stud fees and boarding costs, and that the horses involved in the programs had corresponding value, that all of the horses involved in the programs were thoroughbreds, that all of the horses in the programs were owned by ClassicStar and that the historical figures justified the projected returns referenced in the Illustrations;

(b)   each of these defendants also concealed from Plaintiffs material facts, including the true value of the equine interests involved in the Mare Lease Programs, and the connection between ClassicStar and NELC, while dealing with Plaintiffs under circumstances which created a duty for them to disclose these facts;

(c)   each of these defendants, as well as the defendants ClassicStar Farms, CFI, Robinson, Parrot, SOS and ClassicStar Thoroughbreds, accepted the proceeds of these fraudulent transactions with knowledge of the fraud, thus ratifying the activity and becoming liable therefore.

43

235.    Each of the foregoing representations was false when it was made and each of the omitted facts was one which the Count II defendants had a duty to disclose.

236.    Each of the Count II defendants knowingly profited from the fraudulent practices complained of in this Count.

237.    The Count II defendants knew each representation was false or made same with reckless disregard to the truth or falsity of the misrepresentation, in that they knew they had no basis for the misrepresentation, or intentionally failed to disclose material facts.

238.    Plaintiffs reasonably and justifiably relied on the representations to their detriment by, *inter alia*, their agreement to purchase Mare Lease Programs and their payment for same. The Plaintiffs would not have agreed to purchase the Programs but for the misrepresentations and omissions of the Count II defendants.

239.    Plaintiffs have suffered damages as a direct and proximate result of their reasonable reliance on the misrepresentations of the Count II defendants.

240.    The Count II defendants committed this fraud and made said misrepresentations willfully, wantonly, and with malicious disregard of the rights of the Plaintiffs.

241.    Plaintiffs are entitled to punitive and compensatory damages and/or rescission of the agreements as a result of defendants' fraud.

### COUNT III - NEGLIGENT MISREPRESENTATION
### (by all Plaintiffs against Plummer, Ferguson, Spencer Plummer, ClassicStar, GeoStar, NELC, New NEL, ClassicStar 2004, CFI, GEEI and FEEP)

242.    The allegations of paragraphs 1 - 241 are incorporated by reference as if fully set forth herein.

243.    In order to induce plaintiffs to purchase the Mare Lease Programs, and with the intent that plaintiffs rely on their representations, the defendants named in this Count (the "Count

44

III defendants") made certain misrepresentations of material fact and omitted to disclose certain material facts which they had a duty to disclose.

244.    As described above, from 2004 on, in promotional materials and in presentations, the Count III defendants represented to Plaintiffs that Plaintiffs could claim the deductions described in connection with the Mare Lease Programs and that defendants had structured the programs to fall well within IRS requirements for such deductions, that the actions of the defendants complied with all applicable laws, that the Plaintiffs were provided services of value equal to the amounts attributed to the mare leases, stud fees and boarding costs, and that the horses involved in the programs had corresponding value, that all of the horses involved in the programs were thoroughbreds, that all of the horses in the programs were owned by ClassicStar and that the historical figures justified the projected returns referenced in the Illustrations.  The Count III defendants further failed to disclose the lending relationship between ClassicStar and NELC, the ownership of NELC by a relative of Plummers', and the substitution of round-up mares or quarter horse embryos.

245.    Each of the foregoing representations was false when it was made and each of the omitted facts was one which the Count III defendants had a duty to disclose.

246.    Each of the Count III defendants profited from the misrepresentations and omissions complained of in this Count.

247.    The Count III defendants should have known that each representation was false and that they needed to make additional disclosures in order to prevent what they and/or other representatives of ClassicStar had said to Plaintiffs from being materially misleading.

248.    Plaintiffs reasonably and justifiably relied on the representations to their detriment by, *inter alia*, their agreement to purchase Mare Lease Programs and their payment for same.

The Plaintiffs would not have agreed to purchase the Programs but for the misrepresentations of the Count III defendants.

249.    Plaintiffs have suffered damages as a direct and proximate result of their reasonable reliance on the misrepresentations of the Count III defendants.

250.    The Count III defendants made the representations complained of in this Count in the course of their own business activities and for the avowed reason of guiding Plaintiffs in their business affairs.

## COUNT IV – BREACH OF CONTRACT
### (by all Plaintiffs against ClassicStar and/or ClassicStar 2004)

251.    The allegations of paragraphs 1 - 250 are incorporated by reference as if fully set forth herein.

252.    Defendant ClassicStar and/or ClassicStar 2004 (collectively "ClassicStar") entered into various agreements with Plaintiffs, including the letter agreements, the Mare Lease Agreements, and the Foal Agreements.

253.    ClassicStar failed to fulfill its obligations under these agreements and breached the provisions of these agreements. ClassicStar's breaches include, *inter alia*, its false representation that it owned the mares represented as involved in the Mare Lease Program, its failure to breed the pairs identified on Plaintiffs' schedules, its failure to pay stallion fees as promised, its substitution of quarter horses having significantly less value for thoroughbreds, its failure to obtain insurance as promised and its encumbrance of foals resulting from breedings purchased by Plaintiffs.

254.    As a direct and proximate result of ClassicStar's breaches, Plaintiffs have incurred damages, including the cost of the Mare Lease Programs and lost profits relating to the breeding of the mares.

46

## COUNT V- THEFT BY DECEPTION
### (by all Plaintiffs against Plummer, Spencer Plummer, Ferguson, ClassicStar, GeoStar, NELC, New NEL, ClassicStar Farms, ClassicStar 2004, CFI, Robinson and Parrot)

255.    The allegations of paragraphs 1 - 254 are incorporated by reference as if fully set forth herein.

256.    The defendants named in this Count (the Count V defendants) conspired to and did commit theft by deception as prohibited by KRS 514.040 by obtaining property from the Plaintiffs by deception with the intent to deprive the Plaintiffs of same.

257.    Specifically, the Count V defendants created a false and misleading impression of the horses and services offered in connection with the Mare Lease Programs, through the misrepresentations and other actions described above.

258.    As a direct and proximate result of the deception by the Count V defendants, Plaintiffs paid sums in connection with the Mare Lease Programs, including amounts represented to reflect 30% of the value of the mares, and stud fees and board fees.

259.    Pursuant to KRS 446.070, Plaintiffs are entitled to recover damages directly and proximately resulting from such violation.

## COUNT VI – UNJUST ENRICHMENT
### (by all Plaintiffs against Plummer, Spencer Plummer, Ferguson, Robinson, Parrot, ClassicStar, ClassicStar Farms, ClassicStar 2004, CFI, ClassicStar Thoroughbreds, NELC, New NEL, GeoStar and SOS)

260.    The allegations of paragraphs 1 - 259 are incorporated by reference as if fully set forth herein.

261.    Plaintiffs made payments to ClassicStar and/or NELC based on the false and misleading descriptions of the Mare Lease Programs, the horses involved in the Mare Lease Programs, and the services provided as part of those Mare Lease Programs, as described above

47

and these payments were deposited in or transferred to accounts controlled by the defendants identified in this Count (the "Count VI defendants"), or otherwise placed in their control.

262.    The Count VI defendants used a portion of these funds in furtherance of the fraudulent scheme and a portion to purchase property currently held by the Count VI defendants.

263.    Upon information and belief, a portion of the funds transferred to Count VI defendant Geostar was used in the operation of its business, and specifically to fund gas exploration opportunities which have resulted in profit to Geostar.

264.    The Count VI defendants were not entitled to these funds, which were obtained from Plaintiffs through fraud and improper means, and Plaintiffs would not have transferred the funds had the true nature of the transaction been known.

265.    The Count VI defendants, including defendant Geostar, were unjustly enriched by obtaining proceeds from Plaintiffs by fraud and in exchange for thoroughbred breeding interests never received by Plaintiffs.

266.    As a result of the Count VI defendants' unjust receipt of these sums, Plaintiffs have sustained damages, including the amount of their payments.

## COUNT VII – CONSPIRACY
### (by all Plaintiffs against Plummer, Spencer Plummer, Ferguson, Robinson, Parrot, ClassicStar, ClassicStar Farms, NELC, New NEL, GeoStar, ClassicStar 2004, CFI, GEEI, FEEP, GFS and SOS)

267.    The allegations of paragraphs 1 – 266 are incorporated by reference as if fully set forth herein.

268.    Each of the defendants identified in this Count (the "Count VII defendants") agreed to and acted in concert with the others in carrying out the fraudulent scheme described above.

48

269.    Each of the Count VII defendants performed acts in furtherance of the common fraudulent scheme with the intent that their actions further same.

270.    As described more specifically above, Plummer, Spencer Plummer, Ferguson, ClassicStar, NELC, FEEP, GEEI and GeoStar, *inter alia*, either in person or in documents executed by them made representations or omitted certain material facts in their dealings with the Plaintiffs, while Robinson and Parrot also oversaw the operations of the entities and executed various documents and obtained the services of promoters to further the sale of the Mare Lease Programs. SOS, FEEP, GEEI, ClassicStar Farms, and CFI provided property or services to ClassicStar in furtherance of such sales, and each of these Count VII defendants benefited from the proceeds of the scheme.

271.    Plaintiffs have suffered damages as a result of the Count VII defendants' concerted activities as described above, for which the Count VII defendants are jointly and severally liable.

### COUNT VIII – AIDING AND ABETTING
**(by all Plaintiffs against Plummer, Spencer Plummer, Ferguson, Robinson, Parrot, ClassicStar, ClassicStar Farms, NELC, New NEL, GeoStar, FEEP, ClassicStar 2004, CFI, GFS, GEEI, and SOS)**

272.    The allegations of paragraph 1- 271 are incorporated by reference as if fully set forth herein.

273.    The defendants identified in this Count (the "Count VIII defendants") through the activities described throughout the Amended Complaint, participated in and aided and abetted in commission of the fraudulent scheme by which Plaintiffs were deprived of their property.

274.    The Count VIII defendants undertook such participation and assistance with knowledge of the fraud being committed and with the intent that their actions further same.

49

275.   Plaintiffs have suffered damages as a result of the Count VIII defendants' concerted activities as described above, for which the Count VIII defendants are jointly and severally liable.

## COUNT IX – AGENCY
### (by all Plaintiffs against Plummer, Spencer Plummer, Ferguson, Robinson, Parrot, ClassicStar, ClassicStar Farms, NELC, New NEL, GeoStar, FEEP, ClassicStar 2004, CFI, GFS, GEEI, and SOS)

276.   The allegations of paragraph 1- 275 are incorporated by reference as if fully set forth herein.

277.   The defendants identified in this Count (the "Count IX defendants") each acted as the others' agent and within the scope of their authority as such in furthering the promotion and sale of the Mare Lease Programs as described above, and each is responsible, under principles of agency and respondeat superior, for the misrepresentations, acts and omissions of the others made within the scope of that agency.

## COUNT X – MONEY HAD AND RECEIVED
### (by all Plaintiffs against Plummer, Spencer Plummer, Ferguson, Robinson, Parrot, ClassicStar, ClassicStar Farms, ClassicStar Thoroughbreds, NELC, New NEL, GeoStar, ClassicStar 2004, CFI, and SOS)

278.   The allegations of paragraphs 1 - 277 are incorporated by reference as if fully set forth herein.

279.   The defendants identified in this Count hold funds that in equity and good conscience belong to Plaintiffs, which Plaintiffs are in equity and law entitled to recover.

## COUNT XI – ACCOUNTING
### (by all Plaintiffs against ClassicStar and/or ClassicStar 2004)

280.   The allegations of paragraphs 1 - 279 are incorporated by reference as if fully set forth herein.

281.    As part of the programs, ClassicStar agreed to hold, on behalf of Plaintiffs, title to certain property belonging to Plaintiffs, including the foals resulting from the breedings utilizing the mare leases.

282.    ClassicStar holds such property in trust for and as agent for the Plaintiffs.

283.    Plaintiffs are entitled to an accounting from ClassicStar with regard to that property, including the current status of title to the thoroughbred foals ClassicStar represented as belonging to Plaintiffs, the result of the remaining pairings purchased by Plaintiffs and the disposition of any foals resulting from those pairings.

284.    To the extent that ClassicStar intends to dispose of or distribute such property prior to accounting, such disposition will cause irreparable harm to Plaintiffs for which there is no remedy at law.

## COUNT XII – CONSTRUCTIVE TRUST
### (by all Plaintiffs against all defendants)

285.    The allegations of paragraphs 1 – 285 are incorporated by reference as if fully set forth herein.

286.    Plaintiffs paid ClassicStar tens of millions of dollars between the middle and end of 2004.

287.    ClassicStar did not own the equine interests that it represented to Plaintiffs at the time of these payments; this included some of the mares involved in Plaintiffs' Mare Lease Programs. Further, the true nature of the Mare Lease Programs was misrepresented to Plaintiffs as set forth above.

288.    Upon information and belief, each of the defendants used funds wrongfully acquired from the Plaintiffs to acquire property, including specific thoroughbred mares, currently in their possession.

51

289.   Having obtained Plaintiffs' funds through the improper and fraudulent means described herein, defendants hold those funds or their proceeds in constructive trust for Plaintiffs and must return or account for same.

290.   To the extent that defendants intend to dispose of or distribute such property, such disposition will cause irreparable harm to Plaintiffs for which there is no remedy at law.

## COUNT XIII – ALTER EGO/INSTRUMENTALITY
### (by all Plaintiffs as specified below)

291.   The allegations of paragraphs 1 – 290 are incorporated by reference as if fully set forth herein.

292.   ClassicStar was and is operated by GeoStar, Ferguson, Robinson and Parrott as a mere instrumentality, without observing corporate formalities, without sufficient capital to transact the business it transacted and as a fraud on creditors of that company.

293.   FEEP was and is operated by GeoStar, Ferguson, Parrott and Robinson as a mere instrumentality, without observing corporate formalities, without sufficient capital to transact the business it transacted and as a fraud on creditors of that company.

294.   GeoStar was and is operated by Ferguson, Parrott and Robinson as a mere instrumentality, without observing corporate formalities and as a fraud on creditors of that company.

295.   GEEI was and is operated by GeoStar, Ferguson, Parrott and Robinson as a mere instrumentality, without observing corporate formalities, without sufficient capital to transact the business it transacted and as a fraud on creditors of that company.

296.   GFS was and is operated by GeoStar, Ferguson, Parrott and Robinson as a mere instrumentality, without observing corporate formalities, without sufficient capital to transact the business it transacted and as a fraud on creditors of that company.

52

297.    ClassicStar 2004 was operated by ClassicStar, GeoStar, Ferguson, Robinson and Parrot as a mere instrumentality, without observing corporate formalities, without sufficient capital to transact the business it transacted and as a fraud on creditors of that company.

298.    The controlling defendants exercised control over these entities in such a way as to defraud or harm Plaintiffs.

299.    Each of the controlling defendants received substantial distributions of funds or assets from the controlled entities.

300.    Refusal to disregard the corporate entities in this instance would subject the Plaintiffs to unjust loss or otherwise sanction a fraud.

301.    As a result of the foregoing ClassicStar, GeoStar, Ferguson, Parrot and Robinson are each jointly and severally liable for all the liabilities of ClassicStar 2004; GeoStar, Ferguson, Parrot and Robinson are each jointly and severally liable for all of the liabilities of ClassicStar, GEEI, GFS, and FEEP; and Ferguson, Parrott and Robinson are each jointly and severally liable for all of the liabilities of GeoStar.

## COUNT XIV – FRAUDULENT TRANSFER
### (by all Plaintiffs against Plummer, Spencer Plummer, Ferguson, Robinson, Parrot, ClassicStar Farms, ClassicStar Thoroughbreds, ClassicStar 2004, CFI, NELC, New NEL, GFS, GeoStar and SOS)

302.    The allegations of paragraphs 1 - 301 are incorporated by reference as if fully set forth herein.

303.    ClassicStar made transfers and conveyances of cash and assets, including horses, to, *inter alia*, the defendants identified in this Count with the intent to hinder, delay or defraud its creditors, including Plaintiffs.

304.    The recipients of such transfers had notice of such fraudulent intent at the time of the transfer.

53

305.    Alternatively, ClassicStar made such transfers at a time when it was insolvent and/or for less than a reasonably equivalent consideration from the transferees.

306.    Such transfers have injured Plaintiffs, and Plaintiffs are entitled to recover the transferred assets from the recipients.

## COUNT XV – NEGLIGENT REPRESENTATION
### (by all Plaintiffs against Karren Hendrix)

307.    The allegations of paragraphs 1 – 306 are incorporated by reference as if fully set forth herein.

308.    In its role as ClassicStar's accounting firm, Karren Hendrix prepared opinion letters for ClassicStar which vouched for the soundness from a tax standpoint of ClassicStar's Mare Lease Programs.  Karren Hendrix prepared these opinion letters for the purpose and with the expectation that they would be provided by ClassicStar to a limited number of prospective Program participants.

309.    In addition, in its role as ClassicStar's accounting firm, Karren Hendrix prepared tax returns which grossly overstated the expenses incurred by ClassicStar in the course of its operations.  As with the tax opinions, Karren Hendrix knew that ClassicStar was sharing the contents of its tax returns with the limited number of participants that ClassicStar was approaching to participate in its Programs.  Karren Hendrix should have known that the tax returns would provide false assurance to prospective participants about the integrity of ClassicStar's programs.

310.    By virtue of its opinion letters and tax returns, Karren Hendrix was representing to prospective ClassicStar program participants that these programs were sound and viable from a tax standpoint.

311.    Based on information learned by Karren Hendrix in the course of performing accounting services for ClassicStar, and based on information known by its agent, Green, through his role with NELC, Karren Hendrix should have known that, in order to avoid making the contents of those documents misleading to prospective participants in the ClassicStar programs who reviewed those documents, including Plaintiffs, Karren Hendrix needed to further disclose, *inter alia*, that the breeding interests being provided to Mare Lease Program Purchasers, including Plaintiffs, were either non-existent and/or grossly overstated in value, that ClassicStar was carrying the expenditures it was claiming to make on its equine interests at grossly inflated values and that the loans being offered to finance Mare Lease Program purchases by participants, including Plaintiffs, were not being made by a bona fide independent lender as ClassicStar had represented – all with the result that the deductions that were being represented as available to Program participants were subject to challenge by the Internal Revenue Service.

312.    Karren Hendrix never made these necessary disclosures to Plaintiffs.

313.    Each of the foregoing representations was false when it was made and each of the omitted facts was one which Karren Hendrix had a duty to disclose.

314.    Karren Hendrix profited from the misrepresentations and omissions complained of in this Count.

315.    Karren Hendrix should have known that each representation was false and that it needed to make additional disclosures in order to prevent what it had represented to Plaintiffs from being materially misleading.

316.    Plaintiffs reasonably and justifiably relied on the representations to their detriment by, *inter alia*, their agreement to purchase Mare Lease Programs and their payment for same.

55

317.    Plaintiffs have suffered damages as a direct and proximate result of their reasonable reliance on Karren Hendrix's misrepresentations, for which they are entitled to recover.

318.    Karren Hendrix made the representations complained of in this Count in the course of its business and for the avowed reason of guiding Plaintiffs in their business affairs.

319.    The opinions provided by Karren Hendrix provided legitimacy for the overall ClassicStar Scheme.  Without the overlay of Karren Hendrix and other professionals adding legitimacy to the Programs, Defendants would have been unable to induce Plaintiffs and others to participate in the Programs.  The role of Karren Hendrix and these other professionals in the marketing gave the impression of viability and lawfulness of the Programs and substantially furthered and assisted ClassicStar's efforts in promoting and marketing the Programs; moreover, the participation, opinions and presentations of Karren Hendrix were instrumental in the decision of Plaintiffs and others to participate and continue such participation in the ClassicStar and related exchange Programs.

## COUNT XVI– AIDING AND ABETTING
### (all Plaintiffs against Karren Hendrix)

320.    The allegations of paragraphs 1 - 319 are incorporated by reference as if fully set forth herein.

321.    Karren Hendrix, through the activities described throughout the Amended Complaint, participated in and aided and abetted in the Count II Defendants' commission of the fraud by which Plaintiffs were deprived of their property.

322.    Karren Hendrix undertook such participation and assistance with knowledge of the fraud being committed and with the intent that their actions further same.

56

323.    Plaintiffs have suffered damages as a result of Karren Hendrix' activities in
concert with the Count II Defendants, as described above, for which Karren Hendrix is jointly
and severally liable.

### COUNT XVII– BREACH OF CONTRACT – 2003 PROGRAM
### (by MacDonald against ClassicStar)

324.    The allegations of paragraphs 1 - 323 are incorporated by reference as if fully set
forth herein.

325.    In 2003, MacDonald entered into various agreements with ClassicStar as part of
its 2003 Mare Lease Programs.

326.    When contrary to ClassicStar's representations, ClassicStar substituted quarter
horse pairings for all the breeding pairs purchased by MacDonald, MacDonald contacted
ClassicStar to express his dissatisfaction.

327.    In order to remedy the situation, ClassicStar agreed with MacDonald that they
would cause ClassicStar to sell to MacDonald 1,680,890 shares of Gastar stock having the
approximate value of $5 million in exchange for 1/3 of the interests purchased by MacDonald as
part of the Mare Lease Programs, with the remaining interests to be traded out for units in a
securities offering discussed more fully hereinbelow.

328.    ClassicStar agreed with MacDonald that the stock would be restricted for a period
of one year, but that MacDonald could freely transfer the stock after this period. Instead,
because of, *inter alia*, ClassicStar's failure to transfer the stock at the time promised the stock
remained restricted for two years, thereby preventing MacDonald from transferring the stock.

329.    As a result, MacDonald has suffered damages, including the loss resulting from
his inability to sell the stock at prices prevailing at the expiration of the promised one (1) year
term restriction.

57

## COUNT XVIII – BREACH OF CONTRACT – 2004 PROGRAM
### (by MacDonald against ClassicStar)

330.    The allegations of paragraphs 1 - 329 are incorporated by reference as if fully set forth herein.

331.    In 2004, MacDonald invested $8 million in the ClassicStar Mare Lease Program.

332.    Because ClassicStar had once again assigned to MacDonald pairings consisting entirely of substituted quarter horses, ClassicStar again committed to exchange MacDonald's equine interests for other assets, including, *inter alia*, units in a securities offering discussed hereinbelow, thoroughbred equine interests and units valued at $2 million in an entity known as GeoEquities.

333.    ClassicStar failed to provide MacDonald the promised interests in GeoEquities or any reasonably equivalent alternative thereto

334.    Accordingly, MacDonald has suffered damages, including the loss of $2 million dollars of his payments to ClassicStar in 2004 for which he was promised valuable interests in an entity known as GeoEquities.

## COUNT XIX – DECLARATORY JUDGMENT/ANTICIPATORY BREACH
### (by MacDonald against FEEP and GeoStar)

335.    The allegations of paragraphs 1 - 334 are incorporated by reference as if fully set forth herein.

336.    The FEEP agreement gives MacDonald the right to put his units to FEEP, which is required to, at MacDonald's election, purchase the FEEP units for $1 per unit.

337.    According to the agreement, GeoStar guarantees this purchase.

338.    MacDonald has exercised his put option; neither FEEP nor GeoStar has responded thereto, and based on the prior conduct of defendants in ignoring their obligations to

58

MacDonald and based on the fraudulent conduct by defendants in their operation of FEEP, FEEP cannot meet its obligations to purchase back MacDonald's units and GeoStar will not meet its obligations.

339.    MacDonald, therefore, is entitled to judgment against FEEP and/or GeoStar in the amount of $14,004,828, or $1 per each unit owned by MacDonald.

### COUNT XX – STATE SECURITIES FRAUD
### (by MacDonald and Grovers against FEEP, GeoStar, GEEI, Robinson, Ferguson, Plummer, Spencer Plummer, and ClassicStar)

340.    The allegations of paragraphs 1 – 339 are incorporated by reference as if fully set forth herein.

341.    In addition to the transfer of Gastar stock and other purported consideration, and in order to compensate MacDonald for the unauthorized substitution of quarter horses into his 2003 and 2004 Programs, ClassicStar arranged for the exchange of MacDonald's remaining equine interests for 14,004,828 units in FEEP. Moreover, ClassicStar arranged for the exchange of substantial portions of Grovers' equine interests from their 2003 and 2004 Programs for 7,214,335 units in FEEP.

342.    The FEEP units are securities within the meaning of the relevant state statutes.

343.    The FEEP units were sold in violation of the anti-fraud provisions of the relevant state securities statutes because, *inter alia*: (1) the FEEP Prospectuses and other offering documents delivered to MacDonald and Grovers stated that FEEP owned valuable oil and gas interests contributed to it by a GeoStar affiliate (which interests FEEP did not own and was never intended to own); (2) the FEEP Prospectuses and other offering documents delivered to MacDonald and Grovers stated that FEEP owned valuable equine interests (which interests FEEP did not own and was never intended to own): (3) the FEEP Prospectuses and other offering

documents delivered to MacDonald and Grovers stated that FEEP was a real operating entity (when, in fact, it had no actual operations or assets and was never intended to have any operations or assets).

344.   Moreover, in order to avoid making the representations as to the integrity of the FEEP operations materially misleading, the offerees, including MacDonald and Grovers, needed to be told that FEEP was formed and operated for a criminal purpose of furthering a tax fraud on the United States Government by masking the fact that, unknown to the participants, including MacDonald and Grovers, the quarter horse breeding interests that were being sold to them by ClassicStar and financed for them by ClassicStar's affiliate, NELC, were completely bogus and, as such, their claimed deductions on these interests were subject to challenge.

345.   FEEP is liable to MacDonald and Grovers as the seller of the FEEP units.

346.   The additional defendants identified in this Count (the "Count XX defendants") are each jointly and severally liable to MacDonald and Grovers because they controlled FEEP in connection with the acts complained of, they were privy to and participated in the creation and development of FEEP's records, budgets and reports, they enjoyed significant contact with the other defendants in connection with FEEP and they had access to all company information and were aware of the dissemination of information to MacDonald and Grovers and other investors of information which they could reasonably have determined was false.

347.   The Count XX defendants each knew or reasonably should and could have known in the exercise of reasonable diligence, of the existence of the facts upon which their liability is based.

348.    MacDonald and Grovers did not know and they could not reasonably have known of the true facts complained of herein until after the date that they filed their initial complaint in this action.

349.    As a result, MacDonald and Grovers are entitled to compensatory and/or recessionary damages.

### COUNT XXI – FEDERAL SECURITIES FRAUD
### (by MacDonald and Grovers against FEEP, GeoStar, GEEI, Robinson, Ferguson, Plummer, Spencer Plummer, and ClassicStar)

350.    The allegations of the preceding paragraphs 1 - 349 are incorporated as if fully set forth herein.

351.    The FEEP units are securities within the meaning of the federal securities laws.

352.    The defendants identified in this Count (the "Count XXI defendants") are each responsible, under the group publication doctrine, for the contents, misstatements and omissions contained in the FEEP Prospectuses and other FEEP documents.

353.    By virtue of the representations in the FEEP Prospectuses and other offering documents, the Count XXI defendants falsely represented that FEEP owned valuable equine and oil and gas interests and had legitimate operations. Moreover, FEEP, and the other Count XXII defendants are each responsible for having made the material omission regarding the illegal purposes behind FEEP and the lack of any substantive legitimate purpose and operations of FEEP. Finally, each of the Count XXI defendants is liable as a controlling person of FEEP.

354.    Each of FEEP and the Count XXI defendants made the misrepresentations and omissions complained of in this Count with scienter, that is, with actual knowledge of their falsity or with conscious disregard thereof.

355.    Relying on the representations of the Count XXI defendants contained in the FEEP Prospectuses and other offering documents MacDonald and Grovers exchanged their equine interests for shares of FEEP and suffered damage thereby.

356.    At the time of the misrepresentations and omissions, MacDonald and Grovers did not and could not reasonably have known of their falsity, and they could not reasonably have known of their falsity thereafter until after they filed their original complaint in this action.

357.    As a result, MacDonald and Grovers are entitled to compensatory and/or recessionary damages.

### COUNT XXII – FAILURE TO REGISTER
#### (by MacDonald and Grovers against FEEP, GeoStar, GEEI, Robinson, Ferguson, Plummer, Spencer Plummer, and ClassicStar))

358.    The allegations of paragraphs 1 – 357 are incorporated by reference as if fully set forth herein.

359.    The units of FEEP exchanged with MacDonald and Grovers represent securities subject to registration under federal and state securities law.

360.    Upon information and belief, no exemption from registration applies.

361.    The FEEP units were not registered under either federal or Kentucky or Wisconsin law or Nevada law.

362.    Accordingly, MacDonald and Grovers are entitled to recover from the Count XXII defendants the amounts that they invested in the FEEP shares.

### COUNT XXIII - ACCOUNTING
#### (by Grovers against ClassicStar 2005 Powerfoal Stables, LLC)

363.    The allegations of paragraphs 1 - 362 are incorporated by reference as if fully set forth herein.

364.    After exchanging the majority of their 2003 Program equine interests for other oil and gas related interests as set forth above, Grovers retained interests in three (3) thoroughbred breeding pairings valued by ClassicStar, at the time of their purchase, at over $800,000.

365.    Three thoroughbred foals were produced from these pairings in early 2005.

366.    On April 6, 2005, based on representations by ClassicStar that they could achieve more reliable returns by exchanging their foals to for units in a partnership controlled by ClassicStar consisting of numerous other foals generated from the 2003 Mare Lease Program, Grovers agreed to contribute their 3 thoroughbred foals to ClassicStar 2005 Powerfoal Stables, LLC in exchange for what was represented to be an interest in the Partnership commensurate with the value of their foals.

367.    As represented by ClassicStar 2005 Powerfoal Stables, LLC, the foals owned by the Partnership would be sold as yearlings in 2006, and Grovers would received their prorata distributions at that time.

368.    To date Grovers have received only approximately $365,000 from ClassicStar 2005 Powerfoal Stables, LLC, despite the fact that their foals were valued at far in excess of this sum, and their requests for information as to the status of their interests in the Partnership have gone unheeded.

369.    As partners, Grovers are entitled to an accounting from ClassicStar 2005 Powerfoal Stables, LLC as to the total assets contributed to the Partnership, the current Partnership assets, the Partnership revenues and the Partnership expenses.

## COUNT XXIV - BREACH OF CONTRACT
### (by Grovers against GFS)

370.    The allegations of paragraphs 1 - 369 are incorporated by reference as if fully set forth herein.

371.   In December 2004 Grover entered into an agreement with GFS whereby GFS agreed to pay Grover the sum of $3,796,707 by on or before July 15, 2007.

372.   Despite demand, GFS has failed and refused to pay any of such sums to Grovers.

373.   Accordingly, Grover has suffered damages, including the loss of $3,796,707 of their payments to ClassicStar in 2003 and the costs, including a reasonable attorneys fee, of bringing this action.

### COUNT XXV – DECLARATORY JUDGMENT/ANTICIPATORY BREACH
### (by Grovers against FEEP and GeoStar)

374.   The allegations of paragraphs 1 – 373 are incorporated by reference as if fully set forth herein.

375.   The FEEP agreement gives Grovers the right to put their units to FEEP, which is required to, at Grover's election, purchase the FEEP units for $1 per unit.

376.   According to the agreement, GeoStar guarantees this purchase.

377.   In April or May 2006, Grovers exercised their put option for their 2004 FEEP units.

378.   Moreover, Grovers hereby exercise their put options for their 2005 FEEP units.

379.   Based on the prior conduct of Defendants in ignoring their obligations to Grovers and to other FEEP unit holders exercising their pus options and based on the fraudulent conduct by Defendants in their operation of FEEP, FEEP cannot meet its obligations to purchase back Grover's units and GeoStar will not meet its obligations.

380.   Grovers, therefore, are entitled to judgment against FEEP and/or GeoStar in the amount of $7,214,335, or $1 per each unit owned by Grovers.

64

## COUNT XXVI – BREACH OF CONTRACT – 2004 FEEP AGREEMENT
### (by Grovers against FEEP and GeoStar)

381.    The allegations of paragraphs 1 - 380 are incorporated by reference as if fully set forth herein.

382.    The FEEP agreement gives Grovers the right to put their units to FEEP, which is required to, at Grover's election, purchase the FEEP units for $1 per unit.

383.    According to the agreement, GeoStar guarantees this purchase.

384.    In April or May 2006, Grovers exercised their put option for their 2004 FEEP units.

385.    Neither FEEP nor GeoStar has met its obligations under the FEEP agreement.

386.    Grovers, therefore, are entitled to judgment against FEEP and/or GeoStar in the amount of $1 per each of the 2004 FEEP units.

## COUNT XXVII – NEGLIGENT MISREPRESENTATION
### (by Grovers against Handler)

387.    The allegations of paragraphs 1 - 386 are incorporated by reference as if fully set forth herein.

388.    In their role as ClassicStar's attorneys, Handler prepared opinion letters for ClassicStar which vouched for the soundness from a tax standpoint of ClassicStar's Mare Lease Programs. Handler prepared these opinion letters for the purpose and with the expectation that they would be provided by ClassicStar to a limited number of prospective Program participants.

389.    By virtue of its opinion letters Handler was representing to prospective ClassicStar program participants that these programs were sound and viable from a tax standpoint.

65

390.    Based on information learned by Handler in the course of performing legal services for ClassicStar, Handler should have known that, in order to avoid making the contents of those documents misleading to prospective participants in the ClassicStar programs who reviewed those documents, including Grovers, Handler needed to further disclose, *inter alia,* that the breeding interests being provided to Mare Lease Program Purchasers, including Grovers, were either non-existent and/or grossly overstated in value, that ClassicStar was carrying the expenditures it was claiming to make on its equine interests at grossly inflated values and that the loans being offered to finance Mare Lease Program purchases by participants, including Grovers, were not being made by a bona fide independent lender as ClassicStar had represented – all with the result that the deductions that were being represented as available to Program participants were subject to challenge by the Internal Revenue Service.

391.    Handler never made these necessary disclosures to Grovers.

392.    Each of the foregoing representations was false when it was made and each of the omitted facts was one which Handler had a duty to disclose.

393.    Handler profited from the misrepresentations and omissions complained of in this Count.

394.    Handler should have known that each representation was false and that it needed to make additional disclosures in order to prevent what it had represented to Grovers from being materially misleading.

395.    Grovers reasonably and justifiably relied on the representations to their detriment by, *inter alia*, their agreement to purchase Mare Lease Programs and their payment for same.

396.    Grovers have suffered damages as a direct and proximate result of their reasonable reliance on Handler's misrepresentations, for which they are entitled to recover.

66

397.   Handler made the representations complained of in this Count in the course of its
business and for the avowed reason of guiding Grovers in their business affairs.

398.   The opinions provided by Handler provided legitimacy for the overall ClassicStar
Scheme.   Without the overlay of Handler and other professionals adding legitimacy to the
Programs, Defendants would have been unable to induce Grovers and others to participate in the
Programs.   The role of Handler and other professionals in the marketing gave the impression of
viability and lawfulness of the Programs and substantially furthered and assisted ClassicStar's
efforts in promoting and marketing the Programs; moreover, the participation, opinions and
presentations of Handler were instrumental in the decision of Grovers and others to participate
and continue such participation in the ClassicStar and related exchange Programs.

### COUNT XXVIII – AIDING AND ABETTING
### (by Grovers against Handler)

399.   The allegations of paragraphs 1 - 398 are incorporated by reference as if fully set
forth herein.

400.   Handler, through the activities described throughout the Amended Complaint,
participated in and aided and abetted in commission of the fraudulent scheme by which Grovers
were deprived of their property.

401.   Handler undertook such participation and assistance with knowledge of the fraud
being committed and with the intent that their actions further same.

402.   Grovers have suffered damages as a result of Handler's activities in concert with
the Count II Defendants, as described above, for which Handler is jointly and severally liable.

67

### COUNT XXIX – CONVERSION BREACH OF CONTRACT OR UNJUST ENRICHMENT
### (by West Hills against ClassicStar and Ferguson)

403. The allegations of paragraphs 1 - 402 are incorporated by reference as if fully set forth herein.

404. West Hills purchased, as part of its 2004 Program, the breeding rights to a foal out of Turko's Turn by Gone West.

405. ClassicStar agreed to and did obtain insurance on the Turko's Turn 06 foal for the benefit of West Hills in the amount of $694,000.

406. The Turko's Turn foal has died.

407. ClassicStar has received the $694,000 insurance proceeds due to West Hills as a result of the death of the foal, yet it has refused to pay over the proceeds to West Hills and it has converted those proceeds to its own benefit and use.

408. Such refusal constitutes conversion by ClassicStar, a breach of ClassicStar's agreement with West Hills, or, in the alternative, ClassicStar is unjustly enriched by retaining money which in equity and good conscience belongs to West Hills.

409. West Hills has been damaged by ClassicStar's actions and is entitled to a constructive trust over the proceeds of the policy and/or damages resulting from ClassicStar's actions as described above.

410. By his conduct in directing that ClassicStar retain the proceeds due and owing to West Hills, Ferguson is liable for participating in the conversion by ClassicStar.

### COUNT XXX - PUNITIVE DAMAGES

411. The allegations of paragraphs 1 – 410 are incorporated by reference as if fully set forth herein.

412. The actions of the defendants described above were undertake with fraud, malice and oppression so as to entitle Plaintiffs to punitive damages under applicable law.

WHEREAS, Plaintiffs respectfully demand as follows:

1. judgment upon their complaint against all defendants;

2. compensatory damages;

3. punitive damages;

4. treble damages and attorney fees where authorized;

5. injunctive relief;

6. a constructive trust of assets traceable to payment by Plaintiffs for benefit of Plaintiffs;

7. trial by jury on all issues so triable; and

8. any and all other relief to which Plaintiffs appear entitled.


/s/ Barry D. Hunter
Paul E. Sullivan
Barry D. Hunter
Frost Brown Todd LLC
250 West Main Street, Suite 2700
Lexington, Kentucky 40507-1749
Telephone:    (859) 231-0000
Facsimile:    (859) 231-0011

Robert C. Webb
Frost Brown Todd LLC
400 West Market Street, 32nd Floor
Louisville, Kentucky 40202-3363
Telephone:    (502) 589-5400
Facsimile:    (502) 581-1087

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the Third Amended Complaint has been electronically filed on December 27, 2007, with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the following:

Robert M. Anderson
randerson@vancott.com

Charles R. Brown
crb@clydesnow.com

Neal D. Colton
ncolton@cozen.com

Bethany V. Crawley
bcrawley@fowlerwhite.com

Thomas C. Dearing
tdearing@fowlerwhite.com

T. Parker Douglas
pdouglas@hjdlaw.com

Barbara B. Edelman
Edelman@dinslaw.com,
Stephanie.ross@dinslaw.com

Ronald L. Green
rgreen@bsglex.com

George Edward Henry, II
geh@hwgsg.com

John G. Irvin, Jr.
jirvin@ksattorneys.com

Amanda Brockmann
abrockmann@bsglex.com

Judy A. Clausen
jclausen@murphyandersonlaw.com

Emily H. Cowles
ehc@morganandpottinger.com

Jason W. Crowell
jwcrowell@stoel.com, jalorton@stoel.com,
sea_docket@stoel.com

Nicholas Deenis
ndeenis@stradley.com

Sherryll M. Dunaj
dunajs@stephenslynn.com

Eric D. Freed
efreed@cozen.com, ncolton@cozen.com,
mmerola@cozen.com

David W. Henry
dhenry@addmg.com, abruno@addmg.com

Richard J. Idell
Richard.idell@idellseitel.com,
courts@idellseitel.com,
Elizabeth.rest@idellseitel.com

Brian M. Johnson
bmj@gdm.com, ejk@gdm.com,
ckw@gdm.com

Robert Michael Klein
kleinr@stephenslynn.com

James S. Lowrie
jslowrie@joneswaldo.com

Romaine C. Marshall
rcmarshall@hollandhart.com,
lcpaul@hollandhart.com

Graham N. Morgan
gmorgan@dinslaw.com

David Andrew Owen
dao@gdm.com, ckw@gdm.com

Catherine L. Sakach
csakach@wolfblock.com

J. Ronald Sim
jrsim@stoel.com, jalorton@stoel.com,
sea_docket@stoel.com

Rodney G. Snow
rgs@clydesnow.com, dhales@clydesnow.com

Mary Jane E. Wagg
mwagg@vancott.com,
docketing@vancott.com,
kkatzdorn@vancott.com

T. Scott White
tsw@morganandpottinger.com

Janet Knauss Larsen
larja@fosterpdx.com, erwil@fosterpdx.com,
voldp@fosterpdx.com, reynw@fosterpdx.com,
beldt@fosterpdx.com

Kara Read Marino
kmarino@hwgsg.com

Whitney Howard Mendiondo
Whitney.howard@dinslaw.com,
debra.king@dinslaw.com

Niels P. Murphy
nmurphy@murphyandersonlaw.com,
bblair@murphyandersonlaw.com,
scassidy@murphyandersonlaw.com,
jclausen@murphyandersonlaw.com

Walter A. Romney, Jr.
war@clydesnow.com

Jeffrey Weston Shields
jshields@joneswaldo.com

Christopher B. Snow
cbs@clydesnow.com

Matthew A. Stinnett
mas2@gdm.com, ckw@gdm.com

Scott H. White
shw@morganandpottinger.com

Tracey N. Wise
wisebk@wisedel.com, plickert@wisedel.com

     I further certify that I mailed the foregoing document and the notice of electronic filing by first class mail to the following non-CM/ECF participants on December 27, 2007:

First Equine Energy
37 North Buffalo Road
Farmington, UT  84025

Brian P. Flaherty
Wolf, Block, Schorr & Solis-Cohen
1650 Arch Street
22nd Floor
Philadelphia, PA  19103-2097

Lindsey R. Trowell
Fowler White Boggs & Banker, PA
50 N. Laura Street
Suite 2200
Jacksonville, FL  32202

/s/ Barry D. Hunter
Counsel for West Hills Farms, LLC,
Arbor Farms, LLC,
Nelson Breeders, LLC,
MacDonald Stables LLC
and Jaswinder and Monica Grover

File Date:  _April 29, 2008_

Case No:  _08cv2213_

ATTACHMENT #  _1_

EXHIBIT  _C_

**TAB (DESCRIPTION)**

_____

c

1  RICHARD J. IDELL, ESQ. (SBN 069033)
   ORY SANDEL, ESQ. (SBN 233204)
2  ELIZABETH J. REST, ESQ. (SBN 244756)
3  IDELL & SEITEL LLP
   465 California Street, Suite 300
4  San Francisco, CA 94104
   Telephone: (415) 986-2400
5  Facsimile: (415) 392-9259
6
7  Attorneys for Plaintiffs Gregory R. Raifman and
   Susan Raifman, individually and as Trustees for the
8  Raifman Family Revocable Trust Dated 7/2/03,
9  and Gekko Holdings, LLC, an Alaska
   limited liability company, dba Gekko Breeding and Racing
10
11              UNITED STATES DISTRICT COURT
12              EASTERN DISTRICT OF KENTUCKY
13              CENTRAL DIVISION AT LEXINGTON

| 14 | IN RE CLASSICSTAR MARE LEASE | MDL Docket No. 1877 |
|----|------------------------------|---------------------|
| 15 | LITIGATION | Master File Civil Action No.: 5:07-cv-353-JMH |
| 16 | AND | |
| 17 | GREGORY R. RAIFMAN, individually and as | Eastern Dist. of KY Case No. 5:07-cv-347-JMH |
| 18 | Trustee of the RAIFMAN FAMILY REVOCABLE TRUST DATED 7/2/03, SUSAN | Northern Dist. of CA Case No. 3:07-cv-2552-MJJ |
| 19 | RAIFMAN, individually and as Trustee of the RAIFMAN FAMILY REVOCABLE TRUST | **FIRST AMENDED COMPLAINT** |
| 20 | DATED 7/2/03, and GEKKO HOLDINGS, LLC, | 1.   R.I.C.O. |
| 21 | an Alaska limited liability company, dba GEKKO BREEDING AND RACING, | 2.   COMMON LAW FRAUD |
| 22 | | 3.   AIDING AND ABETTING COMMON LAW FRAUD |
| 23 | Plaintiffs, | 4.   NEGLIGENT MISREPRESENTATION |
| | v. | 5.   BREACH OF CONTRACT |
| 24 | | 6.   RESCISSION OF RELEASE |
| 25 | CLASSICSTAR, LLC, a Utah limited liability company, CLASSICSTAR FARMS, LLC, a | 7.   CONSTRUCTIVE TRUST |
| 26 | Kentucky limited liability company, STRATEGIC OPPORTUNITY SOLUTIONS, LLC, a Utah | 8.   UNJUST ENRICHMENT |
| | | 9.   MONEY AND PROPERTY HAD AND RECEIVED |
| 27 | limited liability company d/b/a BUFFALO RANCH, GEOSTAR CORPORATION, a | 10.  ACCOUNTING |
| 28 | Delaware corporation, S. DAVID PLUMMER, | 11.  CIVIL THEFT |
| | | 12.  AIDING AND ABETTING CIVIL |

                                    1

| | |
|---|---|
| 1  SPENCER D. PLUMMER III, TONY<br>2  FERGUSON, THOMAS ROBINSON, JOHN<br>   PARROT, HANDLER, THAYER & DUGGAN,<br>   LLC, an Illinois Limited Liability Company,<br>3  THOMAS J. HANDLER, THOMAS J.<br>4  HANDLER, J.D., P.C., an Illinois professional<br>   corporation, KARREN, HENDRIX, STAGG,<br>5  ALLEN & COMPANY, P.C., a Utah professional<br>   corporation f/k/a KARREN, HENDRIX &<br>6  ASSOCIATES, P.C., a Utah professional<br>   corporation, TERRY L. GREEN, CLASSICSTAR<br>7  FARMS, INC., a Delaware corporation, and<br>8  DOES 1-1000 inclusive, | **THEFT**<br>13.  **CONVERSION**<br>14.  **NEGLIGENCE**<br><br>**DEMAND FOR JURY TRIAL** |
| 9        Defendants. | |

10        COMES NOW, Plaintiffs, GREGORY R. RAIFMAN, individually and as Trustee of the

11   RAIFMAN FAMILY REVOCABLE TRUST DATED 7/2/03, SUSAN RAIFMAN, individually and

12   as Trustee of the RAIFMAN FAMILY REVOCABLE TRUST DATED 7/2/03, and GEKKO

13   HOLDINGS, LLC, an Alaska limited liability company, ("Plaintiffs"), by its attorneys IDELL &

14   SEITEL LLP, for its complaint against Defendants CLASSICSTAR, LLC, a Utah limited liability

15   company, CLASSICSTAR FARMS, LLC, a Kentucky limited liability company, STRATEGIC

16   OPPORTUNITY SOLUTIONS, LLC, a Utah limited liability company d/b/a BUFFALO RANCH,

17   GEOSTAR CORPORATION, a Delaware corporation, S. DAVID PLUMMER, SPENCER D.

18   PLUMMER III, TONY FERGUSON, THOMAS ROBINSON, JOHN PARROT, HANDLER,

19   THAYER & DUGGAN, LLC, an Illinois Limited Liability Company, THOMAS J. HANDLER,

20   THOMAS J. HANDLER, J.D., P.C., an Illinois professional corporation, KARREN, HENDRIX,

21   STAGG, ALLEN & COMPANY, P.C., a Utah professional corporation f/k/a KARREN, HENDRIX &

22   ASSOCIATES, P.C., a Utah professional corporation, TERRY L. GREEN, CLASSICSTAR FARMS,

23   INC., a Delaware corporation, and DOES 1-1000 inclusive, states as follows:

24        **I.    INTRODUCTION AND NATURE OF THE CASE**

25        1.    Acting together, during the times alleged herein, the Defendants transformed a

26   thoroughbred horse breeding operation into a vehicle used to defraud unsuspecting individuals and other

27   business owners of millions of dollars, including Plaintiffs herein.

28   //

1        2.      Operating in a number of states, Defendants aggressively marketed and sold
2  thoroughbred Mare Lease Programs (the "Mare Lease Programs") to wealthy individuals interested in
3  participating in the thoroughbred horse industry.

4        3.      On information and belief, the United States government, through the Internal Revenue
5  Service Criminal Investigative Division (IRS-CID), is currently pursuing a criminal investigation into
6  the activities of some or all of the Defendants relating to the Mare Lease Programs.

7        4.      As described by the Defendants, the Mare Lease Programs gave business owners
8  ownership of thoroughbred breeding interests worth millions of dollars with the potential to own
9  extremely valuable thoroughbred foals as a result of the breeding. In addition to ownership of the foals,
10  Plaintiffs were offered the option of trading the Mare Lease interests for other supposedly valuable business
11  opportunities, such as the Purchase and Exchange Program Plaintiffs entered into as alleged below. By
12  participation in Defendants' programs, Plaintiffs believed that they had the opportunity to make at least a
13  thirty (30%) return on their initial business plan. If the programs touted by Defendants had proceeded as
14  promised by Defendants, the Plaintiffs would have received large income amounts from the programs.
15  Although Plaintiffs would have then been obligated to pay taxes on their gains, as an added incentive,
16  Defendants represented that there were certain claimed and represented tax benefits associated with the
17  Mare Lease Programs.

18        5.      However, on information and belief, Defendants deliberately sold Mare Lease Programs
19  with a total value of tens of millions of dollars greater than the thoroughbred interests owned by
20  Defendants could sustain and contrived to disguise this fact by purporting to substitute non-thoroughbred
21  horse pairings for the thoroughbred interests promoted and promised to business owners.

22        6.      Based on the Defendants' fraudulent misrepresentations and other illegal actions
23  in connection with the Mare Lease Programs, Plaintiffs bring this action against Defendants
24  pursuant to the Racketeer Influenced and Corrupt Organizations Act ("R.I.C.O."), 18 U.S.C. § 1961
25  *et seq.*, and other federal and state laws. Some Defendants engaged in such violations directly and some
26  as aiders and abetters. The state law claims arise out of the same transaction or occurrence or series of
27  transactions or occurrences that form the basis of the R.I.C.O. cause of action.

28  //

<div align="center">3</div>

<div align="center">FIRST AMENDED COMPLAINT</div>

## II.    JURISDICTION AND VENUE

7.    At all times relevant to this Complaint, each of the Defendants was and is a "person" as that term is defined in 18 U.S.C. § 1961 and used in 18 U.S.C. § 1962.

8.    Pursuant to 28 U.S.C. § 1331, this Court has original jurisdiction over the subject matter of this case because all or part of the claims arise from the Defendants' violations the United States Code, including, *inter alia*, the Racketeer Influenced Corrupt Organizations Act ("R.I.C.O."), 18 U.S.C. § 1961 *et seq.*

9.    This Court has supplemental jurisdiction over the subject matter of the claims asserted herein that arise under state law pursuant to 28 U.S.C. § 1367(a) and the doctrines of pendent and ancillary jurisdiction because the state law claims arise from a common nucleus of operative facts giving rise to the federal claims alleged this case.

10.    Additionally, even if there were no federal question jurisdiction, this Court has diversity jurisdiction over the case because each of the Plaintiffs is a citizen of the State of California, and each of the Defendants is a citizen of a state other than California, including the States of Utah, Kentucky, Delaware, Florida, Michigan and Illinois.  The amount in controversy exceeds $75,000, exclusive of interest and costs.

11.    This Court has personal jurisdiction over each of the Defendants in this action pursuant to 18 U.S.C. § 1965(a), (b) and (d) and state law, as each transacts business in California or has minimum contacts with California, through the execution of contracts in California, through their involvement with, management of, or receipt of funds from Plaintiffs for the CLASSICSTAR Mare Lease Programs (the "Mare Lease Programs," discussed at length below), such that it is fair and reasonable for this Court to exercise jurisdiction over them.

12.    Venue is proper in this District pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391, as one or more Defendants have agents or transacted their affairs within the District and conducted their fraudulent scheme, through use of the United States Mail or interstate wire communications in an illegal manner, to and from the District.

## III.    THE PLAINTIFFS

13.    Plaintiff GREGORY R. RAIFMAN is, and was at all times material hereto, a citizen and resident of the State of California with a residence located in Piedmont, California.  He is a Trustee

4

FIRST AMENDED COMPLAINT

1   of the RAIFMAN FAMILY REVOCABLE TRUST DATED 7/2/03. GREGORY R. RAIFMAN sues
2   in his individual capacity and as Trustee of the family trust.

3       14.    Plaintiff SUSAN RAIFMAN is, and was at all times material hereto, a citizen and
4   resident of the State of California with a residence located in Piedmont, California. She is a Trustee of
5   the RAIFMAN FAMILY REVOCABLE TRUST DATED 7/2/03. SUSAN RAIFMAN sues in her
6   individual capacity and as Trustee of the family trust.

7       15.    Plaintiff GEKKO HOLDINGS, LLC, ("GEKKO") is, and was at all times material
8   hereto, a limited liability company organized and existing under the laws of Alaska and is qualified to
9   do business in the State of California. GEKKO does business as GEKKO HOLDINGS, LLC and as
10  Gekko Breeding and Racing.

11      16.    Hereafter, GREGORY R. RAIFMAN, individually and as Trustee of the RAIFMAN
12  FAMILY REVOCABLE TRUST DATED 7/2/03, SUSAN RAIFMAN, individually and as Trustee of
13  the RAIFMAN FAMILY REVOCABLE TRUST DATED 7/2/03, and GEKKO HOLDINGS, LLC, an
14  Alaska limited liability company, when not referred to specifically and individually, shall be referred
15  to collectively herein as "Plaintiffs." GREGORY RAIFMAN and SUSAN RAIFMAN are hereinafter
16  referred to as the "RAIFMANS."

17              IV.    **THE DEFENDANTS**

18      17.    Plaintiffs are informed and believe and, on that basis, allege that Defendant
19  CLASSICSTAR, LLC ("CLASSICSTAR") is and/or was, at all times material hereto, a limited
20  liability company organized and existing under the laws of the State of Utah and qualified to do
21  business in the State of Kentucky, with a registered agent located in Lexington, Kentucky.

22      18.    Plaintiffs are informed and believe and, on that basis, allege that Defendant
23  CLASSICSTAR FARMS, LLC ("CLASSICSTAR FARMS LLC") is and/or was, at all times material
24  hereto, a limited liability company organized and existing under the laws of the State of Kentucky,
25  with a registered agent located in Lexington, Kentucky.

26      19.    Plaintiffs are informed and believe and, on that basis, allege that Defendant GEOSTAR
27  Corporation ("GEOSTAR") is a corporation organized and existing under the laws of the State of
28  Delaware, with a registered agent located in Wilmington, Delaware. On information and belief,

1    Defendant GEOSTAR is a closely-held corporation that owns, indirectly through subsidiaries,
2    CLASSICSTAR. On information and belief, three individuals, TONY FERGUSON, THOMAS
3    ROBINSON and JOHN PARROTT, own the primary interests in GEOSTAR, with some percentage of
4    GEOSTAR currently owned, or in the past owned, by S. DAVID PLUMMER. On information and
5    belief, in addition to CLASSICSTAR, GEOSTAR owns approximately 15% of Gastar, a publicly
6    traded corporation.

7        20.    Plaintiffs are informed and believe and, on that basis, allege that Defendant
8    STRATEGIC OPPORTUNITY SOLUTIONS, LLC, a Utah limited liability company d/b/a
9    BUFFALO RANCH ("BUFFALO RANCH") is and/or was, at all times material hereto, a business
10   entity form unknown, with its principal place of business located at 37 N. Buffalo Road, Farmington,
11   Utah 84025, and engaged in the business of, *inter alia*, horse breeding.

12       21.    Plaintiffs are informed and believe and, on that basis, allege that Defendant S. DAVID
13   PLUMMER ("D. PLUMMER") is a citizen and resident of the State of Utah, with a residence or place
14   of business located at Kaysville, Utah. On information and belief, D. PLUMMER was the founder of
15   CLASSICSTAR, and at all times material hereto was a co-owner, CEO, Director of Marketing and
16   President of CLASSICSTAR, and, along with his wife, Debby Plummer, is currently the co-owner of
17   BUFFALO RANCH.

18       22.    Plaintiffs are informed and believe and, on that basis, allege that Defendant SPENCER
19   D. PLUMMER III ("S. PLUMMER") is a citizen and resident of the State of Utah, with a residence or
20   place of business located at Farmington, Utah. On information and belief, at all times material hereto,
21   S. PLUMMER was the President of CLASSICSTAR and is the son of D. PLUMMER.

22       23.    Plaintiffs are informed and believe and, on that basis, allege that Defendant TONY
23   FERGUSON ("FERGUSON") is a citizen and resident of the State of Florida, with a residence or
24   place of business located at or near Tampa, Florida. On information and belief, at all times material
25   hereto, FERGUSON was a co-owner, Chairman and Managing Partner of CLASSICSTAR.

26       24.    Plaintiffs are informed and believe and, on that basis, allege that Defendant THOMAS
27   ROBINSON ("ROBINSON") is an individual whose residence is unknown. On information and
28   belief, at all times relevant hereto, ROBINSON was a manager and co-owner of CLASSICSTAR.

FIRST AMENDED COMPLAINT

1    25.    Plaintiffs are informed and believe and, on that basis, allege that Defendant JOHN
2    PARROT ("PARROT") is an individual whose residence is unknown. On information and belief, at
3    all times relevant hereto, PARROT was a co-owner of CLASSICSTAR.

4    26.    Plaintiffs are informed and believe and, on that basis, allege that Defendant
5    HANDLER, THAYER & DUGGAN, LLC, an Illinois Limited Liability Company ("HANDLER
6    LAW FIRM") is a law firm and limited liability company organized and existing under the laws of the
7    State of Illinois. The HANDLER LAW FIRM is not licensed to practice law in the State of California.
8    On information and belief, at all times relevant hereto, no member of the HANDLER LAW FIRM was
9    licensed to practice law in the State of California.

10    27.    Plaintiffs are informed and believe and, on that basis, allege that Defendant THOMAS
11    J. HANDLER is a citizen and resident of the State of Illinois. On information and belief, THOMAS J.
12    HANDLER is an attorney and managing principal in the HANDLER LAW FIRM. On information
13    and belief, Defendant THOMAS J. HANDLER, J.D., P.C., is an Illinois professional corporation
14    owned and controlled by THOMAS J. HANDLER. THOMAS J. HANDLER and THOMAS J.
15    HANDLER, J.D., P.C. are collectively referred to as "HANDLER." On information and belief,
16    HANDLER is not licensed to practice law in the State of California.

17    28.    Plaintiffs are informed and believe and, on that basis, allege that Defendant KARREN,
18    HENDRIX, STAGG, ALLEN & COMPANY, P.C. f/k/a KARREN, HENDRIX & ASSOCIATES,
19    P.C. ("KARREN, HENDRIX") is an accounting firm and professional corporation organized and
20    existing under the laws of the State of Utah. On information and belief, KARREN, HENDRIX is not
21    licensed in the State of California.

22    29.    Plaintiffs are informed and believe and, on that basis, allege that Defendant TERRY L.
23    GREEN ("GREEN") is a citizen and resident of the State of Utah. On information and belief, TERRY
24    L. GREEN is a Certified Public Accountant employed by Defendant KARREN, HENDRIX. On
25    information and belief, GREEN is not licensed in the State of California.

26    //
27    //
28    //

7

FIRST AMENDED COMPLAINT

30.     Plaintiffs are informed and believe and, on that basis, allege that Defendant CLASSICSTAR FARMS, INC. ("CLASSICSTAR FARMS INC") is and/or was, at all times material hereto, a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 2480 West Campus Drive, Building C, Mt. Pleasant, Michigan 48858.

31.     Plaintiffs do not presently know the true names or capacities of those persons, firms, and entities named herein as DOES 1-1000, however, Plaintiffs are informed and believe and, on that basis, allege that each of the said DOE Defendants is responsible in some manner for the events and happenings herein alleged and for the damages and other injuries suffered and to be suffered by Plaintiffs herein.   Plaintiffs reserve the right to amend this Complaint when the true names and capacities of the said DOE Defendants have in fact been ascertained by Plaintiffs.   Plaintiffs are informed and believe and thereon allege that some of the DOE Defendants named herein are agents, employees or representatives of some of the other DOE Defendants and/or the named defendants and, in doing the things herein alleged, were acting within the course and scope of such agency and employment.

32.     Hereafter, CLASSICSTAR, CLASSICSTAR FARMS LLC, BUFFALO RANCH, GEOSTAR, D. PLUMMER, S. PLUMMER, FERGUSON, ROBINSON, PARROT, HANDLER LAW FIRM, HANDLER, KARREN, HENDRIX, GREEN, CLASSICSTAR FARMS INC. and DOES 1-1000 inclusive, shall be referred to herein collectively as "Defendants."

33.     Hereafter, CLASSICSTAR, CLASSICSTAR FARMS LLC, BUFFALO RANCH, GEOSTAR, D. PLUMMER, S. PLUMMER, FERGUSON, ROBINSON, PARROT, CLASSICSTAR FARMS INC. and DOES 501-1000 inclusive, when not referred to specifically and individually, shall be referred to herein collectively as the "CLASSICSTAR Defendants."

34.     Plaintiffs are informed and believe and, on that basis, allege that, in connection with the acts set forth herein, each of the Defendants acted as alleged herein, both for himself, herself, or itself, and in concert with certain other Defendants, and that certain of the Defendants acted as an agents for each of the other Defendants, and were at all times acting within the course and scope of such agency, with the consent, authorization and/or ratification of the other Defendants, and in furtherance of a common scheme to defraud Plaintiffs.

FIRST AMENDED COMPLAINT

1  35.    Plaintiffs are informed and believe, and on that basis allege, that certain of the
2  Defendants are the alter egos of other Defendants, as follows:

3  a.    Plaintiffs are informed and believe and, on that basis, allege that Defendant
4  GEOSTAR and an as yet undetermined number of the other Defendants and DOE Defendants, and
5  each of them, wholly own and control each other, that certain individual Defendants are the sole
6  stockholders, officers, and directors of GEOSTAR, that GEOSTAR is so controlled by said individual
7  Defendants that the monies of GEOSTAR and of said individual Defendants are commingled and
8  intermingled; that there is a unity of ownership and interest between them; that the credit of one is used
9  for the credit of the other; that the obligations of said individual Defendants are paid by GEOSTAR;
10 that GEOSTAR was formed and capitalized for a sum of money insufficient to meet reasonable
11 requirements of GEOSTAR; that as a result of the foregoing, GEOSTAR is the instrumentality,
12 conduit, adjunct and alter ego of said individual Defendants so as to make GEOSTAR and said
13 individual Defendants the instrumentality, conduit, adjunct and alter ego of GEOSTAR, and said
14 individual Defendants have managed and controlled GEOSTAR to avoid personal liability and to
15 defraud creditors of said individuals and GEOSTAR and that unless the fiction of the separateness of
16 said individuals from GEOSTAR and from each other is ignored, great injustice will result and fraud
17 will be sanctioned, all to the irreparable damage and injury of Plaintiffs, and unless judgment in this
18 action includes said individual Defendants and GEOSTAR, Plaintiffs will be unable to recover and
19 enforce the claims and rights hereinafter referred to.

20 b.    Plaintiffs are informed and believe and, on that basis, allege that Defendant
21 CLASSICSTAR and an as yet undetermined number of the other Defendants and DOE Defendants,
22 and each of them, wholly own and control each other, that certain individual Defendants are the sole
23 stockholders, officers, and directors of CLASSICSTAR, that CLASSICSTAR is so controlled by said
24 individual Defendants that the monies of CLASSICSTAR and of said individual Defendants are
25 commingled and intermingled; that there is a unity of ownership and interest between them; that the
26 credit of one is used for the credit of the other; that the obligations of said individual Defendants are
27 paid by CLASSICSTAR; that CLASSICSTAR was formed and capitalized for a sum of money
28 insufficient to meet reasonable requirements of CLASSICSTAR; that as a result of the foregoing,

9

FIRST AMENDED COMPLAINT

1   CLASSICSTAR is the instrumentality, conduit, adjunct and alter ego of said individual Defendants so
2   as to make CLASSICSTAR and said individual Defendants the instrumentality, conduit, adjunct and
3   alter ego of CLASSICSTAR, and said individual Defendants have managed and controlled
4   CLASSICSTAR to avoid personal liability and to defraud creditors of said individuals and
5   CLASSICSTAR and that unless the fiction of the separateness of said individuals from
6   CLASSICSTAR and from each other is ignored, great injustice will result and fraud will be
7   sanctioned, all to the irreparable damage and injury of Plaintiffs, and unless judgment in this action
8   includes said individual Defendants and CLASSICSTAR, Plaintiffs will be unable to recover and
9   enforce the claims and rights hereinafter referred to.

10          c.    Plaintiffs are informed and believe and, on that basis, allege that Defendant
11  BUFFALO RANCH and an as yet undetermined number of the other Defendants and DOE
12  Defendants, and each of them, wholly own and control each other, that certain individual Defendants
13  are the sole stockholders, officers, and directors of BUFFALO RANCH, that BUFFALO RANCH is so
14  controlled by said individual Defendants that the monies of BUFFALO RANCH and of said individual
15  Defendants are commingled and intermingled; that there is a unity of ownership and interest between
16  them; that the credit of one is used for the credit of the other; that the obligations of said individual
17  Defendants are paid by BUFFALO RANCH; that BUFFALO RANCH was formed and capitalized for
18  a sum of money insufficient to meet reasonable requirements of BUFFALO RANCH; that as a result
19  of the foregoing, BUFFALO RANCH is the instrumentality, conduit, adjunct and alter ego of said
20  individual Defendants so as to make BUFFALO RANCH and said individual Defendants the
21  instrumentality, conduit, adjunct and alter ego of BUFFALO RANCH, and said individual Defendants
22  have managed and controlled BUFFALO RANCH to avoid personal liability and to defraud creditors
23  of said individuals and BUFFALO RANCH and that unless the fiction of the separateness of said
24  individuals from BUFFALO RANCH and from each other is ignored, great injustice will result and
25  fraud will be sanctioned, all to the irreparable damage and injury of Plaintiffs, and unless judgment in
26  this action includes said individual Defendants and BUFFALO RANCH, Plaintiffs will be unable to
27  recover and enforce the claims and rights hereinafter referred to.

28  //

FIRST AMENDED COMPLAINT

1          d.      Plaintiffs are informed and believe and, on that basis, allege that Defendant
2    CLASSICSTAR FARMS LLC and an as yet undetermined number of the other Defendants and DOE
3    Defendants, and each of them, wholly own and control each other, that certain individual Defendants
4    are the sole stockholders, officers, and directors of CLASSICSTAR FARMS LLC, that
5    CLASSICSTAR FARMS LLC is so controlled by said individual Defendants that the monies of
6    CLASSICSTAR FARMS LLC and of said individual Defendants are commingled and intermingled;
7    that there is a unity of ownership and interest between them; that the credit of one is used for the credit
8    of the other; that the obligations of said individual Defendants are paid by CLASSICSTAR FARMS
9    LLC; that CLASSICSTAR FARMS LLC was formed and capitalized for a sum of money insufficient
10   to meet reasonable requirements of CLASSICSTAR FARMS LLC; that as a result of the foregoing,
11   CLASSICSTAR FARMS LLC is the instrumentality, conduit, adjunct and alter ego of said individual
12   Defendants so as to make CLASSICSTAR FARMS LLC and said individual Defendants the
13   instrumentality, conduit, adjunct and alter ego of CLASSICSTAR FARMS LLC, and said individual
14   Defendants have managed and controlled CLASSICSTAR FARMS LLC to avoid personal liability
15   and to defraud creditors of said individuals and CLASSICSTAR FARMS LLC and that unless the
16   fiction of the separateness of said individuals from CLASSICSTAR FARMS LLC and from each other
17   is ignored, great injustice will result and fraud will be sanctioned, all to the irreparable damage and
18   injury of Plaintiffs, and unless judgment in this action includes said individual Defendants and
19   CLASSICSTAR FARMS LLC, Plaintiffs will be unable to recover and enforce the claims and rights
20   hereinafter referred to.

21         e.      Plaintiffs are informed and believe and, on that basis, allege that Defendant
22   CLASSICSTAR FARMS INC. and an as yet undetermined number of the other Defendants and DOE
23   Defendants, and each of them, wholly own and control each other, that certain individual Defendants
24   are the sole stockholders, officers, and directors of CLASSICSTAR FARMS INC., that
25   CLASSICSTAR FARMS INC. is so controlled by said individual Defendants that the monies of
26   CLASSICSTAR FARMS INC. and of said individual Defendants are commingled and intermingled;
27   that there is a unity of ownership and interest between them; that the credit of one is used for the credit
28   of the other; that the obligations of said individual Defendants are paid by CLASSICSTAR FARMS

11

FIRST AMENDED COMPLAINT

1 INC.; that CLASSICSTAR FARMS INC. was formed and capitalized for a sum of money insufficient
2 to meet reasonable requirements of CLASSICSTAR FARMS INC.; that as a result of the foregoing,
3 CLASSICSTAR FARMS INC. is the instrumentality, conduit, adjunct and alter ego of said individual
4 Defendants so as to make CLASSICSTAR FARMS INC. and said individual Defendants the
5 instrumentality, conduit, adjunct and alter ego of CLASSICSTAR FARMS INC., and said individual
6 Defendants have managed and controlled CLASSICSTAR FARMS INC. to avoid personal liability
7 and to defraud creditors of said individuals and CLASSICSTAR FARMS INC. and that unless the
8 fiction of the separateness of said individuals from CLASSICSTAR FARMS INC. and from each other
9 is ignored, great injustice will result and fraud will be sanctioned, all to the irreparable damage and
10 injury of Plaintiffs, and unless judgment in this action includes said individual Defendants and
11 CLASSICSTAR FARMS INC., Plaintiffs will be unable to recover and enforce the claims and rights
12 hereinafter referred to.

13                          V.    **GENERAL ALLEGATIONS**

14         36.    This case represents a classic scheme to defraud. Acting together, the Defendants have
15 utilized a thoroughbred horse breeding operation as a vehicle to defraud unsuspecting business owners
16 of millions of dollars, including Plaintiffs herein.  As a result of Defendants' activities, as alleged
17 herein, Plaintiffs have lost $3.4 million dollars plus pre-judgment interest and have suffered and will
18 suffer other damages as alleged herein.

19             **A. PARTICIPATION IN THE THOROUGHBRED INDUSTRY AND TAX**
20                **TREATMENT**

21         37.    Defendants represented to Plaintiffs that mare leases are an alternative method of
22 participating in the thoroughbred industry.  Rather than purchasing a mare directly, the participant leases
23 the rights to the mare for a breeding season and then selects a stallion nomination to be used in
24 connection with the leased mare, retaining or selling the foal that results from the breeding.  Often,
25 the arrangement also includes the price of board and insurance for the mare and/or foal.

26         38.    Defendants represented to Plaintiffs that mare leases are a recognized mode of participation
27 in the thoroughbred industry.

28 //

---

12

FIRST AMENDED COMPLAINT

39. Defendants represented to Plaintiffs that participation in the equine industry has certain tax effects. Defendants represented that a taxpayer that is actively engaged in the horse business may be entitled to deduct, as ordinary and necessary business expenses, the amounts paid in connection with the business during any tax year. Defendants represented that such ordinary expenses can include insurance, board fees, stud fees, and either the depreciation of a mare purchased by the taxpayer or the cost of leasing a mare, if the taxpayer chooses to enter into a leasing program rather than make an outright purchase.

40. Defendants represented to Plaintiffs that when the mare, whether leased or purchased, is bred to a stallion and produces a foal that is sold, the net revenue that is received by the taxpayer may be taxed as ordinary income rather than as capital gains.

41. Defendants represented to Plaintiffs that because the cost of producing the foal was deducted as an ordinary expense, the taxpayer has no basis in the foal, making the proceeds, net of selling costs, taxable ordinary income.

42. Defendants represented to Plaintiffs that when a taxpayer purchases a horse for breeding or racing purposes and retains ownership for two years before selling the horse, any gain on the sale receives capital gains treatment and is subject (in the highest tax bracket) only to 15% taxation, as opposed to the higher percentages applicable to ordinary income.

## B. DEFENDANTS' FRAUDULENT SCHEMES

43. During the times alleged herein, the Defendants FERGUSON, D. PLUMMER, and S. PLUMMER presided over and, in concert with the other Defendants, were associated with and conducted the affairs of an enterprise which systematically and wrongfully obtained millions of dollars from individuals and other business owners who participated in the Mare Lease Programs. The Defendants' schemes were presented, marketed and sold to individuals and other business owners by the Defendants using, *inter alia,* the United States mail and/or interstate wire communications. The Defendants illegal conduct included mail fraud, wire fraud, misrepresentation and misappropriation of business owners' funds and property.

//

//

FIRST AMENDED COMPLAINT

44.     On information and belief, the thoroughbred mare leasing and boarding operation currently controlled by CLASSICSTAR was originally run by an unrelated entity known as Classic Breeders, LLC.

45.     On information and belief, Classic Breeders, LLC, an entity controlled by D. PLUMMER, owned over 60 mares valued at approximately $6 million, in addition to a number of stallion nominations available for use in connection with the Classic Breeders, LLC mares.

46.     On information and belief, Classic Breeders, LLC employed both D. PLUMMER and his son, S. PLUMMER.

47.     On information and belief, through its subsidiaries, GEOSTAR, under FERGUSON's control, subsequently acquired ownership of Classic Breeders, LLC and changed its name to CLASSICSTAR, LLC.

48.     On information and belief, and as stated in CLASSICSTAR's marketing materials, CLASSICSTAR's Mare Lease Business was formed in 1990 by D. PLUMMER.

49.     On information and belief, CLASSICSTAR continued to operate the thoroughbred boarding and mare leasing business, in conjunction with its wholly-owned subsidiary CLASSICSTAR FARMS LLC.

50.     On information and belief, CLASSICSTAR's affairs were also conducted through its parent and/or subsidiary companies, such as CLASSICSTAR FARMS INC., which contracted with S. PLUMMER for S. PLUMMER to act on behalf of CLASSICSTAR, without regard to the separate existence of the companies.

51.     On information and belief, subsequent to the acquisition of control by D. PLUMMER, GEOSTAR and FERGUSON, CLASSICSTAR began selling far more programs than the thoroughbred interests owned by CLASSICSTAR could support. Upon information and belief, the CLASSICSTAR Defendants began aggressively marketing the Mare Lease Programs to individuals with significant incomes and assets, notwithstanding the fact that CLASSICSTAR only had available a limited number of mares.

//

//

14

FIRST AMENDED COMPLAINT

52.    In marketing its Mare Lease Programs, CLASSICSTAR distributed promotional materials both personally and through its agents, and through the United States mail and other interstate methods of communication.

53.    In promotional materials, D. PLUMMER marketed and represented the CLASSICSTAR Mare Lease Programs as an extremely profitable opportunity, with extremely high historical net cash returns on the initial cash outlay.

54.    In addition to the considerable monetary return on their business that Plaintiffs were promised and as represented by Defendants, CLASSICSTAR brochures also touted its representation of ownership of high quality thoroughbred mares and its ability to provide the "Ultimate Tax Solution, which converts ordinary income to long-term capital gains." It was represented that these were viable tax attributes that would pass review by the Internal Revenue Service.

55.    On information and belief, once CLASSICSTAR had generated interest in its programs through the use of its brokers, agents and others, including FERGUSON, D. PLUMMER and S. PLUMMER, CLASSICSTAR would make personal presentations regarding the financial income and tax benefits of purchasing a Mare Lease Program. D. PLUMMER would explain the operations of the Kentucky farms owned by CLASSICSTAR, while FERGUSON would address the purported financial benefits of the Mare Lease Programs.

56.    In marketing the fraudulent scheme, the Defendants explained that the Mare Lease Programs they offered for sale included several components.

57.    The primary component involved participation in the breeding of thoroughbred horses. On information and belief, participants would receive a list of CLASSICSTAR thoroughbred mares available for lease and a listing of stallion nominations owned by CLASSICSTAR to be used in connection with the mares.

58.    Once participants indicated their interest in the program, the Defendants would provide a book detailing the available thoroughbred mares and nominations. On information and belief, participants would make selections from the catalog and, in some instances, because they were generally novices to the horse breeding industry, and were learning the industry, participants would rely on selections made by agents of CLASSICSTAR who had expertise in the area, after consultation

FIRST AMENDED COMPLAINT

1  with participants.

2      59.    D. PLUMMER, FERGUSON, S. PLUMMER and other agents of CLASSICSTAR
3  represented that CLASSICSTAR owned the mares and the nominations from which participants
4  would choose their pairings, and that, assuming a successful breeding, the participants would own the
5  thoroughbred foals that would result.

6      60.    The Defendants, including D. PLUMMER, S. PLUMMER and FERGUSON, also
7  marketed the Mare Lease Programs and represented the programs as complying with IRS guidelines
8  for generating certain tax benefits.   For example, Defendants unequivocally represented that, by
9  following their recommendations regarding participation in the Mare Lease Programs, participants
10 could properly deduct the value of the Mare Lease Programs as ordinary business expenses on their
11 income tax returns.  Defendants were aided and abetted in those representations by the HANDLER
12 LAW FIRM and KARREN, HENDRIX, the law firm and accounting firm, respectively, who provided
13 written opinions included and used as part of Defendants' marketing materials, and, in the case of the
14 HANDLER LAW FIRM directly to Plaintiffs.  HANDLER and GREEN, on behalf of the HANDLER
15 LAW FIRM and KARREN, HENDRIX, respectively, also personally made representations as to the
16 tax benefits of the Mare Lease Programs to SUSAN RAIFMAN during a CLASSICSTAR marketing
17 event in the Virgin Islands.  At the time these representations were made by HANDLER LAW FIRM,
18 KARREN, HENDRIX, HANDLER and GREEN, Plaintiffs had no reason not to rely upon the
19 representations or to believe those representations to be anything other than accurate.

20     61.    The Defendants also represented that participants in the Mare Lease Program would
21 receive breeding rights (a lease) to a group of thoroughbred mares, along with the right to
22 use CLASSICSTAR's stallion nominations in connection with the leased mares, boarding for the
23 mares and foals and ownership of the resulting thoroughbred foals.  In addition, it was represented that the
24 participants would be able to deduct the total cost of participating in the program as an ordinary and
25 necessary business expense and would ultimately receive capital gains treatment of the income resulting
26 from their activities.  It was also represented that such tax treatment was within Internal Revenue regulations
27 and guidelines.

28 //

<div align="center">16

FIRST AMENDED COMPLAINT</div>

62. The Defendants represented that the participants could participate in the Mare Lease Program with an initial cash outlay amounting to only a portion of the value of the total mare lease package.

63. In the case of Plaintiffs, they made three (3) payments, November 26, 2003, December 22, 2003, and December 26, 2003, that made up the total of their initial business contribution.

64. The Defendants also represented that the Mare Lease Programs included a feature whereby the participants could defer the profit on the sale of their foals by exchanging their interests in the foals or leases for other property or interests in other property.

65. On information and belief, Defendants marketed the Mare Lease Programs and these features to a number of potential participants, generating more than Five Hundred Million Dollars ($500,000,000) in sales between 2000 and 2004.

66. Plaintiffs now are informed and believe that the Defendants misrepresented virtually every material aspect of the Mare Lease Programs. Specifically, Defendants led Plaintiffs to believe that they were receiving millions of dollars of interests in thoroughbred bloodstock, and that CLASSICSTAR had structured the programs so that they qualified with Internal Revenue Service requirements for the deductions taken by business owners.

67. On information and belief, Defendants intentionally oversold the Mare Lease Programs, knowing that CLASSICSTAR and/or CLASSICSTAR FARMS LLC and/or CLASSICSTAR FARMS INC. did not have ownership of thoroughbred interests sufficient to fulfill the number of Mare Lease Programs sold.

68. On information and belief, operating in a number of states, including California, Defendants aggressively marketed and sold thoroughbred Mare Lease Programs to wealthy individuals interested in participating in the thoroughbred horse industry. Defendants touted the income opportunities and tax advantages of the Mare Lease Programs, as well as the opportunity to convert the leases into other types of business interests, to unsuspecting potential lessees, and further asserted that there was "no downside."

69. The Mare Lease Programs purportedly gave business owners ownership of thoroughbred breeding interests worth millions of dollars as well as ownership of extremely valuable

17

FIRST AMENDED COMPLAINT

1  thoroughbred foals born as a result of the breeding.  In inducing Plaintiffs (and others) to enter into the
2  Mare Lease Program, the Defendants specifically represented that:

3      a.    The Mare Lease Program was a viable business structure with a large income
4            potential;
5      b.    In addition to the considerable income Plaintiffs would receive, there were
6            favorable tax attributes which were within Internal Revenue Service guidelines
7            and rules;
8      c.    Participation in the Mare Lease Program would qualify Plaintiffs as "farmers"
9            engaged in the "farming business" for tax purposes;
10     d.    Participation in the Mare Lease Program was not a "hobby," but, in fact, a
11           "business for profit," as those terms are defined by United States Dept. of
12           Treasury Regulations;
13     e.    CLASSICSTAR would use their expertise in the horse breeding, training and
14           racing business to help Plaintiffs qualify as "farmers" as that term is defined by
15           the United States Dept. of Treasury regulations, in the business of horse
16           breeding, training and racing;
17     f.    Capitalization by Plaintiffs in the amount of $3.4 million in the Mare Lease
18           Program would appreciate substantially in value;
19     g.    By their participation in the Mare Lease Program, Plaintiffs would be allowed to
20           deduct all ordinary and necessary expenses paid or incurred during a taxable
21           year in carrying on their Mare Lease business;
22     h.    Breeding costs associated with the Mare Lease Program would be construed as
23           the cost of "raising" horses, rather than the cost of "acquiring" horses, allowing
24           Plaintiffs to choose between capitalizing the costs of the Mare Lease Program or
25           deducting them;
26     i.    The Plaintiffs' participation in the Mare Lease Program would not be classified
27           as a "capital asset" under the Internal Revenue Code;
28     j.    The Plaintiffs' participation in the Mare Lease Program would not be classified

18

FIRST AMENDED COMPLAINT

1     as a "passive activity" by the Internal Revenue Service;

2     k.    The "sham transaction doctrine" would have no application to Plaintiffs'

3     participation in the Mare Lease Program;

4     l.    The Mare Lease Program and the exchange program were legitimate businesses

5     that would result in substantial economic gain; and

6     m.    The tax treatment was within Internal Revenue Service guidelines and rules and

7     Plaintiffs would receive the tax treatment represented by Defendants.

8     70.    Plaintiffs are informed and believe and, on that basis, allege that in order to cover up the

9 fact that the same mares were being marketed and leased to multiple business participants, Defendants

10 encouraged lessees to exchange their interests in the Mare Lease Programs for other business

11 arrangements and opportunities with related entities or, in the case of Plaintiffs, for a business

12 opportunity involving other horses. The CLASSICSTAR Defendants represented that those further

13 business alternatives were "no lose" opportunities with a guaranteed upside for the Plaintiffs (and

14 others like them) a few years down the road. However, the CLASSICSTAR Defendants knew full

15 well that these transactions were unlikely to succeed, as the CLASSICSTAR Defendants were

16 overcommitted and would be unable to honor all of their contractual obligations when they came due.

17 In the case of Plaintiffs, FERGUSON and J. Russell Porter, Chairman, President and Chief Executive

18 Officer of Gastar Exploration, Ltd. ("Gastar"), a publicly traded company, owned by GEOSTAR

19 approached GREGORY R. RAIFMAN at the 2004 Kentucky Derby and attempted to convince him to

20 exchange his eight (8) thoroughbred mares for Gastar stock. FERGUSON and Porter represented that

21 this would be a "like kind" exchange. GREGORY R. RAIFMAN declined. Then, in January of 2005

22 CLASSICSTAR, through FERGUSON, contacted GREGORY R. RAIFMAN by telephone and

23 represented that CLASSICSTAR had a "no lose" business opportunity for Plaintiffs. The offer was to

24 exchange twenty (20) performance quarter horse breeding pairs for the Plaintiffs' interests in their

25 eight (8) thoroughbred mare leases. FERGUSON represented that this particular trade was only being

26 offered to a select group of participants in the Mare Lease Program, which FERGUSON described as

27 those business owners who had contributed to the most valuable Mare Lease interests. The Plaintiffs

28 now know that the purported quarter horse foals do not exist, have never existed and will never exist.

<center>19</center>

<center>FIRST AMENDED COMPLAINT</center>

1 Plaintiffs did not discover that the horses did not exist, and therefore did not discover Defendants'
2 fraud, until the Fall of 2006.

3     71. Defendants were aided and abetted in their fraudulent activities by the HANDLER
4 LAW FIRM, HANDLER and various other lawyer members of that firm, KARREN, HENDRIX, an
5 accounting firm, GREEN, and various other members of that firm, who asserted the marketing and
6 promotion of the scheme by purporting to provide tax and other opinions regarding the validity of the
7 Mare Lease Programs. The opinions of these professionals provided legitimacy for the overall scheme.
8 Without the overlay of these professionals adding legitimacy to the programs, Defendants would have
9 been unable to induce Plaintiffs and others to participate in the programs. The role of these
10 professionals in the marketing gave the impression of viability and lawfulness of the programs and to
11 assist in promoting and marketing the programs; the participation, opinions and presentations of the
12 lawyers and accountants were instrumental in the decision of Plaintiffs and others to participate and
13 continue such participation including participation in the Purchase and Exchange Program.

14     72. Subsequent to the participation in the subject transactions by Plaintiffs, Plaintiffs were
15 notified by the Internal Revenue Service ("IRS") of an audit. That audit process has not been
16 completed, but a notice of proposed disallowance was issued on March 23, 2007. The IRS has notified
17 Plaintiffs that the tax benefits of the programs, as represented by Defendants, are proposed to be
18 disallowed. Plaintiffs will suffer additional damages from the results of that tax audit in the form of
19 potential additional taxes, interest, penalties and costs of defense. Plaintiffs are defending the IRS
20 audit, the outcome of which cannot be predicted.

21     73. Based on the Defendants' fraudulent misrepresentations and other illegal actions in
22 connection with the Mare Lease Programs, Plaintiffs bring this action against Defendants to recover all
23 damages suffered by Plaintiffs. The Defendants engaged in such acts directly and/or as aiders and
24 abetters.

25     **C. MARE LEASE INTERESTS**

26     74. As alleged above, mare leases represent an alternative method of participating in the
27 thoroughbred industry. Rather than acquiring a mare directly by way of purchase, the participant
28 leases the rights to the mare for a breeding season and then selects a stallion to be used in connection

FIRST AMENDED COMPLAINT

1  with the leased mare, retaining or selling the foal that results from the breeding.  Often, the
2  arrangement also includes the price of board for the mare and/or foal and insurance.

3       75.    The CLASSICSTAR Defendants, the HANDLER LAW FIRM and KARREN,
4  HENDRIX represented that participation in the equine industry had certain tax effects.    It was
5  represented that a taxpayer that is actively engaged in the horse business may be entitled to deduct as
6  ordinary and necessary business expenses the amounts paid in connection with the business during any
7  tax year.  It was represented that such ordinary expenses can include insurance, board fees, stud fees,
8  and either the depreciation of a mare purchased by the taxpayer or the cost of leasing a mare, if the
9  taxpayer chose to enter into a leasing program rather than make an outright purchase.  As alleged
10 above, the represented tax benefits have now been proposed to be disallowed by the IRS in an audit of
11 Plaintiffs' tax returns.

12                      **D. MARE LEASE PROGRAM AND PLAINTIFFS**

13      76.    On information and belief, Defendants FERGUSON and D. PLUMMER, presided over
14 and, in concert with, or aided and abetted by, the other Defendants, were associated with and
15 conducted the affairs of an enterprise which systematically and wrongfully obtained hundreds of
16 millions of dollars from individuals and other business owners who participated in Mare Lease
17 Programs.  The Defendants' schemes were presented, marketed and sold to individuals and other
18 business owners by the Defendants using, *inter alia*, the United States mail and/or interstate wire
19 communications.  The Defendants' illegal conduct included mail fraud, wire fraud, misrepresentation
20 and misappropriation of business owners' funds and personal property.

21      77.    On information and belief, in marketing the Mare Lease Programs, CLASSICSTAR and
22 other Defendants distributed promotional materials both personally, through their agents, and through
23 the United States mail and other interstate methods of communication.  On information and belief,
24 CLASSICSTAR offered generous payments to third parties in order to induce the sale of its programs.
25 Plaintiffs were introduced and sold the Mare Lease Programs by Private Consulting Group, Inc.
26 ("PCG"), including Robert L. Keys, President and CEO of PCG, who, on information and belief,
27 received significant undisclosed fees for the referral.  Because of PCG's status as a broker-dealer and
28 registered investment advisor, this association and referral added an additional aura of legitimacy to

1   the program.  PCG had a local Marin County affiliate, Ramos Financial Corporation d/b/a Private

2   Capital Management, Inc. ("PCM"), a registered investment advisor.  PCM and Joe Ramos were

3   Plaintiffs' investment advisors.  The role of C. Joseph Ramos, the President of PCM as Plaintiffs'

4   investment advisor added a further aura of legitimacy to the program.  According to the Defendants,

5   the contribution amount for the Mare Lease Program would equal the total value of mare leases,

6   stallion services and pre-paid boarding provided in connection with the mare leases.

7         78.   Defendants represented that, as another component of the Mare Lease Program,

8   participants could make like-kind exchanges of their interest in the Mare Lease Program for interests in

9   other businesses or property.  In the case of Plaintiffs, in May of 2004 FERGUSON presented to

10  Plaintiffs the opportunity to exchange their eight (8) thoroughbred mares for Gastar stock.  Later,

11  Plaintiffs were steered to an exchange program to exchange their mare leases for horses known as

12  "performance quarter horses" (the "Purchase and Exchange Program").  According to Defendants'

13  representations regarding the Purchase and Exchange Program, Plaintiffs would own the performance

14  horses for a specified period of time and would be paid interest at the rate of four percent (4%) per

15  quarter on their initial contribution (here, $3.4 million dollars), and then would be entitled to sell the

16  performance quarter horses back to CLASSICSTAR for the full amount of the contribution plus a "put

17  price" twenty percent (20%) higher than the original contribution, by a date certain, resulting in a

18  premium sale over the contribution amount and a guaranteed thirty percent 30% return.  In other

19  words, a "no lose" business transaction.

20        79.   FERGUSON, on information and belief, knowing that such performances horses never

21  existed, personally contacted Plaintiffs in early January of 2005 about exchanging their right to the

22  eight (8) thoroughbred foals for twenty (20) performance quarter horses.  FERGUSON induced

23  Plaintiffs to exchange their rights in the eight (8) thoroughbred foals for twenty (20) performance

24  horses based on the following representations.  Plaintiffs agreed to the transaction based on the

25  representations of FERGUSON that the exchange was bona fide and that Plaintiffs would receive

26  interest at the rate of four percent (4%) per calendar quarter (here, $34,000.00 per calendar quarter),

27  and a "put" for an amount twenty percent (20%) higher than the original contribution amount

28  exercisable on July 1, 2007.  The "put" price would have been $4,080,000.00.  In other words,

1  Plaintiffs would receive a total thirty percent (30%) return on their original contribution to the Mare

2  Lease Program. Plaintiffs discovered in the Fall of 2006 that these twenty (20) performance quarter

3  horses do not exist, have never existed and will never exist. In addition, Defendants have defaulted on

4  their financial obligations, have admitted that there are no performance quarter horses and it is clear

5  that Defendants cannot and will not deliver on this "put".

6              **E. SOLICITATION OF PLAINTIFFS**

7      80.    CLASSICSTAR represented to the Plaintiffs that D. PLUMMER was a "leading expert

8  on horse and farm taxation" who had worked with the United States House of Representatives Ways

9  and Mean Committee in drafting the 1986 Tax Reform Act.

10     81.    Defendants promised Plaintiffs the opportunity to make at least a thirty (30%) return on

11 their initial business plan. If the program had proceeded as promised by Defendants, the Plaintiffs would

12 have received a large income from the program, and they would have been obligated to pay large taxes,

13 however, as an additional benefit of the program, in numerous pieces of correspondence received from

14 CLASSICSTAR, including several items signed by S. PLUMMER, the "tax benefits" of the Mare

15 Lease Program were touted. In fact, CLASSICSTAR's marketing materials claim that the mare lease

16 business is "The Ultimate Tax Solution!"

17     82.    HANDLER, of the HANDLER LAW FIRM, and GREEN, of KARREN, HENDRIX,

18 aided and abetted the other Defendants in their conduct as alleged herein and, among other acts,

19 attended a marketing and introduction seminar in the Virgin Islands and spoke to SUSAN RAIFMAN

20 about the income and tax benefits of the Mare Lease Program.

21     83.    The Plaintiffs did everything that they were told to do by Defendants, including paying

22 $3.4 Million Dollars into the Mare Lease Program.

23             **F. THE 2003 TRANSACTION WITH CLASSICSTAR**

24     84.    CLASSICSTAR, through D. PLUMMER, S. PLUMMER and FERGUSON,

25 represented that it owned sufficient thoroughbred interests to justify the cost of the Mare Lease

26 Program and that Plaintiffs would own any foals resulting from its pairings and be free to sell them or

27 hold and train them as they wished.

28 //

23

FIRST AMENDED COMPLAINT

85.    Relying on the representations of Defendants as set forth above regarding the viability and legitimacy of the Mare Lease Program, the RAIFMANS, as Trustees of the RAIFMAN FAMILY REVOCABLE TRUST DATED 7/2/03, executed a letter agreement entitled "2003 Letter of Understanding," effective November 20, 2003, committing them to a schedule of payments and to executing the actual mare lease and boarding agreements after consultation with CLASSICSTAR regarding the particular thoroughbred pairings.

86.    Shortly thereafter, the Plaintiffs directed their investment advisors to wire a payment of Three Hundred Forty Thousand Dollars ($340,000) to CLASSICSTAR. The Plaintiffs continued to make payments and incur obligations totaling $3.4 million, the last payment being made on January 5, 2004. The payments were made directly by Plaintiffs' investment advisors, on behalf of the RAIFMANS, to CLASSICSTAR.

87.    On or about December 31, 2003, the RAIFMANS, as Trustees of the RAIFMAN FAMILY REVOCABLE TRUST, DATED 7/2/03, executed the Mare Lease and Breeding Agreement, Foal Agreement, and Boarding Agreement, included among the documentation for the Mare Lease Programs. By this time, in accordance with the terms of the letter agreement, Plaintiffs had already transferred Three Million Four Hundred Thousand Dollars ($3,400,000) to CLASSICSTAR.

88.    On or about August 19, 2004, the RAIFMANS, as Trustees of the RAIFMAN FAMILY REVOCABLE TRUST, DATED 7/2/03, assigned all right, title, and interest in the Mare Lease Program to GEKKO.

89.    The Leases specifically warranted that CLASSICSTAR owned the mares involved.

90.    The Defendants, including D. PLUMMER, S. PLUMMER and FERGUSON, misrepresented virtually every material aspect of the Mare Lease Program. Specifically, the Defendants led Plaintiffs to believe that they were receiving millions of dollars of interests in thoroughbred bloodstock, and that CLASSICSTAR had structured the Programs so that they qualified with Internal Revenue Service requirements for the deductions taken by business owners.

91.    On information and belief, Defendants intentionally oversold the Mare Lease Programs, knowing that CLASSICSTAR did not have ownership of thoroughbred interests sufficient to fulfill the Mare Lease Programs or the number of Mare Lease Programs sold.

24

FIRST AMENDED COMPLAINT

92.    On information and belief, in order to conceal this intentional policy of overselling the Mare Lease Programs and to further their fraudulent scheme, the Defendants contrived to offer alternative business models, such as the Purchase and Exchange Program in which Plaintiffs participated.

93.    On information and belief, because participants, such as Plaintiffs, would not own the expected number of thoroughbred foals at the end of the breeding season due to the overselling of Mare Lease Programs, Defendants knew that participants could not possibly achieve the rate of return represented.

94.    Even if participants elected one of the alternative business models and contributed all or a portion of the value in their Mare Lease interests to one of these alternative business models, the ownership interest in that alternative business model would lack the represented value because that business was valueless and fraudulent. However, the existence of these alternative business models was designed to and did disguise the lack of adequate thoroughbred mares to sustain the Mare Lease Programs and further Defendants' fraud and non-disclosures.

## G. THE 2005 PURCHASE AND EXCHANGE PROGRAM

95.    As alleged above, in order to conceal the fact that it did not have sufficient interests in thoroughbred mares to match the number of 2003 Mare Lease interests it had sold, CLASSICSTAR, through FERGUSON, approached GREGORY R. RAIFMAN at the 2004 Kentucky Derby and attempted to convince him to exchange his eight (8) thoroughbred mares for stock in Gastar. GREGORY R. RAIFMAN declined. Then, in early 2005, FERGUSON, on behalf of CLASSICSTAR, persisted in attempting to convince the RAIFMANS to exchange their interests for a different business model. FERGUSON contacted the RAIFMANS and offered to trade Plaintiffs' 2003 Mare Lease interests for another business opportunity. CLASSICSTAR, through FERGUSON, offered to exchange the Mare Lease interests for ownership interests in performance quarter horses. CLASSICSTAR, through FERGUSON, also offered a "put" option, effective July 1, 2007, whereby CLASSICSTAR would repurchase the performance horse interests for the value paid plus twenty percent (20%). FERGUSON and CLASSICSTAR guaranteed the RAIFMANS an overall thirty percent (30%) return if they participated in the Purchase and Exchange Program. Thus, FERGUSON

FIRST AMENDED COMPLAINT

1  and CLASSICSTAR represented the exchange as a "can't lose" or "no lose" situation, which would
2  garner Plaintiffs promised locked-in profits and preserve the represented tax benefits of the initial
3  program.

4      96.    FERGUSON and CLASSICSTAR further advised Plaintiffs that this exchange was a
5  "like kind exchange" for purposes of the Internal Revenue Service.

6      97.    Relying upon CLASSICSTAR's representations, including but not limited to the direct
7  representations of FERGUSON, Plaintiffs entered into the Purchase and Exchange Agreement dated
8  on or about January, 2005.

9      98.    On information and belief, CLASSICSTAR did not own any interests in the
10  performance quarter horses it agreed to transfer to Plaintiffs.  As it turns out, and as Plaintiffs
11  discovered in the Fall of 2006, the horses did not even exist.  Despite the fact that he signed the
12  Purchase and Exchange Agreement on behalf of CLASSICSTAR, D. PLUMMER did not disclose the
13  true facts regarding the performance quarter horses to the Plaintiffs.

14      99.    Rather, CLASSICSTAR, FERGUSON, S. PLUMMER and D. PLUMMER represented
15  that by virtue of the "put price" option in the Purchase and Exchange Agreement, exercisable on July
16  1, 2007, Plaintiffs would receive the entire value for the 2004 Mare Lease Program, plus twenty
17  percent (20%) interest, from CLASSICSTAR in addition to promised four percent (4%) interest
18  payments each quarter, resulting in a total thirty percent (30%) return on their original contribution.

19      100.    CLASSICSTAR never transferred ownership of the performance horse interests to
20  Plaintiffs and, of course, could not and cannot, because the horses do not exist.

21      101.    Defendants made one payment to Plaintiffs of interest on June 20, 2006 and thereafter
22  have made no payments.  All demands for performance have gone unanswered.  On information and
23  belief, CLASSICSTAR does not have sufficient funds or assets to honor all of its future obligations to
24  investors in the Mare Lease Programs and the Purchase and Exchange Program and all of Plaintiffs'
25  demands and efforts to be made whole have been futile.  Defendants' conduct constitutes an
26  anticipatory repudiation of the sums due from CLASSICSTAR under the Purchase and Exchange
27  Program.

28  //

102. On information and belief Defendants used a portion of the fraudulently obtained funds to support the activities of CLASSICSTAR, CLASSICSTAR FARMS LLC, CLASSICSTAR INC., GEOSTAR and/or their affiliates, which accepted the funds with knowledge of the fraud and aided and abetted with the other Defendants to conceal the true operation of the Mare Lease Programs.

103. The use of these funds in operation of the farms and the marketing of the Mare Lease Programs facilitated the continuation of the fraudulent scheme and enabled the Defendants to defraud Plaintiffs.

104. The HANDLER LAW FIRM, HANDLER, KARREN, HENDRIX and GREEN provided legitimacy for the scheme, were a necessary and essential part of the scheme, and aided and abetted the other Defendants in their fraudulent activities.

105. Using these fraudulent schemes, the Defendants obtained $3.4 million from Plaintiffs and Plaintiffs have been deprived of these funds and the use of those funds as well as suffering other damages all as alleged herein.

## VI.   THE R.I.C.O. PREDICATE ACTS

106. Defendants conspired to and did engage in mail and wire fraud in violation of 18 U.S.C. §1341 or §1343 by using, or causing to be used, the United States mail or interstate wire communications in furtherance of and for the purposes of executing schemes to defraud and to obtain and maintain money by false pretenses. Each use of the mails or interstate wire communications in furtherance of and for the purposes of executing the schemes constitutes a separate and distinct violation of 18 U.S.C. § 1341 and/or 18 U.S.C. § 1343.

107. Defendants used mail and wire communications to collect the proceeds of the fraudulent scheme to induce Plaintiffs to forward payments to them, to forestall Plaintiffs' inquiry into the scheme and to induce Plaintiffs' participation.

108. Defendants made misrepresentations using the United States mail and interstate wire communications with the intent to defraud Plaintiffs, and Plaintiffs in fact reasonably relied upon such misrepresentations, including those relating to the nature of the Mare Lease Programs, to their detriment

//

27

FIRST AMENDED COMPLAINT

1    109.    Several, but not all, specific examples of the use of mail and interstate wire
2  communications are as follows:

3         a.    On or about November 20, 2003, S. PLUMMER, on behalf of CLASSICSTAR,
4                who were then located in Utah, mailed a 2003 Letter of Understanding to the
5                RAIFMANS, who were located in Piedmont, California.

6         b.    On January 2, 2004, Mindi L. Morishita of CLASSICSTAR emailed the 2003
7                Mare Lease and Breeding Agreement, Schedule A, Boarding Agreement, Foal
8                Agreement and Nominee Agreement to GREGORY R. RAIFMAN and SUSAN
9                RAIFMAN, who were located in Piedmont, California, and provided directions
10               to the RAIFMANS to utilize CLASSICSTAR's Federal Express account to
11               overnight the signed agreements to CLASSICSTAR.

12        c.    On August 11, 2004, Mindi L. Morishita of CLASSICSTAR mailed to the
13               RAIFMANS, who were located in Piedmont, California, a status report of their
14               2003 Mare Lease Business.

15        d.    On February 21, 2005, Nick Plummer of CLASSICSTAR in Kentucky mailed
16               correspondence regarding foal corrective surgery to the RAIFMANS in
17               Piedmont, California.

18        e.    On February 22, 2005, Mindi L. Morishita of CLASSICSTAR mailed the
19               RAIFMANS, who were located in Piedmont, California, a congratulatory letter
20               on the birth of a foal from two of the RAIFMANS' horses.

21        f.    On or about November 26, 2003, December 22, 2003, and December 26, 2003,
22               CLASSICSTAR received wire transfers of funds from Plaintiffs' investment
23               advisors on behalf of Plaintiffs.

24        g.    On January 22, 2004, February 23, 2004, March 26, 2004 and June 17, 2004,
25               Mindi Morishita of CLASSICSTAR in Kentucky sent correspondence to the
26               RAIFMANS in Piedmont, California.

27  //
28  //

28

FIRST AMENDED COMPLAINT

  h. On August 11, 2004, Mindi Morishita of CLASSICSTAR mailed a Status Report to the RAIFMANS and GEKKO who were located in Piedmont, California.

  i. On March 2, 2005, Plaintiffs' investment advisors in California, on behalf of the Plaintiffs, faxed the executed January 2005 Purchase and Exchange Agreement to Jim Overton at GEOSTAR Corporation.

110. Defendants also utilized mail and interstate wire communications to solicit participation by other investors in the CLASSICSTAR Mare Lease Program as well as to transfer participants to alternative businesses.

## FIRST CLAIM FOR RELIEF

[R.I.C.O. -- Against All Defendants and DOES 1-1000]

111. The allegations of paragraphs 1-110 are incorporated by reference as if fully set forth herein.

112. At all times relevant to this Complaint, the Defendants, and each of them, were "persons" as that term is defined in 18 U.S.C. § 1961(3) and as used in 18 U.S.C. § 1962. The corporate and entity Defendants engaged in a pattern of racketeering activity through persons and legal entities beyond their control, such as the HANDLER LAW FIRM, HANDLER, KARREN, HENDRIX, GREEN, PCG, Robert L. Keys, PCM and C. Joseph Ramos.

113. At all times relevant to this Complaint, all of the Defendants constituted an association in fact and therefore are an "enterprise" as that term is defined in 18 U.S.C. § 1961(4) and as used in 18 U.S.C. § 1962 (hereinafter the "Mare Leasing Marketing Enterprise"). At all times relevant to this Complaint, the Mare Leasing Marketing Enterprise had continuity of structure and personnel, a common or shared purpose and an ascertainable structure distinct from that inherent in the pattern of racketeering activity. Further, the Mare Leasing Marketing Enterprise was created, existed as an ongoing association engaged in or affecting interstate commerce, and had an ascertainable structure apart from the pattern of racketeering activity alleged in this Complaint. The members of the Mare Leasing Marketing Enterprise were linked together by more than their participation in the same pattern of racketeering activity alleged in this Complaint. In addition to Defendants named herein, the Mare

1    Leasing Marketing Enterprise included the activities of PCG and its principals, including but not

2    limited to Robert L. Keys, and PCM, Ramos Financial Corporation and its principals, including but not

3    limited to C. Joseph Ramos, who promoted and sold interests in the Mare Lease Programs to Plaintiffs.

4    Other lawsuits alleging R.I.C.O. violations have been filed including in the United States District Court

5    for the Eastern District of Kentucky, Lexington Division, being action No. 06-243-JMH, entitled *West*

6    *Hill Farms, LLC v. ClassicStar, LLC, et al.*, and in the United States District Court for the Eastern

7    District of Pennsylvania, being action No. CV-07-0163, entitled *J & L Canterbury Farms, LLC v.*

8    *ClassicStar, LLC et al.*, also alleging racketeering activity involving most of these same Defendants

9    and other parties.

10        114.    At all times relevant to this Complaint, the Defendants engaged in or affected interstate

11    commerce by transacting business in numerous states and across state lines. Further, CLASSICSTAR

12    held several of their participant meetings in the Virgin Islands. Specifically, HANDLER, of the

13    HANDLER LAW FIRM, GREEN, of KARREN, HENDRIX, D. PLUMMER and FERGUSON

14    conducted seminars at these Virgin Islands meetings, of which Plaintiffs were attendees.

15        115.    Each of the Defendants was associated with or employed by the Mare Leasing

16    Marketing Enterprise and each aided and abetted and/or conspired to, and did as part of that

17    employment or association, conduct or participate in the conduct of the affairs of the Mare Leasing

18    Marketing Enterprise through engaging in a pattern of racketeering activity.

19        116.    Each of the Defendants operated or managed the Mare Leasing Marketing Enterprise

20    itself by conducting or participating, directly or indirectly, in the conduct of the enterprise's affairs.

21        117.    Each of the Defendants conspired to, and did, derive or receive income from a pattern

22    of racketeering activity, some part of which was used to operate the Mare Leasing Marketing

23    Enterprise, enabling the Mare Leasing Marketing Enterprise to defraud Plaintiffs, as set forth herein.

24        118.    As a whole, Defendants acted in concert, with specific, well-defined roles, in the Mare

25    Leasing Marketing Enterprise to achieve the common goal of defrauding participants, such as

26    Plaintiffs, into making payments for the misrepresented Mare Leasing Programs and then switching

27    Plaintiffs into alternative business models with related entities, such as through the Purchase and

28    Exchange Program. CLASSICSTAR, D. PLUMMER, S. PLUMMER and FERGUSON offered the

FIRST AMENDED COMPLAINT

1   Mare Leases and purported to provide information regarding the legitimacy of the businesses.
2   HANDLER, the HANDLER LAW FIRM, GREEN and KARREN, HENDRIX purported to provide
3   legal and accounting opinions as marketing and promotional support, both in writing and at various
4   CLASSICSTAR sponsored events, to support and provide legitimacy to the Mare Lease Programs and
5   thus purported to provide a cloak of legitimacy to the programs. HANDLER LAW FIRM and
6   KARREN, HENDRIX assisted in marketing and promoting the program to participants apart from
7   their respective legal and accounting roles.

8       119.    On information and belief, all of the Defendants encouraged the switch to alternative
9   business models in order to continue the scheme and to further delay discovery of the fact that there
10  were insufficient mares to justify the number of Mare Lease Programs being sold and that Defendants
11  had intentionally oversold the Mare Lease Programs. In addition, the Purchase and Exchange Program was
12  a complete fraud in as much as the performance quarter horses did not exist, do not exist, and have never
13  existed.

14      120.    These acts of Defendants, including the conduct of the affairs of the Mare Leasing
15  Marketing Enterprise through a pattern of racketeering activity, took place over a period of at least four
16  (4) continuous years, were not isolated events and included multiple acts of mail fraud, wire fraud and
17  violations of state law.

18      121.    Defendants have continuously engaged in criminal activities, including but not limited
19  to mail and wire fraud, as part of their overall scheme for at least four (4) years and will continue
20  indefinitely unless prevented. The fraudulent representations and conduct of Defendants is set forth in
21  Paragraphs 130 and 132, which are incorporated by reference.

22      122.    The Defendants' pattern of racketeering activity, including acts of mail fraud and wire
23  fraud, have occurred within the relevant time periods outlined in 18 U.S.C. § 1961(5).

24      123.    Through their operation and management of the enterprise, the Defendants have made
25  or caused to be made or distributed communications by United States mail which included
26  misrepresentations of material fact regarding the Mare Leasing Programs and Purchase and Exchange
27  Program and have made or caused to be made interstate wire transfers as a result of such
28  misrepresentations.

31

FIRST AMENDED COMPLAINT

1    124.    By virtue of these and similar communications occurring over at least the past four (4)
2    years, the Defendants have engaged in, and are continuing to engage in, an uninterrupted series of
3    predicate acts of mail and wire fraud that were related to one another in furtherance of the fraudulent
4    schemes.

5    125.    By conducting or participating, directly or indirectly, in the conduct of the Mare Lease
6    Marketing Enterprise through a pattern of racketeering activity, and conspiring to conduct and
7    participate in such racketeering activity, the Defendants, and each of them, have violated both 18
8    U.S.C. § 1962 (c) and 18 U.S.C. § 1962 (d) of the R.I.C.O. statute.

9    126.    As a direct and proximate result of Defendants' conduct, as set forth herein, including
10   Defendants' conduct of the affairs of and participation in the Mare Lease Marketing Enterprise,
11   Plaintiffs were injured in their business and property and have suffered and continue to suffer injuries,
12   including but not limited to the amounts of their contribution, business costs, interest and legal
13   expenses. Plaintiffs' damages include, but are not limited to, the $3.4 million paid, plus pre-judgment
14   interest, additional damages arising from the ongoing Internal Revenue audit and any and all other
15   consequential and compensatory damages proximately caused by Defendants' conduct, as alleged
16   herein.

17   127.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from the Defendants,
18   jointly and severally, treble damages, their costs and reasonable attorneys' fees.

19   WHEREFORE, Plaintiffs pray for relief as follows:

20   a.    For damages in the amount of $3.4 million, or more, according to proof;

21   b.    For further compensatory damages, according to proof, including but not limited to
22         damages arising form the ongoing tax audit;

23   c.    For pre-judgment interest on damages, according to proof;

24   d.    For treble damages pursuant to 18 U.S.C. § 1964(c);

25   e.    For attorneys' fees;

26   f.    For costs of suit;

27   g.    For such other and further ruling as the Court deems just and proper in the premises.

28   //

## SECOND CLAIM FOR RELIEF

[COMMON LAW FRAUD -- Against All Defendants and DOES 1-1000]

128. The allegations of paragraphs 1-127 are incorporated by reference as if fully set forth herein.

129. In order to induce Plaintiffs to participate in the Mare Lease Programs, and with the intent that Plaintiffs rely on their representations, Defendants made certain misrepresentations of material fact and omitted to disclose certain material facts which they had a duty to disclose.

130. As alleged above, from mid-2003 on, in promotional materials and in presentations, Defendants made representations to Plaintiffs as alleged, including but not limited to as set forth in paragraphs 37, 38, 39, 40, 41, 42, 53, 54, 55, 56, 59, 60, 61, 62, 64, 68, 69, 70, 72, 75, 77, 78, 79, 80, 81, 82, 84, 85, 89, 90, 95, 96, 97 and 99 above.

131. Defendants KARREN, HENDRIX, HANDLER LAW FIRM, HANDLER, GREEN and certain of DOES 1-1000 knew that the representations of other Defendants and their own representations regarding the validity of the Mare Lease Programs were false, or were made with reckless disregard as to the truth or falsity thereof, and made their personal presentations and gave their opinions knowing they were false or were made with reckless disregard as to the truth or falsity thereof.

132. The CLASSICSTAR Defendants further represented through FERGUSON that Plaintiffs should exchange their Mare Lease Program for the Purchase and Exchange Program and that if they did so there were guaranteed upsides, as alleged above in Paragraphs 68, 70, 78, 79, 95 and 96 above.

133. Each of the foregoing representations was false when it was made and each of the omitted facts were facts which Defendants had a duty to disclose.

134. Defendants knew each representation was false or made the representations with reckless disregard as to the truth or falsity of the representations, in that they knew they had no basis for the representations, or intentionally failed to disclose material facts. With regard to the Purchase and Exchange Program, the representations were made with full knowledge that the entities responsible for providing the guaranteed upsides did not have sufficient property or funds to honor all of their contractual obligations to participants like the Plaintiffs. Each of the representations were

1 | made with the intent to induce Plaintiffs to rely on the representations.

2 | 135. Plaintiffs reasonably and justifiably relied on the representations to their detriment by,
3 | *inter alia*, their agreement to participate in Mare Lease Programs and their contribution to the same. In
4 | addition, the Plaintiffs would not have agreed to enter into the Purchase and Exchange Program but for
5 | the representations of the Defendants. Plaintiffs also reasonably and justifiably relied on the
6 | representations of Defendants in exchanging their Mare Lease Programs for other businesses, *i.e.*, the
7 | non-existent performance quarter horses.

8 | 136. Plaintiffs have suffered damages as a direct and proximate result of their reasonable
9 | reliance on the misrepresentations of Defendants.

10 | 137. Plaintiffs are entitled to recovery of all damages proximately caused by the conduct of
11 | Defendants, including but not limited to the amount of $3.4 million or more, according to proof, plus
12 | pre-judgment interest. Plaintiffs are entitled to recovery of additional damages arising from the
13 | ongoing Internal Revenue audit any and all other consequential and compensatory damages
14 | proximately caused by Defendants' conduct, all as alleged above.

15 | 138. In doing the things herein alleged, Defendants acted willfully, fraudulently,
16 | oppressively, maliciously, and with a conscious disregard of the rights of the Plaintiffs. Accordingly,
17 | Plaintiffs are entitled to punitive damages in an amount to be determined by the trier of fact.

18 | WHEREFORE, Plaintiffs pray for relief as follows:

19 | a. For damages in the amount of $3.4 million or more, according to proof;

20 | b. For further compensatory damages, according to proof, including but not limited to
21 | damages arising from the ongoing tax audit;

22 | c. For pre-judgment interest on damages, according to proof;

23 | d. For punitive damages in the amount to be determined by the trier of fact;

24 | e. For costs of suit;

25 | f. For such other and further relief as the Court deems just and proper in the premises.

26 | //

27 | //

28 | //

---

34

FIRST AMENDED COMPLAINT

## THIRD CLAIM FOR RELIEF

[AIDING AND ABETTING COMMON LAW FRAUD -- Against KARREN, HENDRIX, HANDLER LAW FIRM, HANDLER, GREEN and DOES 1-1000]

139.    The allegations of paragraphs 1-138 are incorporated herein by reference as if fully set forth herein.

140.    As described above, from mid-2003 on, in promotional materials and in presentations, Defendants made representations to Plaintiffs and others concerning the viability and legality of Mare Lease Program.

141.    Each of the representations alleged in this Complaint, including but not limited to those specified above in paragraph 130, was false when it was made and each of the omitted facts were facts which Defendants had a duty to disclose.

142.    Defendants would have been incapable of perpetuating their fraud on participants, including Plaintiffs, if it had not been for the legal, tax and financial opinions, as well as the business presentations, marketing, and promotional support provided by Defendants KARREN, HENDRIX, HANDLER LAW FIRM, HANDLER, GREEN and certain of DOES 1-1000. Such defendants aided and abetted the promotion and marketing of the program through these activities.

143.    In order to induce Plaintiffs to participate in the Mare Lease Programs, and with the intent that Plaintiffs rely on their representations, Defendants KARREN, HENDRIX, HANDLER LAW FIRM, HANDLER, GREEN and certain of DOES 1-1000 gave substantial assistance or encouragement to CLASSICSTAR and other Defendants in accomplishing their fraud on Plaintiffs.

144.    Defendants KARREN, HENDRIX, HANDLER LAW FIRM, HANDLER, GREEN and certain of DOES 1-1000 knew that the representations of other Defendants and their own representations regarding the validity of the Mare Lease Programs were false, or were made with reckless disregard as to the truth or falsity thereof, and made their personal presentations and gave their opinions knowing they were false or were made with reckless disregard as to the truth or falsity thereof.

145.    Plaintiffs reasonably and justifiably relied on the representations of Defendants to their detriment by, *inter alia*, their agreement to participate in the Mare Lease Programs and funding the

1   same.   Plaintiffs would not have agreed to enter into the Mare Lease Program but for the

2   representations of Defendants KAREN, HENDRIX, HANDLER LAW FIRM, HANDLER, GREEN

3   and various of the DOES 1-1000.

4        146.   Plaintiffs have suffered damages as a direct and proximate result of their reasonable

5   reliance on the misrepresentations of Defendants as aided and abetted by KAREN HENDRIX,

6   HANDLER LAW FIRM, HANDLER, GREEN and certain of the other DOES 1-1000. Moreover,

7   having participated in the Mare Lease Program, Plaintiffs were further induced to participate in the

8   Purchase and Exchange Program, compounding their damages.

9        147.   Plaintiffs have suffered damages as a direct and proximate result of their reasonable

10   reliance on the misrepresentations of Defendants.

11        148.   Plaintiffs are entitled to recovery of all damages proximately caused by the conduct of

12   Defendants, including but not limited to the amount of $3.4 million or more, according to proof, plus

13   pre-judgment interest.   Plaintiffs are entitled to recovery of additional damages arising from the

14   ongoing Internal Revenue audit any and all other consequential and compensatory damages

15   proximately caused by Defendants' conduct, all as alleged above.

16        149.   In doing the things herein alleged, Defendants acted willfully, fraudulently,

17   oppressively, maliciously, and with a conscious disregard of the rights of the Plaintiffs. Accordingly,

18   Plaintiffs are entitled to punitive damages in an amount to be determined by the trier of fact.

19        WHEREFORE, Plaintiffs pray for relief as follows:

20        a.     For damages in the amount of $3.4 million or more, according to proof;

21        b.     For further compensatory damages, according to proof, including but not limited to

22            damages arising from the ongoing tax audit;

23        c.     For pre-judgment interest on damages, according to proof;

24        d.     For punitive damages in the amount to be determined by the trier of fact;

25        e.     For costs of suit;

26        f.     For such other and further relief as the Court deems just and proper in the premises.

27   //

28   //

FIRST AMENDED COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FOURTH CLAIM FOR RELIEF**

[NEGLIGENT MISREPRESENTATION – Against All Defendants and DOES 1-1000]

150.    The allegations of paragraphs 1-149 are incorporated by reference as if fully set forth herein.

151.    As an alternative allegation to the allegations of intentional misrepresentation, Defendants negligently made the representations alleged in this complaint, including but not limited to the representations set forth in Paragraph 130 and 132, in that said Defendants knew or should have known that there was no reasonable grounds for believing the representations were true when they made them.

152.    Defendants intended that the Plaintiffs rely upon their representations and the Plaintiffs did, in fact, rely upon Defendants' representations.

153.    The Plaintiffs have been harmed by their reliance upon Defendants' representations.

154.    Plaintiffs reasonably and justifiably relied on the representations to their detriment by, *inter alia,* their agreement to participate in the Mare Lease Program and the Purchase and Exchange Program.    The Plaintiffs would not have agreed to the Mare Lease Programs or the Purchase and Exchange Program but for the negligent misrepresentations of Defendants, and each of them, and certain of DOES 1-1000.    Plaintiffs reasonably and justifiably relied on the representations of Defendants as set forth herein.

155.    Plaintiffs have suffered damages as a direct and proximate result of their reasonable reliance on the negligent misrepresentations of Defendants.

156.    Plaintiffs are entitled to recovery of all damages proximately caused by the conduct of Defendants, including but not limited to the amount of $3.4 million or more, according to proof, plus pre-judgment interest.    Plaintiffs are entitled to recovery of additional damages arising from the ongoing Internal Revenue audit any and all other consequential and compensatory damages proximately caused by Defendants' conduct, all as alleged above.

WHEREFORE, Plaintiffs pray for relief as follows:

a.    For damages in the amount of $3.4 million or more, according to proof;

b.    For further compensatory damages, according to proof, including but not limited to

37

damages arising form the ongoing tax audit;

c.    For pre-judgment interest on damages, according to proof;

d.    For costs of suit.

### FIFTH CLAIM FOR RELIEF

[BREACH OF CONTRACT -- Against CLASSICSTAR and DOES 1-1000]

157.    The allegations of paragraphs 1-156 are incorporated by reference as if fully set forth herein.

158.    Plaintiffs entered into and executed the contracts relating to the Mare Lease Programs, including the November 20, 2003, Letter of Understanding, the Mare Lease and Breeding Agreement dated on or about December 31, 2003, the Boarding Agreement dated on or about December 31, 2003, the Foal Agreement dated on or about December 31, 2003, the Nominee Agreement dated on or about December 31, 2003, and the Trade out Agreements dated on or about November 1, 2004, and January 27, 2005, as well as the Purchase and Exchange Agreement (collectively the "Contracts with CLASSICSTAR").

159.    Plaintiffs performed all of their obligations pursuant to the Contracts with CLASSICSTAR.

160.    CLASSICSTAR failed to fulfill its obligations under the Purchase and Exchange Agreement and breached the provisions of that agreement, including, *inter alia*, and without limitation, its warranty that it owned the performance horses it claimed to provide in exchange for Plaintiffs' Mare Lease Interests. CLASSICSTAR also failed to transfer ownership of any performance horses to Plaintiffs.

161.    CLASSICSTAR has failed to perform its contractual obligations. It failed to deliver the exchange horses and it has failed to pay the sums due and payable under the Purchase and Exchange Agreement, including but not limited to payment of interest. The conduct of CLASSICSTAR in failing to make the required payments constitutes an anticipatory repudiation of their obligations under the Purchase and Exchange Agreement to perform in July 2007 and pay the "put" price.

162.    As a direct and proximate result of CLASSICSTAR's breach, Plaintiffs have suffered damages all as alleged above; Plaintiffs have lost property valued at $3.4 million or more, according to

38

1  proof. In addition, due to CLASSICSTAR's anticipatory repudiation and breach, Plaintiffs will not
2  receive the "put" price.

3      163.    Plaintiffs are entitled to recovery of all damages proximately caused by the conduct of
4  Defendants, including but not limited to the amount of $3.4 million or more, according to proof, plus
5  pre-judgment interest. Plaintiffs are entitled to recovery of additional damages arising from the
6  ongoing Internal Revenue audit any and all other consequential and compensatory damages
7  proximately caused by Defendants' conduct, all as alleged above.

8      WHEREFORE, Plaintiffs pray for relief as follows:

9      a.     For damages in the amount of $3.4 million or more, according to proof;

10     b.     For further compensatory damages, according to proof, including but not limited to
11            damages arising form the ongoing tax audit;

12     c.     For pre-judgment interest on damages, according to proof;

13     d.     For costs of suit;

14     e.     For such other and further relief as the Court deems just and proper in the premises.

15                          **SIXTH CLAIM FOR RELIEF**

16  [RESCISSION OF RELEASE -- Against the CLASSICSTAR Defendants and DOES 1-1000]

17     164.    The allegations of paragraphs 1-163 are incorporated by reference as if fully set forth
18  herein.

19     165.    In order to induce Plaintiffs to participate in the Mare Lease Programs, and with the
20  intent that Plaintiffs rely on their representations, Defendants made misrepresentations of material fact
21  and omitted to disclose certain material facts which they had a duty to disclose.

22     166.    Pursuant to California Civil Code § 1668, all contracts which have for their object,
23  directly or indirectly, to exempt any one from responsibility for his own fraud, whether willful or
24  negligent, are against the policy of the law.

25     167.    Defendants procured the contracts associated with the Mare Lease Programs, including
26  the November 20, 2003, Letter of Understanding, the Mare Lease and Breeding Agreement dated on or
27  about December 31, 2003, the Boarding Agreement dated on or about December 31, 2003, the Foal
28  Agreement dated on or about December 31, 2003, the Nominee Agreement dated on or about

1   December 31, 2003, and the Trade out Agreements dated on or about November 1, 2004, and January

2   27, 2005, as well as the Purchase and Exchange Agreement (collectively the "Contracts with

3   CLASSICSTAR") by fraud, all as set forth above.

4       168.   The release contained in the Purchase and Exchange Agreement purports to exempt the

5   CLASSICSTAR Defendants from any claim or cause of action arising out of the Contracts with

6   CLASSICSTAR.

7       169.   Pursuant to California Civil Code § 1689, Plaintiffs are entitled to rescind the release

8   provision of the Purchase and Exchange Agreement because the Plaintiffs' consent to the Contracts

9   with CLASSICSTAR, and specifically to the release provision contained in the Purchase and

10   Exchange Agreement, was procured through fraud exercised by or with the CLASSICSTAR

11   Defendants. By service of this Complaint, Plaintiffs give notice of rescission of the release to the

12   extent such notice is required.

13       170.   Plaintiffs seek rescission and severance of the release clause contained in the Purchase

14   and Exchange Agreement since it was procured by fraud and is thereby against the policy of law as set

15   forth in the California Civil Code.

16       WHEREFORE, Plaintiffs pray for relief as set forth below:

17     a.     For rescission of the release provision of the Purchase and Exchange Agreement and

18            any and all other clauses of the Purchase and Exchange Agreement the Court deems

19            necessary in order to obtain an equitable result;

20     b.     For restitution of all consideration given under the Purchase and Exchange Agreement;

21     c.     For costs of suit;

22     d.     For such other and further relief as the Court deems just and proper in the premises.

23                **SEVENTH CLAIM FOR RELIEF**

24       [CONSTRUCTIVE TRUST -- Against All Defendants and DOES 1-1000]

25       171.   The allegations of paragraphs 1-170 are incorporated by reference as if fully set forth

26   herein.

27       172.   Plaintiffs paid CLASSICSTAR Three Million Four Hundred Thousand Dollars

28   ($3,400,000) between 2003 and 2004.

<div align="center">40</div>

173.   On information and belief, Defendants used funds wrongfully acquired from the Plaintiffs to acquire property which, on information and belief, is currently in Defendants' possession.

174.   Having obtained Plaintiffs' funds through the improper and fraudulent means as alleged herein, Defendants hold those funds or their proceeds in constructive trust for Plaintiffs and must return or account for same. A constructive trust should be imposed on and against any and all property acquired or held by Defendants with the property or money of Plaintiffs.

175.   To the extent that Defendants intend to dispose of or distribute such property, such disposition will cause irreparable harm to Plaintiffs for which there is no remedy at law.

WHEREFORE, Plaintiffs pray for relief as follows:

a.   For damages in the amount of $3.4 million or more, according to proof;

b.   For further compensatory damages, according to proof, including but not limited to damages arising form the ongoing tax audit;

c.   For pre-judgment interest on damages, according to proof;

d.   For imposition of a constructive trust for the benefit of Plaintiffs on all money and/or property acquired by Defendants;

e.   For costs of suit;

f.   For such other and further relief as the Court deems just and proper in the premises.

## EIGHTH CLAIM FOR RELIEF

[UNJUST ENRICHMENT -- Against All Defendants and DOES 1-1000]

176.   The allegations of paragraphs 1-175 are incorporated by reference as if fully set forth herein.

177.   Plaintiffs made payments to Defendants based on Defendants' misrepresentations as alleged herein, and these payments were deposited in accounts controlled by Defendants. Defendants further fraudulently induced Plaintiffs into entering into the Purchase and Exchange Agreement, all as alleged herein.

178.   Defendants were not entitled to these funds which were obtained from Plaintiffs through fraud and improper means, and Plaintiffs would not have transferred the funds had the true nature of the transaction been known.

1        179.   Defendants have been unjustly enriched by obtaining money and property from

2  Plaintiffs by fraud.

3        180.   As a result of Defendants' unjust receipt of these sums, Plaintiffs have sustained

4  damages, including but not limited to the amount of their payments.

5        WHEREFORE, Plaintiffs pray for relief as follows:

6        a.    For damages in the amount of $3.4 million or more, according to proof;

7        b.    For further compensatory damages, according to proof, including but not limited to

8                damages arising form the ongoing tax audit;

9        c.    For pre-judgment interest on damages, according to proof;

10       d.    For costs of suit;

11       e.    For such other and further relief as the Court deems just and proper in the premises.

12                      **NINTH CLAIM FOR RELIEF**

13  [MONEY AND PROPERTY HAD AND RECEIVED -- Against All Defendants and DOES 1-1000]

14       181.   The allegations of paragraphs 1-180 are incorporated by reference as if fully set forth

15  herein.

16       182.   Defendants received money and property of Plaintiffs and hold money and property that

17  in equity belong to Plaintiffs, which Plaintiffs are equitably and legally entitled to recover.

18       WHEREFORE, Plaintiffs pray for relief as follows:

19       a.    For damages in the amount of $3.4 million or more, according to proof;

20       b.    For further compensatory damages, according to proof, including but not limited to

21               damages arising form the ongoing tax audit;

22       c.    For pre-judgment interest on damages, according to proof;

23       d.    For costs of suit;

24       e.    For such other and further relief as the Court deems just and proper in the premises.

25                      **TENTH CLAIM FOR RELIEF**

26  [ACCOUNTING – Against CLASSICSTAR, D. PLUMMER, S. PLUMMER, BUFFALO RANCH

27                       and DOES 1-1000]

28       183.   The allegations of paragraphs 1-182 are incorporated by reference as if fully set forth

FIRST AMENDED COMPLAINT

1  herein.

2      184.   Plaintiffs are entitled to an accounting from CLASSICSTAR, D. PLUMMER, S.

3  PLUMMER, BUFFALO RANCH, and other Defendants with regard to Plaintiffs' ownership interest

4  in Plaintiffs' Mare Lease Interests as well as the performance horses that CLASSICSTAR exchanged

5  for Plaintiffs' 2004 Mare Lease Interests, including the current status of title to each mare, foal and

6  performance horse that CLASSICSTAR represented as belonging to Plaintiffs or in which Plaintiffs

7  had an interest.

8      185.   To the extent that CLASSICSTAR, D. PLUMMER, S. PLUMMER and/or BUFFALO

9  RANCH intends to dispose of or distribute such property prior to accounting, such disposition will

10  cause irreparable harm to Plaintiffs for which there is no remedy at law.

11     WHEREFORE, Plaintiffs pray for relief as follows:

12     a.     For an accounting of the disposition of all money and property of Plaintiffs;

13     b.     For costs of suit;

14     c.     For such other and further relief as the Court deems just and proper in the premises.

15                              **ELEVENTH CLAIM FOR RELIEF**

16         [CIVIL THEFT -- Against the CLASSICSTAR Defendants and DOES 1-1000]

17     186.   The allegations of paragraphs 1-185 are incorporated by reference as if fully set forth

18  herein.

19     187.   California Penal Code Section 484(a) provides in pertinent part as follows:

20                  Every person who shall feloniously steal . . . the personal
                    property of another . . . or who shall knowingly and
21                  designedly, by any false or fraudulent representation or
                    pretense, defraud any other person of money . . or personal
22                  property . . . is guilty of theft. . . . For the purposes of this
                    section, any false or fraudulent representation or pretense
23                  made shall be treated as continuing, so as to cover any
                    money, property or service received as a result thereof, and
24                  the complaint, information or indictment may charge that
                    the crime was committed on any date during the particular
25                  period in question.
26
27     188.   California Penal Code Section 496(a) provides in pertinent part as follows:
                    Every person who buys or receives any property that has
28                  been stolen or that has been obtained in any manner

                                        43

                              FIRST AMENDED COMPLAINT

constituting theft or extortion, knowing the property to be
so stolen or obtained, or who conceals, sells, withholds, or
aids in concealing, selling, or withholding any property
from the owner, knowing the property to be so stolen or
obtained, shall be punished by imprisonment in a state
prison, or in a county jail for not more than one year. . . .

189.    California Penal Code Section 496(c) provides a civil remedy as follows:
Any person who has been injured by a violation of
subdivision (a) or (b) may bring an action for three times
the amount of actual damages, if any, sustained by the
plaintiff, if any, costs of suit, and reasonable attorney's
fees.

190.    The CLASSICSTAR Defendants, and each of them, with an intent to permanently

deprive Plaintiffs, fraudulently appropriated money and/or property of Plaintiffs. The CLASSICSTAR

Defendants, and each of them, knowingly and designedly, by false or fraudulent representations or

pretenses, defrauded Plaintiffs of money and/or property by fraudulently inducing Plaintiffs to enter

into the Purchase and Exchange Program and turn over their interests in the Mare Lease Programs

when the equine interests Plaintiffs purportedly were to receive under the Purchase and Exchange

Program did not, in fact, exist. To date, the CLASSICSTAR Defendants, and each of them, have

withheld from Plaintiffs the value of the Mare Lease Program or the Purchase and Exchange Program

and have withheld the sums due under the Purchase and Exchange Program. This conduct constitutes

theft in violation of California Penal Code Sections 484 and 496 and gives rise to liability under

Section 496(c) of the Penal Code. The CLASSICSTAR Defendants' theft and unlawful withholding of

Plaintiffs' money and property is continuing in that Defendants have failed and refused to deliver

payments to Plaintiffs after repeated demands and have fraudulently obtained and retained Plaintiffs'

property.

191.    The theft by the CLASSICSTAR Defendants, and each of them, has proximately

damaged Plaintiffs by, *inter alia*, depriving Plaintiffs of their money and/or property. Pursuant to

California Penal Code Section 496 (c), Plaintiffs are entitled to: (a) three times the amount of their

actual damages; (b) costs of suit and (c) reasonable attorneys' fees.

192.    The conduct of the CLASSICSTAR Defendants, and each of them, was willful,

oppressive, fraudulent and malicious and in conscious disregard of the rights of Plaintiffs so as to

FIRST AMENDED COMPLAINT

1  justify the imposition of punitive damages against the CLASSICSTAR Defendants, and each of them,

2  pursuant to California Civil Code Section 3294, in an amount to be determined by the trier of fact.

3        WHEREFORE, Plaintiffs pray for relief as follows:

4      a.     For damages in the amount of $3.4 million or more, according to proof;

5      b.     For further compensatory damages, according to proof, including but not limited to

6            damages arising form the ongoing tax audit;

7      c.     For pre-judgment interest on damages according to proof;

8      d.     For treble damages;

9      e.     For punitive damages in an amount to be determined by the trier of fact;

10      f.     For attorneys' fees;

11      g.     For costs of suit;

12      h.     For such other and further relief as the Court deems just and proper in the premises.

13                    **TWELFTH CAUSE OF ACTION**

14      [AIDING AND ABETTING CIVIL THEFT -- Against the CLASSICSTAR Defendants

15                    and DOES 1-1000]

16      193.   The allegations of paragraphs 1-192 are incorporated by reference as if fully set forth

17  herein.

18      194.   California Penal Code Section 484(a) provides in pertinent part as follows:

19                    Every person who shall feloniously steal . . . the personal
property of another . . . or who shall knowingly and

20                    designedly, by any false or fraudulent representation or
pretense, defraud any other person of money . . or personal

21                    property . . . is guilty of theft. . . . For the purposes of this
section, any false or fraudulent representation or pretense

22                    made shall be treated as continuing, so as to cover any
money, property or service received as a result thereof, and

23                    the complaint, information or indictment may charge that
the crime was committed on any date during the particular

24                    period in question.

25      195.   California Penal Code Section 496(a) provides in pertinent part as follows:

26                    Every person who buys or receives any property that has
been stolen or that has been obtained in any manner

27                    constituting theft or extortion, knowing the property to be

28                    so stolen or obtained, or who conceals, sells, withholds, or

45

1

2

                  aids in concealing, selling, or withholding any property from the owner, knowing the property to be so stolen or obtained, shall be punished by imprisonment in a state prison, or in a county jail for not more than one year. . . .

3

     196.   California Penal Code Section 496(c) provides a civil remedy as follows:

4

                  Any person who has been injured by a violation of subdivision (a) or (b) may bring an action for three times the amount of actual damages, if any, sustained by the plaintiff, if any, costs of suit, and reasonable attorney's fees.

5

6

7

8

     197.   The Plaintiffs' money and/or property has been obtained by Defendants in a manner

9

constituting theft, within the meaning ascribed in California Penal Code Section 484, as alleged herein.

10

     198.   On information and belief, the CLASSICSTAR Defendants and certain of DOES 1-

11

1000 inclusive, and each of them, knew that the Plaintiffs' money and/or property were obtained in a

12

manner constituting theft. The CLASSICSTAR Defendants, and each of them nevertheless aided and

13

abetted the CLASSICSTAR Defendants in the withholding of Plaintiffs' money and/or property.

14

     199.   By aiding and abetting the CLASSICSTAR Defendants, and each of them, the

15

CLASSICSTAR Defendants, and each of them, violated Penal Code Section 496.

16

     200.   Accordingly, the CLASSICSTAR Defendants and certain of DOES 1-1000 inclusive,

17

are liable to Plaintiffs for damages and for treble damages, attorneys' fees and costs recoverable under

18

California Penal Code Section 496 (c).

19

     201.   In doing the things herein alleged, Defendants acted willfully, fraudulently,

20

oppressively, maliciously, and with a conscious disregard of the rights of the Plaintiffs. Accordingly,

21

Plaintiffs are entitled to punitive damages in an amount to be determined by the trier of fact.

22

     WHEREFORE, Plaintiffs pray for relief as follows:

23

     a.     For damages in the amount of $3.4 million or more, according to proof;

24

     b.     For further compensatory damages, according to proof, including but not limited to

25

            damages arising form the ongoing tax audit;

26

     c.     For pre-judgment interest on damages according to proof;

27

     d.     For treble damages;

28

     e.     For punitive damages in the amount to be determined by the trier of fact;

1    f.    For attorneys' fees;

2    g.    For costs of suit;

3    h.    For such other and further relief as the Court deems just and proper in the premises.

4                          **THIRTEENTH CLAIM FOR RELIEF**

5              [CONVERSION -- Against the CLASSICSTAR Defendants and DOES 1-1000]

6         202.   The allegations of paragraphs 1-201 are incorporated by reference as if fully set forth

7    herein.

8         203.   The CLASSICSTAR Defendants and certain of DOES 1 to 1000, and each of them,

9    through their fraudulent representations and conduct, as alleged herein, including but not limited to the

10   allegations set forth in Paragraphs 130 and 132 herein, which are incorporated by reference, obtained

11   $3.4 million of Plaintiffs' money as well as Plaintiffs' equine interests in thoroughbred foals that were

12   obtained by Plaintiffs through their participation in the Mare and Lease Program.

13        204.   By virtue of the terms of the Purchase and Exchange Program, and according to the

14   CLASSICSTAR Defendants' representations regarding that program, Plaintiffs exchanged their equine

15   interests for interests in performance horses and were to be paid interest at the rate of four percent (4%)

16   per quarter on their initial business contribution of $3.4 million dollars. Plaintiffs would then be

17   entitled to sell the horses back to CLASSICSTAR at a date certain for the full amount of the original

18   $3.4 million contribution plus a "put price" twenty percent (20%) higher than the original contribution,

19   resulting in a premium sale over the contribution amount and a guaranteed thirty percent (30%) return.

20        205.   Through the fraudulent Purchase and Exchange Program, Defendants, and each of them,

21   have taken possession of Plaintiffs initial business contribution as well as their equine interests for a

22   significant amount of time and have failed to respond to Plaintiffs' demands for their return.

23        206.   The Plaintiffs now know that the purported quarter horse foals that were the subject of

24   the Purchase and Exchange Program do not exist, have never existed and will never exist. Plaintiffs

25   did not discover that the horses did not exist, and therefore did not discover the CLASSICSTAR

26   Defendants' conversion of their money and equine interests, until the Fall of 2006.

27        207.   The CLASSICSTAR Defendants, and each of them, by the fraudulent means alleged

28   herein, including but not limited to the CLASSICSTAR Defendants' inducement of Plaintiffs to

1 participate in the Purchase and Exchange Program, misappropriated and converted to their use and
2 possession, without Plaintiffs' knowledge or consent, Plaintiffs' money and equine interests.

3 208. The CLASSICSTAR Defendants' conversion and unlawful withholding of Plaintiffs'
4 money and property is continuing in that the CLASSICSTAR Defendants have failed and refused to
5 deliver Plaintiffs' money and property after repeated demands and have fraudulently obtained and
6 retained Plaintiffs' money and property.

7 209. As a proximate result of the CLASSICSTAR Defendants' conversion and
8 embezzlement, Plaintiffs have suffered damages in that they have not received the benefits of their
9 breeding business, they have been deprived of the money they used to fund their business in the
10 amount of $3.4 million, their equine interests, and all sums due and owing to Plaintiffs under the
11 Purchase and Exchange Agreement. Moreover, they have suffered and will suffer additional damages
12 as a result of the IRS audit. Plaintiffs reserve the right to amend this Complaint to set forth the full
13 extent of their damages when ascertained.

14 210. In doing the things herein alleged, the CLASSICSTAR Defendants and certain of DOES
15 1-1000, and each of them, acted willfully, oppressively, fraudulently and maliciously, and with a
16 conscious disregard of the rights of Plaintiffs and, accordingly, Plaintiffs are entitled to recovery of
17 punitive damages in an amount to be determined by the trier of fact.

18 WHEREFORE, Plaintiffs pray for relief as follows:

19 a. For damages in the amount of $3.4 Million, or more, according to proof;

20 b. For pre-judgment interest at the legal rate;

21 c. For costs, expenses and attorneys' fees;

22 d. For punitive damages to be determined by the trier of fact; and

23 e. For such other and further relief as the Court may deem proper in the premises.

24 ### FOURTEENTH CLAIM FOR RELIEF

25 [NEGLIGENCE -- Against All Defendants and DOES 1-1000]

26 211. The allegations of paragraphs 1-210 are incorporated by reference as if fully set forth
27 herein.

28 212. The Defendants and certain of DOES 1-1000, and each of them, directly or indirectly,

48

FIRST AMENDED COMPLAINT

1    negligently developed, structured, marketed, promoted and/or executed the Mare Lease Program
2    and/or the Purchase and Exchange Program when they knew, or in the exercise of ordinary care,
3    should have known that the programs were not viable, that the tax attributes likely would not pass
4    muster under IRS Code requirements and that Plaintiffs' business interests in the programs would
5    become worthless.

6        213.    At all times material hereto, Defendants and certain of DOES 1-1000 had a duty to
7    Plaintiffs to exercise reasonable care in their dealings and advisement to Plaintiffs regarding the
8    business interests sold in the programs and the viability of the tax saving strategies.

9        214.    Defendants and certain of DOES 1-1000, and each of them, breached their duties and
10   were negligent in their actions, misrepresentations and omissions toward Plaintiffs, including but not
11   limited to, in that they:

12           a. marketed, promoted, advised and recommended that Plaintiffs engage in the Mare Lease
13               Program and/or the Purchase and Exchange Program as viable programs when they
14               were not;

15           b. advised Plaintiffs that the tax attributes in the programs as represented were legitimate,
16               proper and in accordance with all applicable tax laws, rules and regulations;

17           c. failed to advise Plaintiffs that if they filed tax returns claiming losses based on the tax
18               attributes represented in the programs that Plaintiffs would be audited and all of their
19               tax positions (based on those representations) potentially disallowed with potential
20               exposure for interest and penalties as well as additional tax;

21           d. failed to revise, alter, amend or modify the advice, recommendations, instructions,
22               representations and opinions made to Plaintiffs regarding the propriety of the tax
23               attributes or the financial viability of the programs;

24           e. failed to advise Plaintiffs that Defendants, or some of them, had engaged in criminal
25               conduct justifying a criminal investigation by the IRS.

26   //
27   //
28   //

49

FIRST AMENDED COMPLAINT

1    215.    Defendants and certain of DOES 1 to 1000 knew or should have known that the
2  programs were not viable and that the IRS would challenge the tax positions. Nevertheless, Defendants
3  and DOES 1 to 1000 actively and aggressively developed, structured, marketed, promoted and/or
4  executed the programs.

5    216.    Defendants and certain of DOES 1 to 1000 owed Plaintiffs a legal duty of care to act in
6  an ordinary prudent and reasonable manner so as not to damage or cause injury to Plaintiffs.

7    217.    Defendants, and each of them, breached their duties of care by, including without
8  limitation, engaging in the wrongful conduct alleged herein.

9    218.    At the times Defendants, and each of them, engaged in the wrongful conduct alleged
10 herein, it was foreseeable that said conduct would cause an unreasonable risk of harm to Plaintiffs;

11    219.    Plaintiffs did not discover Defendants' breaches of duty until the Fall of 2006.

12    220.    The Defendants' negligence was the proximate and legal cause of the Plaintiffs' injuries.

13    221.    The Plaintiffs have been harmed by Defendants' negligence as follows: (a) they are
14 currently being audited by the IRS, have incurred legal expenses defending the audit and the outcome
15 is not known but potentially may result in liability for additional tax, interest and penalties; (b) their
16 contribution of $3.4 million to their mare leasing business, as well as their equine interests, have been
17 lost; (c) they have not received the benefits of their breeding business; (d) they have not received the
18 sums due and owing to them under the Purchase and Exchange Program; and (e) they have incurred
19 other damages, according to proof.

20    WHEREFORE, Plaintiffs pray for relief as follows:

21        a.    For damages in the amount of $3.4 Million, or more, according to proof;

22        b.    For further compensatory damages according to proof, including but not limited
23            to damages arising form the ongoing tax audit;

24        c.    For pre-judgment interest on damages according to proof;

25        d.    For costs of suit;

26 //

27 //

28 //

1         e.     For such other and further relief as the Court deems just and proper in the

2          premises.

3

4                        IDELL & SEITEL LLP

5

6 Dated: December 21, 2007         By: _____

7                        Richard J. Idell
                       Ory Sandel

8                        Elizabeth J. Rest
                       Attorneys for Plaintiffs Gregory R. Raifman and Susan

9                        Raifman, individually and as Trustees for the Raifman
                       Family Revocable Trust Dated 7/2/03, and Gekko

10                        Holdings, LLC, an Alaska limited liability company, dba

11                        Gekko Breeding and Racing

12                  **DEMAND FOR JURY TRIAL**

13       The Plaintiffs hereby demand a trial by jury in the above matter.

14                        IDELL & SEITEL LLP

15

16 Dated: December 21, 2007         By: _____

17                        Richard J. Idell
                       Ory Sandel

18                        Elizabeth J. Rest
                       Attorneys for Plaintiffs Gregory R. Raifman and Susan

19                        Raifman, individually and as Trustees for the Raifman
                       Family Revocable Trust Dated 7/2/03, and Gekko

20                        Holdings, LLC, an Alaska limited liability company, dba

21                        Gekko Breeding and Racing

22

23

24

25

26

27

28

51

**FIRST AMENDED COMPLAINT**

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of this FIRST AMENDED COMPLAINT has been electronically filed on December 21, 2007, with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the following:

| ATTORNEY-FIRM | REPRESENTED PARTIES |
|---|---|
| Robert M. Anderson<br>Van Cott, Bagley, Cornwall & McCarthy<br>36 South State Street, Suite 1900<br>Salt Lake, UT 84111-1478<br>Phone: 801-237-0213<br>Fax: 801-534-0058<br>Email: randerson@vancott.com | *Gastar Exploration, Ltd.*<br>*(Defendant)* |
| John G. Irvin, Jr.<br>Kinkead & Stilz, PLLC<br>301 E. Main Street, Suite 800<br>Lexington, KY 40507<br>Phone: 859-296-2300<br>Fax: 859-296-2566<br>Email: jirivin@ksattorneys.com | *Terry L. Green*<br>*(Defendant)* |
| Janet Knauss Larsen, Esq.<br>Foster Pepper, LLP<br>601 Southwest Second Avenue, Suite 1800<br>Portland, OR 97204<br>Phone: 503-221-7308<br>Fax: 888-521-9914<br>Email: larja@fosterpdx.com | *Private Consulting Group, Inc.*<br>*(Defendants)* |
| Nicholas Deenis<br>Stradley Ronon Stevens & Young LLP<br>2600 One Commerce Square<br>2005 Market Street<br>Philadelphia, PA 19103-7098<br>Phone: 215-564-8142<br>Fax: 215-564-8120<br>Email: ndeenis@stradley.com | *David S. Forman*<br>*(Defendant)* |
| T. Parker Douglas<br>Hatch, James & Dodge<br>10 West Broadway, Suite 400<br>Salt Lake City, UT 84101 | *Beechglen Farms; Dr. John Hales*<br>*(Plaintiff)* |

Phone: 801-363-6363
Fax: 801-363-6666
Email: pdouglas@hjdlaw.com

First Equine Energy                           *First Equine Energy Partners, LLC*
37 North Buffalo Rd.
Farmington, UT 84025

Brian P. Flaherty, Esq.                       *J&L Canterbury Farms, LLC; Leo Hertzog*
Wolf, Block, Schorr & Solis-Cohen LLP         *& Jean Hertzog*
1650 Arch Street, 22nd Floor                  *(Plaintiffs)*
Philadelphia, PA 19103-2097
Phone: 215-977-2048
Fax: 215-405-2948
Email: bflaherty@wolfblock.com

Catherine L. Sakach                           *J&L Canterbury Farms, LLC, Leo Hertzog*
Wolf, Block, Schorr and Solis-Cohen, LLP      *& Jean Hertzog*
1940 Route 70 East, Suite 200                 *(Plaintiffs)*
Cherry Hill, NJ 08003
(856) 874-4226
(856) 874-4386 (fax)
Email: csakach@wolfblock.com

Eric D. Freed                                 *Wilmington Trust of Pennsylvania*
Neal D. Colton                                *(Defendant)*
Cozen O'Connor
1900 Market Street
Philadelphia, PA 19103
Phone: 215-665-3724
Fax: 215-701-2324
Email: efreed@cozen.com
        ncolton@cozen.com
Barbara B. Edelman, Esq.                      *Handler, Thayer & Duggan,  LLC and*
Grahmn M. Morgan, Esq.                        *Thomas J. Handler, J.D., P.C.*
Whitney Howard Mendiondo, Esq.                *(Defendants)*
Dinsmore & Shohl LLP
250 West Main Street, Suite 1400
Lexington, Kentucky 40507
(859) 425-1010 | Phone
(859) 425-1099 | Fax
 Email:  barbara.edelman@dinslaw.com
        grahmn.morgan@dinslaw.com

Barry D. Hunter                               *West Hills Farms, LLC; Arbor Farms,*
Medrith Lee Norman                            *LLC; Nelson Breeders, LLC; and*
Paul E. Sullivan                              *MacDonald Stables, LLC, Jaswinder and*
Robert C. Webb                                *Monica Grover*
Frost Brown Todd LLC                          *(Plaintiffs)*

250 West Main Street, Suite 2700
Lexington, KY 40507
Phone: 859-231-0000
Fax: 859-231-0011
Email: bhunter@fbtlaw.com
     psullivan@fbtlaw.com
     mnorman@fbtlaw.com
     bwebb@fbtlaw.com

| | |
|---|---|
| Brian M. Johnson<br>David A. Owen<br>Matthew Stinnett<br>Greenbaum, Doll & McDonald, PLLC<br>300 West Vince Street, Suite 1100<br>Lexington, KY 40507<br>Phone: 859-288-4613<br>Fax: 859-255-2742<br>Email: bmj@gdm.com<br>     mas2@gdm.com<br>     dao@gdm.com | *ClassicStar 2004, LLC; ClassicStar Farms, LLC; ClassicStar Thoroughbreds, LLC; ClassicStar, LLC; Tony P. Ferguson; GeoStar Corp ; Geostar Equine Energy, Inc.; John W. Parrot; Thomas Robinson (Defendants)* |
| Romaine C. Marshall<br>Holland & Hart<br>60 East South Temple, Suite 2000<br>Salt Lake City, UT 84111-1031<br>Phone: 801-799-5922<br>Fax: 866-871-6139<br>Email: rcmarshall@hollandhart.com | *Bissmeyer Properties (Plaintiff)* |
| Scott H. White<br>Emily H. Cowles<br>T. Scott White<br>Morgan & Pottinger, PSC<br>133 W. Short Street<br>Lexington, KY 40507<br>Phone: 859-226-5288<br>Email: tsw@m-p.net | *Strategic Opportunity Solutions, LLC dba Buffalo Ranch; David Plummer, S. David Plummer; S. David Plummer, II, Spencer Plummer; Spencer D. Plummer, III (Defendants)* |
| Jason W. Crowell<br>600 University Street, Suite 3600<br>Seattle, WA 98101<br>Phone: 206-386-7526<br>Fax: 206-386-7500<br>Email: jwcrowell@stoel.com | *David Plummer (Defendant)* |
| Neils P. Murphy<br>Murphy & Anderson, PA<br>One Independent Drive, Suite 1801<br>Jacksonville, FL 32202 | *Premiere Thoroughbreds, LLC; Greg Minor; Stephanie Minor (Plaintiff)* |

Phone: 904-598-9283
Fax: 904-598-9283
Email:
nmurphy@murphyandersonlaw.com

Christopher B. Snow            *National Equine Lending Co., LLC, New*
Rodney G. Snow               *NEL, LLC*
Walter A. Romney, Jr.           *(Defendant)*
Charles R. Brown
Clyde, Snow, Sessions & Swenson
201 South Main Street, 13th Floor
Salt Lake City, UT 84111-2216
Phone: 801-322-2516
Fax: 801-521-6280
Email: war@clydesnow.com
      rgs@clydesnow.com
      cbs@clydesnow.com
      crb@clydesnow.com

                                 *Schiellack & Associates, Dwayne*
Sherryll M. Dunaj, Esq.         *Schiellack*
Stephens, Lynn, Klein, La Cava, Hoffman    *(Defendant)*
& Puya, PA
Penthouse II- Datran Two
9130 S. Dadeland Blvd.
Miami, FL 33156
Phone: 305-670-3700
Fax: 305-670-8592
Email: Dunajs@stephenslynn.com

Jeffrey Weston Shields         *Spencer D Plummer, III*
Jones Waldo Holbrook & McDonough    *(Plaintiff & Counter-Defendant)*
170 South Main Street, Suite 1500
Salt Lake City, UT 84101
Phone: 801-521-3200
Fax: 801-328-0537
Email: jwshields@joneswaldo.com

J. Ronald Sim, WSBA No. 4888     *Strategic Opportunity Solutions, LLC,*
STOEL RIVES LLP              *David Plummer, Spencer Plummer*
600 University Street, Suite 3600     *(Defendant)*
Seattle, WA 98101
Phone: (206) 386-7592
Email: jrsim@stoel.com

James S. Lowrie                *Zeus Investments, LLC*
Jeffrey Weston Shields
170 South Main Street, Suite 1500
Salt Lake City, Utah 84101
Telephone: (801) 521-3200

Facsimile: (801) 328-0537
Email Address:
JSHIELDS@joneswaldo.com

*Karren, Hendrix, Stagg, Allen & Co., P.C*
*(Defendant)*

Amanda L. Brockmann
Ronald L. Green
Boehl Stopher & Graves, LLP
444 West Second Street
Lexington, KY 40507
Phone: 859-252-6721
Fax: 859-253-1445
Email: rgreen@bsglex.com
    abrockmann@bsglex.com

*Karren, Hendrix, Stagg, Allen & Co , P.C*
*(Defendant)*

David W. Henry
Allen, Dyer, Doppelt, Milbrath & Gilchrist,
PA
255 S. Orange Avenue, Suite 1401
Phone: 407-841-2230
Fax: 407-841-2343
Email: dhenry@addmg.com

*Karren, Hendrix, Stagg, Allen & Company,*
*P.C*

Ronald Green, Esq.
Boehl, Stopher & Graves LLP
444 W. Second Street
Lexington, KY 40507

I further certify that I mailed the foregoing document and the notice of electronic filing
by first class mail to the following non-CM/ECF participants:

Brian P. Flaherty, Esq.
Wolf, Block, Schorr & Solis-Cohen LLP
1650 Arch Street, 22nd Floor
Philadelphia, PA 19103-2097
Phone: 215-977-2048
Fax: 215-405-2948
Email: bflaherty@wolfblock.com

*J&L Canterbury Farms, LLC; Leo Hertzog*
*& Jean Hertzog*
*(Plaintiffs)*

Suzanne M. Slavens

# United States District Court

## EASTERN DISTRICT OF KENTUCKY
### CENTRAL DIVISION AT LEXINGTON

IN RE CLASSICSTAR MARE LEASE LITIGATION

AND

GREGORY R. RAIFMAN, individually and as Trustee of the RAIFMAN
FAMILY REVOCABLE TRUST DATED 7/2/03, SUSAN RAIFMAN,
individually and as Trustee of the RAIFMAN FAMILY REVOCABLE
TRUST DATED 7/2/03, and GEKKO HOLDINGS, LLC, an
Alaska limited liability company, dba GEKKO BREEDING AND RACING.

      Plaintiffs,

v

CLASSICSTAR, LLC, a Utah limited liability company,
CLASSICSTAR FARMS, LLC, a Kentucky limited liability company,
STRATEGIC OPPORTUNITY SOLUTIONS, LLC, a Utah limited
liability company d/b/a BUFFALO RANCH, GEOSTAR CORPORATION.
a Delaware corporation, S DAVID PLUMMER, SPENCER D
PLUMMER III, TONY FERGUSON, THOMAS ROBINSON.
JOHN PARROT, HANDLER, THAYER & DUGGAN. LLC,
an Illinois Limited Liability Company, THOMAS J HANDLER,
THOMAS J HANDLER, J D, P C. an Illinois professional corporation,
KARREN. HENDRIX, STAGG. ALLEN & COMPANY, P.C.,
a Utah professional corporation f/k/a KARREN. HENDRIX &
ASSOCIATES, P C., a Utah professional corporation. TERRY L
GREEN, CLASSICSTAR FARMS, INC , a Delaware corporation,
and DOES 1-1000 inclusive,

      Defendants

## AMENDED
## SUMMONS IN A CIVIL CASE

MDL Docket No. 1877

Master File in Civil Action No.: 5:07-cv-353-JMH

Eastern District of KY Case No.: 5:07-cv-347-JMH
Northern District of CA Case No.: 3:07-cv-2552-MJ

TO:    See Attachment "A"

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

      Richard J. Idell
      Idell & Seitel, LLP
      465 California Street, Suite 300
      San Francisco, CA 94104

      an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of
the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint You must
also file your answer with the Clerk of this Court within a reasonable period of time after service

CLERK

(BY) DEPUTY CLERK

## RETURN OF SERVICE

| Service of the Summons and Complaint was made by me | DATE |
|---|---|
| Name of SERVER | TITLE |

*Check one box below to indicate appropriate method of service*

☐ Served Personally upon the Defendant  Place where served:

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein  Name of person with whom the summons and complaint were left:

☐ Returned unexecuted:

☐ Other *(specify)*.

### STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL |
|---|---|---|
| | | |

### DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____
           Date

_____
*Signature of Server*

_____
*Address of Server*

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure

## ATTACHMENT "A"

Karren, Hendrix, Stagg, Allen & Company, P.C., a Utah professional corporation f/k/a
Karren Hendrix & Associates, P.C., a Utah professional corporation
c/o
Amanda L. Brockmann
Ronald L. Green
Boehl Stopher & Graves, LLP
444 West Second Street
Lexington, KY 40507

-AND-

David W. Henry
Allen, Dyer, Doppelt, Milbrath & Gilchrist, PA
255 S. Orange Avenue, Suite 1401


Thomas J. Handler
c/o
Barbara B. Edelman, Esq.
Grahmn M. Morgan, Esq.
Whitney Howard Mendiondo, Esq.
Dinsmore & Shohl LLP
250 West Main Street, Suite 1400
Lexington, Kentucky 40507

Thomas J. Handler, J.D., P.C.
c/o Thomas J. Handler
191 N. Wacker Drive, 23rd Floor
Chicago, IL 60606

Strategic Opportunity Solutions, LLC, A Utah limited liability company
d/b/a Buffalo Ranch
c/o
Scott H. White
Emily H. Cowles
T. Scott White
Morgan & Pottinger, PSC
133 W. Short Street
Lexington, KY 40507

ClassicStar Farms, LLC, a Kentucky limited liability company
c/o
Brian M. Johnson
David A. Owen

Matthew Stinnett
Greenbaum, Doll & McDonald, PLLC
300 West Vince Street, Suite 1100
Lexington, KY 40507


ClassicStar, LLC, a Utah limited liability company
c/o
Brian M. Johnson
David A. Owen
Matthew Stinnett
Greenbaum, Doll & McDonald, PLLC
300 West Vince Street, Suite 1100
Lexington, KY 40507

Geostar Corporation, a Delaware corporation
c/o
Brian M. Johnson
David A. Owen
Matthew Stinnett
Greenbaum, Doll & McDonald, PLLC
300 West Vince Street, Suite 1100
Lexington, KY 40507

Handler, Thayer & Duggan, LLC, an Illinois Limited Liability Company
c/o
Barbara B. Edelman, Esq.
Grahmn M. Morgan, Esq.
Whitney Howard Mendiondo, Esq.
Dinsmore & Shohl LLP
250 West Main Street, Suite 1400
Lexington, Kentucky 40507


John Parrot
c/o
Brian M. Johnson
David A. Owen
Matthew Stinnett
Greenbaum, Doll & McDonald, PLLC
300 West Vince Street, Suite 1100
Lexington, KY 40507

S. David Plummer
c/o
Scott H. White
Emily H. Cowles

T. Scott White
Morgan & Pottinger, PSC
133 W. Short Street
Lexington, KY 40507

Spencer D. Plummer, III
c/o
Scott H. White
Emily H. Cowles
T. Scott White
Morgan & Pottinger, PSC
133 W. Short Street
Lexington, KY 40507

Terry L. Green
c/o
John G. Irvin, Jr.
Kinkead & Stilz, PLLC
301 E. Main Street, Suite 800
Lexington, KY 40507

Thomas Robinson
c/o
Scott H. White
Emily H. Cowles
T. Scott White
Morgan & Pottinger, PSC
133 W. Short Street
Lexington, KY 40507

Tony Ferguson
c/o
Scott H. White
Emily H. Cowles
T. Scott White
Morgan & Pottinger, PSC
133 W. Short Street
Lexington, KY 40507

ClassicStar Farms, Inc.
c/o The Company Corporation
2711 Centerville Road, Suite 400
Wilmington, DE 19808

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of this SUMMONS FOR FIRST AMENDED COMPLAINT has been electronically filed on December 21, 2007, with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the following:

| ATTORNEY-FIRM | REPRESENTED PARTIES |
|---|---|
| Robert M. Anderson<br>Van Cott, Bagley, Cornwall & McCarthy<br>36 South State Street, Suite 1900<br>Salt Lake, UT 84111-1478<br>Phone: 801-237-0213<br>Fax: 801-534-0058<br>Email: randerson@vancott.com | *Gastar Exploration, Ltd.*<br>*(Defendant)* |
| John G. Irvin, Jr.<br>Kinkead & Stilz, PLLC<br>301 E. Main Street, Suite 800<br>Lexington, KY 40507<br>Phone: 859-296-2300<br>Fax: 859-296-2566<br>Email: jirivin@ksattorneys.com | *Terry L. Green*<br>*(Defendant)* |
| Janet Knauss Larsen, Esq.<br>Foster Pepper, LLP<br>601 Southwest Second Avenue, Suite 1800<br>Portland, OR 97204<br>Phone: 503-221-7308<br>Fax: 888-521-9914<br>Email: larja@fosterpdx.com | *Private Consulting Group, Inc.*<br>*(Defendants)* |
| Nicholas Deenis<br>Stradley Ronon Stevens & Young LLP<br>2600 One Commerce Square<br>2005 Market Street<br>Philadelphia, PA 19103-7098<br>Phone: 215-564-8142<br>Fax: 215-564-8120<br>Email: ndeenis@stradley.com | *David S. Forman*<br>*(Defendant)* |
| T. Parker Douglas<br>Hatch, James & Dodge<br>10 West Broadway, Suite 400<br>Salt Lake City, UT 84101 | *Beechglen Farms, Dr. John Hales*<br>*(Plaintiff)* |

Phone: 801-363-6363
Fax: 801-363-6666
Email: pdouglas@hjdlaw.com

First Equine Energy                          *First Equine Energy Partners, LLC*
37 North Buffalo Rd.
Farmington, UT 84025

Brian P. Flaherty, Esq.                      *J&L Canterbury Farms, LLC; Leo Hertzog*
Wolf, Block, Schorr & Solis-Cohen LLP        *& Jean Hertzog*
1650 Arch Street, 22nd Floor                 *(Plaintiffs)*
Philadelphia, PA 19103-2097
Phone: 215-977-2048
Fax: 215-405-2948
Email: bflaherty@wolfblock.com

Catherine L. Sakach                          *J&L Canterbury Farms, LLC, Leo Hertzog*
Wolf, Block, Schorr and Solis-Cohen, LLP     *& Jean Hertzog*
1940 Route 70 East, Suite 200                *(Plaintiffs)*
Cherry Hill, NJ 08003
(856) 874-4226
(856) 874-4386 (fax)
Email: csakach@wolfblock.com

Eric D. Freed                                *Wilmington Trust of Pennsylvania*
Neal D. Colton                               *(Defendant)*
Cozen O'Connor
1900 Market Street
Philadelphia, PA 19103
Phone: 215-665-3724
Fax: 215-701-2324
Email: efreed@cozen.com
       ncolton@cozen.com
Barbara B. Edelman, Esq.                     *Handler, Thayer & Duggan,  LLC and*
Grahmn M. Morgan, Esq.                       *Thomas J. Handler, J.D., P.C*
Whitney Howard Mendiondo, Esq.               *(Defendants)*
Dinsmore & Shohl LLP
250 West Main Street, Suite 1400
Lexington, Kentucky 40507
(859) 425-1010 | Phone
(859) 425-1099 | Fax
 Email: barbara.edelman@dinslaw.com
         grahmn.morgan@dinslaw.com

Barry D. Hunter                              *West Hills Farms, LLC; Arbor Farms,*
Medrith Lee Norman                           *LLC; Nelson Breeders, LLC; and*
Paul E. Sullivan                             *MacDonald Stables, LLC, Jaswinder and*
Robert C. Webb                               *Monica Grover*
Frost Brown Todd LLC                         *(Plaintiffs)*

250 West Main Street, Suite 2700
Lexington, KY 40507
Phone: 859-231-0000
Fax: 859-231-0011
Email: bhunter@fbtlaw.com
     psullivan@fbtlaw.com
     mnorman@fbtlaw.com
     bwebb@fbtlaw.com

| | |
|---|---|
| Brian M. Johnson<br>David A. Owen<br>Matthew Stinnett<br>Greenbaum, Doll & McDonald, PLLC<br>300 West Vince Street, Suite 1100<br>Lexington, KY 40507<br>Phone: 859-288-4613<br>Fax: 859-255-2742<br>Email: bmj@gdm.com<br>    mas2@gdm.com<br>    dao@gdm.com | *ClassicStar 2004, LLC; ClassicStar Farms,*<br>*LLC; ClassicStar Thoroughbreds, LLC;*<br>*ClassicStar, LLC; Tony P. Ferguson;*<br>*GeoStar Corp.; Geostar Equine Energy,*<br>*Inc.; John W. Parrot; Thomas Robinson*<br>*(Defendants)* |
| Romaine C. Marshall<br>Holland & Hart<br>60 East South Temple, Suite 2000<br>Salt Lake City, UT 84111-1031<br>Phone: 801-799-5922<br>Fax: 866-871-6139<br>Email: rcmarshall@hollandhart.com | *Bissmeyer Properties*<br>*(Plaintiff)* |
| Scott H. White<br>Emily H. Cowles<br>T. Scott White<br>Morgan & Pottinger, PSC<br>133 W. Short Street<br>Lexington, KY 40507<br>Phone: 859-226-5288<br>Email: tsw@m-p.net | *Strategic Opportunity Solutions, LLC dba*<br>*Buffalo Ranch; David Plummer, S. David*<br>*Plummer; S. David Plummer, II, Spencer*<br>*Plummer, Spencer D. Plummer, III*<br>*(Defendants)* |
| Jason W. Crowell<br>600 University Street, Suite 3600<br>Seattle, WA 98101<br>Phone: 206-386-7526<br>Fax: 206-386-7500<br>Email: jwcrowell@stoel.com | *David Plummer*<br>*(Defendant)* |
| Neils P. Murphy<br>Murphy & Anderson, PA<br>One Independent Drive, Suite 1801<br>Jacksonville, FL 32202 | *Premiere Thoroughbreds, LLC; Greg*<br>*Minor; Stephanie Minor*<br>*(Plaintiff)* |

Phone: 904-598-9283
Fax: 904-598-9283
Email:
nmurphy@murphyandersonlaw.com

Christopher B. Snow                          *National Equine Lending Co., LLC; New*
Rodney G. Snow                               *NEL, LLC*
Walter A. Romney, Jr.                        *(Defendant)*
Charles R. Brown
Clyde, Snow, Sessions & Swenson
201 South Main Street, 13th Floor
Salt Lake City, UT 84111-2216
Phone: 801-322-2516
Fax: 801-521-6280
Email: war@clydesnow.com
        rgs@clydesnow.com
        cbs@clydesnow.com
        crb@clydesnow.com

                                             *Schiellack & Associates; Dwayne*
                                             *Schiellack*
Sherryll M. Dunaj, Esq.                      *(Defendant)*
Stephens, Lynn, Klein, La Cava, Hoffman
& Puya, PA
Penthouse II- Datran Two
9130 S. Dadeland Blvd.
Miami, FL 33156
Phone: 305-670-3700
Fax: 305-670-8592
Email: Dunajs@stephenslynn.com

Jeffrey Weston Shields                       *Spencer D. Plummer, III*
Jones Waldo Holbrook & McDonough             *(Plaintiff & Counter-Defendant)*
170 South Main Street, Suite 1500
Salt Lake City, UT 84101
Phone: 801-521-3200
Fax: 801-328-0537
Email: jwshields@joneswaldo.com

J. Ronald Sim, WSBA No. 4888                 *Strategic Opportunity Solutions, LLC,*
STOEL RIVES LLP                              *David Plummer, Spencer Plummer*
600 University Street, Suite 3600            *(Defendant)*
Seattle, WA 98101
Phone: (206) 386-7592
Email: jrsim@stoel.com

James S. Lowrie                              *Zeus Investments, LLC*
Jeffrey Weston Shields
170 South Main Street, Suite 1500
Salt Lake City, Utah 84101
Telephone: (801) 521-3200

Facsimile: (801) 328-0537
Email Address:
JSHIELDS@joneswaldo.com

*Karren, Hendrix, Stagg, Allen & Co., P.C.*
*(Defendant)*

Amanda L. Brockmann
Ronald L. Green
Boehl Stopher & Graves, LLP
444 West Second Street
Lexington, KY 40507
Phone: 859-252-6721
Fax: 859-253-1445
Email: rgreen@bsglex.com
       abrockmann@bsglex.com

*Karren, Hendrix, Stagg, Allen & Co., P.C.*
*(Defendant)*

David W. Henry
Allen, Dyer, Doppelt, Milbrath & Gilchrist, PA
255 S. Orange Avenue, Suite 1401
Phone: 407-841-2230
Fax: 407-841-2343
Email: dhenry@addmg.com

*Karren, Hendrix, Stagg, Allen & Company, P.C.*

Ronald Green, Esq.
Boehl, Stopher & Graves LLP
444 W. Second Street
Lexington, KY 40507

I further certify that I mailed the foregoing document and the notice of electronic filing by first class mail to the following non-CM/ECF participants:

Brian P. Flaherty, Esq.
Wolf, Block, Schorr & Solis-Cohen LLP
1650 Arch Street, 22nd Floor
Philadelphia, PA 19103-2097
Phone: 215-977-2048
Fax: 215-405-2948
Email: bflaherty@wolfblock.com

*J&L Canterbury Farms, LLC, Leo Hertzog*
*& Jean Hertzog*
*(Plaintiffs)*

Suzanne M. Slavens

File Date:  April 29, 2008

Case No: O8cv2213

ATTACHMENT # 2

EXHIBIT  D through E

TAB (DESCRIPTION)

D

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at LEXINGTON

| | |
|---|---|
| IN RE CLASSICSTAR MARE LEASE LITIGATION | MDL No. 1877 |
| and | Master File: Civil Action No. 5:07-cv-353-JMH |
| J & L CANTERBURY FARMS, LLC, 301 Oxford Valley Road, Suite 1903B, Yardley, Pennsylvania 19067; and | and |
| | Civil Action No. 5:07-cv-349-JMH |
| LEO AND JEAN HERTZOG, 9751 Bent Grass Bend, Florida 34108 | **SECOND AMENDED COMPLAINT** |
| Plaintiffs, | **JURY DEMANDED** |
| v. | |
| CLASSICSTAR, LLC, 500 North Marketplace Drive, Suite 200, Centerville, Utah 84014; | |
| GEOSTAR CORPORATION, 13907 Carrollwood Village Run, Tampa, Florida 33624; | |
| S. DAVID PLUMMER, Buffalo Ranch 37 N. Buffalo Road, Farmington, Utah 84025; | |
| SPENCER PLUMMER, Buffalo Ranch, 37 N. Buffalo Road, Farmington, Utah 84025; | |
| TONY FERGUSON, 13907 Carrollwood Village Run, Tampa, Florida 33624; | |
| PRIVATE CONSULTING GROUP, INC., 4650 S.W. Macadam Ave., Suite 400, Portland, Oregon 97239-4262; | |
| WILMINGTON TRUST OF PENNSYLVANIA, 116 East Court Street, Doylestown, Pennsylvania 18901-4321; | |

| | |
|---|---|
| DAVID S. FORMAN, 1236 Brace Road, Suite F, Cherry Hill, New Jersey 08034;<br><br>KARREN HENDRIX STAGG, ALLEN & COMPANY, P.C,. 111 E. Broadway, Suite 250, Salt Lake City, Utah 84111;<br><br>TERRY L. GREEN, 111 E. Broadway, Suite 250, Salt Lake City, Utah 84111; and<br><br>HANDLER, THAYER, DUGGAN, LLC, 191 North Wacker Drive, 23rd Floor, Chicago, Illinois 60606;<br><br>                        Defendants. | |

## SECOND AMENDED COMPLAINT

For their Second Amended Complaint against the defendants, the Plaintiffs J & L Canterbury Farms, LLC ("J&L"), Leo Hertzog and Jean Hertzog (collectively "Plaintiffs"), through counsel, state as follows:

## I.    INTRODUCTION

1.    This case represents a classic RICO scheme. Acting together as alleged in detail below, over the past five years, defendants have utilized a thoroughbred horse breeding operation as a vehicle to defraud unsuspecting purchasers of millions of dollars.

2.    Operating in a number of states, including Pennsylvania, defendants aggressively marketed and sold thoroughbred Mare Lease Programs (the "Mare Lease Programs") to wealthy individuals interested in participating in the thoroughbred horse industry.

3.    The Mare Lease Programs purportedly gave purchasers ownership of thoroughbred breeding interests worth millions of dollars as well as ownership of extremely valuable thoroughbred foals born as a result of the breeding.

4.    However, defendants deliberately marketed and sold Mare Lease Programs with a total value of tens of millions of dollars greater than the thoroughbred interests truly available for the investor, necessitating a constant turnover in investors.

5.    To cover up the fact that the same mares were being marketed and leased to multiple investors, defendants encouraged investors, shortly after the leases were entered into, to exchange their interests in the Mare Leases for other investments with related entities. In fact, that encouragement was necessary to conceal the fact that the same Mare Interests were being sold over and over again. Defendants falsely claimed those replacement investments were "no lose" investments with guaranteed upsides for investors, just a few years down the road.

However, defendants knew that these investments with related entities were unlikely to succeed as the entities were overcommitted and would be unable to honor all of their contractual obligations when they came due.

6.      Wilmington Trust of Pennsylvania ("Wilmington Trust"), the Private Consulting Group ("PCG"), and David Forman were active participants in the scheme. While they purported to provide and represented that they were providing independent investment advice to plaintiffs, they were instead serving as an advocate for the purchase of as many Mare Lease Programs as they could persuade persons like the plaintiffs to buy, which was critical to the success of the scheme. They marketed the inappropriate and unsuitable investments in the Mare Lease Programs and the replacement investments and shared in the proceeds of the scheme, through retaining a portion of the purchase price paid for the Mare Leases. These defendants' participation provided legitimacy for the entire scheme and was critical to its operation and success. On information and belief, Wilmington Trust, PCG and Forman knew that more Mare Leases Programs were being sold than there were mares available to service them, unless the purchasers agreed to convert the Mare Leases soon after they were purchased. Wilmington Trust, PCG and Forman knew that the investments in entities related to ClassicStar, LLC ("ClassicStar") were fatally flawed in the manner described in this complaint, but failed to advise their clients of this fact and, in fact, encouraged their clients' participation in those investments. In fact, Wilmington Trust, PCG and Forman stood to benefit from the constant turnover in investors in the Mare Lease Program because it would enable them to earn more commissions.

7.      Based on defendants' fraudulent misrepresentations and other illegal actions in connection with the Mare Lease Programs, plaintiffs bring this action against defendants pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961

et. seq., and state laws. Defendants engaged in such violations directly and as co-conspirators. The state law claims arise out of the same transaction or occurrence or series of transactions or occurrences that form the basis of the RICO cause of action.

## II.    PARTIES

8.    Plaintiff J & L Canterbury Farms, LLC ("J&L") is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business located at 301 Oxford Valley Road, Suite 1903-B, Yardley, Pennsylvania 19067.

9.    Plaintiffs Leo and Jean Hertzog are individuals who are residents and citizens of the State of Florida with a residence in Naples, Florida.

10.    Defendant S. David Plummer ("Plummer") is a citizen and resident of the State of Utah with a residence or place of business located in Farmington, Utah. He was formerly the CEO and director of marketing of ClassicStar. He was also employed by GeoStar.

11.    Defendant Spencer Plummer is a citizen and resident of the State of Utah with a residence or place of business located in Farmington, Utah. He was formerly the president of ClassicStar.

12.    Defendant Tony Ferguson ("Ferguson") is a citizen and resident of the State of Florida with a residence or place of business located in Tampa, Florida. He is currently the managing partner of ClassicStar and is a principal shareholder of GeoStar.

13.    Defendant ClassicStar is a limited liability company organized and existing under the laws of Utah with a registered agent in Kentucky. Its principal place of business is in Kentucky.

14.    Defendant GeoStar Corporation ("GeoStar") is a corporation organized and existing under the laws of Delaware with a registered agent located in Michigan. Defendant

GeoStar is a closely-held corporation that owns, indirectly through subsidiaries, ClassicStar.

Three individuals, Ferguson, Thomas Robinson, of Michigan, and John Parrott, of the U.S.

Virgin Islands, own the primary interest in GeoStar, with a small percentage of GeoStar currently

owned or owned in the past by Spencer Plummer. In addition to ClassicStar, GeoStar owns

approximately 15% of Gastar, a publicly traded corporation. Prior to January 2005, GeoStar was

the parent corporation of Gastar.

      15.     Collectively, Plummer, Spencer Plummer, Ferguson, ClassicStar and GeoStar are

referred to as the "ClassicStar Defendants."

      16.     Defendant Wilmington Trust is a corporation organized and existing under the

laws of Pennsylvania with its principal place of business in Villanova, Pennsylvania. It, along

with its affiliated companies, is among the country's largest personal trust providers and is

purported to be among its most esteemed wealth managers. Wilmington Trust holds itself out to

the public and held itself out to plaintiffs in particular as adhering to the highest business and

ethical standards in their dealings with clients, claiming those standards are "held dear" and

guide its work for its customers. It claims it offers a unique approach to each client's financial

situation and remains true to traditional principles of prudent business practices. In particular, it

claims that avoiding conflicts of interest is paramount, representing that it would always avoid

actual conflicts of interest or even the appearance of any conflicts of interest, and that its private

interests would not interfere with the best interests of its clients. It also represented that it placed a

special emphasis in advising clients on asset allocation, diversifying a client's investments across

major asset classes and sectors and that a portfolio must be able to withstand the impact of a

volatile market, and that it would take into account the tax impact of investment

recommendations.

17.    Defendant PCG is a corporation organized and existing under the laws of Oregon with its principal place of business in Portland, Oregon. According to PCG's website, it has offices located throughout the country, including in Cherry Hill, New Jersey.

18.    Defendant David S. Forman is, upon information and belief, a citizen and resident of the State of New Jersey with a residence or place of business located in Cherry Hill, New Jersey. He is identified on PCG's website as a senior managing director of PCG.

19.    Defendant Karren, Hendrix, Stagg, Allen & Company, P.C. ("Karren Hendrix") is, upon information and belief, a corporation organized and existing under the laws of Utah, with its principal place of business in Salt Lake City, Utah. It was formerly known as Karren, Hendrix & Associates, P.C. Karren Hendrix is comprised of certified public accountants. Karren Hendrix, upon information and belief, at all relevant times was engaged by ClassicStar as its accountant.

20.    Defendant Terry L. Green is a certified public accountant who, upon information and belief, is a citizen and resident of the State of Utah with his place of business located in Salt Lake City, Utah. He is employed by Karren Hendrix and is a certified public accountant.

21.    Defendant Handler, Thayer & Duggan, LLC ("Handler Thayer") is, upon information and belief, a corporation organized and existing under the laws of Illinois, with its principal place of business located in Chicago, Illinois. Hander Thayer's managing principal, Thomas J. Handler, is also a member of PCG's Wealth Strategies Design Team. Handler Thayer, upon information and belief, at all relevant times was engaged by ClassicStar as its attorneys.

### III.    JURISDICTION AND VENUE

22.    At all times relevant to this Complaint, each of defendants was and is a "person" as that term is defined in 18 U.S.C. §1961 and used in 18 U.S.C. §1962.

23.    Pursuant to 28 U.S.C. §1331, this Court has original jurisdiction over the subject matter of this case because all or part of the claims arise from defendants' violations of the United States Code, including, inter alia, the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. §1961, et. seq.

24.    This Court has supplemental jurisdiction over the subject matter of the claims asserted herein that arise under state law pursuant to 28 U.S.C. §1367(a) and the doctrines of pendent and ancillary jurisdiction, because the state law claims arise from a common nucleus of operative facts giving rise to the federal claims alleged in this case.

25.    This Court has personal jurisdiction over each of the defendants in this action pursuant to 18 U.S.C. § 1965(a), (b) and (d) as each regularly transacts business in Pennsylvania or has minimum contacts with Pennsylvania, through their sale of, involvement with, management of, or receipt of funds from the ClassicStar Mare Lease Programs, such that it is reasonable for this Court to exercise jurisdiction over them.

26.    Venue is proper in this district pursuant to 18 U.S.C. § 1965 and 28 U.S.C. §1391 as one or more of the defendants reside, are found, have agents, or transact their affairs within the Eastern District of this Court and conducted their fraudulent scheme, through use of the United States Mail or interstate wire communications in an illegal manner, in this District.

## IV.    MARE LEASE INTERESTS

27.    Mare leases represent one method of participating in the thoroughbred industry. Rather than investing in a mare directly by way of outright purchase, the participant leases the rights to the mare for a breeding season and then selects a stallion to be used in connection with the leased mare, retaining or selling the foal that results from the breeding. Often the arrangement also includes the price of a stallion stud fee, board for the mare and/or foal and insurance. Since the gestation period for a horse is eleven months and the foal is not weaned for

four to five months thereafter, and, the mare cannot safely be bred for several months, a mare

lease would render the mare unavailable for use in other Mare Lease Programs for an extended

period of time. The time period a leased mare would be unavailable to other purchasers of Mare

Lease Programs is also variable depending upon when during the breeding season the mare

becomes pregnant.

28.    Participation in the equine industry has certain tax effects. A taxpayer that is

actively engaged in the horse business may be entitled to deduct as ordinary and necessary

business expenses the amounts that he or she pays in connection with the business during any tax

year. Such ordinary expenses can include insurance, board fees, stud fees, and either the

depreciation of a mare purchased by the taxpayer or the cost of leasing a mare if the taxpayer

chose to enter into a leasing program, rather than make an outright purchase.

## V.    FACTUAL BACKGROUND

### The Plan to Sell ClassicStar Mare Leases and Alternative Investments

29.    At some time prior to the events detailed below, GeoStar, controlled by

Ferguson, acquired control of ClassicStar, and thereafter, in association with the Plummers,

operated ClassicStar. S. David Plummer was C.E.O. and Director of Marketing of ClassicStar

and his son, Spencer Plummer, was its President. Ferguson is now the managing partner of

ClassicStar.

30.    When the ClassicStar Defendants acquired control of ClassicStar, they devised a

plan to systematically defraud persons interested in acquiring Mare Leases by inflating the value

of its Mare Lease Programs, by selling far more Programs than the thoroughbred interests owned

by ClassicStar could support, by falsely representing the characteristics of the leases, by

converting Mare Leases into other investments with related entities that purported to offer

guaranteed returns, and by marketing them to wealthy individuals as virtually risk free methods
of earning high returns on their investments and generating tax benefits.

31.    The plan was to sell far more Mare Lease Programs than ClassicStar could
possibly support through either existing mares and existing stallion nominations (rights to utilize
a stallion to breed with a mare). As noted above, a Mare Lease Program would typically require
that mares that were part of it would be unavailable for an extended period. If, however, buyers
of Mare Lease Programs could be induced to pay full value for the Mare Lease, and then induced
to sell the Mare Lease Programs, the mare could be leased again to another purchaser, also at a
value based on the premise that the mare could become pregnant and be unavailable for an
extended period. In this manner, the same mare could be "leased" over and over to a series of
lease purchasers, each time at "full value." By constantly re-leasing the same mares over and
over again to new investors, the ClassicStar Defendants would maximize the income stream
ClassicStar would realize. In order to do that, ClassicStar needed to entice persons who had
purchased Mare Lease Programs to relinquish them after a shorter period of time then it would
actually take to breed the mare to a stallion and for a foal to be born.

32.    To accomplish that purpose, once persons who had purchased Mare Lease
Programs had done so, the scheme was to immediately persuade the purchaser to sell its Mare
Lease Program back to ClassicStar or a related entity in return for another type of investment. To
entice purchasers of Mare Lease Programs to make such exchanges, the ClassicStar Defendants
planned to make extravagant representations about the value and lack of risk in the alternative
investments, which typically included guaranteed exorbitant returns at a future date.

33.    The ClassicStar Defendants did not have access to a sufficient number of wealthy
individuals to accomplish their purposes and thus had to enlist other entities in their scheme. For

that purpose, they enlisted PCG, Forman and Wilmington Trust to become involved in the
scheme. That came about in the following manner.

34.    PCG entered into an agreement with ClassicStar pursuant to which it agreed that
PCG would locate persons capable of investing substantial funds in the Mare Lease Programs
and attempt to induce them to purchase Mare Lease Programs. PCG was to share in the
proceeds of the scheme by retaining 7% of the amounts of Mare Lease Programs purchased by
persons it located. In addition, upon information and belief, PCG shared in the proceeds from its
branch offices and entered into agreements to share a portion of the sales price retained by other
promoters of Classic Star Mare Leases.

35.    PCG became a major promoter of the ClassicStar Mare Lease Programs and
successfully solicited a large number of ClassicStar Mare Lease Program participants. Upon
information and belief, PCG made these solicitations directly or through its branch offices
throughout the United States.

36.    PCG, knowing Wilmington Trust had numerous clients with substantial wealth
such as the Hertzog's, enlisted Wilmington Trust in the scheme. Specifically, Forman, of PCG,
approached Kevin Coccetti ("Coccetti") and others at Wilmington Trust, including Martin Wolf
("Wolf"), about marketing ClassicStar Mare Lease Programs to Wilmington Trust's clients
sometime prior to 2003. Wilmington Trust agreed to attempt to entice its clients to purchase
Mare Lease Programs and to share in the 7% of the purchase price that PCG would receive in
return for its role in the scheme. Wilmington Trust would also be able to profit by providing
financing to Wilmington Trust clients for the purchase of the Mare Lease Interests.

37.    Once the ClassicStar Defendants had enlisted PCG, Wilmington Trust and others,
the scheme was ready to be carried out.

38.   Working in concert with the ClassicStar Defendants, PCG and Wilmington Trust

devised a marketing plan. Their marketing plans included:

(a)   providing information regarding ClassicStar Mare Leasing Programs to wealthy persons;

(b)   making representations about the legitimacy and trustworthiness of the Classic Star Defendants;

(c)   making representations about the favorable tax advantages of Mare Lease Programs;

(d)   organizing trips for prospective purchasers to visit ClassicStar and other sites;

(e)   arranging personal presentations by Plummer and Ferguson to prospective purchasers of Mare Lease Programs who had been identified and arranged through the meetings with PCG and Wilmington Trust;

(f)   attending presentations and other events such as PCG/ClassicStar "day at the races," where individual representatives of Wilmington Trust and PCG would lend credence to the advisability of purchasing the Mare Lease Programs and switching to alternative investments;

(g)   distributing wildly optimistic tax and revenue projections purportedly designed for each individual investor;

(h)   arranging lines of credit or other financing for prospective purchasers to purchase Mare Lease Programs without having to liquidate other investments or use other liquid assets the purchasers had available, thereby creating the appearance that huge projected gains could be enjoyed without even investing liquid assets;

(i)   offering to assist purchasers in maintaining logs and records required by IRS regulations in order to achieve the stated tax benefits;

(j)   advising possible Mare Lease purchasers that they should reject other investment ideas in favor of preserving their ability to make substantial investments in Mare Lease Programs; and

(k)   promising continuing involvement and support to prospective purchasers following the purchase of Mare Lease Program.

39.     The plans also included distributing tax opinions and analysis that were prepared by Karren Hendrix—specifically Terry Green—and Handler Thayer, which purported to opine as to the favorable tax treatment available to purchasers of Mare Leases.

**The Solicitation of Plaintiffs**

40.     Leo Hertzog was a businessman who owned a successful direct marketing company. In 2002, after almost 30 years engaged in business, Mr. Hertzog and his partner sold the business for a substantial sum of money. Although he was very successful, the direct marketing business was the only business Mr. Hertzog had background and experience in.

41.     After the sale of his business was completed, Leo Hertzog placed his portion of the proceeds of the sale with Wilmington Trust. He and his wife, Jean Hertzog, entered into agreements with Wilmington Trust pursuant to which it agreed to provide him with investment management advice in return for management fees. The Hertzogs chose Wilmington Trust to be their investment advisor due to its outstanding reputation and conservative investment approach and received investment advice through its Wealth Advisory Services, purportedly, according to Wilmington Trust, all in accord with the standards it represented it adhered to.

42.     Leo Hertzog informed Wilmington Trust that he was seeking a conservative, balanced investment approach. Wilmington Trust stressed its approach to diversifying assets to mitigate risks and, at least initially, Wilmington Trust recommended a diversified mix of investments for the Hertzogs.

43.     Coccetti was assigned as the Hertzogs' personal investment advisor. Wilmington Trust held Coccetti out as an experienced advisor who was competent to provide comprehensive investment advice, including advice related to the tax consequences of investments.

44.     Coccetti and Wolf were sophisticated investment professionals, with intimate knowledge about various investment alternatives and prudent risk assessment. Coccetti was a

Vice President of Wilmington Trust. Wolf was also a Vice President, Private Capital Services, of

Wilmington Trust as well as a lawyer and a certified public accountant. Wolf was held out as

having specialized knowledge with respect to Mare Leases.

45.     Wilmington Trust, Coccetti and Wolf, knew that each owed a fiduciary duty to

plaintiffs, and that plaintiffs looked to them as careful and prudent advisors. They were paid fees

by plaintiffs to advise them independently with respect to their financial affairs.

46.     Wilmington Trust utilized its relationship to advise plaintiffs not to under

undertake investment ideas that plaintiffs had to enter into new businesses. With respect to each

of those investments, if plaintiffs had made them, Wilmington Trust would not have earned any

commission or retain any portion of the amount invested by plaintiffs.

47.     For example, from mid 2002 to early 2003, Leo Hertzog approached Wilmington

Trust with five investment opportunities that he was considering, such as ownership of a retail

shopping center or a building that housed a restaurant. Wilmington Trust, through Coccetti,

advised Mr. Hertzog that such investments were too risky, that he did not have sufficient

expertise in these areas to make them suitable investments, and that they would require too much

time. Wilmington Trust advised Mr. Hertzog against each investment idea that Mr. Hertzog

brought to Wilmington Trust's attention. It did so without any real assessment of the business

opportunities plaintiffs inquired about, but for the purpose of ensuring that as much of the

Hertzogs' financial capacity as possible was available for the purchase of Mare Leases.

48.     Wilmington Trust also planned to offer the financing for these Mare Leases. By

doing so, Wilmington Trust would be enriched in the following ways:

> (a)     Unknown to plaintiffs, Wilmington Trust had entered into a secret
> agreement with PCG to retain a portion of the purchase price paid by the
> Hertzogs to ClassicStar for any Mare Leases that were purchased. The

more Mare Leases that were purchased, the more money Wilmington Trust would receive.

(b) The plan was to loan the funds that the plaintiffs would use to acquire the Mare Leases. That loan would be made by a Demand Note, callable at any time by Wilmington Trust, and fully secured by assets in more traditional investments.

49. Wilmington Trust knew of the risk inherent in the purchase of the Mare Leases, and that it was virtually certain that the represented benefits-in terms of economic return on the purchases-could not be realized, but proceeded anyway because of the gains Wilmington Trust would realize by inducing plaintiffs to participate.

50. Coccetti and Wolf knew the following facts about the Mare Lease Programs:

(a) that there was an unlimited number of Mare Lease Programs for sale in that the ClassicStar Defendants had no limitation whatsoever on the number of programs that could be sold, and, in promotional literature supplied by the ClassicStar Defendants and distributed to Wilmington Trust's clients, virtually unlimited purchases of Mare Lease Programs were promoted for as much as $30 million per person, amounts equal to or exceeding the value of assets owned by possible purchasers;

(b) that the plan from the outset was to sell Mare Lease Programs at prices based on the assumption that the mare would become pregnant and bear a foal, but then sell the purchased Mare Lease soon after it was bought back to ClassicStar in return for another "investment," to be followed by the suggestion to the investor who had just sold the Mare Lease he or she had purchased that he or she would be well advised to purchase more Mare Leases to remain active in the equine industry and enhance their tax position;

(c) that the replacement investments would be comprised of highly speculative or even non-existing stock, such as that which plaintiffs exchanged their 2003 Mare Lease Program for, or other equally worthless investments with entities affiliated with the ClassicStar Defendants;

(d) that following this plan would involve persons of substantial wealth borrowing enormous amounts in relation to their overall wealth from Wilmington Trust, all secured for Wilmington Trust by liens on more traditional investments owned by the investors and held by Wilmington Trust; and

(e)     that obtaining the anticipated tax benefits of the Mare Lease Program
entailed difficult adherence to complicated tax regulations which were
frequently the subject of costly disputes with the Internal Revenue
Service and of uncertain outcome.

51.     By early 2003, Wilmington Trust had formulated the plans outlined above and
was ready to implement them.

52.     In early 2003, before any mention was ever made by Wilmington Trust of the
ClassicStar Mare Lease Programs, Wilmington Trust advised that the Hertzogs should obtain a
credit facility in the amount of $6,000,000 from Wilmington Trust for "working capital." The
$6,000,000 could be used for any investments that the Hertzogs chose to pursue.

53.     The March 10, 2003, $6,000,000 credit facility was structured as a demand note
and required that the Hertzogs pledge as collateral the assets they held at Wilmington Trust,
which were required to be in excess of $6,000,000 or 1.30 times the value of the outstanding
loan. Wilmington Trust collected a management fee on the assets that were secured as collateral,
approximately 1% of invested equities and 0.3% for cash and bonds. The collateral was required
to remain at Wilmington Trust until the loan was repaid.

54.     As noted above, notwithstanding the availability of this credit, at around this
time, Wilmington Trust consistently advised against any of the several investments about which
the Hertzogs had sought its advice. Wilmington Trust's plan, consistent with the plans
formulated by all of defendants set forth above, was to suggest to plaintiffs, once the credit
facility was in  place, that the available funds could be used as the mechanism for purchasing the
Mare Lease Program that Coccetti would suggest the plaintiffs purchase.

55.     At the time, plaintiffs' assets totaled approximately $30 million dollars, and no
reasonable, prudent investment advisor would possibly have advised plaintiffs to borrow $6
million dollars and invest it in a risky enterprise such as purchasing Mare Lease Programs.

56.    In the late Spring of 2003, Coccetti informed plaintiffs that Wilmington Trust had a business opportunity to present and raised the idea of ClassicStar Mare Leasing. He informed plaintiffs that they should not make a decision until they saw all of the numbers.

57.    On June 27, 2003, PCG provided Coccetti at Wilmington Trust with "Illustrations" of the Mare Lease Program that, upon information and belief, had been prepared by ClassicStar for the Hertzogs. The Illustrations, which identified ClassicStar as "a division of the GeoStar Group," were dated June 24, 2003 and set forth several scenarios for the Hertzogs. Each of the scenarios anticipated: (1) a significant loan by the Hertzogs; (2) payments to ClassicStar in the form of tax refunds the Hertzogs would received from the Internal Revenue Service; and (3) a large down payment from the Hertzogs. There were three Illustrations; the first based upon an investment by the Hertzogs of $33,719,785, the second based upon a $12,802,992 investment, and the third based upon a $6,184,289 investment. The Illustrations showed "Net After Tax Mare Lese Revenue" for each of these investments as $13,251,416, $5,021,766 and $2,416,602 respectively.

58.    In addition, these "Illustrations" included references to plans for the purchaser of the Mare Leases to convert the Mare Lease Programs to alternative investments with entities related to the ClassicStar Defendants. As noted above, the intent to convert the Mare Lease Programs soon after they were acquired was part of the scheme planned by all the defendants from the outset.

59.    Additional "Illustrations" were provided to plaintiffs, also dated June 24, 2003, which set forth two different scenarios. One envisioned a $14,602,992 investment which would produce net after tax Mare Lease revenue in the amount of $5,679,754. The second proposed an

investment of $35,518,785 which would generate net after tax mare lease revenue of
approximately $13,909,403.

60.     Coccetti subsequently forwarded the "Illustrations" to plaintiffs. Coccetti
informed Leo Hertzog that he had carefully reviewed and analyzed the "Illustrations."

61.     The Hertzogs were also provided with tax opinions prepared by Handler Thayer
and Karren Hendrix, which purported to offer opinions regarding the favorable tax treatments
available for participants in Mare Leasing Programs. These opinions were prepared for
ClassicStar with the understanding that they would be used to solicit potential investors.

62.     When Leo Hertzog advised Coccetti that he wanted to consult with his lawyer
and accountant about the proposed investment, Coccetti immediately told Leo Hertzog that he
predicted that plaintiffs' lawyer and accountant would advise him against it, but that Mr. Hertzog
should ignore any such advice for the reason that it was too conservative. Coccetti assured Leo
Hertzog at that time that, contrary to any such advice, the proposed purchase was a prudent and
safe investment for Leo Hertzog, specifically, that it was a "no brainer." In fact, Coccetti knew at
the time he made that statement that it was false, that the Mare Leasing scheme was at best a
highly speculative investment whose proposed benefits were highly unlikely to be realized.

63.     Coccetti and Wolf arranged a meeting with Leo Hertzog, Forman, the Hertzogs'
accountant and lawyer, and Plummer (who participated by phone) on July 10, 2003. Forman
utilized a power point presentation which included an array of graphs, spreadsheets and charts to
sell the ClassicStar Mare Lease Programs and to describe the financial potential and profitability
of the Mare Lease Programs. Coccetti and Wolf concurred with each of the points made by
Forman. Plummer spoke last and reiterated the points made by Forman, including the rosy
financial projections, as well as advising Leo Hertzog that investing in the ClassicStar Mare

CHL:404649.1/HER191-235202                  - 18 -

Lease Programs would make plaintiffs member of an elite group, that only a select few were

chosen to be investors. Coccetti and Wolf represented that they had a very favorable experience

with ClassicStar with respect to another client and that they were strongly in favor of the

proposal.

64.    In fact, Wilmington Trust and Coccetti knew that the plans were to counsel

plaintiffs to sell the Mare Leases in return for an investment with an entity related to the

ClassicStar Defendants almost as soon as plaintiffs had paid for the Mare Leases, and then, as

soon as plaintiffs had done that, they would be advised to take yet another loan from Wilmington

Trust to acquire yet more Mare Lease interests.

65.    The effort to induce plaintiffs to purchase Mare Lease Programs followed the

plans that had been established long before, specifically:

(a)    In the July 10, 2003 meeting, Coccetti of Wilmington Trust and Forman of
       PCG represented that ClassicStar was a long-standing, legitimate business
       that each had thoroughly investigated and, therefore, each could
       recommend the investments because they were safe and conservative.
       Those were false statements.

(b)    Coccetti of Wilmington Trust and Forman of PCG informed Leo Hertzog
       that the investments in the Mare Lease Programs had favorable tax
       consequences. Coccetti and Forman also represented that the Mare Lease
       Programs complied with IRS guidelines in meetings and telephone calls in
       late 2003. Plummer, Spencer Plummer and Ferguson, similarly told Mr.
       Hertzog that the Mare Lease Programs complied with IRS guidelines for
       generating certain tax benefits in telephone calls and in meetings in 2003.
       For example, Plummer, Spencer Plummer and Ferguson unequivocally
       represented that, by following their recommendations regarding
       participation in the Mare Lease Programs, plaintiffs could properly deduct
       the value of the Mare Lease Programs as ordinary business expenses on
       their income tax returns. Those were false statements in that the Internal
       Revenue Service has contested the viability of the promised tax treatment
       of most, if not all, of the purchases of Mare Lease Programs.

(c)    Coccetti and Forman personally accompanied Mr. Hertzog to meetings
       with ClassicStar as well as initiated and participated in telephone calls
       with ClassicStar to discuss the potential investment. The purpose of
       accompanying plaintiffs on such trips and participating in the calls was to

convey to plaintiffs that. Wilmington Trust, PCG and Forman were well informed, knowledgeable, and concurred with the statements made by ClassicStar and GeoStar employees. Coccetti and Forman represented that had previous good experiences with the ClassicStar Defendants.

(d)     Wilmington Trust and PCG ensured that plaintiffs would attend personal presentations regarding the Mare Lease Programs made by Plummer and Ferguson.

(e)     ClassicStar provided "Illustrations" regarding the Mare Lease Programs' anticipated benefits to Wilmington Trust to forward to plaintiffs. The Illustrations falsely represented the gains that the plaintiffs could expect to receive.

(f)     Wilmington Trust advised plaintiffs they could utilize the $6 million dollar line of credit Wilmington Trust had provided to plaintiffs to invest in the 2003 Mare Lease Program.

(g)     Coccetti and Forman represented that they would assist plaintiffs in maintaining records and would review plaintiffs' log books to ensure compliance with IRS regulations in conversations in October of 2003.

(h)     Coccetti and Forman also promised that they would stay involved and assist plaintiffs.

66.     ClassicStar sent plaintiffs a "Due Diligence" Notebook in the Summer of 2003. The notebook contained proposed Mare Lease Agreements, in which ClassicStar represented that ClassicStar owned the mares and the nominations from which participants would choose their pairings, and that, assuming a successful breeding, the participants would own the thoroughbred foals that would result, as well as the legal opinion letters of Handler Thayer and Karren Hendrix which purported to opinion on the availability of favorable tax treatments for Mare Leases.

67.     As for the size of the purchase, Coccetti and Forman recommended that plaintiffs invest $6,000,000, the precise amount Wilmington Trust arranged to provide the Hertzogs for working capital, before Wilmington Trust had even mentioned the Mare Lease Programs to the Hertzogs. Coccetti explained the tax advantages to plaintiffs and stated that he would handle the communications with the ClassicStar Defendants.

68.    Wilmington Trust did not disclose the fact that it would be retaining a portion of the price paid by the Hertzogs for the ClassicStar Mare Lease Programs.

69.    In August of 2003, the ClassicStar Defendants arranged for the Hertzogs to visit the Saratoga Springs race track in New York. They met with John Freston, Operations Manager for ClassicStar. He arranged for the Hertzogs to go "behind the scene at the race track" as well as attend a seminar on thoroughbred breeding. Coccetti was aware of the trip and told Leo Hertzog it was a great idea as these were the type of activities the Internal Revenue Service wanted to see.

70.    On August 20, 2003, a conference call occurred between Leo Hertzog, Spencer Plummer, Coccetti and Wolf. Spencer Plummer made certain representations at that meeting, including specifically that no client had lost money comparing a purchase price to a selling price, that investors could double their investment, that ClassicStar would review the owners' logs compiled by the Hertzogs, that a former senior IRS official was selling ClassicStar Mare Lease Programs in Texas, and generally touted the alleged advantages of purchasing Mare Leases without including any review of the risks associated therewith. Spencer Plummer stated that ClassicStar clients never had any problems with the Internal Revenue Service.

71.    Following the meeting, Leo Hertzog requested that Coccetti and Wolf send their assessment of the meeting to him. Mr. Hertzog wanted to get their views regarding the advisability of the investment.

72.    Coccetti and Wolf had, prior to this time, unreservedly advised Leo Hertzog that based upon their prior experience with the ClassicStar Defendants, that it was a "no brainer" and strongly advised him to do it. But, they consistently declined to state that in writing to Leo Hertzog, for the reason that, while they orally strongly advocated that the Hertzogs purchase the Mare Lease Interests, they wanted to avoid the creation of any writing with which both the fact

of and degree of their advocacy could be proven. Finally, because Leo Hertzog insisted, Coccetti sent him notes taken by Wolf at the August 20, 2003 meeting, which repeated the rosy scenarios set forth by Spencer Plummer at the meeting and made no negative comment and raised no questions regarding those representations. The purpose in doing so was to republish the representations made by Spencer Plummer and to create the impression that Wilmington Trust's experts agreed with those representations, without explicitly stating so in writing, notwithstanding that they had explicitly stated so orally.

73.     Coccetti and Wolf, as well as another Wilmington Trust employee, Clyde Mease, accompanied Leo Hertzog on a trip to the Keeneland Yearling Sales, arranged by ClassicStar from September 6th to September 9th of 2003. The trip also included a visit to ClassicStar's farm in Kentucky to review its operations. Coccetti and Wolf went on the trip, ostensibly to assist and advise Leo Hertzog, as well as other Wilmington Trust clients in attendance, and to lend credence to the idea that Wilmington Trust was knowledgeable and had full faith in ClassicStar and GeoStar. Forman and Alan Gottlob, both of PCG, also went on the trip.

74.     The purpose of this trip at this time was to convince plaintiffs to make a final decision to purchase a ClassicStar Mare Lease Program. A big push was made to convince Leo Hertzog that he should do so and that the Mare Leases were a safe and prudent investment. Coccetti made all of the introductions and was involved in the meetings with Plummer and Ferguson. Most nights Leo Hertzog had dinner with Ferguson, Plummer and Spencer Plummer, as well as other ClassicStar employees, and Coccetti and Forman at the finest restaurants in Lexington, during which time Leo Hertzog was constantly and consistently being told that he should invest in ClassicStar Mare Leases.

75.     On September 16, 2003, a representative of ClassicStar e-mailed an updated 2003

Letter of Intent, ready for Leo Hertzog's signature if he decided to proceed. She e-mailed the

draft to Coccetti first, asking if there were any problems. This was a consistent pattern between

the ClassicStar Defendants and Wilmington Trust in that ClassicStar typically sent materials

pertaining to the plaintiffs' Mare Leases to Coccetti, either before they were sent to the Hertzogs,

or sent simultaneously, and sometimes Coccetti delivered the materials directly to the Hertzogs

on ClassicStar's behalf. Coccetti would typically receive copies of e-mails to Leo Hertzog

regarding ClassicStar and Coccetti would forward them to Leo Hertzog, stating he just wanted to

make sure that Mr. Hertzog had seen it. Coccetti would usually follow upon with a call to

reinforce or emphasize the items he forwarded. For example, Coccetti forwarded a November 8,

2004 e-mail from ClassicStar to Mr. Hertzog regarding the Keeneland 2004 Breeding Stock sale

with a notation "[j]ust wanted to make sure you got this." Similarly, ClassicStar's attorney,

Handler Thayer, forwarded a draft purchase agreement for converting plaintiffs' Mare Lease

Program into shares of Gastar stock on September 9, 2004 to Coccetti, which Coccetti then

forwarded to Leo Hertzog.

76.     This pattern of communicating and coordinating through Wilmington Trust was

part of the fraudulent scheme as it lent credibility and credence to the plans of and

representations made by the ClassicStar Defendants and indicated to plaintiffs Wilmington

Trust's continuing involvement.

77.     As a follow-up to the Keeneland trip and for the same purpose, on September 23,

2003, Forman of PCG, sent Leo Hertzog, as well as other PCG clients, a list of the results from

the 2003 ClassicStar yearling sales, which purported to be "hot off the presses," touting the

success of the yearling sales as an inducement to convince plaintiffs that the Mare Lease

purchase was advisable, although the plan at that point, as far as everyone other than plaintiffs were concerned, was to switch plaintiffs to an alternative investment before any of the mares they selected became pregnant, much less bore a foal. Forman stated that PCG was able to assist with any questions regarding the structure of the limited liability corporation used to own the client's Mare Leases or income tax reporting. Forman also stated that the staff of ClassicStar and its outside accounting firm would also assist with any issues related to the clients' business, tax matters, reporting or financing.

78.     In keeping with the plan to create the impression that Wilmington Trust, having a reputation of prudence and disinterested analysis, stood by the investment, Forman copied Coccetti, Martin Wolf and Clyde Mease of Wilmington Trust with the e-mail. And of course, Coccetti, Wolf and Mease did nothing to question or challenge the rosy scenario being presented.

79.     On September 25, 2003, relying on the representations of the ClassicStar Defendants as well as the representations and advice provided by Wilmington Trust, PCG and Forman, J&L executed a letter of intent effective September 25, 2003, committing it to a schedule of payments and to executing the actual mare lease and boarding agreements after consultation with ClassicStar regarding the particular thoroughbred pairings.

80.     The Hertzogs were advised to form a limited liability corporation to own all of their thoroughbred interests. Accordingly, the Hertzogs formed J&L to own the Mare Lease interests.

81.     At about the same time, the Hertzogs directed Wilmington Trust to wire a payment of $600,000 to ClassicStar. The Hertzogs continued to make payments - all borrowed from Wilmington Trust - for a total of $6 million dollars up until the execution of the Mare

Lease and Boarding agreements, effective as of November of 2003. The payments were wired directly by Wilmington Trust to ClassicStar.

82.    Defendants intentionally oversold the Mare Lease Programs, knowing that ClassicStar did not have ownership of the thoroughbred interests necessary to support the valuations placed on the Programs or the number of Programs sold.

83.    After signing the letter of intent, Mr., Hertzog attempted to get in touch with ClassicStar to select the specific mares and stallions that would be included in plaintiffs' Mare Lease Program. ClassicStar, however, was difficult and purposefully slow in providing plaintiffs with the information necessary to make mare selections for the reason that it and all of the other defendants intended all along to have plaintiffs switch out of the Mare Lease Program in a short period of time. The actual selection and pairing of mares and stallions did not occur until early in 2004.

84.    In late October of 2003, plaintiffs visited ClassicStar. They had dinner with Forman and Alan Gottlob of PCG, who represented that ClassicStar had been researched by a former IRS agent and accountant, who was also present, and that it was a good fit for many individuals similarly situated to plaintiffs.

85.    The Hertzogs also attended sales presentations with Plummer, Spencer Plummer, Forman, as well as Alan Gottlob from PCG and Terry Green from GeoStar on October 24, 2003. Plummer discussed mare leasing, the payment of stud fees in advance, and the issue of where the mares were coming from with Leo Hertzog on October 24, 2003. In fact, all of the defendants knew at the time, the issue of where the mares were coming from was secondary since they intended, as they had all along, to convince plaintiffs to convert their Mare Lease Program to an alternative investment, not involving thoroughbred horses, in order to sell more Mare Leases.

Leo Hertzog also met with James M. Duggan of Handler Thayer on October 25, 2003, who reiterated the favorable tax treatment available.

**The Sale of Alternative Investments to Further the Scheme**

86.    As had been planned all along, to conceal this intentional policy of overselling the Mare Lease Programs and further their fraudulent scheme, defendants contrived to offer alternative investments.

87.    Defendants knew that participants could not possibly achieve the rate of return represented because participants such as plaintiffs would not own the expected number of thoroughbred foals at the end of the breeding season due to the overselling of Mare Lease Interests. Thus, in order to continue the scheme and avoid detection, defendants sought to convince purchasers of Mare Lease Programs to sell those interests for alternative investments. The ClassicStar Defendants structured the alternative investments with purportedly "guaranteed" put options that promised significant returns, but at a date several years in the future, in order to provide significant enticement to investors without having to actually fulfill any obligations or incur any costs.

88.    Although the defendants represented that the conversion of Mare Lease Program to one of the "alternative investments" was an exchange of equal value, the represented value of the alternative investment was fraudulent, because that entity did not hold the assets needed to fulfill the future obligations associated with those investments.

89.    In keeping with this plan, on October 25, 2003, just one month after plaintiffs committed to the Mare Lease Program, defendants began in earnest their plans to convert the plaintiffs' Mare Lease Program to another investment. Leo Hertzog met with John Parrott, a senior Vice President of GeoStar, Mr. Parrott discussed opportunities for converting Mare Lease

Interests to Gastar stock in the future. Leo Hertzog relayed this information to Mr. Coccetti following the meeting.

90.    During a golfing outing on January 22, 2004 with Ferguson and Coccetti, Ferguson represented to Leo Hertzog that there was possibly a stock option in Gastar stock available for the following year.

91.    By e-mail dated February 5, 2004, Jim Overton of GeoStar advised Leo Hertzog that no Gastar stock was available for sale in response to Leo Hertzog's inquiry about purchasing such stock outright but that he would keep Leo posted "as we make progress towards the conversions."

92.    On February 16, 2004, Coccetti called Leo Hertzog and told him that GeoStar was interested in purchasing plaintiffs Mare Lease Program in exchange for Gastar stock. The offer included a guaranteed put option, whereby plaintiffs would be guaranteed a minimum return of $2,000,000 by January 1, 2007.

93.    Leo Hertzog had a second phone call with Coccetti on February 27, 2004 to further discuss the conversion option. At that time, it was discussed that plaintiffs would, if they exercised the conversion option, need to purchase an additional Mare Lease Program in 2004 in order to remain in the horse business and preserve their tax benefits. At that time, Coccetti and Leo Hertzog discussed plaintiffs purchasing a 2004 Mare Lease Program in the amount of $3 million dollars. Coccetti and Leo Hertzog planned to meet with the ClassicStar Defendants in April to discuss this proposed purchase.

94.    Defendants, consistent with their plan all along, were anxious to ensure the conversion of the Hertzogs' 2003 Mare Lease Program. This was especially true in light of the fact that, in March of 2004, Leo Hertzog was asking about plaintiffs' specific mares and whether

any were pregnant. The ClassicStar Defendants, with Wilmington Trust, arranged a golfing outing for Mr. Hertzog, an avid golfer, to the Augusta National Golf Course, for three days of golfing and entertainment in late March of 2004. The participants on this trip, including Coccetti and Ferguson, flew to and from Augusta on Ferguson's private jet. Ferguson offered his personal financial statements and offered to provide a personal guarantee with respect to the put option included in the conversion. Coccetti had previously promised Mr. Hertzog that, if Mr. Hertzog did this deal, he would get to play at Augusta. Coccetti also represented that plaintiffs were better off receiving stock than horses as the stock had a guaranteed return.

95.     The day after returning from this golf outing, on March 29, 2004, Jim Overton, ClassicStar's attorney, Greg Bertsch, and Coccetti met with Leo Hertzog and his son-in-law to discuss converting plaintiffs' 2003 Mare Lease Program to shares of Gastar Stock.

96.     Following this meeting, Mr. Hertzog agreed to sell his 2003 Mare Lease Program in return for a promise that GeoStar would deliver to plaintiffs 2,000,000 shares of stock in Gastar. The stock was to be restricted from transfer for a year, but after that time could be sold and plaintiffs would be provided with an option to "put" the stock to GeoStar at a price of $4.00 per share on January 1, 2007, thereby ensuring a profit of at least $2,000,000. Coccetti was specifically consulted by Leo Hertzog and Coccetti advised that it was a prudent arrangement, He did so fully aware that if Leo Hertzog undertook this transfer, it would be necessary for plaintiffs to remain active in the horse business to acquire additional Mare Lease Programs in 2004.

97.     The advice given by Coccetti was known by him to be incorrect and purposefully so. The conversion was highly suspect in that, while GeoStar appeared to have some stock in Gastar at the time it was promising to deliver it, upon information and belief, no

investigation whatsoever was undertaken by Wilmington Trust to confirm that it actually had the stock that it was promising to deliver to plaintiffs. In fact, GeoStar did not have sufficient stock to honor all of the promises it made to deliver stock to other investors in Mare Lease Programs. Moreover, even assuming that it could deliver stock to plaintiffs, upon information and belief, no investigation whatsoever was undertaken to confirm that it would be financially able to honor the put option if exercised by plaintiffs on January 1, 2007, and, in fact, GeoStar does not have the financial ability to honor those promises. Notwithstanding that those attributes of the conversion made the conversion extremely imprudent and risky, Coccetti advised plaintiffs that they should undertake the conversion.

98.    The purposefulness and ill-motive of Coccetti in his dealings with the Hertzogs regarding the Mare lease Programs and the conversion of those programs to alternative investments is illustrated by the entirely different approach he exhibited with regard to other investment advice he gave. In April of 2004, Leo Hertzog consulted with Coccetti regarding the advisability of making an investment completely unrelated to ClassicStar, namely making a loan of approximately $2,700,000 on a real estate development transaction. In his April 19, 2004 analysis of that transaction, Mr. Coccetti exhibited the caution and prudence that he purposefully and intentionally did not utilize in analyzing ClassicStar's Mare Lease Programs and the conversion to Gastar stock discussed above. He actively discouraged Leo Hertzog from pursuing that real estate investment, citing the credit risk and the need to obtain credit reports, the difficulty of securing repayment when a project goes "bad," even for professionals such as Wilmington Trust, the need to "understand how [the] investment will be taken out when the project is completed, the need to identify the source of funds from which the principal will be repaid" and lastly the need for Mr. Hertzog to consider his "credit availability" since, as Coccetti

put it, "the other investment we are contemplating will require your remaining credit...." The

other investments referenced in the e-mail by Coccetti were the additional investments of many

additional millions of dollars, also financed by Wilmington Trust, in a 2004 Mare Lease

Program.

99.    Coccetti was intentionally misleading Leo Hertzog in his purported analysis of the

respective investment opportunities for plaintiffs, purposefully stating that the conversion option

(along with all the other ClassicStar investments) were prudent and safe and met the criteria that

the Hertzogs required, but at the same time, just as he had done purposefully in early 2003,

Coccetti intentionally overstated the risks (especially in comparison to the risks of the

ClassicStar investments) of pursuing other investment opportunities upon which he would not

earn a commission.

100.    Coccetti did so for the purpose of ensuring that the Hertzogs would use funds to

be borrowed from Wilmington Trust to purchase a 2004 ClassicStar Mare Lease Program

that Coccetti knew was; in fact, far more risky than the proposed real estate investment that Leo

Hertzog had asked his opinion about.

101.    GeoStar did not disclose that it was valuing the Gastar shares at $2.00 a share

with respect to purchase offers provided to other owners of ClassicStar Mare Lease Programs,

including other Wilmington Trust clients. Wilmington Trust was aware of this discrepancy as it

had presented a GeoStar purchase offer to another one of its clients it had persuaded to invest in

ClassicStar Mare Lease Programs that valued the shares at $2.00. Plaintiffs would have received

an additional 1,000,000 shares of Gastar stock if the shares were valued at $2.00 in its purchase

offer.

102. GeoStar, acting at the direction of Ferguson, offered the Gastar stock in exchange for interests in the Mare Lease Program and did so with the knowledge that the Mare Lease Programs had been substantially oversold and with the intent of facilitating and concealing the fraudulent schemes. Further, upon information and belief, GeoStar never intended to transfer the stock, as agreed upon, and did not in fact, own sufficient unrestricted stock to transfer. GeoStar concealed this fact from participants by the use of the put option, which served to keep participants patiently waiting for the date they could exercise their option, several years in the future. GeoStar, upon information and belief, never intended to honor any of the put options it provided in exchange for Mare Lease Interests.

103. Relying upon this advice, as well as GeoStar's and Ferguson's representations, by Agreement dated August 1, 2004, J&L sold its 2003 Mare Lease Interests to GeoStar.

104. Despite GeoStar's representation that it was:

> not subject to or under any obligation under any charter, bylaw, contract, or other instrument or any permit, or subject to any law, which would be defaulted, breached, terminated, forfeited or violated by or in conflict with (or upon the failure to give notice of the lapse of time), or both, would result in a default, breach, termination, forfeiture or conflict with) [GeoStar's] executing, delivery and performance of this Agreement

GeoStar did not transfer the shares to J&L, and still has not done so.

105. While plaintiffs did not immediately receive the promised stock, they were reassured by Ferguson that it would be transferred. Due to the fact that the stock was restricted for one year and the share value was less than the put option, plaintiffs were satisfied with Ferguson's representations at that time. This was also due, in part, to the fact that Coccetti also advised plaintiffs to be patient and not to worry as the ClassicStar Defendants had a great reputation and had "never screwed anyone."

## Sale of the 2004 Mare Lease Program

106.    Consistent with the plan of selling as many Mare Lease Programs as possible,
Coccetti, having advised that it was wise for the plaintiffs to exchange their 2003 Mare Lease
Program for Gastar stock, and then advising the Hertzogs not to invest in investments unrelated
to the ClassicStar Defendants in order to preserve their ability to have funds available from
Wilmington Trust in order to purchase more Mare Leases in 2004, advised the Hertzogs to do
just that. Specifically, he advised that the plaintiffs should invest $4,500,000 in such a program
and that Wilmington Trust would provide the financing, bringing the total used to purchase
Mare Lease Programs to $10.5 million, or about one-third of the entire value of the Hertzogs'
assets.

107.    The ClassicStar Defendants were also eager for plaintiffs to purchase an
additional Mare Lease Program in 2004. As in the past, they arranged for trips related to the
horse racing business where they could make continuing sales presentations to plaintiffs. On
April 29, 2004, Leo Hertzog went to the Kentucky Derby through a trip arranged by ClassicStar.
He had meetings with Spencer Plummer and Forman to discuss investing in a 2004 Mare Lease
Program. He had a separate breakfast meeting with Forman and Gottlob of PCG, along with
another Wilmington Trust client, to discuss an additional investment in ClassicStar Mare Leases.

108.    In order to further entice plaintiffs to enter into a 2004 Mare Lease Program,
ClassicStar agreed to pay the interest on the additional $4,500,000 that Wilmington Trust was
proposing to loan to the Hertzogs. Spencer Plummer sent Coccetti an e-mail dated June 24, 2004,
advising that ClassicStar would pay the interest on the loan for the 2004 Mare Lease Program
through the remainder of the year.

109.    The ClassicStar defendants also arranged for Handler Thayer to provide an
opinion letter to the Hertzogs, which ClassicStar paid for. In its engagement letter to the

Hertzogs, Handler Thayer represented that it was retained due to its experience in the areas of

business law and agribusiness taxation. The opinion letter reiterated that the favorable tax

treatment was available for owners of Mare Leases.

110. On July 9, 2004, Wilmington Trust approved an increase in the amount of the

loan it had previously provided plaintiffs, in the amount of $4,500,000, to a total of $8,400,000

(consisting of the then existing balance on the note plus the additional funds). Wilmington Trust

wired the proceeds on plaintiffs' behalf to ClassicStar for the purchase of an additional

$4,500,000 in a Mare Lease Program with ClassicStar. At the time this was done, Coccetti was

aware that ClassicStar had promised to pay the interest on the additional funds borrowed from

Wilmington Trust, in order to induce plaintiffs to purchase the 2004 Mare Lease Program.

111. Despite the fact that Coccetti was fully aware that ClassicStar was going to pay

the interest on the $4,500,000 loan from Wilmington Trust - Coccetti even personally calculated

the amount that ClassicStar would be required to pay - he purposefully ignored this fact which

was understood by him to be a sure sign that the ClassicStar Defendants were desperate to obtain

additional Mare Lease purchasers at all costs, even if it required paying the interest on the

purchasers' loan used to fund the purchase. Coccetti did not change or alter his opinion regarding

the advisability of entering into the 2004 Mare Lease Program as this advice was necessary for

the continuation of the scheme, and used ClassicStar's willingness to pay the Hertzogs' interest

as a device to convince the Hertzogs to take the loan from Wilmington Trust and purchase the

Mare Leases.

112. Soon after the defendants had convinced Mr. Hertzog to purchase an additional

Mare Lease Program on August 25, 2004, Coccetti, having been sent the ClassicStar 2004 CD

describing the mares available for lease, reviewed it and represented to Mr. Hertzog that both

the mares and stallions were "impressive." As usual, Coccetti had received the CD before the

plaintiffs and, in the customary manner, was passing it along with a comment of approval that

was entirely made up and had no foundation in fact.

113. Despite having committed the money in July of 2004, plaintiffs did not sign the

formal 2004 Mare Lease Program documents until December of 2004. The reason for the delay

was that ClassicStar was again being very slow in providing information regarding available

mares. As was so with respect to the 2003 Mare Lease Program, it knew all along that it

intended to convert plaintiffs' Mare Lease Program to an alternative investment.

**The Conversion of the 2004 Mare Lease Program for Quarter Horses**

114. Consistent with the plans to switch participants out of Mare Leases, almost

immediately after the formal documents were signed, as part of the continuation of the fraudulent

scheme, the ClassicStar Defendants asked plaintiffs if they would be willing to transfer their

2004 Mare Lease Programs for outright ownership interests in male and female horses. Plaintiffs

were willing to consider this option, but wanted more information as to the status of the mares it

had leased and their breeding prospects. Mr. Hertzog was also only interested in owning

thoroughbreds and was not willing to consider owning other types of horses.

115. Consistent with the plans and the methods of communications, the proposal to

convert the 2004 Mare Lease Program to ownership interests in quarter horses was made first to

Coccetti, who then passed it along to Mr. Hertzog, in early 2005. On March 7, 2005, Coccetti

again discussed the conversion option with Leo Hertzog. Plummer then followed up with a call

on March 11, 2005, touting the benefits of the conversion.

116. As plaintiffs did not immediately agree to the conversion, in large part because

the proposed horses were quarter horses and not thoroughbreds, as a further inducement to enter

into this arrangement, ClassicStar, through Jim Overton, again offered to pay the interest on the outstanding loans from Wilmington Trust, now through July of 2007.

117.    ClassicStar also offered a put option, effective July 1, 2007, whereby ClassicStar would repurchase the horses for $4,500,000, the amount paid for the 2004 Mare Lease Program, plus 10 percent. ClassicStar represented the exchange as a "can't lose" situation, which would preserve tax benefits while maintaining the promised profits.

118.    As usual, Wilmington Trust was a proponent of the investment, using its position of trust with respect to the Hertzogs to further this scheme by purposefully failing to advise of the speculative and risky nature of the proposal. Relying upon ClassicStar's representations and Wilmington Trust's advice, J&L entered into the Purchase and Exchange Agreement dated March 16, 2005.

119.    Upon information and belief, ClassicStar did not own any interests in the horses it agreed to transfer to J&L. Rather, those interests were either: (1) owned by Plummer in his individual capacity or by a family member; or (2) the horses did not exist. Despite the fact that he signed the Purchase and Exchange Agreement on behalf of ClassicStar, Spencer Plummer did not disclose the true ownership of the quarter horses to the Hertzogs.

120.    Further, the value of the quarter horses was grossly inflated in any event. Plaintiffs were exchanging Mare Leasing interests in twenty-two thoroughbreds in exchange for eleven quarter horses. ClassicStar, Ferguson, Plummer and Spencer Plummer deliberately concealed this information from J&L.

121.    By e-mail dated April 6, 2005, Jim Overton, acting on behalf of ClassicStar and GeoStar, advised Leo Hertzog that as part of the Purchase and Exchange Agreement, ClassicStar agreed to pay all horse-related expenses including insurance, board and medical for the quarter

horses. Upon information and belief, ClassicStar did so because it knew that no such expenses would be incurred as it never owned the horses in question. Upon information and belief, ClassicStar never paid any horse-related expenses for the horses listed in Schedule A of the Purchase and Exchange Agreement and this representation was, therefore, false.

122.    By virtue of a put option, exercisable on July 1, 2007, in the Purchase and Exchange Agreement, J&L is entitled to receive the entire purchase price for the 2004 Mare Lease Program, plus ten percent interest, i.e., $4,950,000, from ClassicStar.

123.    ClassicStar never transferred ownership of the quarter horse interests to J&L.

124.    Upon information and belief, ClassicStar does not have sufficient funds or assets to honor all of its future obligations to investors in its Mare Lease programs, including those who were switched into alternative investments with entities related to the ClassicStar Defendants. Indeed, upon information and belief, the ClassicStar Defendants have not honored such obligations.

**The Scheme Begins to Implode**

125.    By mid to late 2005, the ClassicStar Defendants began to run into trouble honoring their obligations. They ceased providing promoters of the scheme with the full 7% of the purchase price ClassicStar committed to pay. On September 30, 2005, one such promoter, Anderson Corporate Finance & Investments, Inc. ("Anderson"), filed suit in the Superior Court of Washington, and alleged in an amended complaint that it had successfully located numerous investors in ClassicStar Mare Leases and ClassicStar owed Anderson in excess of $6.2 million dollars. This would mean that Anderson, alone, between May 23, 2003 and September of 2004, had sold Mare Lease Programs in excess of approximately $88,500,000, the amount on which it claims it did not receive its 7%. Anderson also alleged that it had entered into numerous

agreements with PCG related entities wherein the PCG entities would earn 217th of the amount that Anderson received from the sale of the Mare Lease Programs.

126.    In early February of 2006, Plummer and Spencer Plummer left ClassicStar abruptly and the ClassicStar Utah office was allegedly relocated to Kentucky.

127.    Plummer and Spencer Plummer entered into a Termination and Severance Agreement with GeoStar effective February 1, 2006. In connection with that agreement, GeoStar entered into a Statement of Undertaking Regarding Payment of Fees and Associated Costs for Plummer and Spencer Plummer. By virtue of that agreement, GeoStar agreed to advance legal expenses and associated costs for Plummer and Spencer Plummer with respect to certain matters, including the IRC Section 6700 audit and/or promoter investigation, Anderson Corporate Finance & Investments, Inc. v. ClassicStar, LLC, Civ. No. 05-1656 TSZ (U.S. Dist. Ct. W.D. Wash.); the investigation being conducted by the U. S. Attorney's Office in Portland, Oregon, the PCG/Anderson arbitration being conducted in Seattle, Washington and the Duane Tiede litigation,

128.    On February 23, 2006, the criminal division of the Internal Revenue Service conducted a raid of ClassicStar and seized its books and records with the aid of a search warrant.

129.    Plummer and Spencer Plummer have been identified as targets with respect to an investigation being conducted by the United States Attorney's Office of the District of Oregon, which, upon information and belief, pertains to the Plummers' activities in connection with ClassicStar and GeoStar.

130.    By early 2007, multiple lawsuits had been filed by similarly situated victims of the ClassicStar Defendants fraudulent scheme. Those suits include: West Hills Farms. LLC v. ClassicStar. Inc. et al., United States District Court for the District of Kentucky, Docket No.

5:06-cv-00243-JMH; McNeill v. GeoStar et al., United States District Court for the District of

Utah, Docket No. 2:06-cv-00911-TS-DN; Associated Communications Services. Inc. v. GeoStar

Financial Services Corp., Inc., United States District Court for the Eastern District of Michigan,

Docket No. 1:06-cv-14928-TLL-CEB; and Beechglen Farms et al. v. ClassicStar et al., United

States District Court for the Central District of Utah; Docket No. 2:07-cv-0001-PGC. A common

pattern emerges from many of these cases wherein Mare Lease Programs were purchased,

exchanged for investments with entities related to the ClassicStar Defendants, and thereafter, the

related entities subsequently refused to honor their contractual obligations.

**GeoStar's Failure to Transfer the Stock or Honor the Put Option**

131.    Plaintiffs, upon learning of ClassicStar's difficulties with the IRS, became

concerned about receiving the Gastar stock that had been promised to them, but had never been

delivered. Consistent with the plan to conceal discovery of the scheme for as long as possible,

Ferguson, in multiple telephone calls with Leo Hertzog, throughout the early Spring of 2006,

repeatedly assured Mr. Hertzog that plaintiffs would receive the Gastar stock, notwithstanding

that GeoStar had failed to deliver it when promised in 2004.

132.    Further, on April 26, 2006, Ferguson, in a telephone call with Kevin Coccetti,

provided assurances that GeoStar would honor the January 31, 2007 put option in plaintiffs'

agreement with GeoStar.

133.    Ferguson also sought to reassure Leo Hertzog personally on May 7, 2006, stating

that GeoStar was doing fine and had the cash and the shares necessary to honor its obligations.

He further stated that the delay in delivering the stock was due to an "overload" in getting the

shares distributed and that they would be delivered in another two or three weeks. This

representation was false.

134. Ferguson made repeated phone calls to Coccetti throughout the Spring, promising the stock but always with an excuse as to why it could not be delivered immediately.

135. GeoStar has subsequently refused to transfer the stock.

136. Upon information and belief, ClassicStar, at the direction of Plummer, Spencer Plummer and Ferguson, was fully aware that GeoStar did not intend to honor its obligations with respect to the Purchase Agreement as this was part of defendants' plan and, therefore, ClassicStar never transferred any of J&L's 2003 Mare Lease Interests to GeoStar. In fact, in accordance with the fraudulent scheme, ClassicStar had re-leased such mares to others.

137. Pursuant to paragraph 6a of the 2003 Mare Lease Purchase Agreement between GeoStar and J&L, J&L had the right, effective January 1, 2007 and for a period of thirty days thereafter, to sell to GeoStar the 2,000,000 shares of Gastar stock that J&L was to have received in exchange of its ClassicStar 2003 Mare Lease Program at a price of $4.00 per share.

138. By letter dated December 28, 2006, J&L advised GeoStar and Tony Ferguson that it was exercising the put option, effective January 1, 2007, for all 2,000,000 shares of stock governed by the 2003 Mare Lease Purchase Agreement.

139. Pursuant to paragraph 6a of the 2003 Mare Lease Purchase Agreement, GeoStar was required to remit payment of $8,000,000 to J&L within 15 days.

140. GeoStar did not respond to J&L's December 28, 2006 letter in any fashion.

141. GeoStar failed to remit payment of the $8,000,000 within 15 days of January 1, 2007.

**The Plummers' Sale of the Quarter Horses Purportedly Owned by J&L**

142. As the scheme began to unravel, plaintiffs sought assurances that ClassicStar would honor its obligations with respect to the 2005 Purchase and Exchange Agreement. Purportedly on their behalf, Coccetti called Jim Overton of ClassicStar to discuss ClassicStar's

obligations on March 2, 2006. By e-mail dated March 3, 2006, Coccetti reported to Leo Hertzog that Jim Overton had confirmed that, if plaintiffs elected to exercise the Put Option clause in the 2005 Purchase and Exchange Agreement, the payment by ClassicStar would be made in cash.

143.    Plaintiffs also sought to locate the quarter horses they believed they owned. Pursuant to the 2005 Purchase and Exchange Agreement, J&L had transferred its interest in the 2004 Mare Lease Program to ClassicStar in exchange for eleven quarter horses. Spencer Plummer signed this agreement on behalf of ClassicStar.

144.    ClassicStar, Spencer Plummer and Plummer represented that the quarter horses were housed and cared for at the Plummers' ranch in Utah, known as the Buffalo Ranch.

145.    By letter dated August 8, 2006, J&L wrote to Plummer in an effort to make arrangements to inspect the horses.

146.    Plummer did not respond to the letter.

147.    By letter dated February 1, 2007, J&L reiterated its request to see the quarter horses it purportedly owned.

148.    By letter dated February 12, 2007, counsel for the Plummers advised that the Plummers believed that the quarter horses purchased by plaintiffs were no longer owned by plaintiffs, in that they had been "traded" by plaintiffs back to ClassicStar for unidentified "assets" of ClassicStar. The Plummers advised that ClassicStar had then sold the quarter horses that it had purportedly reacquired from plaintiffs to Buffalo Ranch, the ranch owned by the Plummers, in January of 2006 and most of the horses have since been sold by the Plummers.

149.    None of the foregoing was ever to the Hertzogs, and, in fact, is total fiction, manufactured to hide the fact that the quarter horses were never conveyed in the first place.

**Wilmington Trust Calls the Hertzogs' Note**

150.    Following the raid of ClassicStar and the Plummers' departure, plaintiffs sought assurances from Wilmington Trust that it would assist them with respect to the disaster that was unfolding as to the investments that Wilmington Trust had recommended and encouraged plaintiffs to invest in.

151.    However, Wilmington Trust, through its General Counsel, threatened plaintiffs that if plaintiffs sued it, it would disclose purported sexual improprieties on the part of Mr. Hertzog and that Mr. Hertzog was a gambler.

152.    Pursuant to the 2005 Purchase and Exchange Agreement, ClassicStar was required to pay the monthly interest on the Hertzogs' outstanding note with Wilmington Trust. Wilmington Trust was aware of this arrangement, billed ClassicStar and contacted ClassicStar directly to inquire about the status of the interest payments when such payments were late.

153.    ClassicStar was often late making interest payments. By December of 2006, ClassicStar stopped making the required interest payments. Leo Hertzog sought Wilmington Trust's help in getting ClassicStar to pay the interest as well as to honor its outstanding commitments to plaintiffs.

154.    On or about February 15, 2007, following the filing of the Complaint in this matter, Wilmington Trust declared a default under the terms of the Note and demanded immediate repayment of the balance due, approximately $7,048, 919 plus interest. Wilmington Trust threatened to immediately liquidate plaintiffs' assets under its control unless plaintiffs reached a settlement with it. Plaintiffs were subsequently able to arrange for an orderly liquidation of the collateral held by Wilmington Trust.

155. Upon information and belief, several other clients of Wilmington Trust's Wealth Advisory Service invested in ClassicStar Mare Leases and were subsequently switched to alternate investments. Wilmington Trust provided financing for these investors.

156. Upon information and belief, Wilmington Trust called plaintiffs' note, in part, as an effort to avoid lawsuits by these other investors and to force plaintiffs to settle this lawsuit. By calling plaintiffs' note, Wilmington Trust hoped to send a message to its other clients that they should wait and see if ClassicStar, GeoStar and their related entities would honor their obligations rather than pressing Wilmington Trust on its role in the scheme.

157. Wilmington Trust, in so doing, sought to continue the illegal scheme, continue to collect interest payments and management fees, and to keep other investors silent.

## VI. THE RICO PREDICATE ACTS

158. The defendants conspired to and did engage in mail and wire fraud in violation of 18 U.S.C. § 1341 or § 1343 by using, or causing to be used, the United States mail or interstate wire communications in furtherance of and for the purposes of executing schemes to defraud and to obtain and maintain money by false pretenses. Each use of the mails or interstate wire communications in furtherance of and for the purposes of executing the schemes constitutes a separate and distinct violation of 18 U.S.C. §1341 and/or §1343.

159. Defendants used mail and wire communications to induce plaintiffs' participation in ClassicStar Mare Leases, to collect the proceeds of sale of ClassicStar Mare Leases, to conceal the overselling of the Mare Leases, to provide information related to the tax treatment of the Mare Leases, to encourage investors to convert their Mare Leases into other investments with entities related to the ClassicStar Defendants, and to forestall plaintiffs' inquiry into the scheme.

160. Defendants' use of the United States mail and interstate wire communications were made with the intent to defraud plaintiffs. Plaintiffs reasonably relied upon defendants

misrepresentations, including those relating to the nature of the Mare Lease Programs and the
alternative investments, to their detriment.

161. Specific examples of the use of mail and interstate wire communications in
furtherance of the scheme to defraud plaintiffs and other investors are set forth above and also
include the following:

      (a)   ClassicStar

          (i)     On or about September 15, 2003, ClassicStar mailed plaintiffs a
letter of intent with respect to the 2003 Mare Lease Agreement.

          (ii)    On or about December 29, 2003, Mindi Morishita, Compliance and
Customer Relations at ClassicStar, mailed plaintiffs a letter
summarizing the Hertzogs' activities at ClassicStar on November
14, 2003 and November 15, 2003 for tax purposes.

          (iii)   On or about January 2, 2004, Mindi Morishita of ClassicStar e-
mailed Leo Hertzog the 2003 Mare Lease Agreement documents
for his signature.

          (iv)   On or about January 19, 2004, Spencer D. Plummer, President of
ClassicStar, sent plaintiffs a letter setting forth the income and
expenses paid to ClassicStar for the year 2003. The letter was
intended to be provided to plaintiffs' tax advisor to assist in the
preparation of Schedule F of the plaintiffs' 2003 tax return.

          (v)    ClassicStar, through Mike Snow, e-mailed the 2005 Purchase and
Exchange Agreement to Kevin Coccetti, at Wilmington Trust, on
or about June 8, 2005.

          (vi)   ClassicStar, at the direction of Tony Ferguson, mailed monthly
payments to J&L, representing the interest payments due
Wilmington Trust.

          (vii)  By e-mail dated April 6, 2005, Jim Overton, acting on behalf of
ClassicStar and GeoStar, advised Leo Hertzog that, as part of the
Purchase and Exchange Agreement, ClassicStar agreed to pay all
horse-related expenses including insurance, board and medical for
the quarter horses.

(b)    <u>GeoStar</u>

     (i)     GeoStar, through its counsel, e-mailed a draft purchase agreement relating to the conversion of J&L's 2003 Mare Lease Interest into shares of common stock of Gastar on September 9, 2004.

     (ii)     GeoStar, through its counsel, mailed the executed Purchase Agreement to Leo Hertzog on or about October 21, 2004, which contained false representations regarding GeoStar's ability and intentions to transfer stock to plaintiffs as well as false representations that GeoStar would take ownership of the plaintiffs' Mare Lease Program.

     (iii)     On February 25, 2006, Tony Ferguson had an interstate telephone call with Leo Hertzog regarding the IRS seizure of ClassicStar. Ferguson offered to buy back horses owned by J&L in exchange for Gastar stock.

     (iv)     On March 30, 2006, Joene Gingrich of GeoStar's accounting department, e-mailed Charlotte Connelly regarding the interest payments due to Leo Hertzog on behalf of ClassicStar.

     (v)     On April 26, 2006, Tony Ferguson had an interstate telephone call with Kevin Coccetti in which he provided assurances that GeoStar would honor the January 31, 2007 put option in plaintiffs' agreement with GeoStar.

(c)    <u>S. David Plummer</u>

     (i)     Sent a letter dated April 1, 2003 to prospective clients, CPAs, attorneys and tax advisors forwarding a table summarizing annual foal sales and representing that, for the year 2003, foals had sold for 299% of the cost to produce the foal.

     (ii)     Participated in a sales presentation with Forman, Coccetti and Martin Wolf on July 10, 2004, via interstate telephone call, to solicit plaintiffs' participation in the Mare Lease Programs.

     (iii)     Made an interstate telephone call to Leo Hertzog on March 11, 2005 to discuss plaintiffs' 2004 Mare Lease.

(d)    <u>Spencer Plummer</u>

     (i)     Mailed a 2003 letter of Intent to J&L, Leo and Jean Hertzog on or about September 15, 2003.

     (ii)     Had an interstate telephone call with Leo Hertzog on January 5, 2004 regarding mare lease pairings and stallion selections.

   (iii) Had an interstate telephone call with Leo Hertzog on January 10, 2004 regarding mare selections.

   (iv) E-mailed Leo Hertzog on January 5, 2004 to confirm that 2003 Mare Lease and Breeding Agreement, Boarding Agreement, Foal Agreement, Nominee Agreement and Schedule A were executed in 2003.

   (v) Had an interstate telephone call with Leo Hertzog on March 31, 2004 to discuss plaintiffs' Mare Leases, ClassicStar, ClassicStar events for 2004 and 2005 as well as a fractional share investment in a super stallion, or select stallion for racing as part of a syndicate outside of CS.

   (vi) E-mailed Kevin Coccetti on June 24, 2004 to confirm that plaintiffs would be sending balance of payment plan of $4,050,000 to ClassicStar and to confirm that ClassicStar would pay the interest on the loan with Wilmington Trust.

  (e) <u>Tony Ferguson</u>

   (i) On April 7, 2004, had an interstate telephone call with Leo Hertzog regarding the 2004 Mare Lease Program.

   (ii) On August 18, 2004 had an interstate telephone call with Leo Hertzog regarding the structure of ClassicStar and the role of Plummer and Spencer Plummer.

   (iii) Directed ClassicStar to mail monthly payments to J&L, representing the interest payments due to Wilmington Trust. Such interest payments were intended to further delay discovery of the fraudulent scheme.

   (iv) On February 25, 2006, had an interstate telephone call with Leo Hertzog regarding the IRS seizure of ClassicStar. Ferguson offered to buy back horses owned by J&L in exchange for Gastar stock.

   (v) On April 26, 2006, Tony Ferguson had an interstate telephone call with Kevin Coccetti in which he provided assurances that GeoStar would honor the January 31, 2007 put option in plaintiffs' agreement with GeoStar.

  (f) <u>The Private Consulting Group and David Forman</u>

   (i) Ann Giampeitro, on behalf of Forman and PCG, e-mailed various "Illustrations" prepared by ClassicStar for the Hertzogs to Coccetti on or about June 27, 2003.

(ii)   Arranged and participated in July 10, 2003 meeting and
conference call with Leo Hertzog, Coccetti, Wolf, Forman, and
Plummer as well as plaintiffs' lawyer, accountant and executive
assistance to present the opportunity to invest in ClassicStar Mare
Lease programs

(iii)   On September 5, 2003, Ann Giampietro of PCG e-mailed Leo
Hertzog, Alan Gottlob of PCG, David Forman of PCG, Kevin
Coccetti of Wilmington Trust, Clyde Mease of Wilmington
Trust and Marty Wolf of Wilmington Trust, along with other
investors, an itinerary and list of participants for a trip to
Keeneland, Kentucky to visit the ClassicStar Farm as well as to
attend the Keeneland yearling sales.

(iv)   On September 23, 2003, David Forman of PCG e-mailed Leo
Hertzog, and participants in the Mare Lease Programs, including
Michael Ginaldi, James Horn, Tim Schaeffer, Lew Teffeau and
Arthur Beckenstein, results from the ClassicStar 2003 Yearling
Sales and offered to assist clients with any questions regarding
their LLC, income tax reporting or activity that the clients were
scheduling.

(v)   On October 1, 2003, David Forman of PCG forwarded by e-mail,
an e-mail and a memorandum prepared by Gregory J. Bertsch of
Handler, Thayer & Duggan, L.L.C., regarding a case called
Truskowsky v. Commissioner to Leo Hertzog, Marty Wolf and
Kevin Coccetti.

(vi)   David Forman of PCG had an interstate conference call with Leo
Hertzog, Kevin Coccetti, Marty Wolf, Terry Green, among
others, regarding record keeping and logs on October 2, 2003,

(vii)   On June 7, 2005, David Forman of PCG e-mailed employees of
ClassicStar, including Spencer Plummer, requesting that final
documentation of the 2004 Mare Lease Agreement be forwarded to
Leo Hertzog.

(viii)   On January 1, 2006 David Forman of PCG had an interstate
telephone call with Leo Hertzog regarding ClassicStar and the
Utah operation being halted.

(g)   <u>Wilmington Trust</u>

(i)   During the period prior to the execution of the Mare Lease
Agreement between J&L and ClassicStar on or about November of
2003, Wilmington Trust, through Kevin Coccetti and Marty Wolf,
made to and received from Leo Hertzog, a number of interstate
telephone communications, including communications in which

matters relating to the nature of the investment requirements for and timing of closing were discussed.

(ii) Arranged and participated in July 10, 2003 meeting and conference call with Leo Hertzog, Coccetti, Wolf, Forman, and Plummer as well as plaintiffs' lawyer, accountant and executive assistance to present the opportunity to invest in ClassicStar Mare Lease programs

(iii) Arranged and participated in the August 20, 2003 conference telephone call with Spencer Plummer, Leo Hertzog, Coccetti, Wolf to discuss the proposed ClassicStar investments and to answer plaintiffs' questions

(iv) On September 5, 2003, Coccetti faxed Wolf's notes from the ClassicStar Conference Call on August 20, 2003 to Leo Hertzog.

(v) Kevin Coccetti spoke with Leo Hertzog in an interstate telephone call on December 24, 2003 regarding a trip to the Virgin Islands with ClassicStar.

(vi) On January 4, 2004, Kevin Coccetti, Spencer Plummer, David Plummer had a telephone call with Leo and Jean Hertzog to discuss the Mare Lease Agreements and breeding selections.

(vii) Wilmington Trust wired funds to ClassicStar on or about June 16, 2004 and on July 9, 2004 for the plaintiffs' investment.

(viii) Kevin Coccetti e-mailed Spencer Plummer on August 6, 2004 information regarding the interest carrying costs on the plaintiffs' loans that ClassicStar had agreed to pay.

(ix) Kevin Coccetti e-mailed Leo Hertzog on August 25, 2004 regarding the ClassicStar CD with mare leases available for this year along with the pool of stallions, noting that both lists were impressive.

(x) On August 26, 2004, Kevin Coccetti e-mailed Greg Bertsch, the attorney for ClassicStar with regard to the terms of the sale of the 2003 Mare Leases "back to ClassicStar."

162. Defendants also utilized mail and interstate wire communications to solicit participation by other investors in the ClassicStar Mare Lease Programs as well as to persuade other investors to convert Mare Leases to alternate investments. The predicate acts are a

regular way of defendants doing business and are part of the manner in which defendants

conducted the enterprise. Further, defendants reasonably anticipated that their fraudulent

scheme would require the use of mail and interstate wire communications.

163.    There are other similarly situated victims of defendants. The precise number of

victims is not presently known.

<div align="center">

**COUNT I- RICO**
**ALL DEFENDANTS -18 U.S.C. 1962(c)**

</div>

164.    The allegations of paragraphs 1 - 163 are incorporated by reference as if fully set

forth herein.

165.    At all times relevant to the First Amended and Supplemental Complaint, all of

defendants, i.e., Ferguson, Plummer, Spencer Plummer, ClassicStar, GeoStar, Wilmington Trust,

PCG, and Forman constituted an association in fact and therefore are an "enterprise" as that term

is defined in 18 U.S.C. §1961(4) and used in 18 U.S.C. §1962 (hereinafter the "Mare Leasing

Marketing Enterprise"). Each of the defendants is a "person" as that term is defined in 19 U.S.C.

§ 1961(3). The Mare Leasing Marketing Enterprise was established and has existed as an

ongoing association engaged in or affecting interstate commerce, apart from the pattern of

racketeering activity alleged in this Complaint. The Mare Leasing Marketing Enterprise engages

in a pattern of activity that differs from the usual and daily activities of its members. It oversees

and coordinates the commission of several different predicate offenses and other activities on an

ongoing basis.

166.    As a whole, defendants acted in concert, with specific, well-defined roles in the

Mare Leasing Marketing Enterprise, to achieve the common goal of defrauding participants such

as the plaintiffs into making payments for the misrepresented Mare Lease Programs and then

switching plaintiffs into alternative investments with related entities. The behavior of the

defendants is coordinated between and amongst themselves so that they function as a continuing
unit.

167.   There was a consensual decision making structure, independent from the
defendants' regular business practices. By agreement amongst defendants, Wilmington Trust,
PCG, and Forman located wealthy individuals and marketed the Mare Lease programs to such
individuals. Wilmington Trust, PCG and Forman stayed involved in the scheme once the
individuals were located by acting as the intermediary between ClassicStar and the investors.
Wilmington Trust, PCG and Forman further assisted investors, such as plaintiffs, with
maintaining records. ClassicStar, Plummer, Spencer Plummer and Ferguson offered the Mare
Leases and purported to provide information regarding the legitimacy of the investments to the
individuals located by Wilmington Trust, PCG and Forman. ClassicStar, Plummer, Spencer
Plummer and Ferguson also ran the horse operations. GeoStar offered alternative investments to
investors such as the plaintiffs. All of the defendants decided amongst themselves how to
approach the potential purchasers, whether or not the potential purchasers would receive a Mare
Lease Program, how much the potential purchases should invest, where and when to offer the
conversion to an alternative investments, how to approach Mare Lease participants with these
plans, and how to arrange funding for the Mare Lease Programs.

168.   This consensual decision-making structure is evidenced by the manner and
method of communications amongst the defendants. The ClassicStar Defendants included
Wilmington Trust and PCG in their communications with plaintiffs. They forwarded documents
they intended to show plaintiffs to Wilmington Trust, to both obtain Wilmington Trust's input
and to have Wilmington Trust forward the documents to plaintiffs. The ClassicStar Defendants
discussed the proposed Mare Leases with Wilmington Trust and PCG prior to discussing those

investments with plaintiffs. The ClassicStar Defendants discussed the proposed alternative investments with Wilmington Trust prior to discussing those investments with plaintiffs.

169.    Each of the defendants participated in the operation or management of the Mare Leasing Marketing Enterprise. ClassicStar, GeoStar, Ferguson, Plummer and Spencer Plummer managed the horses and operated ClassicStar Farm, which was a necessary element of the underlying scheme. Wilmington Trust, PCG and Forman participated in and were responsible for locating investors for marketing the Mare Lease interest and for advising investors to switch to alternative investments. GeoStar arranged for alternative investments.

170.    All of the defendants encouraged the switch to alternate. investments in order to continue the scheme and to further delay discovery of the fact that there were insufficient mares to justify the number of Mare Lease Programs being sold.

171.    These acts of defendants, including the conduct of the affairs of the Mare Leasing Marketing Enterprise through a pattern of racketeering activity, took place over a period of at least four years and included multiple acts of mail and wire fraud in violation of 18 U.S.C 1962(c).

172.    Defendants have continuously engaged in criminal activities including, but not limited to, mail and wire fraud, as part of their overall scheme for at least four years and will continue indefinitely unless prevented.

173.    Defendants' pattern of racketeering activity, including acts of mail fraud and wire fraud, have occurred within the relevant time periods outlined in 18 U.S.C. § 1961(5).

174.    Through their conduct of the enterprises, defendants have made or caused to be made or distributed communications by United States mail as well as by interstate wire which included misrepresentations of material fact regarding the Mare Lease Programs and the

alternative investments. Defendants have made or caused to be made interstate wire transfers as a result of such misrepresentations.

175.    By virtue of these and similar communications occurring over at least the past four years, defendants have engaged in, and are continuing to engage in, an uninterrupted series of predicate acts of mail and wire fraud that were related to one another in furtherance of the fraudulent schemes.

176.    As a direct and proximate result of defendants' conduct as set forth herein, including defendants' conduct of the affairs of and investment in the Mare Lease Marketing Enterprise, plaintiffs were injured in their business and property and continue to suffer injuries, including the amounts of their investments, interest paid on the loan from Wilmington Trust and legal expenses. Plaintiffs were persuaded to invest $10,500,000 dollars in ClassicStar Mare Leases, were subsequently switched to alternative investments with GeoStar and ClassicStar that GeoStar and ClassicStar have failed to honor, and paid thousands more in interest and management fees to Wilmington Trust as a result of the overt acts.

177.    Pursuant to 18 U.S.C. § 1964(c), plaintiffs are entitled to recover from defendants, jointly and severally, treble damages, their costs and reasonable attorney fees.

### COUNT II - RICO
### GEOSTAR, FERGUSON, PLUMMER, SPENCER PLUMMER AND PCG - 1962(c)

178.    The allegations of paragraphs 1 - 177 are incorporated by reference as if fully set forth herein.

179.    At all times relevant to the First Amended and Supplemental Complaint, ClassicStar was an "enterprise" as that term is defined in 18 U.S.C. §1961(4) and used in 18 U.S.C. §1962. ClassicStar was created and has existed as an ongoing corporation engaged in or affecting interstate commerce, apart from the pattern of racketeering activity alleged in this

First Amended and Supplemental Complaint. Specifically, ClassicStar was engaged in the business of breeding and raising thoroughbred horses.

180.    GeoStar, Ferguson, Plummer, Spencer Plummer and PCG were associated with or employed by ClassicStar and each conspired to and did as part of that employment or association conduct or participate in the conduct of the affairs of ClassicStar through engaging in a pattern of racketeering activity. Specifically, GeoStar was the parent corporation of ClassicStar. Ferguson is the managing director of ClassicStar. Plummer was the former CEO and Director of Marketing while Spencer Plummer was the former president. PCG was the promoter of Classic Star Mare Leases and was responsible for locating investors. In each of their respective roles, they conducted the affairs of ClassicStar.

181.    GeoStar, Ferguson, Plummer, Spencer Plummer and PCG conspired to and did derive or receive income from a pattern of racketeering activity, some part of which was used to operate ClassicStar, enabling ClassicStar to defraud plaintiffs as set forth herein.

182.    As a whole, GeoStar, Ferguson, Plummer, Spencer Plummer and PCG acted in concert to achieve the common goal of defrauding participants such as the plaintiffs into making payments for the Mare Lease Programs and then switching plaintiffs into alternative investments with related entities that were worthless. GeoStar, Plummer, Spencer Plummer, Ferguson and PCG offered the Mare Leases and purported to provide information regarding the legitimacy of the investments. GeoStar, Plummer, Spencer Plummer, Ferguson and PCG encouraged the switch to alternate investments in order to continue the scheme and to further delay discovery of the fact that there were insufficient mares to justify the number of Mare Lease Programs being sold.

183. These acts of these defendants, including the conduct of the affairs of ClassicStar through a pattern of racketeering activity, took place over a period of at least four years and included multiple acts of mail and wire fraud in violation of 18 U.S.C 1962(c).

184. These defendants have continuously engaged in criminal activities including, but not limited to, mail and wire fraud, as part of their overall scheme for at least four years and will continue indefinitely unless prevented.

185. These defendants' pattern of racketeering activity, including acts of mail fraud and wire fraud, have occurred within the relevant time periods outlined in 18 U.S.C. § 1961(5).

186. Through their conduct of the enterprises, these defendants have made or caused to be made or distributed communications by United States mail as well as by interstate wire which included misrepresentations of material fact regarding the Mare Lease Programs and the alternative investments. Defendants have made or caused to be made interstate wire transfers as a result of such misrepresentations.

187. By virtue of these and similar communications occurring over at least the past four years, defendants have engaged in, and are continuing to engage in, an uninterrupted series of predicate acts of mail and wire fraud that were related to one another in furtherance of the fraudulent schemes.

188. There are many other similarly situated victims of these defendants' scheme.

189. As a direct and proximate result of these defendants' conduct as set forth herein, including defendants conduct of the affairs of and investment in ClassicStar, plaintiffs were injured in their business and property and continue to suffer injuries, including the amounts of their investments, interest on the loan from Wilmington Trust and legal expenses. Plaintiffs were persuaded to invest $10,500,000 dollars in ClassicStar Mare Leases, were subsequently switched

to alternative investments with GeoStar and ClassicStar that GeoStar and ClassicStar have failed

to honor, and paid thousands more in interest and management fees to Wilmington Trust as a

result of the overt acts.

190.  Pursuant to 18 U.S.C. §1964(c), plaintiffs are entitled to recover from defendants,

jointly and severally, treble damages, their costs and reasonable attorney fees.

## COUNT III - CONSPIRACY
## GEOSTAR, FERGUSON, PLUMMER, SPENCER PLUMMER,
## WILMINGTON TRUST, PCG AND FORMAN - 1962(d)

191.  The allegations of paragraphs 1 - 190 are incorporated by reference as if fully set

forth herein.

192.  Upon information and belief, beginning from at least early 2003 and continuing

until at least mid-2006, these defendants did knowingly and willfully conspire and agreed to

conduct the affairs of ClassicStar through a pattern of racketeering activity.

193.  All of these defendants knowingly agreed to facilitate the scheme to conduct the

affairs of ClassicStar through a pattern of racketeering activity. Specifically, Ferguson agreed to

facilitate the scheme by his role in marketing the leases, in directing both ClassicStar and

GeoStar's activities, and his role in repeatedly assuring investors that payments would be made

in the future. Ferguson was aware of the scheme and knew that his actions furthered and

facilitated the scheme. Plummer and Spencer Plummer agreed to facilitate the scheme by

marketing the Mare Leases, directing ClassicStar's activities, permitting ClassicStar to falsely

represent that it owned quarter horses that it did not own and in actively persuading investors to

switch to alternative investments. GeoStar was aware of the scheme and knew that its actions in

proposing alternative investments further the scheme. Wilmington Trust similarly was aware of

the scheme and facilitated it by offering financing to investors such as plaintiffs, by purporting to

offer independent investment advice and by actively persuading investors to switch to alternative

- 54 -

investments. PCG and Forman likewise were aware of the scheme and facilitated it by marketing the Mare Leases, purporting to offer independent investment advice and by actively persuading investors to switch to alternative investments.

194.    All of these defendants knowingly agreed to the commission of at least two predicate acts.

195.    The object of the conspiracy was to induce victims to invest millions of dollars in Mare Lease Programs, which would then be converted to alternative investments that were ultimately worthless. In so doing, these defendants would be able to maximize their profits by re-leasing the same mares repeatedly. GeoStar, Ferguson, Plummer and Spencer Plummer would also be able to obtain millions of dollars from unsuspecting victims and never provide anything of value in return. Wilmington Trust would also be able to profit by receiving interest on loans from victims such as the plaintiffs.

196.    Plaintiffs were injured by the commission of overt acts in furtherance of the conspiracy. Plaintiffs were persuaded to invest $10,500,000 dollars in ClassicStar Mare Leases, were subsequently switched to alternative investments with GeoStar and ClassicStar that GeoStar and ClassicStar have failed to honor, and paid thousands more in interest and management fees to Wilmington Trust as a result of the overt acts.

197.    Pursuant to 18 U.S.C. § 1964(c), plaintiffs are entitled to recover from defendants, jointly and severally, treble damages, their costs and reasonable attorney fees.

### COUNT IV - COMMON LAW FRAUD
### ALL DEFENDANTS

198.    The allegations of paragraphs 1 - 197 are incorporated by reference as if fully set forth herein.

199. In order to induce plaintiffs to purchase the Mare Lease Programs and to switch to alternative investments, and with the intent that plaintiffs rely on their representations, these defendants made misrepresentations of material fact and failed to disclose certain material facts which they had a duty to disclose.

200. As described above, from mid-2003 on, in promotional materials and in presentations, ClassicStar, GeoStar, Ferguson, Plummer, Spencer Plummer, Handler Thayer, and Karren Hendrix represented to plaintiffs that plaintiffs could claim the deductions described in connection with the Mare Lease Programs, that defendants had structured the programs to fall well within IRS requirements for such deductions, that the actions of defendants complied with all applicable laws, that the plaintiffs were provided services of value equal to the amounts attributed to the mare leases, stud fees and boarding costs, and that the historical figures justified the projected returns referenced in the Illustrations. These representations were false as the Internal Revenue Service is auditing virtually all of the ClassicStar Mare Lease Program participants and has not allowed deductions pertaining to ClassicStar. The ClassicStar defendants, Handler Thayer and Karren Hendrix also did not disclose that ClassicStar did not have sufficient ownership of horses or stallions to support the number of Mare Lease Programs they were selling.

201. The ClassicStar Defendants also fraudulently represented that plaintiffs could achieve guaranteed returns if they exchanged their Mare Lease Programs for alternative investments. The ClassicStar Defendants knew that ClassicStar and GeoStar did not intend to honor the put options in the agreements with plaintiffs, and therefore, the representations regarding guaranteed returns were false when made.

202.    ClassicStar and Spencer Plummer falsely represented that ClassicStar owned the horses attached as Schedule A to the Purchase and Exchange Agreement dated March 16, 2005 in the Purchase and Exchange Agreement.

203.    Kevin Coccetti and Marty Wolf of Wilmington Trust also made similar representations to plaintiffs in mid-2003, regarding plaintiffs' ability to claim the deductions described in connection with the Mare Lease Programs and that Mare Lease Programs were structured to fall well within IRS requirements for such deductions, and that the historical figures justified the projected returns referenced in the Illustrations. Forman, acting on behalf of PCG, likewise made similar representations in presentations to plaintiffs, including a presentation made on July 10, 2003. Those representations were false.

204.    Ferguson, Plummer and Spencer Plummer represented in 2004 and 2005 that plaintiffs should exchange their Mare Lease Programs for alternate investments which had guaranteed upsides, with full knowledge that the entities responsible for providing the guaranteed upsides did not have sufficient funds to honor all of their contractual obligations to investors like the plaintiffs. Those representations were also set forth in the 2003 Mare Lease Purchase Agreement between GeoStar and J&L and in the 2005 Purchase and Exchange Agreement between ClassicStar and J&L.

205.    Wilmington Trust, as set forth above, advised plaintiffs in 2004 and 2005, that J&L should exchange its Mare Lease Programs for alternative investments offered by ClassicStar and GeoStar.

206.    PCG, Forman, Karren Hendrix and Handler Thayer knew that the Mare Lease Programs were being churned, but did not disclose that information to plaintiffs.

207. Each of the foregoing representations was false when it was made and/or omitted facts which defendants had a duty to disclose.

208. Defendants knew each representation was false or made same with reckless disregard for the truth or falsity of the misrepresentation, in that they knew they had no basis for the misrepresentation, or intentionally failed to disclose material facts.

209. Plaintiffs reasonably and justifiably relied upon the representations to their detriment by, *inter alia*, their agreement to purchase Mare Lease Programs and their payment for same and the subsequent conversion of those Mare Leases to investments with GeoStar and ClassicStar. Plaintiffs would not have agreed to purchase the Mare Lease Programs but for the misrepresentations of defendants. Plaintiffs also reasonably and justifiably relied upon the representations in exchanging their Mare Lease Programs for other investments.

210. Plaintiffs have suffered damages as a direct and proximate result of their reasonable reliance upon the misrepresentations of defendants.

211. Defendants committed this fraud and made said misrepresentations willfully, wantonly and with malicious disregard of the rights of the plaintiffs.

212. Plaintiffs are entitled to punitive and compensatory damages and/or rescission of the agreements as a result of defendants' fraud.

### COUNT V - COMMON LAW FRAUD
### WILMINGTON TRUST

213. The allegations of paragraphs 1 - 206 are incorporated by reference as if fully set forth herein.

214. While holding itself out as a disinterested financial advisor who was receiving management fees for providing such independent investment advice, Wilmington Trust was

instead offering advice to further its own financial goals, with little or no regard for the plaintiffs' interests.

215.    In its recommendations and advice, as detailed above, Wilmington Trust failed to disclose the fact that it was going to retain a portion of money plaintiffs paid for Mare Lease Programs.

216.    Wilmington Trust failed to disclose that it had not conducted a disinterested investigation of or provide disinterested advice regarding the ClassicStar defendants and the Mare Lease Programs.

217.    Wilmington Trust failed to disclose that it did not conduct a disinterested investigation of or provide disinterested advice with respect to investment proposals unrelated to the ClassicStar Defendants that the Hertzogs presented to it for its disinterested investment advice.

218.    Wilmington Trust failed to disclose that it did not conduct a disinterested investigation of or provide disinterested advice with regard to the conversion of plaintiffs' Mare Lease Programs to alternative investments with GeoStar and ClassicStar.

219.    As detailed above, Wilmington Trust's recommendations and advice contained either misrepresentations and/or omitted facts which Wilmington Trust had a duty to disclose.

220.    Wilmington Trust knew each representation was false or made same with reckless disregard for the truth or falsity of the misrepresentation, in that they knew they had no basis for the misrepresentation, or intentionally failed to disclose material facts. Wilmington Trust did so with the intent that plaintiffs would rely upon their advice.

221.    Plaintiffs reasonably and justifiably relied upon the representations to their detriment by, *inter alia*, their agreement to purchase Mare Lease Programs and their payment for

same and the subsequent conversion of those Mare Leases to investments with GeoStar and ClassicStar. Plaintiffs would not have agreed to purchase the Mare Lease Programs or agreed to convert the Mare Lease Programs to investments with GeoStar and ClassicStar but for the misrepresentations of and omissions of material fact by Wilmington Trust. Plaintiffs also reasonably and justifiably relied upon the representations in exchanging their Mare Lease Programs for other investments.

222.    Plaintiffs have suffered damages as a direct and proximate result of their reasonable reliance upon the misrepresentations of and omissions of material facts by Wilmington Trust.

223.    Wilmington Trust committed this fraud and made said misrepresentations willfully, wantonly and with malicious disregard of the rights of the plaintiffs.

### COUNT VI - BREACH OF CONTRACT
### GEOSTAR

224.    The allegations of paragraphs 1 - 223 are incorporated by reference as if fully set forth herein.

225.    By Purchase Offer dated August 1, 2004, GeoStar offered to purchase J&L's 2003 Mare Lease Interests for 2,000,000 shares of Gastar stock. The shares were valued at $3.00 a share. GeoStar, through Ferguson, represented to J&L that the offer was a "no lose" situation as it included a put option, whereby GeoStar would be obligated to repurchase the stock at $4.00 per share effective January 1, 2007, if J&L elected the put option.

226.    The 2004 Purchase Agreement with GeoStar is a valid, binding contract. J&L performed all of its obligations pursuant to the Purchase Agreement.

227. GeoStar has failed to perform its contractual obligations; specifically, it has refused to transfer the Exchanged Shares to J&L and it has failed to pay the $8,000,000 it was required to remit to J&L pursuant to paragraph 6a of the 2004 Purchase Agreement.

## COUNT VII - BREACH OF CONTRACT
## CLASSICSTAR

228. The allegations of paragraphs 1 - 227 are incorporated by reference as if fully set forth herein.

229. Defendant ClassicStar entered into a Purchase and Exchange Agreement with J&L. Pursuant to paragraph 1(b) of the Purchase and Exchange Agreement, ClassicStar agreed to pay interest on plaintiffs' outstanding loan with Wilmington Trust until the earlier of July 31, 2007 or upon payment of the put price as set forth in paragraph 2(a) of the Purchase and Exchange Agreement.

230. ClassicStar has failed to make all of the required interest payments to Wilmington Trust.

231. ClassicStar has also failed to fulfill its obligations under the Purchase and Exchange Agreement and breached the provisions of that agreements, including, *inter alia*, its warranty that it owned the quarter horses it claimed to provide in exchange for J&L's 2004 Mare Lease Interests. ClassicStar failed to transfer ownership of any quarter horses to J&L.

232. Upon information and belief, ClassicStar does not have sufficient funds to honor the put option set forth in paragraph 2(a) of the Purchase and Exchange Agreement which requires ClassicStar to repurchase the exchanged quarter horses for $4,500,000 plus 10 percent, i.e., $4,950,000.

233. As a direct and proximate result of ClassicStar's breaches, plaintiffs have incurred damages.

## COUNT VIII - UNJUST ENRICHMENT
## CLASSICSTAR, GEOSTAR, FERGUSON, PLUMMER AND SPENCER PLUMMER

234.    The allegations of paragraphs 1 - 233 are incorporated by reference as if fully set forth herein.

235.    Plaintiffs made payments to ClassicStar based on the ClassicStar Defendants false and misleading descriptions of the Mare Lease Programs, the horses involved in the Mare Lease Programs, and the services that they provided as part of those Mare Lease Programs, and these payments were deposited in accounts controlled by ClassicStar, GeoStar, Ferguson, Plummer and/or Spencer Plummer.

236.    ClassicStar, GeoStar, Ferguson, Plummer and Spencer Plummer further provided false and misleading descriptions of the exchange of J&L's 2003 Mare Lease Interests for Gastar stock allegedly owned by GeoStar and false and misleading descriptions of the exchange of J&L's 2004 Mare Lease Interests for interests in quarter horses purportedly owned by ClassicStar.

237.    ClassicStar, GeoStar, Ferguson, Plummer and Spencer Plummer used a portion of these funds in furtherance of their fraudulent scheme and to purchase property held by ClassicStar, GeoStar, Ferguson, Plummer and Spencer Plummer, including, upon information and belief, horses owned in Plummer's and Spencer Plummer's names.

238.    In addition, upon information and belief, ClassicStar, GeoStar, Ferguson, Plummer and/or Spencer Plummer transferred a portion of the funds to defendant GeoStar, for use in the operation of its business, and specifically to fund gas exploration opportunities which have resulted in profit to GeoStar.

239.    ClassicStar, GeoStar, Ferguson, Plummer and Spencer Mummer were not entitled to these funds, which were obtained from plaintiffs through fraud and improper means, and plaintiffs would not have transferred the funds had the true nature of the transaction been known.

240.    ClassicStar, GeoStar, Ferguson, Plummer and Spencer Plummer were unjustly enriched by obtaining proceeds from plaintiffs by fraud and in exchange for thoroughbred breeding interests, stock and quarter horse interests that were never received by plaintiffs.

241.    As a result of defendants' unjust receipt of these sums, plaintiffs have sustained damages, including the amount of their payments.

## COUNT IX- CONSPIRACY
## ALL DEFENDANTS

242.    The allegations of paragraphs 1 - 241 are incorporated by reference as if fully set forth herein.

243.    Each of defendants agreed to and acted in concert with the others in carrying out the fraudulent scheme described above.

244.    Each of the defendants performed acts in furtherance of the common fraudulent scheme. The defendants did so with the intent to injure the plaintiffs by depriving the plaintiffs of their property.

245.    Plaintiffs have suffered damages as a result of defendants' concerted activities as described above, for which defendants are jointly and severally liable.

## COUNT X - ACCOUNTING
## (CLASSICSTAR, PLUMMER AND SPENCER PLUMMER)

246.    The allegations of paragraphs 1 - 245 are incorporated by reference as if fully set forth herein.

247.    Plaintiffs are entitled to an accounting from ClassicStar, Plummer and Spencer Plummer with regard to J&L's ownership interest in the quarter horses that ClassicStar

exchanged for J&L's 2004 Mare Lease Interests, including the current status of title to each

quarter horse that ClassicStar represented as belonging to plaintiffs.

248. To the extent that ClassicStar, Plummer or Spencer Plummer intends to dispose of

or distribute such property prior to conducting an accounting, such disposition will cause

irreparable harm to plaintiffs for which there is no remedy at law.

## COUNT XI - CONSTRUCTIVE TRUST
## CLASSICSTAR, GEOSTAR, FERGUSON, PLUMMER, AND SPENCER PLUMMER

249. The allegations of paragraphs 1 - 248 are incorporated by reference as if fully set

forth herein.

250. Plaintiffs paid ClassicStar in excess of ten million dollars between 2003 and the

end of 2004. Plaintiffs also paid interest on financing from Wilmington Trust.

251. ClassicStar did not own the equine interests that it represented to plaintiffs at the

time of these payments; this included some of the mares involved in plaintiffs' Mare Lease

Programs. Further, defendants misrepresented the true nature of the Mare Lease Programs.

252. Upon information and belief, ClassicStar, GeoStar, Ferguson, Plummer, and

Spencer Plummer used funds wrongfully acquired from plaintiffs to acquire property,

including specific thoroughbred mares, currently in their possession.

253. Having obtained plaintiffs' funds through the improper and fraudulent means

described herein, these defendants hold those funds or their proceeds in constructive trust for

plaintiffs and must return or account for same.

254. To the extent that these defendants intend to dispose of or distribute such

property, such disposition will cause irreparable harm to plaintiffs for which there is no remedy

at law.

## COUNT XII - BREACH OF FIDUCIARY DUTY
### WILMINGTON TRUST

255.    The allegations of paragraphs I - 254 are incorporated by reference as if fully set forth herein.

256.    Wilmington Trust entered into Investment Agency agreements with Leo Hertzog in his individual capacity and with Leo and Jean Hertzog in or about July of 2002, wherein Wilmington Trust agreed to be an Investment Agent for both Leo and for Leo and Jean Hertzog. Wilmington Trust collected management fees for the services it provided to the Hertzogs.

257.    Wilmington Trust, in its capacity as an investment advisor and agent to Leo and Jean Hertzog, owed a fiduciary duty to Leo and Jean Hertzog.

258.    Wilmington Trust had a confidential relationship with plaintiffs and actively encouraged plaintiffs to repose a high level of trust in Wilmington Trust.

259.    Wilmington Trust, through its Wealth Advisory Services, undertook to recommend suitable investments and provide investment advice to Leo and Jean Hertzog on prudent asset allocation, including asset diversification.

260.    Wilmington Trust breached that fiduciary duty by recommending and encouraging the Hertzogs' investment of almost 1/3 of their entire wealth in Mare Lease Interests and the subsequent investments with GeoStar and ClassicStar.

261.    Wilmington Trust, through Coccetti and Wolf, knowingly represented that the Mare Lease Programs were suitable investments that would have little risk and would achieve significant tax advantages with full knowledge that the investments were fraudulent and that the Internal Revenue Service might not allow the deductions claimed. It further knowingly represented that the alternative investments with GeoStar and ClassicStar were suitable investments with guaranteed outcomes that had little risk with knowledge that the alternative

investments were extremely risky as the ClassicStar Defendants were unlikely to have sufficient assets to honor all of their future commitments.

262. Upon information and belief, Wilmington Trust and/or its employees, received a commission in excess of $300,000 from ClassicStar and/or PCG for recommending the ClassicStar investments. Wilmington Trust did not disclose either the fact or the amount of the commission to the Hertzogs.

263. Wilmington Trust facilitated the Hertzogs' investment by providing financing for the purchase of the Mare Lease Interests. Wilmington Trust secured the loans using other collateral, thereby insulating itself from any risk that the ClassicStar investments would fail. In so doing, Wilmington Trust also ensured that it could continue to receive management fees from plaintiffs.

264. Wilmington Trust actively discouraged the Hertzogs from relying upon the advice of any other professionals, deeming the Hertzogs' accountants and estate planning attorneys as "too conservative."

265. The plaintiffs relied upon Wilmington Trust to provide sound investment advice and were harmed as a result of that reliance.

## COUNT XIII - NEGLIGENT MISREPRESENTATION
## (WILMINGTON TRUST, PCG AND FORMAN)

266. The allegations of paragraphs 1 - 265 are incorporated by reference as if fully set forth herein.

267. Wilmington Trust, PCG and Forman negligently misrepresented that an investment in ClassicStar's Mare Lease Programs was a suitable investment for Leo and Jean Hertzog. They further made negligently misrepresented that plaintiffs should convert their Mare Lease Programs to investments with GeoStar and ClassicStar.

268.    Based upon both the size and nature of the investment, Wilmington Trust, PCG and Forman knew or should have known that the investments was not suitable for the Hertzogs. Wilmington Trust, PCG and Forman knew or should have known that ClassicStar and GeoStar would not be able to honor all of the future commitments they had made to investors.

269.    Wilmington Trust, PCG and Forman intended that the Hertzogs rely upon its investment advice and the Hertzogs did, in fact, rely upon Wilmington Trust's, PCG's and Forman's advice.

270.    The Hertzogs have been harmed by their reliance upon Wilmington Trust's, PCG's and Forman's investment advice, as they are currently being audited by the Internal Revenue Service and they have not received the benefits of any of their investments with ClassicStar and GeoStar.

271.    Wilmington Trust, PCG and Forman knowingly represented that the Mare Lease Programs and alternate investments with ClassicStar and GeoStar were suitable investments, that would have little risk and would achieve significant tax advantages with full knowledge that the investments were fraudulent and that the Internal Revenue Service might not allow the deductions claimed.

272.    Upon information and belief, Wilmington Trust and/or its employees as well as PCG and Forman, each received a commission from ClassicStar for successfully soliciting the plaintiffs to invest in ClassicStar Mare Lease Programs. Wilmington Trust did not disclose either the fact or the amount of the commission to the Hertzogs.

### XIV - DECLARATORY JUDGMENT
### CLASSICSTAR, PLUMMER AND SPENCER PLUMMER

273.    The allegations of paragraphs 1 - 272 are incorporated by reference as if fully set forth herein.

274.    ClassicStar agreed to transfer ownership of the horses listed on Exhibit "A" to the

Purchase and Exchange Agreement to J&L.

275.    ClassicStar has failed to transfer ownership of the horses.

276.    Spencer Plummer, who signed the Purchase and Exchange Agreement on behalf

of ClassicStar, knew that Plummer had retained ownership of the quarter horses or that such

horses never existed.

277.    By reason of the foregoing, a declaratory judgment is both necessary and proper

in order to determine the ownership and status of the quarter horses.

## XV – PROFESSIONAL MALPRACTICE
## (HANDLER THAYER, KARREN HENDRIX AND TERRY GREEN)

278.    The allegations of paragraphs 1 - 277 are incorporated by reference as if fully set

forth herein.

279.    Handler Thayer prepared an opinion letter for ClassicStar dated September 28,

2001, regarding certain federal income tax consequences associated with participation in the

Mare Lease Program that was operated by ClassicStar.  Handler Thayer knew or should have

known that such opinion letter was intended to be provided to and relied upon by individuals

who were considering entering into Mare Leasing Programs with ClassicStar.

280.    Karren Hendrix and Terry Green  prepared an opinion letters for ClassicStar

dated September 7, 2001, regarding the federal income tax matters and issues associated with a

thoroughbred horse breeding business—especially in connection with the transactions that an

individual may have under mare leasing, breeding, and boarding contracts with ClassicStar.

Karren Hendrix and Terry Green also prepared a June 13, 2001 letter for New Classic Breeders,

LLC, ClassicStar's predecessor, that similarly offered opinions regarding federal income tax

matters and issues associated with a thoroughbred horse breeding business.  Karren Hendrix and

Terry Green knew or should have known that such letters were intended to be provided to and relied upon by individuals who were entering into Mare Leasing Programs with ClassicStar.

281.    Plaintiffs were provided with copies of the 2001 opinion Handler Thayer and Karren Hendrix letters by ClassicStar in its "Due Diligence & Mare Lease Information Booklet" and relied upon the opinions contained in those letters prior to entering into Mare Lease Programs with ClassicStar in 2003 and 2004.

282.    On September 30, 2003, Handler Thayer also provided Leo Hertzog with a May 23, 2003 Memo regarding recent cases involving material participation in the farming context as well as discussing the applicability of a recent case to the ClassicStar Mare Lease Program.

283.    On October 25, 2003, James M. Duggan of Handler Thayer met with Leo Hertzog to discuss the ClassicStar Mare Lease Programs strategy and how it applied to the Hertzog's financial situation.

284.    By letter dated March 24, 2004—as subsequently revised by letter dated April 1, 2004—Handler Thayer provided a tax opinion directly to Plaintiffs with regard to the Plaintiffs' horse breeding business. Although Plaintiffs were Handler Thayer's client, the opinion was paid for by ClassicStar, also a Handler Thayer client. Both opinion letters and the engagement letter were dated December 21, 2003, although not provided to Plaintiffs until months later.

285.    In 2003, Terry Green had telephone calls with Plaintiffs in which he provided advice related to bookkeeping and record-keeping procedures and logs with respect to the ClassicStar Mare Leases.

286.    In each of the opinion letters, Handler Thayer, Karren Hendrix and Terry Green represented that certain tax treatments were available to Plaintiffs. Plaintiffs claimed the benefits of those tax treatments on their federal tax returns.

287.    Plaintiffs were subsequently notified of an audit by the Internal Revenue Service ("IRS"). That process has not been completed, but a notice of proposed disallowance was issued by the IRS on February 28, 2007. The IRS has notified Plaintiffs that the purported tax benefits of the Mare Lease Programs as represented by defendants, including carrying back net operating losses, are to be disallowed. Plaintiffs are currently defending against the audit, however, the ultimate outcome cannot be predicted.

288.    Handler Thayer, Karren Hendrix and Terry Green failed to exercise ordinary skill and knowledge in preparing the opinion letters and in providing advice to the Plaintiffs.

289.    Further, as ClassicStar's attorneys and accountants, Handler Thayer, Karren Hendrix and Terry Green had special knowledge regarding the underlying scheme, which would have prompted IRS scrutiny and which should have been disclosed in the opinion letters.

290.    Plaintiffs have suffered damages as a result of the audit, including legal fees incurred with regard to the appeal of the proposed disallowance. Plaintiffs may also incur additional damages in the form of additional taxes, interest, penalties and further legal and accounting fees, in the event the IRS upholds the notice of disallowance.

## COUNT XVI - NEGLIGENT MISREPRESENTATION
## (KARREN HENDRIX , TERRY GREEN AND HANDLER THAYER)

291.    The allegations of paragraphs 1 - 290 are incorporated by reference as if fully set forth herein.

292.    Karren Hendrix and Handler Thayer negligently misrepresented that certain federal income tax consequences associated with participation in the Mare Lease Program operated by ClassicStar were available to participants. Karren Hendrix and Handler Thayer knew or should have known that the opinion letters were intended to be provided to and relied

upon by individuals who were considering entering into Mare Leasing Programs with
ClassicStar.

293.   Plaintiffs relied upon those opinion letters in entering into Mare Leases with
ClassicStar.

294.   Plaintiffs have been harmed by their reliance upon the opinion letters, as the
underlying Mare Leases were fraudulent, they are currently being audited by the Internal
Revenue Service and they have not received the benefits of any of their investments with
ClassicStar and GeoStar.

## XVII – BREACH OF CONTRACT
## HANDLER THAYER

295.   The allegations of paragraphs 1 – 294 are incorporated by reference as if fully set
forth herein.

296.   Handler Thayer formed a contract to provide legal services to Plaintiffs.

297.   Handler Thayer breached its duty to Plaintiffs under that contract in that it failed
to perform those services provided to Plaintiffs in that manner expected of the profession at
large, and that breach has caused harm to Plaintiffs, as Plaintiffs are now required to defend
against the IRS's disallowance of the tax treatment sought.


**WHEREAS,** Plaintiffs respectfully demand as follows:

1.   judgment upon their complaint against all defendants;

2.   compensatory damages;

3.   punitive damages;

4.   treble damages and attorney fees where authorized;

5.   injunctive relief;

6.     a constructive trust of defendants ClassicStar's, GeoStar's, Ferguson's, Plummer's

and Spencer Plummer's assets traceable to payment by the plaintiffs for benefit of plaintiffs;

7.     trial by jury on all issues so triable; and

8.     any and all other relief to which plaintiffs appear entitled.


WOLF BLOCK SCHORR AND SOLIS-COHEN, LLP


By:  /s Catherine L. Sakach _____
     Brian Flaherty
     Catherine L. Sakach
     1650 Arch Street, 22nd Floor
     Philadelphia, PA  19103-2097
     Attorneys for Plaintiffs

December 27, 2007

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at LEXINGTON**

| | | |
|---|---|---|
| In Re: | ) | MDL No. 1877 |
| | ) | |
| CLASSICSTAR MARE LEASE | ) | Master File: |
| LITIGATION | ) | |
| | ) | |
| and | ) | Civil Action No. 5:07-cv-353-JMH |
| | ) | and |
| J & L CANTERBURY FARMS, LLC, et al | ) | Civil Action No. 5:07-cv-349-JMH |
| | ) | |
| v. | ) | |
| | ) | |
| CLASSICSTAR, LLC, et al | ) | |
| | ) | |

## CERTIFICATE OF SERVICE

I, Catherine L. Sakach, hereby certify that I caused true and correct copies of the

foregoing Second Amended Complaint to be electronically filed with the Clerk of the Court and

to be served upon the persons listed on the Panel Attorney Service List, set forth in Exhibit B, of

the Court's First Amended Practice and Procedure Order dated 10/31/07, as amended, either

electronically via this Court's CM/ECF system or by U.S. Mail, postage pre-paid on December

27, 2007.


/s/ Catherine L. Sakach
Catherine L. Sakach

Dated: December 27, 2007

🖎AO 440 (Rev. 8/01) Summons in a Civil Action

# United States District Court

|               EASTERN               | District of |              KENTUCKY              |

IN RE: CLASSICSTAR MARE LEASE
LITIGATION and
J & L CANTERBURY FARMS, LLC, et al;

            V.

CLASSICSTAR, LLC, et al

### SUMMONS IN A CIVIL ACTION

CASE NUMBER:   MDL NO. 1877
                    MASTER FILE:
                    CIVIL ACTION NO. 5:07-cv-353-JMH
                    and CIVIL ACTION NO. 5:07-cv-349-JMH

      TO: (Name and address of Defendant)

           TERRY L. GREEN
           111 E. Broadway, Suite 250
           Salt Lake City, Utah  84111

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

           Brian P. Flaherty, Esquire
           Catherine L. Sakach, Esquire
           Wolf Block Schorr & Solis-Cohen, LLP
           1650 Arch Street, 22nd Floor
           Philadelphia, PA  19103-2097

an answer to the complaint which is served on you with this summons, within _____ days after service
of this summons on you, exclusive of the day of service.  If you fail to do so, judgment by default will be taken against you
for the relief demanded in the complaint.  Any answer that you serve on the parties to this action must be filed with the
Clerk of this Court within a reasonable period of time after service.

CLERK                              DATE

(By) DEPUTY CLERK

AO 440  (Rev.  8/01)  Summons in a Civil Action

## RETURN OF SERVICE

| | DATE |
|---|---|
| Service of the Summons and complaint was made by me[1] | |
| NAME OF SERVER *(PRINT)* | TITLE |

*Check one box below to indicate appropriate method of service*

☐  Served personally upon the defendant.  Place where served:

☐  Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.

Name of person with whom the summons and complaint were left:

☐  Returned unexecuted:

☐  Other (specify):

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL  $0.00 |
|---|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____    _____
                        Date                                    *Signature of Server*

                                                _____
                                                *Address of Server*

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

%AO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

_____ District of _____

V.

**SUMMONS IN A CIVIL ACTION**

CASE NUMBER:

TO: (Name and address of Defendant)

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

an answer to the complaint which is served on you with this summons, within _____ days after service of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the Clerk of this Court within a reasonable period of time after service.

_____
CLERK

_____
DATE

_____
(By) DEPUTY CLERK

AO 440  (Rev. 8/01) Summons in a Civil Action

| RETURN OF SERVICE | | |
|---|---|---|
| Service of the Summons and complaint was made by me[1] | DATE | |
| NAME OF SERVER *(PRINT)* | TITLE | |

*Check one box below to indicate appropriate method of service*

☐ Served personally upon the defendant.  Place where served:

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.

  Name of person with whom the summons and complaint were left:

☐ Returned unexecuted:

☐ Other (specify):

| STATEMENT OF SERVICE FEES | | |
|---|---|---|
| TRAVEL | SERVICES | TOTAL |

| DECLARATION OF SERVER |
|---|

  I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____     _____
                    Date                     *Signature of Server*


                                         _____
                                          *Address of Server*

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

AO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

District of _____

**SUMMONS IN A CIVIL ACTION**

V.

CASE NUMBER:

TO: (Name and address of Defendant)

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

an answer to the complaint which is served on you with this summons, within _____ days after service of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the Clerk of this Court within a reasonable period of time after service.

CLERK _____    DATE _____

(By) DEPUTY CLERK _____

AO 440 (Rev. 8/01) Summons in a Civil Action

## RETURN OF SERVICE

| | DATE |
|---|---|
| Service of the Summons and complaint was made by me[1] | |

| NAME OF SERVER *(PRINT)* | TITLE |
|---|---|
| | |

*Check one box below to indicate appropriate method of service*

☐ Served personally upon the defendant. Place where served:

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.

 Name of person with whom the summons and complaint were left:

☐ Returned unexecuted:

☐ Other (specify):

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL |
|---|---|---|
| | | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____        _____
                        Date                             *Signature of Server*



                                                _____
                                                *Address of Server*

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

E

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

LYNN T. MACDONALD,
LINDALEE MACDONALD, and
MACDONALD STABLES, LLC,

                       Case No.

       Plaintiffs,

   v.

HANDLER, THAYER & DUGGAN, LLC,
THOMAS J. HANDLER, JAMES M. DUGGAN,
and GREGORY J. BERTSCH,

       Defendants.

## COMPLAINT

For their Complaint against the defendants Handler, Thayer & Duggan, LLC,

("Handler Thayer"), Thomas J. Handler, James Duggan, and Greg Bertsch (collectively

"Defendants"), Plaintiffs, Lynn T. MacDonald and Lindalee MacDonald ("MacDonalds") and

MacDonald Stables, LLC ("Stables" and, together with MacDonalds, "Plaintiffs"), through

counsel, state as follows:

### PARTIES

    1.     Plaintiff Lynn T. MacDonald is a citizen of Canada and a resident of the state of

Wisconsin.

    2.     Plaintiff Lindalee MacDonald is a citizen and resident of the state of Wisconsin.

    3.     Plaintiff MacDonalds Stables, LLC is a limited liability company organized and

existing under the laws of the state of Wisconsin with its principal place of business located in

Neenah, Wisconsin.

4.    Defendant, Thomas J. Handler, is upon information and belief a citizen and resident of the State of Illinois.

5.    Defendant, James M. Duggan, is upon information and belief, a citizen and resident of the State of Illinois.

6.    Defendant, Gregory J. Bertsch, is upon information and belief a citizen and resident of the State of Illinois.

7.    Defendant, Handler Thayer & Duggan, LLC is, upon information and belief, a professional corporation organized and existing under the laws of the state of Illinois with a principal place of business located in Chicago, Illinois.

## JURISDICTION AND VENUE

8.    This Court has original jurisdiction over the subject matter of this case pursuant to 28 U.S.C. § 1332(a) because all of the plaintiffs and all of the defendants are citizens of different states and the amount in controversy exceeds $75,000.

9.    Venue is proper in the Eastern District of Wisconsin pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## FACTUAL BACKGROUND

A.    **Introduction**

10.    During the period 2003-2005, Stables purchased the rights to lease and breed a number of thoroughbred mares from an entity called ClassicStar, LLC which operated horse farms in Kentucky and Utah. Stables did so in reliance on the representations of Defendants that they had investigated the ClassicStar transactions and considered participation in those transactions to be in the Plaintiffs' best interests. In fact, Defendants either inadequately

2

investigated the ClassicStar transactions or they knew same to be of dubious legality and integrity and to be contrary to the best interests of Plaintiffs, and Defendants promoted ClassicStar, without regard to their clients' interests, because Defendants were receiving millions of dollars of undisclosed commissions from ClassicStar for getting their clients to participate in those transactions.

11.    The United States government is currently pursuing a criminal investigation into the activities of ClassicStar and others relating to the ClassicStar Mare Lease Programs and, in February, 2006, the Internal Revenue Service Criminal Investigation Division seized the books and records of ClassicStar, LLC through the simultaneous execution of two federal search warrants at ClassicStar locations in Kentucky and Utah. As a result, the participation of Plaintiffs and all others who participated in the Mare Lease Programs have been called into question.

12.    As described by ClassicStar, the ClassicStar Mare Lease Program was a business opportunity offered by ClassicStar that gave participants ownership of thoroughbred breeding interests (the "Mare Lease interests") worth millions of dollars with the potential to own extremely valuable thoroughbred foals as a result of the breeding (the "Mare Lease Program(s)"). Moreover, by virtue of certain tax benefits associated with the Mare Lease Programs, participants could fund their participation with an out-of-pocket outlay of only a fraction of the Mare Lease Program's value.

13.    However, ClassicStar deliberately sold Mare Lease Programs with a total value of tens of millions of dollars greater than the thoroughbred interests owned by defendants could sustain. ClassicStar contrived to disguise this fact by substituting non-thoroughbred horse pairings for the thoroughbred interests promoted and promised to purchasers and by encouraging

3

participants in the Mare Lease Programs to exchange their Mare Lease interests for interests in a variety of related entities.

14.     As part of its sales strategy, ClassicStar entered into agreements with various professionals, including accountants and lawyers. These professionals provided ClassicStar with opinion letters which ClassicStar and the professionals used to reassure potential participants as to the legality and tax advantages of the Mare Lease Programs. Some of the professionals also received commissions from ClassicStar for steering participants to ClassicStar and some represented participants in their dealings with ClassicStar. Some of the professionals did both.

15.     Plaintiffs were represented by one such professional, Handler Thayer, who initially promoted ClassicStar to Plaintiffs, who organized Stables for purposes of Plaintiffs' participation in the ClassicStar Program, who prepared an opinion for the legality of the Mare Lease Programs, who represented Plaintiffs in negotiations with ClassicStar, and who received commissions from ClassicStar for every dollar of Plaintiffs' participation in the ClassicStar Program

**B.    The ClassicStar Scheme**

16.     During the period 2003-2005, Stables purchased the rights to lease and breed a number of thoroughbred mares from an entity called ClassicStar, LLC ("ClassicStar") which operated horse farms in Kentucky and Utah.

17.     As described by ClassicStar, the ClassicStar Mare Lease Program was a business opportunity offered by ClassicStar that gave participants ownership of thoroughbred breeding interests (the "Mare Lease interests") worth millions of dollars with the potential to own extremely valuable thoroughbred foals as a result of the breeding of thoroughbred horses (the "Mare Lease Program(s)"). Moreover, by virtue of certain tax benefits associated with the Mare

4

Lease Programs, participants could fund their participation with an out-of-pocket outlay of only a fraction of the Mare Lease Program's value.

18.    In marketing The Mare Lease Programs, ClassicStar explained that the programs it offered for sale included several components.

19.    The primary component involved participation in the breeding of thoroughbred horses. Participants would receive a list of ClassicStar thoroughbred mares available for lease and a listing of stallion nominations owned by ClassicStar to be used in connection with the mares.

20.    As part of its sales strategy, ClassicStar entered into agreements with various professionals, including accountants and lawyers. These professionals provided ClassicStar with opinion letters which ClassicStar and the professionals used to reassure potential participants as to the legality and tax advantages of the Mare Lease Programs. Some of the professionals also received commissions from ClassicStar for steering participants to ClassicStar and some represented participants in their dealings with ClassicStar. Some of the professionals did both.

21.    ClassicStar's marketing materials and agents of ClassicStar represented that ClassicStar owned the mares and the Stallion nominations from which participants would choose their pairings, and that, assuming a successful breeding, the participants would own the thoroughbred foals that would result. ClassicStar represented that participants had historically enjoyed an extremely high net rate of return, up to 1,133%, on their investments.

22.    ClassicStar, through its marketing materials and its agents, also marketed the Mare Lease Programs as complying with IRS guidelines for generating certain tax benefits. For example, ClassicStar unequivocally represented that, by following their recommendations regarding participation in the Mare Lease Programs, participants could properly deduct the value

5

of the Mare Lease Programs as ordinary business expenses on their income tax returns. ClassicStar advertised its Programs as the "Ultimate Tax Solution, which converts ordinary income to long term capital gains."

23.     According to ClassicStar and its agents, the purchase price of the Mare Lease Programs would equal the total value of Mare Leases, stallion services and pre-paid boarding provided in connection with the mare leases, with the price associated with the mare leases being set at 30 percent of the market value of the mare as given to the participants.

24.     ClassicStar also encouraged participants to purchase more expensive Mare Lease Programs than they otherwise would have purchased by arranging for participants to borrow a large portion of the necessary funds from a supposedly independent company, National Equine Lending Company ("NELC"). Thus ClassicStar, through its marketing materials and agents, represented that the participants could purchase the Mare Lease Programs with an initial cash outlay amounting to only a fraction of the value of the total mare lease package, because a substantial portion would be funded by NELC.

25.     Thus, ClassicStar and its agents represented that participants in the Mare Lease Program would receive breeding rights (a lease) to a group of thoroughbred mares, along with the right to use ClassicStar's stallion nominations in connection with the leased mares, boarding for the mares and foals, and ownership of the resulting thoroughbred foals.

26.     In addition, ClassicStar and its agents represented that the participants would be able to deduct the total cost of participating in the Mare Lease Programs as an ordinary business expense and would ultimately receive capital gains treatment of the income resulting from their activities.

6

27.    ClassicStar and its agents misrepresented virtually every material aspect of the Mare Lease Programs and/or concealed material information which they had a duty to disclose.

28.    Specifically, ClassicStar led participants to believe that they were receiving millions of dollars of interests in thoroughbred bloodstock, that the Mare Lease Programs fairly reflected the value of the horses and services involved, and that ClassicStar had structured those Programs so that the financing arrangement qualified with Internal Revenue Service requirements for the tax deduction taken by purchasers.

29.    In fact, ClassicStar intentionally oversold the Programs, knowing that it did not have ownership of sufficient equine interests to support the valuations placed on the Programs or the number of Programs sold.

30.    Moreover, the financing arranged by ClassicStar to finance the participants' purchases of largely fictitious equine interests seriously jeopardized the tax deductions that ClassicStar and the professionals it hired to promote its Programs told participants they could lawfully take  for their Mare Lease Program purchases.

**C.    Defendants' Promotion of the ClassicStar Scheme**

31.    Defendant Handler Thayer entered into an agreement with ClassicStar to promote the Mare Lease Programs to prospective participants.

32.    Prior to mid-2003, Defendants had entered into an attorney-client relationship with MacDonalds under which they provided tax consulting, tax preparation and other legal services to MacDonalds.

33.    In mid-2003 Defendants contacted MacDonalds and recommended that they enter into mare Lease transactions with ClassicStar.  According to Defendants, these transactions were substantially likely to yield tremendous profits and substantial tax benefits to MacDonalds.

7

Moreover, as told by Defendants to MacDonalds, Defendants knew from their prior dealings with ClassicStar that it was a high quality organization, and that Defendants could vouch for the integrity and professionalism of ClassicStar's principals.

34.    After promoting ClassicStar to Plaintiffs Defendants organized Stables for the purpose of Plaintiffs' participation in the ClassicStar Mare Lease Programs.

35.    Defendants subsequently confirmed the representation that they would be advising Plaintiffs on all tax and other legal aspects and considerations of their participation in ClassicStar.

36.    While Defendants disclosed to Plaintiffs that they also represented ClassicStar, they wrongly assured Plaintiffs that there was no real conflict between the interests of MacDonalds and those of ClassicStar, and that the representation by Defendants of both the Plaintiffs and ClassicStar would not negatively impact Defendants' representation.

37.    What Defendants did not tell Plaintiffs was that Defendants were receiving a commission of between 3.5 to 10 percent of every dollar that MacDonalds put into the ClassicStar Mare Lease Programs, and the Defendants' disclosures were inadequate and ineffective as more fully set forth below.

38.    In December 2003 Defendant Handler Thayer provided Plaintiffs with a tax opinion letter regarding the federal income tax consequences of their participation in the ClassicStar Mare Lease Programs. By means of the December 2003 letter, by means of other similar tax opinion letters prepared by Defendants for use by ClassicStar, by means of Defendants' oral assurances to Plaintiffs, and by means of Defendants' represented knowledge of ClassicStar's proper legal structure (of which Defendants claimed to be aware from their role as ClassicStar's counsel), Plaintiffs were led to believe that the ClassicStar Program was properly

8

and legally structured to provide for substantial profits and substantial tax benefits to the participants.

39.     Defendants knew or should have known, by virtue of information acquired by them in the course of their representation of ClassicStar and other ClassicStar participants, that the structure of the ClassicStar Mare Lease Programs was such that the purported tax benefits related to the Plaintiffs' participation in the programs would not withstand challenge by the Internal Revenue Service, and that, absent the purported tax benefits of the programs, there was virtually no way for the Plaintiffs to earn a profit.

40.     Relying on the continuing advice and representations of Defendants, Stables executed binding agreements to participate in the 2003, 2004 and 2005 ClassicStar Mare Lease Programs.

41.     In this regard Plaintiffs paid approximately $14 million to ClassicStar and, based on the advice of Defendants and their review of the loan documents, Plaintiffs borrowed another $11 million from NELC, which Defendants falsely represented to Plaintiffs was an independent lender as required by the Internal Revenue Service and Federal Tax Regulations.

42.     NELC was in fact merely a sham set up by ClassicStar—a fact of which, upon information and belief, Defendants were aware.

43.     Subsequent to 2003, acting on the advice of Defendants, Stables agreed with ClassicStar to exchange out certain of its 2003 equine interests for stock in a ClassicStar affiliate called Gastar.

44.     According to the exchange agreement, which Defendants negotiated for Stables, ClassicStar was supposed to provide Stables with stock that would become freely transferable by February 2006; instead, because Defendants failed to document the agreement between Stables

9

and ClassicStar, Stables belatedly received stock from ClassicStar which could not be transferred until July 2007—at which point the stock was worth only a fraction of the price that Stables would have received had the transaction been properly documented.

45.     Moreover, subsequent to 2004, and again acting on the advice of Defendants, Stables agreed with ClassicStar to exchange out certain of its 2004 equine interests for units in a ClassicStar sponsored securities offering for a company known as GeoEquities which, according to Defendants and ClassicStar, was supposed to have both equine and oil and gas assets.

46.     Defendants represented Stables in the GeoEquities exchange agreement with ClassicStar; however, because Defendants failed to document the transaction for Stables, Stables received none of the promised units.

47.     In addition, after both 2003 and 2004, and again upon Defendants' advice and representation, Stables agreed to exchange certain other of its equine interests in a securities offering arranged by ClassicStar in a company called First Equine Energy Partners, LLC ("FEEP").

48.     According to the representations by ClassicStar and Defendants, FEEP was an entity holding substantial equine interests and oil and gas interests.

49.     In fact, however, FEEP was a sham concocted by ClassicStar to conceal the fraudulent nature of the equine interests sold to Stables and the other participants.

50.     Upon information and belief, Defendants were involved in the planning and organization of FEEP and were fully aware of its illicit purposes.

51.     Plaintiffs would not have participated in any of the foregoing transactions but for their reliance on Defendants' advice and repeated assurances as to the propriety and integrity of

10

the ClassicStar Programs, which assurances Defendants continued to provide to Plaintiffs through at least early 2007.

## COUNT I – CLAIM FOR RECOVERY OF COMMISSIONS/UNJUST ENRICHMENT

52.    The allegations of paragraphs 1 through 45 are incorporated by reference as if fully set forth herein.

53.    ClassicStar retained Defendants, among other things, to vouch for the integrity of ClassicStar's Mare Lease Programs and to influence Defendants' clients to participate in the programs.

54.    ClassicStar and other promoters of the ClassicStar Programs paid commissions to Defendants, calculated based upon the amount of money paid to ClassicStar by Defendants' clients, in order to induce Defendants to tout its programs to Defendants' clients.

55.    Plaintiffs were among the clients of Defendants who Defendants recommended should participate in ClassicStar's Programs.

56.    In touting ClassicStar to Plaintiffs and in representing Plaintiffs in connection with their participation in the ClassicStar Programs, Defendants did not disclose to Plaintiffs that Defendants were receiving commissions from ClassicStar based upon the amount of Plaintiffs' participation in ClassicStar's Programs.

57.    By virtue of Defendants' failure to disclose to Plaintiffs the degree of their dual agency, and their receipt of payments from an adverse party in the transaction in which Defendants represented Plaintiffs without their knowledge or consent, Defendants are required to disgorge all commissions paid by ClassicStar for Plaintiffs' participation in the ClassicStar Mare Lease Programs.  Defendants would be unjustly enriched if they were not ordered to do so.

11

## COUNT II – NEGLIGENT MISREPRESENTATION

58.     The allegations of paragraphs 1 through 51 are incorporated by reference as if fully set forth herein.

59.     Defendants prepared an opinion letter for ClassicStar that vouched for the legitimacy and viability of the tax deductions that ClassicStar stated could be taken for Mare Lease Program expenditures.

60.     Thereafter, in the course of their legal representation of the Plaintiffs, Defendants prepared virtually identical new opinion letters for the Plaintiffs and made oral representations to Plaintiffs representing the integrity of the ClassicStar operations and the legitimacy and the viability of the tax deductions that purportedly could be taken for Mare Lease Program participation.

61.     As Defendants knew or should have known from their representation of ClassicStar and other Mare Lease Program participants, ClassicStar was operated as an illegal Ponzi Scheme and the Mare Lease Programs were structured so as to raise questions as to the legitimacy of the participants' deductions.

62.     Defendants were obligated to disclose the foregoing negative characteristics of the ClassicStar Programs to Plaintiffs both because of their duties as Plaintiffs' attorneys and because such disclosure was necessary to avoid making their representations to Plaintiffs about the Programs materially misleading.

63.     Moreover, Defendants were required to disclose to Plaintiffs, but failed to disclose to Plaintiffs, the substantial risks caused by the various conflicts of interest between ClassicStar and the various ClassicStar participants it represented, including Plaintiffs, such as:

12

- ClassicStar, by paying Defendants directly for Defendants' opinion letters regarding the federal tax consequences of Plaintiffs' participation in the ClassicStar Mare Lease Programs, could dictate the outcome of such opinion.

- The legal advice provided ClassicStar related directly to the advice regarding the federal tax consequences to Plaintiffs of the ClassicStar Programs and, therefore, such advice was a key component of the legality of the ClassicStar Program.

- Plaintiffs were not told that they had the right to, and should discuss, the Defendants' conflict with independent counsel.

- Plaintiffs were not told that, because of the Defendants' representation of ClassicStar, Defendants may have or may obtain information concerning ClassicStar relevant to the legality of the ClassicStar Programs which Defendants could not disclose to Plaintiffs.

- That the fact that Defendants were representing both ClassicStar and Plaintiffs was a factor that the Internal Revenue Service would consider unfavorably in determining if the Plaintiffs' investments were legitimate tax planning devices.

- That if Plaintiffs had obtained counsel independent of Defendants, that would be a factor the Internal Revenue Service would consider favorably in determining if the Plaintiffs' investments were legitimate tax planning devices.

- That Defendants were receiving fees and commissions from promoting the ClassicStar Mare Lease Programs which would have caused Plaintiffs to seek advice independent of Defendants.

64.     As a result of the inadequate disclosures, Defendants did not obtain informed consent from plaintiffs regarding Defendants' conflicts of interest.

13

65.     Defendants' opinions on the legality and appropriateness of the Plaintiffs' investment in the Mare Lease Program were substantively wrong and inadequate and did not meet the requisite standard of care and expertise.

66.     Each of the foregoing representations was false when it was made, and each of the omitted facts was one which Defendants had a duty to disclose.

67.     Defendants profited from the misrepresentations and omissions complained of in this Count.

68.     Defendants should have known that each representation was false and that it needed to make additional disclosures in order to prevent what it had represented to Plaintiffs from being materially misleading.

69.     Plaintiffs reasonably and justifiably relied on the representations to their detriment by, among other things, their agreement to purchase Mare Lease Programs and their payment for same.

70.     Plaintiffs have suffered damages as a direct and proximate result of their reasonable reliance on Defendants' misrepresentations.

71.     Defendants made the representations complained of in this Count in the course of their own business activities and for the avowed reason of guiding Plaintiffs in their business affairs.

## COUNT III – INTENTIONAL MISREPRESENTATION

72.     The allegations of paragraphs 1 through 65 are incorporated by reference as if fully set forth herein.

73.    Defendants, as described above, made material factual representations to Plaintiffs that were untrue and/or made recklessly without caring whether those representations were true or false.

74.    Defendants made those representations with the intent to defraud and to induce Plaintiffs to act upon those representations.

75.    Plaintiffs reasonably believed the untrue and misleading statements of material fact to be true and relied on those statements to their detriment.

<p align="center">**COUNT IV – STRICT LIABILITY MISREPRESENTATION**</p>

76.    The allegations of paragraphs 1 through 69 are incorporated by reference as if fully set forth herein.

77.    Defendants, as described above, made material factual representations to Plaintiffs that were untrue.

78.    Defendants made the untrue representations of material fact with personal knowledge that the statements were not true and/or under circumstances in which Defendants should have known the truth or untruth of the statements.

79.    Defendants had an economic interest in making the untrue representations of material fact.

80.    Plaintiffs reasonably believed the untrue and misleading statements of material fact to be true and relied on those statements to their detriment.

<p align="center">**COUNT V – LEGAL MALPRACTICE**</p>

81.    The allegations of paragraphs 1 through 74 are incorporated by reference as if fully set forth herein.

<p align="center">15</p>

82.     As stated above, Plaintiffs retained Defendants to provide independent legal counsel concerning the potential tax consequences of the Plaintiffs' participation in the ClassicStar Programs.

83.     As the Plaintiffs' legal counsel, Defendants acted as a fiduciary to the Plaintiffs.

84.     The Plaintiffs not only relied on Defendants' skill and advice but also placed a special trust and confidence in Defendants.

85.     Defendants were aware that the Plaintiffs had reposed this special trust and confidence in it.

86.     As Plaintiffs' legal counsel, Defendants represented to the Plaintiffs that the purported tax benefits of the ClassicStar Programs were accurate and legitimate.

87.     Moreover, as Plaintiffs' legal counsel Defendants were intimately aware of the level of participation and the types of activities that the Plaintiffs were performing and proposing to be performing in the operation of their breeding businesses.  Defendants assisted MacDonalds in setting up Stables; and Defendants advised Plaintiffs that, if they followed their advice in structuring their activities and preparing their tax returns, which Plaintiffs did in all respects, Plaintiffs could properly and legitimately deduct the full amount of their participation in the Mare Lease Programs and that such deductions would not be challenged by the Internal Revenue Service.

88.     The Internal Revenue Service has challenged all of the Plaintiffs' deductions for their Mare Lease Program expenditures, and it has taken the position that none of said deductions was proper or legitimate.

89.     In providing their tax advice to Plaintiffs, Defendants negligently failed to disclose facts to the Plaintiffs that were material to the Plaintiffs' decision as to whether they

should participate in the Mare Lease Program in that Defendants omitted to disclose that they had a significant conflict of interest that precluded them from providing independent legal advice to the Plaintiffs concerning the ClassicStar Programs due to Defendants' receipt of commissions from ClassicStar and promoters of the ClassicStar Programs that were based upon the amount of money that the Plaintiffs paid ClassicStar in order to participate in the Programs.

90.    In providing their tax advice to Plaintiffs, Defendants negligently failed to perform sufficient due diligence into ClassicStar's equine holdings, its principals, its operations, the representations contained in ClassicStar's projections and marketing materials, and the relationships and transactions between ClassicStar and NELC, the entity which ClassicStar arranged to lend Plaintiffs the funds for their participation, that were plainly germane to, and had the potential effect of defeating, the tax benefits which Defendants advised Plaintiffs they would receive by participating in the Mare Lease Programs.

91.    In providing their tax advice to Plaintiffs, Defendants negligently and erroneously advised Plaintiffs on the requirements of the deductibility of their participations in the ClassicStar Mare Lease Programs.

92.    In providing representation to Stables in its transactions with ClassicStar, including in the transactions whereby ClassicStar and its affiliates contracted to provide Stables with certain oil and gas properties in exchange for the equine interests initially sold to Stables, Defendants failed to document the agreements reached between Plaintiffs and ClassicStar and its affiliates.

93.    By virtue of the conduct aforesaid, Defendants provided legal services to Plaintiffs that fell below the standard of care applicable to lawyers in the community in which Defendants practice and/or in the area of tax planning.

17

94.     Plaintiffs would not have participated in the ClassicStar Mare Lease Programs but for Defendants' negligent advice and recommendation that they do so; moreover, had Defendants given Plaintiffs proper advice on the matters which Defendants undertook to advise them on, Plaintiffs would not have participated.

95.     Plaintiffs, and each of them, have been damaged as a proximate result of Defendants' negligence by, among other things, the amount of legal fees they have been and will continue to be obligated to expend as a result of the Internal Revenue Service challenge of their deductions; any deficiencies, interest and penalties that they are ultimately required to pay as a result of that challenge; the value of the oil and gas assets which Stables was promised but failed to receive because of Defendants' failure to document the agreements between Stables and ClassicStar and its affiliates; and Stables' losses in connection with its participation in the ClassicStar Mare Lease Programs.

96.     In connection with the foregoing misconduct, Defendants acted recklessly and/or with conscious disregard for the consequences of their actions.

### COUNT VI – FRAUDULENT REPRESENTATIONS – WIS. STAT. § 100.18

97.     The allegations of paragraphs 1 through 90 are incorporated by reference as if fully set forth herein.

98.     Defendants knowingly made false representations about, among other things, the tax-deductibility and purported economic benefits of the ClassicStar Programs for the purpose of inducing the Plaintiffs and other members of the public to purchase ClassicStar Mare Lease interests and to unjustly enrich Defendants.

99.     Plaintiffs reasonably relied on Defendants' representations.

100.    Defendants' untrue, deceptive and misleading statements damaged Plaintiffs in an amount to be determined at trial.

101.    Plaintiffs are also entitled to recover statutory costs and attorney fees.

## COUNT VII – BREACH OF FIDUCIARY DUTY

102.    The allegations of paragraphs 1 through 95 are incorporated by reference as if fully set forth herein.

103.    As the attorneys for Plaintiffs, the Defendants were Plaintiffs' fiduciaries, which relationship required Defendants to exercise the highest duty of care to act for the benefit of Plaintiffs on all matters within the scope of the attorney-client relationship.

104.    Plaintiffs placed trust in the faithful integrity of Defendants to act in Plaintiffs' best interests, and as a result Defendants had influence over Plaintiffs' decisions.

105.    Defendants' acts of self-dealing in obtaining commissions from between 3.5 to 10 percent of every dollar that Plaintiffs put into the ClassicStar Mare Lease Programs, and Defendants failure to fully disclose the nature of their conflict of interest in simultaneously representing Plaintiffs and ClassicStar constitute a breach of fiduciary duty.

106.    Defendants' breach of fiduciary duty damaged Plaintiffs in an amount to be determined at trial.

WHEREFORE, Plaintiffs respectfully demand the following relief:

1.    Judgment upon their complaint against defendant;

2.    Compensatory damages;

3.    A constructive trust of Defendants' assets traceable to payment by Plaintiffs for benefit of Plaintiffs;

19

4.    A constructive trust of all Defendants' assets traceable to commissions or other fees received by Defendants as a result of Plaintiffs' participation in the ClassicStar Mare Lease Programs;

5.    Punitive damages;

6.    Costs and attorney fees pursuant to Wis. Stat. § 100.18; and

7.    Any and all other relief to which Plaintiffs appear entitled.

## JURY DEMAND

Plaintiffs respectfully demand a trial by jury for all of the counts of its Complaint.

Dated this 28th day of January, 2008.

<div style="margin-left: 40%;">

**s/William E. Duffin**

Daniel T. Flaherty
State Bar No. 1011357
William E. Duffin
State Bar No. 1012163
Mark E. Schmidt
State Bar No. 1052450
GODFREY & KAHN, S.C.
780 North Water Street
Milwaukee, WI 53202-3590
Phone:    414-273-3500
Fax:        414-273-5198
Email:    weduffin@gklaw.com

*Attorneys for Plaintiffs Lynn T. MacDonald, Lindalee MacDonald, and MacDonald Stables, LLC*

</div>

Of Counsel:
Paul E. Sullivan
Barry D. Hunter
FROST BROWN TODD LLC
250 West Main Street, Suite 2700
Lexington, KY 40507-1749
Phone:  859-231-0000
Fax:     859-231-0011

Robert C. Webb
FROST BROWN TODD LLC
400 West Market Street, 32nd Floor
Louisville, KY 40202-3363
Phone:  502-589-5400
Fax:     502-581-1087

Direct Inquiries To:
William E. Duffin
414-287-9576
mw1444982_3

21

F

GREAT AMERICAN

# Great American Insurance Companies
## Legal Professional Liability Insurance
### Renewal Application

**Firm:** Handler, Thayer & Duggan, LLC        **Contact Name:** Steven J. Thayer/Kerry Tantillo

**Address:** 191 North Wacker Drive, 23rd Floor

**City:** Chicago        **State:** IL        **Zip:** 60606-1633        **County:** Cook

**Phone:** 312-641-2100        **Fax:** 312-641-6866        **Policy Number:** LPL 665-41-57

1. **a.** Number of:

   | 14 | Attorneys | 3 | Of Counsel | | Independent Contractors | | Law Clerks |
   |---|---|---|---|---|---|---|---|
   | 3 | Clerical | 2 | Paralegals | 6 | Legal Secretaries | 1 | Other |

   **b.** If applicable, please request and complete the Of Counsel/Independent Contractor Supplement.

   **c.** *Please attach a copy of the firm's letterhead listing each attorney and their date of hire.*

2. **a.** What is the expiration date of your current policy?        10/6/2006

   **b.** Limits desired this year    1mil/1mil        Deductibles desired this year        10,000

3. What is your estimated gross income for the past 12 months?    # 7,895,832.35 (8/1/05-7/31/06)

4. **a.** Has your firm, by merger or acquisition, assumed the liabilities of any lawyer(s) or law firm(s) in the last 12 months?        ☐ Yes  ☒ No

   If yes, please give full details

   **b.** How many attorneys have left your firm in the last 12 months?    4

   How many attorneys have joined your firm in the last 12 months?    5

5. **a.** Do you share office space with other attorneys or law firms?        ☐ Yes  ☒ No

   **b.** If you share office space with other attorneys or law firms, do you also share letterhead and or cases? If yes, please provide a detailed narrative        ☐ Yes  ☒ No

6. **a.**

   | | | |
   |---|---|---|
   | | Administrative Law | | Criminal | | Local Government |
   | | Admiralty Law | | Domestic Relations | | *Mass Tort/Class Action |
   | | Antitrust/Trade Regulation | | *Environment Law | | Natural Resources (Oil & Gas) |
   | | Bankruptcy | | *Entertainment | | * Personal Injury-Plaintiff |
   | 5 | Business Transaction/Contract | 30 | Estate, Trust & Probate | | * Personal Injury-Defense |
   | | Civil Rights & Discrimination | | *Financial Institution/Banking | 0.5 | * Real Estate - Commercial |
   | | Collection/Repossession | | Government Contracts & Claim | 3 | * Real Estate - Residential |
   | | Commercial Litigation-Defense | | Immigration & Naturalization | 1.5 | * Securities |
   | | Commercial Litigation -Plaintiff | | Insurance Defense | 20 | Tax |
   | | Construction/Building Contracts | | *Intellectual Property - | | Workers' Compensation - Defense |
   | | Consumer Claims | | (Patent/Copyright/Trademark) | | Workers' Compensation - Plaintiff |
   | 5 | Corporate Administrative | | International Law | | Other: |
   | 35 | Corporate & Business Organization | | Labor-Management | | Other: |
   | | Corporate Merger & Acquisition | | Labor-Union/Employee | | Other: |

   *If you have indicated a *PERCENTAGE* of your practice in the referenced fields, please call your company representative for a Supplement.    100

   *PERCENTAGES* of billings given for each practice must equal 100%.

   **b.** Are the practice categories completed above anticipated to change by more than 10% during the next 12 months?        ☐ Yes  ☒ No

   If yes, please provide a detailed narrative on the anticipated change(s).

   ## RISK MANAGEMENT SYSTEMS

7. **a.** How many independent docket controls are maintained by the firm?        2

   **b.** Are they maintained and cross- referenced by different individuals?        ☒ Yes  ☐ No

   ☐ Single Calendar  ☒ Dual Calendars  ☐ Tickler  ☒ Computer  ☒ Other Master listing

8. Does your firm have a system for detecting and avoiding conflicts of interest?        ☒ Yes  ☐ No

   ☐ Index  ☒ Computer  Tabs/Outlook        ☒ Other Oral/Memory

   (Program name)

1 of 2

9.  Please check all client communications which your firm uses as a matter of procedure.
    - [X] Engagement/Fee Agreements
    - [ ] Non-Representation
    - [X] Monthly Billing/Contingency Fee
    - [X] Periodic File Status Updates
    - [X] Conflict waivers
    - [X] Termination of Services

10. Please attach a copy of the firm's letterhead with each attorneys CLE attendance at a Great American seminar or a seminar emphasizing Risk Management, Malpractice Prevention and / or Ethics within the last 12 months OR A COPY OF ICLEF REPORT

11. How many suits for fees (against clients) have been filed by, or on the behalf of the firm, during the past 12 months?     3 - 1 filed and 2 being prepared for suit

## OUTSIDE EXPOSURES

12. Do (or have) any past or present members of your firm suffer(ed) from any impairment that would affect their professional ability to be competent, prompt, diligent, thorough, prepared and fit?     [ ] Yes  [X] No

13. Has your firm or anyone in your firm, in the past 12 months represented issuers, underwriters, or affiliates thereof with respect to the issuance, offering or sale of securities or bonds? *If yes, please call your sales representative for the Securities/Bonds Supplement*     [ ] Yes  [X] No

14. Do any attorneys serve, or have they served as a Director, Officer, Trustee, Partner, Employee, Shareholder of any client of the firm which has *not* been previously disclosed?     [ ] Yes  [X] No

15. a.  Do any attorneys serve, or have they served as a Director, Officer, Trustee, Partner or Employee of any Financial Institution which has not been previously disclosed?     [ ] Yes  [X] No
    b.  During the last 12 months, through the present date, has your firm, or anyone affiliated with your firm, provided legal services for any Financial Institution?     [ ] Yes  [X] No
        *If yes, please call your sales representative for a Financial Institution Supplement.*

16. a.  How many claims, including disciplinary matters, have been made against your firm, or any present or past partners, employees or "of counsel" in the last 12 months that have not already been reported in writing, to Great American Insurance?     0
    b.  How many incidents, circumstances, errors, omission or offenses which may result in a claim being made against your firm or any individual for this insurance, are your now aware of?     0

## WARRANTY, AUTHORIZED SIGNATURE AND CONTINUING DUTY TO UPDATE

The undersigned is an authorized representative of the prospective Named Insured, and acknowledges that the information provided with the Application, including all supplements, attachments and replies to underwriter inquiries, and applications from other insurance companies which have been submitted to Great American and made a part of this Application:

1.  Will be relied upon by Great American Insurance Companies in determining the acceptability of the prospective Named Insured and the premium amount to be charged;
2.  Are true, accurate and complete; and
3.  Will be considered an integral part of any resultant insurance contract.

The undersigned further agrees that the prospective Named Insured has a continuing duty, through date of policy inception, to update this Application, including all supplements, attachments and replies to underwriter inquiries.

_____          Managing Member          8/25/06
Signature of Authorized Firm Representative        (Title)              (Date)



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

GREAT AMERICAN INSURANCE           )
COMPANY, an Ohio corporation,      )
                                   )
                    Plaintiff,     )    Case No.  08-cv-02213
                                   )
         vs.                       )    Hon. William T. Hart
                                   )
HANDLER, THAYER & DUGGAN, LLC, an  )    **FILED UNDER SEAL**
Illinois limited liability company; THOMAS J.  )
HANDLER; STEVEN J. THAYER; JAMES M.  )
DUGGAN; and GREGORY J. BERTSCH;    )
                                   )
                    Defendants.    )

## NOTICE OF MOTION

**FILED**

APR 2 9 2008
~~Apr 29, 2008~~
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

To:    Katherine Smith Dedrick, Esq.
       Childress Duffy Goldblatt, Ltd.
       515 N. State Street
       Suite 2200
       Chicago, IL 60610
       Tel.:  (312) 494-5596
       Fax:  (312) 494-0202
       kdedrick@childresslawyers.com

        PLEASE TAKE NOTICE that on Thursday, May 1, 2008, at 11:00 a.m. or as soon
thereafter as counsel may be heard, we shall appear before Judge William T. Hart or any Judge
sitting in his stead, in Room 2243 of the United States District Court for the Northern District of
Illinois, Eastern Division and then and there present **PLAINTIFF'S MOTION FOR LEAVE
TO WITHDRAW COMPLAINT AND FILE AMENDED COMPLAINT UNDER SEAL**, a
copy of which is hereby served upon you.

Dated: April 29, 2008                    Respectfully submitted,


                                         __/s/ Eric J. Marler___


                                         Scott O. Reed (IL Bar No. 3127632)
                                         Eric J. Marler (IL Bar No. 6276648)
                                         REARDON GOLINKIN & REED
                                         111 West Washington Street
                                         Suite 707



Chicago, Illinois  60602
Phone:        312/855-3700
Fax:          312/855-1089
E-mail:       sreed@rgrlaw.com
              emarler@rgrlaw.com

*Attorneys for Plaintiff Great American*
*Insurance Company*


## CERTIFICATE OF SERVICE

The undersigned, an attorney admitted to appear before this Court in this matter, hereby certifies under penalty of perjury as follows:

On April 29, 2008, I caused the foregoing **Notice of Plaintiff's Motion For Leave To Withdraw Complaint And File Amended Complaint Under Seal**, together with its attachments, to be served upon:

Katherine Smith Dedrick, Esq.
Childress Duffy Goldblatt, Ltd.
515 N. State Street
Suite 2200
Chicago, IL 60610
Tel.: (312) 494-5596
Fax: (312) 494-0202
kdedrick@childresslawyers.com

by e-mail before 5:00 p.m. and by depositing a copy of same in the U.S. Mail at 111 West Washington Street, Chicago, Illinois, using the address shown above and proper postage prepaid.


        /s/ Eric J. Marler
Eric J. Marler (IL Bar No. 6276648)